# 22-902

## 22-1136(XAP)

*To Be Argued By*:
RACHEL A. SHANIES

# United States Court of Appeals

## For the Second Circuit



UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—against—

CARLOS MARTINEZ,

*Defendant-Appellant-Cross-Appellee.*

On Appeal From The United States District Court
For The Eastern District of New York

## BRIEF FOR THE UNITED STATES

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

SAMUEL P. NITZE,
RACHEL A. SHANIES,
*Assistant United States Attorneys,*
*Of Counsel.*

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iv

PRELIMINARY STATEMENT ................................................... 1

JURISDICTIONAL STATEMENT ........................................... 5

STATEMENT OF FACTS ........................................................... 6

I. The Charges and Underlying Offense Conduct ................................................................. 6

II. The First Trial ........................................................... 7

III. The *Brady* Issue ...................................................... 8

IV. The Retrial ............................................................... 10

    A. The Redacted Trial Indictment .................................. 10

    B. Retrial Proceedings and Testimony ............................................................. 12

        1. Maria's Testimony ........................................... 12

            a. Background .............................................. 12

            b. The MDC ................................................. 12

            c. Initial Contact with Martinez .................................................. 13

            d. The December 2015 Oral and Vaginal Assaults (Counts One Through Six) ......................... 15

            e. The Aftermath of the First Vaginal Rape ............................................. 22

ii

Case 22-902, Document 83, 02/15/2023, 3469815, Page3 of 81

ii

f. Subsequent Rapes (Counts Seven Through Fifteen) .......................................24

2. Additional Witness Testimony.........................................26

3. Martinez's Testimony .........................................28

4. Martinez's Rule 29 Motions...........................................28

5. The Verdict....................................................28

V. Sentencing ...................................................30

A. The Applicable Guidelines Range...............................30

B. The Sentencing Hearing ................................................31

C. Post-Sentencing Revision of the PSR ....................................................36

ARGUMENT ........................................................................40

POINT ONE - THERE WAS SUFFICIENT EVIDENCE OF MARTINEZ'S USE OF FORCE IN CONNECTION WITH THE CHALLENGED CONVICTIONS (COUNTS FOUR AND FIVE) .......................................40

I. Applicable Law.................................................40

II. Discussion.......................................................42

POINT TWO - MARTINEZ'S SENTENCE WAS BOTH PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE .......................50

I. Applicable Law.................................................51

        A.    Procedural Unreasonableness ...................................... 51

        B.    Substantive Unreasonableness................................... 53

    II.    Discussion................................................................... 55

        A.    Martinez's Sentence Was
              Procedurally Unreasonable ....................................... 55

        B.    Martinez's Sentence Was
              Substantively Unreasonable....................................... 63

CONCLUSION ...................................................................... 72

# TABLE OF AUTHORITIES

Page

## CASES

Brady v. Maryland,
   373 U.S. 83 (1963) ....................................................................8, 9, n. 4

Gall v. United States,
   552 U.S. 38 (2007) ....................................................... passim

Jackson v. Virginia,
   443 U.S. 307 (1979)................................................................41

United States v. Allery,
   139 F.3d 609 (8th Cir. 1998)................................................47

United States v. Arline,
   660 F. App'x 35 (2d Cir. 2016)............................................44

United States v. Atilla,
   966 F.3d 118 (2d Cir. 2020) ................................................42

United States v. Bordeaux,
   997 F.2d 419 (8th Cir. 1993)................................................48

United States v. Buckley,
   195 F.3d 1034 (8th Cir. 1999)..............................................47

United States v. Cavera,
   550 F.3d 180 (2d Cir. 2008) ....................................... passim

United States v. Ceasar,
   10 F.4th 66 (2d Cir. 2021) .......................................53, 69, 70

United States v. Cerno,
   No. 05-CR-1603, 2006 WL 8443204 (D.N.M. Dec. 12, 2006) ..........n. 14

United States v. Coplan,
   703 F.3d 46 (2d Cir. 2012) ..................................................40

United States v. Coppola,
   671 F.3d 220 (2d Cir. 2012) .................................................. 43

United States v. Curry,
   461 F.3d 452 (4th Cir. 2006) ................................................ 52

United States v. Denjen,
   258 F. Supp. 2d 194 (E.D.N.Y. 2003) ........................... 45, 61

United States v. Diaz,
   951 F.3d 148 (3d Cir. 2020) .................................................. 52

United States v. Dorvee,
   616 F.3d 174 (2d Cir. 2010) .................................................. 63

United States v. George,
   No. 19-CR-4841, 2021 WL 5505404 (4th Cir. Nov. 24, 2021) .. 52, 56, 70

United States v. Glenn,
   312 F.3d 58 (2d Cir. 2002) .................................................... 41

United States v. Guadagna,
   183 F.3d 122 (2d Cir. 1999) .................................................. 41

United States v. H.B.,
   695 F.3d 931 (9th Cir. 2012) ................................................ 47

United States v. Harvey,
   746 F.3d 87 (2d Cir. 2014) .................................................... 40

United States v. Heyward,
   3 F.4th 75 (2d Cir. 2021) ...................................................... 43

United States v. Hourihan,
   66 F.3d 458 (2d Cir. 1995) .............................. 52, 55, 58, 62

United States v. Hunt,
   521 F.3d 636 (6th Cir. 2008) ................................................ 70

United States v. Josephberg,
   562 F.3d 478 (2d Cir. 2009) .................................................. 44

United States v. Landesman,
    17 F.4th 298 (2d Cir. 2021)..................................................65

United States v. Lauck,
    905 F.2d 15 (2d Cir. 1990) ....................................... 45, 46, 48

United States v. Lifshitz,
    714 F.3d 146 (2d Cir. 2013) ................................................54

United States v. Lucas,
    157 F.3d 998 (5th Cir. 1998)..................................... 47, 61, 67

United States v. Matta,
    777 F.3d 116 (2d Cir. 2015) ................................................53

United States v. McDermott,
    245 F.3d 133 (2d Cir. 2001) ................................................41

United States v. Mumuni,
    946 F.3d 97 (2d Cir. 2019) ......................................... passim

United States v. One Feather,
    465 F. App'x 577 (8th Cir. 2012) ........................................61

United States v. Powell,
    469 U.S. 57 (1984) ............................................. 44, 66, n. 14

United States v. Rigas,
    583 F.3d 108 (2d Cir. 2009) ..........................................51, 55

United States v. Shaw,
    891 F.3d 441 (3d Cir. 2018) ...........................................45, 46

United States v. Singh,
    877 F.3d 107 (2d Cir. 2017) ....................................... passim

United States v. Temple,
    447 F.3d 130 (2d Cir. 2006) ................................................41

United States v. Verkhoglyad,
    516 F.3d 122 (2d Cir. 2008) ................................................53

United States v. Ware,
  577 F.3d 442 (2d Cir. 2009) ................................................... 44

United States v. Webb,
  214 F.3d 962 (8th Cir. 2000) ................................................ 45

## FEDERAL STATUTES

18 U.S.C. § 242 ............................................................... 1, 2, 6

18 U.S.C. § 2241(a) ........................................................ passim

18 U.S.C. § 2242 ........................................................... passim

18 U.S.C. § 2243(b) ..................................................... 2, 6, 31

18 U.S.C. § 2244(a)(1) .......................................................... 46

18 U.S.C. § 3231 .................................................................... 5

18 U.S.C. § 3553(a) ........................................................ passim

18 U.S.C. § 3661 .................................................................. 64

18 U.S.C. § 3742(b) ............................................................... 5

34 U.S.C. § 30302 ................................................................. 7

## FEDERAL RULES

Federal Rule of Criminal Procedure 33 ......................................... passim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 22-902

_____

UNITED STATES OF AMERICA,

<u>Appellee-Cross-Appellant</u>,

-against-

CARLOS MARTINEZ,

<u>Defendant-Appellant-Cross-Appellee</u>.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

## <u>PRELIMINARY STATEMENT</u>

Defendant-appellant Carlos Martinez appeals from a judgment entered on April 25, 2022, in the United States District Court for the Eastern District of New York (Korman, J.), convicting him, after two jury trials, of one count of depriving a victim (identified at trial and herein as "Maria") of her civil rights, in violation of 18 U.S.C. § 242; one count of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1);

five counts of sexual abuse, in violation of 18 U.S.C. § 2242(1); and five counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b). Martinez was sentenced principally to ten years' imprisonment—well below the life sentence recommended by the advisory U.S. Sentencing Guidelines—to be followed by a five-year term of supervised release. (A 3-9).[1]

Martinez, a former Bureau of Prisons ("BOP") Lieutenant at the Metropolitan Detention Center in Brooklyn, New York ("MDC"), was convicted of repeatedly raping Maria, then a female inmate at the MDC. Martinez argues on appeal that the evidence was insufficient to support two of his twelve counts of conviction. Specifically, he challenges his convictions, following the second of two jury trials, of Counts Four and Five of the operative indictment, which alleged deprivation of civil rights, in violation of 18 U.S.C. § 242, and aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1), respectively (together, the "Challenged

---

[1]     Parenthetical references to "Br.," "A," and "GA" refer to Martinez's brief and appendix and the government's appendix, respectively.

3

Convictions").[2]   (Br. 18).   The Challenged Convictions arose from Martinez's forcible rape of Maria on or about December 13, 2015.

In support of his sufficiency argument, Martinez contends, in essence, that the jury must have rejected Maria's testimony and credited his own, and that, accordingly, the evidence was insufficient to support the Challenged Convictions.   The argument is meritless.   Martinez's repeated, conclusory assertions that the jury rejected the relevant portions of Maria's testimony finds no support in the record; indeed, it is flatly contradicted by the very convictions challenged on appeal. Martinez's related argument that there was no evidentiary support—in Maria's testimony or otherwise—for the jury's conclusion that Martinez forcibly raped Maria on December 13, 2015 fares no better.   Maria

---

[2]   The count numbering used herein corresponds to the counts alleged in the redacted indictment used during the second trial, which can be found in Martinez's appendix at pages A 23-32.  As discussed in greater detail below, the verdicts in this case were rendered across two jury trials.   Martinez was convicted during the first trial of all twenty counts charged in the indictment.   Thereafter, the district court granted Martinez's motion for a new trial on fifteen counts and upheld his convictions on five counts of sexual abuse of a ward.   The counts in the redacted indictment used in the retrial were renumbered.   See infra at 10-11.  The District Court's judgment refers to the counts from the retrial indictment with an "r" – for "redacted."   (See A 3).

4

provided direct, detailed testimony that Martinez used force—including by picking Maria up, pinning her chest-down on a desk, and holding her arm—to vaginally rape Maria while Martinez was an active-duty BOP Lieutenant at the MDC and Maria was an inmate at the facility. In short, the jury was properly instructed on the law, and the evidence presented, including Maria's testimony, was more than sufficient for a reasonable jury to find that Martinez used force to rape Maria on December 13, 2015 as alleged in Counts Four and Five. Accordingly, and for the reasons discussed below, the Challenged Convictions should be affirmed.

Separately, the government cross-appeals the sentence imposed in this case. Martinez faced a Guidelines sentence of life in custody. The ten-year sentence imposed by the district court was both procedurally and substantively unreasonable because it was based on a factually incorrect and legally unsupportable view of the record and jury verdict. The jury's verdict reflects that it found, beyond a reasonable doubt and based on sufficient evidence, that Martinez raped Maria five times, including once by physical force and threats or fear and four additional times through the use of threats or fear, and that each of these five rapes also qualified as sexual abuse of a ward. (A 3). The district

court disregarded the jury's findings and sentenced Martinez as if Maria had consented to the five sexual encounters at issue and Martinez had only committed sexual abuse of a ward. Because the court based Martinez's sentence on a theory of the case that was inconsistent with facts necessary to the jury's verdict, the sentence should be vacated and the case remanded for resentencing.

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction pursuant to 18 U.S.C. § 3231. For purposes of the government's cross-appeal, the jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 3742(b). The government filed a timely notice of appeal on May 24, 2022. This appeal has been personally approved by the Solicitor General of the United States. (GA 566).

6

## STATEMENT OF FACTS

### I.     The Charges and Underlying Offense Conduct

In May 2017, a federal grand jury returned a 20-count indictment charging Martinez with raping Maria five times across four separate encounters between December 2015 and April 2016. Specifically, Martinez was alleged to have raped Maria twice—once orally, once vaginally—on December 13, 2015, and to have raped Maria vaginally on three other occasions, one sometime between December 2015 and February 2016, one in January 2016, and one in April 2016. The charges included five counts of deprivation of civil rights, in violation of 18 U.S.C. § 242; five counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1); five counts of sexual abuse, in violation of 18 U.S.C. § 2242(1); and five counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b)—one count under each statute for each of the five alleged rapes.  (A 23-31; GA 265-76).

The indictment alleged that during the relevant period, Martinez used physical force and fear to repeatedly rape Maria, a sentenced female prisoner at the MDC.  (A 3, 23-31; GA 265-76).  Maria was in her twenties and spoke minimal English.  (GA 6, 46).  At the time

of Martinez's crimes, he was an active-duty BOP Lieutenant at the MDC with supervisory authority over other correctional officers and supervisory and disciplinary authority over inmates. (GA 536 ¶ 15). More specifically, Martinez had responsibility for: (1) operational aspects of the Correctional Department and supervision of correctional officers assigned to given areas at the MDC; (2) providing day-to-day counseling of subordinates and resolving work-related problems; (3) evaluating the performance of subordinates; (4) maintaining order between and among officers and inmates; and (5) handling disciplinary matters. (Id.). Martinez also was involved in educating MDC staff regarding protocols and related requirements of the Prison Rape Elimination Act, a federal statute that, among other things, was meant to implement standards for the prevention, detection, and punishment of prison rape. (Id.); see also 34 U.S.C § 30302 (describing purposes of Prison Rape Elimination Act). In short, Martinez was a person with substantial authority and control over the lives of inmates and the careers of staff at the MDC.

## II.   The First Trial

Jury selection for the first trial took place on January 8, 2018. Trial commenced immediately thereafter and concluded two weeks later,

on January 19, 2018. After hearing testimony from more than a dozen witnesses, including from Maria, Maria's fellow inmates, and BOP employees, the jury rendered a verdict of guilty on all counts. (A 17).

## III. The *Brady* Issue

Following the first trial, the government learned that it had inadvertently failed to provide Martinez with a memorandum of an interview (the "Interview Report") of an individual (hereinafter, "Yolanda")[3] who was a victim-witness in a separate criminal matter in which another MDC officer was charged with sexual abuse. Yolanda did not testify at Martinez's first trial, but she had known Maria at the MDC. The Interview Report contained statements by Yolanda that, in substance, Maria had told Yolanda that "something was going on between [Maria] and Lieutenant Martinez"; that in one instance another inmate and Yolanda had offered to go with Maria to clean the lieutenant's office (which was where the rapes took place), but that Maria had declined and said she would go alone; and that Maria had declined medical tests because of her relations with Martinez. (GA 471, 562).

---

[3]     This individual testified at Martinez's retrial under the pseudonym "Yolanda" and is referred to as such herein.

9

On November 30, 2018, Martinez moved pursuant to Federal Rule of Criminal Procedure 33 for a new trial on the ground that the Interview Report contained exculpatory <u>Brady</u> material, as defined in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.  (GA 423-37). The government opposed the motion for a new trial.  (GA 439-83).

The district court found that the statements contained in the Interview Report could support a defense theory that Maria "pursued" Martinez.  (GA 493).  Accordingly, on June 24, 2019, the court granted Martinez's motion for a new trial on all counts except for the five counts of conviction that were based on sexual abuse of a ward, as "consent" was not relevant to those counts.[4]  (GA 500).

---

[4] Martinez makes repeated reference to the <u>Brady</u> violation found by the district court, but the court's ruling and the evidence at issue therein are irrelevant to Martinez's pending appeal.  Martinez was granted a new trial with the benefit of the Interview Report and access to Yolanda; Yolanda testified at the retrial, where Martinez had a full and fair opportunity to cross-examine her; and the verdict at issue here was rendered after the relevant disclosure was made.

IV.   The Retrial

   A.   The Redacted Trial Indictment

The operative indictment during the retrial was redacted to remove the five counts of sexual abuse of a ward that were upheld following the Rule 33 litigation, and the remaining fifteen counts were renumbered.   The following chart reflects the count number in the original indictment, the revised count number (where applicable) in the redacted indictment used during the retrial, and the final verdict on each count.

| Indictment | Redacted Indictment | Verdict |
|---|---|---|
| One (Deprivation of Civil Rights) | One | Not Guilty |
| Two (Aggravated Sexual Abuse) | Two | Not Guilty |
| Three (Sexual Abuse) | Three | **Guilty** |
| Four (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Five (Deprivation of Civil Rights) | Four | **Guilty** |
| Six (Aggravated Sexual Abuse) | Five | **Guilty** |
| Seven (Sexual Abuse) | Six | **Guilty** |

| Indictment | Redacted Indictment | Verdict |
|---|---|---|
| Eight (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Nine (Deprivation of Civil Rights) | Seven | Not Guilty |
| Ten (Aggravated Sexual Abuse) | Eight | Not Guilty |
| Eleven (Sexual Abuse) | Nine | **Guilty** |
| Twelve (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Thirteen (Deprivation of Civil Rights) | Ten | Not Guilty |
| Fourteen (Aggravated Sexual Abuse) | Eleven | Not Guilty |
| Fifteen (Sexual Abuse) | Twelve | **Guilty** |
| Sixteen (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Seventeen (Deprivation of Civil Rights) | Thirteen | Not Guilty |
| Eighteen (Aggravated Sexual Abuse) | Fourteen | Not Guilty |
| Nineteen (Sexual Abuse) | Fifteen | **Guilty** |
| Twenty (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |

(Compare GA 265-76, with A 23-30; see also A 3).

12

B. <u>Retrial Proceedings and Testimony</u>

Jury selection for the retrial took place on February 10, 2020, and trial commenced immediately thereafter. More than a dozen witnesses testified, including Maria, several of Maria's fellow inmates, Yolanda, and BOP employees.

1. <u>Maria's Testimony</u>

Maria testified to the following facts, among others:[5]

a. <u>Background</u>

Maria was born in the Dominican Republic and lawfully moved to the United States to be with her boyfriend in April 2008, when she was in her early twenties. (GA 4, 6-7). In September 2013, Maria was arrested and charged in connection with her possession of drugs and a related conspiracy. (GA 9). After pleading guilty, Maria was sentenced to a three-year term in custody. (GA 11-12).

b. <u>The MDC</u>

In March or April of 2015, Maria was moved to the MDC, where Martinez worked and where Maria remained until her release

---

[5]    Maria testified at both trials; she gave the testimony referenced herein during the retrial.

from custody in April 2016. (GA 14). Maria testified that, while in custody, the most important thing to her was her "good time," which she described as the prospect of having her sentence reduced based on good conduct while in custody. (GA 14). Failure to follow rules could result in "tickets," which, in turn, could lead to time in the SHU—"a small punishment room where you get locked in"—or the loss of privileges, including phone, computer, and visitation privileges. (GA 20-21).

While at the MDC, Maria worked as a cleaner. She was assigned to clean the second floor, a secure area that included the lieutenant's office. (GA 23-24, 27). When called to clean, Maria would be escorted to the second floor by an officer who would typically leave her there to do her work. (GA 26, 31).

c. Initial Contact with Martinez

Martinez began calling Maria to clean the lieutenant's office and the bathrooms and hallway on the second floor starting in August or September 2015. (GA 34). He typically called Maria to clean on Fridays,

Saturdays, or Sundays, when there was reduced staffing and the second floor was largely empty. (GA 34-35).

At first, Martinez initiated conversation (in Spanish) with Maria, telling her about himself and discussing his divorce and his children. (GA 41-42). He called Maria by her first name and asked if she wanted to switch units, which she did not. (GA 42-43). Martinez eventually turned the conversations toward topics that made Maria uncomfortable. Martinez asked Maria when they were alone in the lieutenant's office how she satisfied her body, which Maria understood to mean how she orgasmed. (GA 43-44). Maria responded by saying, "[E]xcuse me," and Martinez replied, "[Y]eah, tell me. We're adults." (GA 44). The conversation made Maria feel embarrassed and ashamed. (GA 44). Martinez also told Maria that when she returned to her unit she should "touch herself in his name." (GA 44). When Maria told Martinez that she was married, he noted that her husband never visited her. (GA 44). Up to that point, Maria had never had a visitor while at the MDC. (GA 44-45). Martinez also mentioned another inmate, Jenny, to Maria, noting that Jenny was about to be released and commenting that it was "like Jenny didn't say anything" (GA 45, 61), implying that

speaking up or reporting could result in more time in custody, and that timely release required that Maria stay quiet.

Maria did not report Martinez's inappropriate comments because she "didn't want any problems" and because she understood that if she refused to clean on the second floor when called to do so, she would be put in the SHU. (GA 45-47). Maria did ask a counselor to switch jobs, but the request was not granted. (GA 46).

> d. The December 2015 Oral and Vaginal
> Assaults (Counts One Through Six)

In December 2015, Martinez's behavior towards Maria became violent, coercive, and criminal. On December 13, 2015, Maria was brought to the lieutenant's office to clean for Martinez. (GA 49-50). When Maria arrived at the lieutenant's office to clean, she initially went to get cleaning sprays from under the lieutenant's desk. (GA 50-51). While Maria was crouched down preparing the cleaning supplies, Martinez exposed his erect penis through the zipper of his pants. (GA 52). Martinez then grabbed Maria's head and pushed her, putting his penis in her mouth despite her efforts to push him away. (GA 52-53). Maria was crying and told Martinez to leave her alone. (GA 54). Instead

of leaving her alone, Martinez, who was larger, taller, and stronger than Maria, physically stood Maria up, pinned the top portion of her body against the desk, pulled Maria's pants and underwear down, and penetrated Maria's vagina with his penis from behind, thrusting until he ejaculated inside of Maria. (GA 53-57). Maria testified as follows:[6]

> Q:    And when you first got to the office, what did you do?
>
> A:    Clear out the garbage, get the sprays.
>
> Q:    And where did you go to get the sprays?
>
> A:    I first went over to a closet that was there, but they weren't there. And then I went to get them where that woman kept them.
>
> Q:    Are you referring to the African-American lieutenant that you testified about yesterday whose name you don't remember?
>
> A:    Yes.
>
> Q:    And where was it that she kept the supplies?
>
> A:    Under the desk in a sort of – under the desk.
>
> . . .
>
> Q:    And what specifically were you doing when you went – after going to that area to get the sprays?

---

[6]    Maria testified in Spanish, with the assistance of a translator.

A: I was pouring liquid from the bottle into the other bottle that I would put water in to make it a spray.

Q: And which way – which direction were you facing as you were doing that?

A: I was – the wall. I was crouched down, and emptying the sprays.

Q: And where, if anywhere, was the Defendant?

A: Sitting in his chair.

Q: And which chair are you referring to?

A: The lieutenant's chair.

Q: And you've made a mark, for the record, on Government Exhibit 103D on the black chair in the photo; is that correct?

A: Yes.

Q: What, if anything, happened while you were filling up the spray bottle?

A: He turned around. I turned around, because when he turned around, I turned around and I looked at him. I said what are you doing?

Q: What did you see when you turned around to look at him?

A: His penis.

Q: And how – and how were you able to see his penis?

A:   Because he had it out, coming out of his zipper.

Q:   Was it erect?

A:   Yes.

Q:   What happened next?

A:   What happened?  He made me give him oral sex.

Q:   How did he do that?

A:   By grabbing my head.  Even though my hands were on his knees, he was pushing me.

Q:   What, if anything, were you doing with your hands on his knees?

A:   Pushing myself, but I couldn't push myself so much, because the other wall was right behind me.

Q:   When you say 'the other wall,' what are you referring to?

A:   Where the printer is.

Q:   So the other desk behind you, you mean?

. . .

A:   Yes.

Q:   And you said he – you testified he was pushing you. What – what do you mean?

19

A:    He grabbed my head, grabbed me here.  He grabbed my
      head and I was grabbing onto him on his knees.

Q:    Trying to push him away?

A:    Yes.

Q:    Was he able to get his penis inside your mouth that
      day?

A:    Yes.

Q:    What, if any, physical reaction did you have to that?

A:    What was he doing?  I didn't want any problems.  He
      said I wasn't going to have any problems, because he
      could see everything on his computer.

Q:    How did you feel while the Defendant's penis was in
      your mouth?

A:    Horrible, bad.

Q:    And did you have any physical reaction to that?

A:    Yes.

Q:    What reaction?

A:    I was crying.  I was telling him to leave me alone.  But
      that pig didn't care.

Q:    What happened next?

A:    He stood me up.  And he put me down on the desk.
      And he  penetrated me.

Q:    You made a movement with your hands when you said he stood you up, and you, for the record, made a movement towards your shoulders; is that right?  Or towards under your shoulders; is that right?

A:    He stood me up like I was a little bird.

Q:    And how did he put your body on the desk?

A:    This part down on the desk.

Q:    Are you referring to your chest?

A:    Yes.

Q:    You testified he penetrated you.  What part of your body did he penetrate?

A:    My vagina.

Q:    What did he penetrate it with?

A:    With his penis.

Q:    And was he behind you when that happened?

A:    Yes.

Q:    What, if anything, did he do with his hands while penetrating you?

A:    He grabbed me by the arm, and like keeping me down on the desk.

Q:    You mentioned something about, or you mentioned a comment he made about the computer; is that right?

A:    Yes.

Q:    What do you remember about that?

A:    He could – well, there were four or six squares on the computer, where he could see, well, he could see the second floor, the unit, he could see the entire prison.

Q:    I'm showing you what's in evidence as Government Exhibit 103C.  Do you see the computer you're referring to in this exhibit?

A:    Yes.

Q:    Where is it?

A:    That's it.

Q:    And, for the record, you've made a mark on 103C at the computer, the black computer on the desk; is that correct?

A:    Yes.

Q:    Now, before the defendant penetrated you, did he do anything with respect to your pants and underwear?

A:    Yes.  He forcibly unbuttoned them, and he pulled them down to here, practically to my knees.

Q:    And you testified earlier that you had been crying, were you still crying at that time?

A:    Yes.

Q:    Did that make him stop penetrating you?

A: No, not even when I was bleeding did he stop; he didn't care.

Q: At some point, did he finish?

A: Yes.

Q: How did you feel while all of this was going on?

A: Dirty.

(GA 50-56).

### e. The Aftermath of the First Vaginal Rape

Maria testified that during the vaginal rape on December 13, 2015, Martinez did not use a condom and ejaculated inside of her. (GA 58). Martinez later told Maria she could not become pregnant because he had had a vasectomy (which was confirmed with medical records), but Maria begged Martinez to get her a morning-after pill to ensure she did not become pregnant. (GA 58-59, 508). When Maria was unable to stop crying, Martinez agreed to bring her the pill at midnight. (GA 59). Before allowing Maria to return to her unit, Martinez warned her not to tell anyone what had happened, telling her that if she did, she would have problems. (GA 60). Maria understood that to mean that if she told anyone about what had happened, she would go to the SHU or

lose her "good time" credit, meaning she would be incarcerated for longer. (GA 60-61).

After returning to her housing unit, Maria was upset and distraught, a fact corroborated by the testimony of other witnesses who were inmates at the MDC with Maria. See infra at 26-27. Maria disclosed aspects of what had occurred with Martinez to three other inmates—Kiara Maldonado, Danilda Lora, and Melva Vasquez—including that Martinez had "penetrated" her, but Maria did not provide these inmates with a full account of the sexual assaults. (GA 64-70). Lora helped Maria with the vaginal bleeding, providing her with a sanitary napkin, which Maria needed to absorb the blood, and told Maria to calm down when she continued crying throughout the day. (GA 65-66,70).

After midnight, Martinez brought Maria the morning-after pill (his purchase of which was confirmed by pharmacy receipts). (GA 70-74, 449). Maria took the pill and kept the packaging for Lora to read to confirm that it was the correct pill, since Lora spoke English. (GA 75-77). After Lora confirmed that it was the correct pill, Maria flushed the

packaging because she was afraid of being punished for having "contraband." (GA 77-78).

f.   Subsequent Rapes (Counts
     Seven Through Fifteen)

Maria testified that Martinez raped her repeatedly in the lieutenant's office in the months that followed the assaults on December 13, 2015. (GA 78-79). Maria did not recall the precise number of times Martinez assaulted her but estimated that it was at least ten times. (GA 78-79, 154). Maria described assaults that took place in or about December 2015 (GA 87-90); in January 2016 (GA 92-95); and in April 2016 (GA 121-26). Maria testified that during each rape, Martinez used force by taking hold of her, twisting her arm, and grabbing her by the hair. (GA 80). Each time, Martinez vaginally penetrated Maria with his penis from behind. (GA 88-89, 94-95, 123-25). Each time, Maria was scared. (GA 80). Each time, Martinez used the computer on his desk to access video surveillance camera footage of various areas in the MDC to ensure that no one was coming and that his conduct would remain undetected (a tactic he used when engaging in consensual sex acts with

a fellow MDC employee as well). (GA 53-55, 80, 88). At no point did Maria want to have or consent to having sex with Martinez. (GA 80).

Throughout this period, Martinez made clear to Maria that he was keeping track of her—that he knew she rarely if ever received visitors; knew when Maria received her first visitor and that it was a male, whom she kissed; knew that Maria had spoken about Martinez in a phone call to a friend. (GA 44-45, 95-99, 101-08). Martinez also made clear to Maria that if anyone found out what Martinez was doing, Maria would be investigated and could get in trouble. (See, e.g., GA 45, 61, 107).

Despite her fear, Maria made several attempts to dissuade Martinez from raping her, but each attempt failed. Maria asked a counselor (who spoke only English) to switch jobs, but her request was not granted.[7] (GA 46). When Maria tried to delay going into the lieutenant's office to clean, Martinez would get mad at Maria and pursue her until she entered his office. (GA 86-87). Maria considered fighting back physically, but was too afraid. (GA 87-88). Once, Maria slapped Martinez in the head after he tried to grab her, to which Martinez

---

[7]    At the time, Maria, a Spanish speaker, had difficulty communicating in English. (GA 46).

responded, "Do you know how much [time in custody] somebody could get for hitting an officer?" (GA 92-94). He then grabbed Maria and raped her again. (GA 94).

### 2.    Additional Witness Testimony

Maria's testimony was corroborated in part by MDC inmates Kiara Maldonado, Danilda Lora, and Melva Vasquez. Each of these witnesses saw Maria following the December 13, 2015 rape and described the aftermath of that rape. Each described Maria's distress when she returned to the unit. Lora testified that Maria appeared "frenzied, a little agitated," and like she "wanted to talk" to Lora, Vasquez, and Maldonado. (GA 288). When they spoke, Maria was "nervous" and rubbing her hands together a lot. (GA 290). Maldonado similarly testified that Maria returned to the unit "look[ing] a little freaked out." (GA 321). Vasquez testified that Maria was crying. (GA 353). Consistent with Maria's testimony, all three witnesses reported that Maria told them she had been penetrated by Martinez, that Maria was vaginally bleeding, and that Martinez brought Maria a morning-after pill to prevent pregnancy. (See, e.g., GA 289 (Lora testimony that Maria told her that "she had crouched down to get the cleaning detergents and then as she turned

around [Martinez] had his [penis] out."); <u>see also</u> GA 291, 294 (Lora); GA 322-23, 325, 327-30 (Maldonado); GA 353-54, 357-59 (Vasquez)). Maldonado also testified that Maria asked her not to tell anyone what had happened because Martinez had told Maria that she could be sent to the SHU. (GA 331). Vasquez similarly testified that Maria believed she could lose "some of her good time so she would have to spend more time in jail" if anyone found out what had happened. (GA 356).

All three witnesses testified that Maria could not stop crying after the assault. (GA 290-91 (Lora); GA 327-28 (Maldonado); GA 356 (Vasquez)). Moreover, Lora testified that after the events of December 13, 2015, whenever Maria was called to clean, Maria "would say that she didn't want to go back down [to the lieutenant's office]" and "[w]hen [Maria] would go down, she didn't know who she was going to clean for. When she would come back up, [Lora would] know who [Maria] had cleaned for and she wasn't happy." (GA 296). After the incident, Maldonado also noticed a change in Maria's behavior. She testified that Maria, who had been her friend, "wasn't hanging out with [her friends] anymore" and that she "was always sleeping, like, she kept to herself." (GA 332).

### 3.   Martinez's Testimony

Martinez testified in his defense and, perhaps in light of the convictions for sexual abuse of a ward that remained in place from the first trial, he admitted that he had sex with Maria in the lieutenant's office at the MDC on certain occasions.  (A 54).  Martinez maintained that these sexual encounters were consensual.[8]  (A 54).

### 4.   Martinez's Rule 29 Motions

At the close of the government's evidence, the district court denied "whatever motions would be deemed made at this point pursuant to Rule 29" without hearing any argument from either party.  (GA 404). After the defense's case, Martinez's counsel moved to dismiss all counts for insufficient evidence.  (GA 405).  The court denied this motion as well. (GA 405).

### 5.   The Verdict

On February 20, 2020, the jury rendered a verdict of guilty on seven of the fifteen counts on which Martinez was retried (as set forth in

---

[8]    Martinez did not testify at the first trial and did not at that time admit his guilt with respect to the five counts of sexual abuse of a ward.

the chart, supra at 10-11), convicting Martinez of raping Maria on each of the occasions charged in the indictment. Specifically, the jury convicted Martinez of depriving Maria of her civil rights (Count Four), raping Maria by force (Count Five), and raping Maria by fear or threat (Count Six) with respect to the vaginal rape on December 13, 2015; raping Maria by fear or threat with respect to the oral contact on December 13, 2015 (Count Three); and raping Maria by fear or threat with respect to the sexual assaults committed on the three other occasions alleged in the indictment—one between December 2015 and February 2016 (Count Nine), another in January 2016 (Count Twelve), and another in April 2016 (Count Fifteen). The jury acquitted Martinez on the civil rights and forcible rape charges related to the latter four incidents. On appeal, Martinez challenges only his convictions on Counts Four and Five, relating to his forcible, vaginal rape of Maria on December 13, 2015.[9] Martinez did not file a Rule 33 motion in connection with the retrial. (A 20-21).

---

[9] Martinez falsely asserts that the jury verdict "affirmed, in substantial part, the sworn testimony of [Martinez], that his sexual contact with [Maria] was not unwanted." (Br. 4). Martinez was convicted of sexual abuse in connection with every single charged incident. Sexual

V.   Sentencing

   A.   The Applicable Guidelines Range

Following Martinez's conviction, the United States Probation Office (the "Probation Office") prepared a presentence investigation report ("PSR") that addressed the five convictions of sexual abuse of a ward from the first trial and the seven convictions of, variously, aggravated sexual abuse, deprivation of rights, and sexual abuse by threat or fear from the second trial.  (GA 505-07 ¶¶ 1-15).  The Probation Office calculated a total adjusted offense level of 46, which, coupled with Martinez's criminal history category of I, resulted in an advisory Guidelines range of life in prison.[10]  (GA 516 ¶ 112, 524 ¶ 151).

The government recommended that the district court sentence Martinez to a significant term of imprisonment in excess of 20

---

abuse in violation of 18 U.S.C. § 2242(1) makes it a crime to knowingly "cause[] another person to engage in a sexual act <u>by threatening</u> or <u>placing that other person in fear</u> (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping)."  (emphasis added)  Sexual abuse is <u>not</u> voluntary or "wanted" sexual contact.  It is rape.  It is simply rape inflicted without the use of physical force.

[10]    Section 242 provides a statutory maximum penalty of death in certain circumstances.  The death penalty was not sought in this case, so the relevant statutory maximum was life imprisonment.  Sections

years based on the nature, circumstances, and seriousness of the offense;

Martinez's history and characteristics; and the need to promote respect

for the law, provide just punishment, and provide both specific and

general deterrence. (GA 410). Martinez requested a sentence of time

served (at the time, 52 months) or no greater than 60 months'

imprisonment, arguing, among other things, that he and Maria had "a

consensual affair, a secret relationship that we both agreed on," and that

he "never forced, demanded, [or] threatened" Maria. (A 48; GA 414).

B.   The Sentencing Hearing

On April 13, 2022, more than two years after the retrial, the

district court conducted a sentencing proceeding. The court found that

the applicable Guidelines sentence was life but imposed a sentence of 10

years' imprisonment. (GA 200, 260). In explaining the sentence, the

court adopted much of the reasoning behind Martinez's defense theory,

essentially concluding, despite the jury's verdict finding sexual abuse,

aggravated sexual abuse, and deprivation of civil rights, that Maria had

---

2241 and 2242 provide a statutory maximum penalty of life
imprisonment. Section 2243 provides a statutory maximum penalty of
15 years' imprisonment.

consented to a sexual relationship with Martinez. The court explained that, in its view, the guilty verdicts for sexual abuse by threat or fear did not apply to Martinez's conduct because Maria had testified and the government had argued that Martinez used force during each encounter. (GA 200-01, 231-32, 237-38). The court opined that there was no substantive difference between the convictions of sexual abuse by threat or fear and the convictions of sexual abuse of a ward because Martinez "ha[d] the ability to cause [Maria] harm" by virtue of their respective roles as prison guard and prisoner. (GA 203; see also GA 226 ("to what extent do I impose a sentence that would be imposed if it was simply purely consensual and it was simply a ward situation."); GA 201-02 ("[F]or the purpose of sentencing, I'm looking at this as a one count indictment, one count conviction. . . .").[11] Finally, the court repeatedly

---

[11] The government repeatedly attempted to clarify that the use of force necessary for aggravated sexual abuse and the use of threats or fear for sexual abuse were not mutually exclusive and that the threats or fear need not be explicit. (GA 202 ("Where I do disagree is that it is mutually exclusive that the assault, the sexual abuse in this case could not be both through physical force, and . . ."); GA 203 ("The case law does not require just an explicit threat in order for the sexual abuse counts to be well founded."); GA 204 ("And an act can be caused to take place by multiple things."); GA 231 ("[A] jury can draw inferences from the

expressed, and clearly was influenced by, its doubts about Maria's credibility, notwithstanding the jury's verdict. (See, e.g., GA 206, 215-18, 221, 226-27, 235-36).

In addition to repeatedly expressing doubts about Maria's "veracity," the district court also stated that the only way to explain the verdict—specifically, the acquittals for deprivation of rights and aggravated sexual abuse on all but one count—was to understand that the jury "rejected" Maria's testimony and "found that she was not telling the truth." (GA 206). The court said that this was so because, "under her testimony," "this is a case of forcible rape[.]" (GA 232, 238; see also, e.g., GA 238 ("It wasn't a case where she said I was caused to do this because I was in fear of threats or force[.] . . . What motivated her throughout this was that [he] essentially [was] forcing her. And the jury didn't believe that.")). In particular, the court did not understand or agree with certain steps that Maria took in response to being raped and thus questioned whether she was in fact forced to engage in sexual acts with Martinez by threats or fear. (See, e.g., GA 215-17, 233-37). The court's disagreement

---

evidence and [that Maria acquiesced to sexual contact because she was afraid] is a valid inference to draw.").

with Maria's actions led it to question the convictions, despite the court's acknowledgement that it "kn[e]w she was scared." (GA 232-33).

Additionally, the district court opined that, as an inmate, Maria was of a class of people "who are not people of the highest moral character" and questioned whether Maria was simply repeating a story of sexual abuse that she had previously given in connection with obtaining a T-Visa (i.e., a visa for victims of human trafficking). (GA 217, 240). The court went so far as to state its concern as to "whether false testimony was given by the complainant and the jury found that[.]" (GA 218). The court stated multiple times that it was not questioning the verdict, but, as detailed below, much of the record suggested otherwise, and the court also stated that some of its qualms about Maria's behavior were "relevant" to the sentencing proceeding. (GA 234-37).

The district court sentenced Martinez to ten years in custody for each conviction, to run concurrently, to be followed by a five-year term of supervised release. (A 5-6, 9). Before detailing the "considerations that [it took] into account," the court reiterated that the jury "did acquit [Martinez] of four of the five most serious offenses." (GA 259).

As to the nature and circumstances of the offense, the district court stated that Martinez's conduct constituted "serious crimes[,] . . . assuming [they] w[ere] committed," and that it "ha[d] to accept the jury's verdict despite [its] own qualms about [Maria's] credibility." (GA 221 (emphasis added)). The court also acknowledged that Maria's status as an inmate "makes this a serious crime because [she's] subject to the control of guards and the overall prison personnel." (GA 250). The court added, however, that Martinez was "not a violent criminal." (GA 226). It stated that it had "no doubt" that Martinez was "not going to go out and rape anyone if he[ was] released," and that the crime only took place because Martinez "was in a special position that enabled him to do it." (GA 226, 258).

Regarding the need for deterrence, the district court commented, "[W]hat message do I send? And I said this to guards at the MDC, I've already tried to send a message to the MDC to the extent they never pay any attention to what judges think. What message do I send to people who are at the MDC." (GA 226). The court stated that it was not concerned about specific deterrence because it had no doubt that Martinez would not reoffend, but that "one has to be concerned about

deterring people who work at the Metropolitan Correction Center that conduct of this kind will not go unpunished." (GA 226, 260).

Finally, the district court considered numerous mitigation factors. It detailed the "life that the defendant led," including his military service, work record at the prison, and service at the World Trade Center, from which he developed cancer (now in remission). (GA 259-60). The court also stated that Martinez "did undergo two trials himself and whatever difficulties that may pose to the victim, it also poses to a defendant[.]" (GA 260). The court concluded that "a sentence of ten years for someone who is of his age and who has potential health problems . . . is a reasonable and just sentence under the sentencing guidelines." (GA 260).

C.    Post-Sentencing Revision of the PSR

Shortly after the district court imposed its sentence, the Probation Office distributed a revised PSR. (GA 530-58 ("Post-Sentencing PSR")). The Post-Sentencing PSR had a number of changes from the original 2020 PSR. Most notably, the Post-Sentencing PSR included the following paragraph:

> Per the Court's directive, the presentence report is amended to reflect particular findings made by the jury in the instant case. Specifically, during the trial, the jury found many aspects of the victim's testimony about the circumstances under which she had sexual intercourse with the defendant not credible. Although the victim testified that on at least four separate occasions she was forcibly raped, the jury rejected her testimony as to all of those occasions except one, which occurred on December 13, 2015. Furthermore, while the jury did convict the defendant on all counts of sexual abuse, the elements of which required that the victim's consent was induced by threats or fear, the victim did not testify that she consented to have sexual intercourse with the defendant because of threats or fear. She instead testified that each occasion was brought about by force.

(GA 537 ¶ 22). Additionally, the Post-Sentencing PSR replaced the terms "rape" and "forcible penetration" with "aggravated sexual abuse," "sexual intercourse," "sexual contact," and "to have sex." (Compare GA 508 ¶¶ 21-23, with GA 537 ¶¶ 19-21).

The district court issued its Judgment and Statement of Reasons ("SOR") three days after the Post-Sentencing PSR was dated and distributed. (GA 567-71). The court indicated in its SOR that it was adopting the presentence report (presumably the Post-Sentencing PSR) "without change." (GA 567). The court also noted that it had varied

below the Sentencing Guidelines and indicated that the history and
characteristics of Martinez—specifically his age, charitable service and
good works, and military service—warranted such a variance. (GA 569).
The court did not list any other Section 3553(a) factor as a basis for its
variance but provided the following narrative description of its rationale:

> As the jury did for the reasons I stated on the record,
> I found many aspects of the victim's testimony about
> the circumstances under which she had sexual
> intercourse with the defendant not credible, and I
> have considered this in fashioning the ultimate
> sentence in this case. Indeed, the victim testified
> that on at least four separate occasions, she was
> forcibly raped, but the jury rejected her testimony
> as to all of those occasions except that occurred [sic]
> on December 13, 2015. This rejection is clearly
> reflected in the jury's not guilty verdicts on counts
> 1r, 2r, 7r, 8r, 10r, 11r, 13r, and 14r[.] . . . While the
> jury did convict the defendant on all counts of sexual
> abuse, the elements of which required that the
> victim's consent was induced by threats or fear, the
> victim did not testify that she consented to have
> sexual intercourse with the defendant because of
> threats or fear—instead she testified that each
> occasion was brought about by force. Indeed, I
> should have granted the judgment of acquittal,
> which was made during trial, as to all counts of
> sexual abuse[.]

(GA 569-70). The court went on to explain which aspects of Martinez's history and characteristics it believed warranted a variance. (GA 570-71).

The government objected to the Post-Sentencing PSR in a sealed letter. (GA 559-61). After noting that the district court no longer had jurisdiction over the case because Martinez had already filed a notice of appeal, the government objected to the court-directed addition to the Post-Sentencing PSR on two grounds. (GA 559). First, it challenged the Post-Sentencing PSR's conclusion that the jury made "particular findings" about Maria's credibility and testimony. (GA559-60). Second, it objected to the Post-Sentencing PSR's new finding that "the victim did not testify that she consented to have sexual intercourse with the defendant because of threats and fear." (GA 560-61). Martinez filed a letter opposing the government's objection, arguing that "[t]he language in the revised PSR accurately reflects the trial testimony and the jury findings in this case." (GA 572). The court did not respond to either party's letter.

ARGUMENT

POINT ONE

THERE WAS SUFFICIENT EVIDENCE OF MARTINEZ'S USE OF
FORCE IN CONNECTION WITH THE CHALLENGED
CONVICTIONS (COUNTS FOUR AND FIVE)

Martinez argues that there was insufficient evidence that he
used force during his vaginal rape of Maria on December 13, 2015, but in
so arguing he all but ignores the most important record evidence on this
point, namely, Maria's testimony. Maria testified, among other things,
that Martinez physically lifted her up, forcibly removed her pants and
underwear, pinned her chest down on a desk, and held her arm while he
penetrated her vagina with his penis, using such force as to cause vaginal
bleeding. This testimony alone was easily enough to support the jury's
verdict. Accordingly, the Challenged Convictions should be affirmed.

I.   Applicable Law

This Court reviews a challenge to the sufficiency of the
evidence de novo, see United States v. Harvey, 746 F.3d 87, 89 (2d Cir.
2014), but "[a] defendant challenging the sufficiency of the evidence . . .
at trial bears a heavy burden, as the standard of review is exceedingly
deferential," United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)

(internal quotation marks and citations omitted). A jury verdict must be upheld if "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original).

In considering the sufficiency of the evidence supporting a guilty verdict, this Court views the evidence in the light most favorable to the government. <u>See</u> <u>United States v. Temple</u>, 447 F.3d 130, 136-37 (2d Cir. 2006). The Court must "credit[] every inference that the jury might have drawn in favor of the government," <u>id.</u> (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," <u>United States v. McDermott</u>, 245 F.3d 133, 137 (2d Cir. 2001); <u>see also</u> <u>United States v. Guadagna</u>, 183 F.3d 122, 129 (2d Cir. 1999). Moreover, "it is well-settled" that this Court will "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." <u>United States v. Glenn</u>, 312 F.3d 58, 64 (2d Cir. 2002) (internal quotation marks omitted). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable

doubt." United States v. Atilla, 966 F.3d 118, 128 (2d Cir. 2020) (internal quotation marks omitted).

## II. Discussion

As described above, Maria provided detailed, powerful testimony describing the violent sexual assault underlying the Challenged Convictions and the force Martinez used to perpetuate that assault. Maria's testimony alone precludes the relief sought on appeal.

The Challenged Convictions involve a forcible vaginal rape that took place on or about December 13, 2015. (See A 25-26). Maria, who was a mere 5'1" tall and weighed 138 pounds at the time of the assault, testified that Martinez physically lifted her up, positioned her chest-down onto a desk, grabbed her arm to keep her down, and penetrated her vagina with his penis. (GA 54-57). Prior to penetrating Maria, Martinez "forcibly unbuttoned" her pants and pulled them down to near her knees. (GA 56). Maria was crying throughout the rape. (GA 56). Martinez's assault left Maria vaginally bleeding for some time after the rape. (GA 57, 60, 67, 70). The bleeding was severe enough to require a sanitary napkin to absorb the blood. (GA 65-66, 70).

Perhaps recognizing that Maria's testimony is devastating to his sufficiency argument, Martinez contends that the jury must have rejected Maria's testimony because it acquitted Martinez of other counts alleging forcible rape. The argument finds no support in the record or in the law. Indeed, if anything, the jury's mixed verdict reflects that the jurors took their obligations seriously and carefully weighed the evidence as to each count. The jury was entitled to conclude that Martinez used force during the vaginal rape committed on December 13, 2015 but that he did not use force—relying instead on fear—to carry out the oral rape committed on that same date and the vaginal rapes committed on three other occasions. It is a basic and settled principle that a jury may credit part or all of a witness's testimony, and it is not for the trial court or this Court to second guess the jury's credibility determinations or reweigh the trial evidence. See, e.g., United States v. Heyward, 3 F.4th 75, 86 (2d Cir. 2021) ("[I]t is well-settled that when reviewing the sufficiency of the evidence we defer to the jury's assessment of witness credibility." (internal quotation marks omitted)); United States v. Coppola, 671 F.3d 220, 239 (2d Cir. 2012) ("[T]he task of choosing among permissible competing inferences is for the jury, not a reviewing court." (internal

quotation marks omitted)); United States v. Ware, 577 F.3d 442, 447 (2d

Cir. 2009) ("The assessment of witness credibility lies solely within the

province of the jury, and the jury is free to believe part and disbelieve

part of any witness's testimony." (internal quotation marks omitted));

United States v. Josephberg, 562 F.3d 478, 487 (2d Cir. 2009) ("[W]here

there are conflicts in the testimony, we must defer to the jury's resolution

of the weight of the evidence and the credibility of the witnesses."

(internal quotation marks omitted)); see also United States v. Powell, 469

U.S. 57, 58, 66-68 (1984) (finding that inconsistent verdicts are not

reviewable); United States v. Arline, 660 F. App'x 35, 38 (2d Cir. 2016)

("[I]t has long been established that inconsistency in jury verdicts of

guilty on some counts and not guilty on others is not a ground for reversal

of the verdicts of guilty." (internal quotation marks omitted)).

      The question before this Court is whether any rational juror

could have concluded that Martinez used force during the vaginal rape

committed on December 13, 2015. The answer is clearly yes, because a

rational juror could have credited Maria's testimony describing the rape

underlying Counts Four and Five and therefore found that Martinez used

force sufficient to satisfy the applicable statutes. This Court has held

that the requirement of force may be satisfied by a showing that use of physical force was sufficient to restrain a person.  See United States v. Lauck, 905 F.2d 15, 17 (2d Cir. 1990).  Thus, if "the sexual contact resulted from a restraint upon the other person that was sufficient that the other person could not escape the sexual contact, that is sufficient force to violate section 2244(a)(1)."  Id. at 18.  "The statute requires only the use of 'force,' not of 'significantly violent action or threats.'"  Id.; see also United States v. Shaw, 891 F.3d 441, 449 (3d Cir. 2018) (adopting standard set forth in Lauck); United States v. Webb, 214 F.3d 962, 966 (8th Cir. 2000) ("The Second Circuit also has explicitly rejected the violence requirement, holding that '[18 U.S.C. § 2244(a)(1)] requires only the use of 'force,' not of 'significantly violent actions or threats.'"" (citing Lauck, 905 F. 2d at 18)); United States v. Denjen, 258 F. Supp. 2d 194, 196 (E.D.N.Y. 2003) (same).  "The legislative history indicates that a specific intent of Congress was to reduce the necessity of demonstrating the use of excessive force, in order to provide greater protection for the

46

victim." <u>Lauck</u>, 905 F.2d at 18; <u>see also</u> H.R.REP. No. 99-594 at 11, 14 (1986).

Maria, a petite woman in her twenties, described how Martinez, a former marine in his 40s (Br. 5), forcibly removed Maria's pants and underwear. She described being physically stood up and then pinned down to a desk while Martinez held her arm and penetrated her against her will. A rational jury could, and did, find that such conduct was sufficient to overcome, restrain, or injure Maria and that, because of that restraint, Maria could not escape Martinez's sexual contact, especially when considered in conjunction with Martinez's superior size and strength. <u>See</u> <u>Lauck</u>, 905 F.2d at 17-18 (finding force sufficient to "restrain" where defendant "put his arm around" the victim so she "couldn't continue walking"; backed her into a corner and "held her there" so she "couldn't get away from him"; and held her head "forcibly" "with both hands"); <u>see also</u>, <u>Shaw</u>, 891 F.3d at 453 ("Viewed in the light most favorable to the Government, a rational juror could have found that [the defendant] used actual force when he forced himself on [the victim] by pressing down his hands on [the victim's] chest so that she was unable to get up, while committing the sexual act of digital penetration, and laid

on [the victim] with the weight of his body, while having sexual intercourse with her, such that she was unable to move and felt like she couldn't breathe." (internal quotation marks, citations and alterations omitted)); United States v. H.B., 695 F.3d 931, 936-37 (9th Cir. 2012) (finding that a rational trier of fact could conclude the defendant used physical force sufficient to restrain the victim based on the weight of the defendant on top of the victim, his efforts to silence her by covering her mouth with his hand, and a third party holding one of the victim's legs); United States v. Buckley, 195 F.3d 1034, 1035 (8th Cir. 1999) (finding sufficient force where victim testified that defendant removed her clothing, got on top of her, had intercourse with her, causing pain and bleeding, where she indicated she wanted him to stop and attempted to push him off her, but was unable to do so because of his size); United States v. Allery, 139 F.3d 609, 612 (8th Cir. 1998) (finding sufficient force where victim awoke with defendant lying on top of her having sexual intercourse and attempted to push him away); United States v. Lucas, 157 F.3d 998, 1002 (5th Cir. 1998) (finding sufficient force where the defendant, a jail warden, "summoned [the victim-inmate] to a relatively secluded location, locked the door so that she could not escape his

advances, and pressed her against a table in such a way that she could not leave"); <u>United States v. Bordeaux</u>, 997 F.2d 419, 421 (8th Cir. 1993) (finding that a size disparity between the defendant and the victim might be enough to establish a restraint sufficient that the child victim could not escape the sexual contact). Accordingly, there was sufficient evidence of the use of force for a rational jury to find Martinez guilty of deprivation of civil rights and aggravated sexual abuse, as charged in Counts Four and Five.

To the extent Martinez suggests that the jury understood force to mean something other than what the law proscribes, the suggestion is wrong. (Br. 23-24, 29). Notably, there was no error in the district court's instruction to the jury on force, and Martinez does not argue otherwise. Regardless, any such argument would be meritless. The court properly instructed the jury on the definition of force, advising the jury, consistent with Second Circuit precedent, that "the use of force means the use of physical force as is sufficient to overcome, restrain, or injure a person." (GA 394). <u>See also</u> <u>Lauck</u>, 905 F.2d at 17. Following the jury instructions, the district court asked the parties if there were

any objections to the overall charge as he gave it. There were none. (GA 403).

In sum, the jury was properly instructed on the definition of force; heard credible testimony that during the vaginal assault on December 13, 2015, Martinez used force "sufficient to overcome, restrain, or injure" Maria by standing her up, pinning her to the desk, holding her arm, and penetrating her with such violence as to cause continual vaginal bleeding; and returned a verdict consistent with the trial evidence. Martinez's appeal asks this Court to do what it may not—overturn the jury's assessment of witness credibility, namely the jury's crediting of Maria's testimony with respect to the Challenged Convictions. Accordingly, Martinez's appeal should be denied.

50

## POINT TWO

### MARTINEZ'S SENTENCE WAS BOTH PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

In sentencing Martinez to a ten-year term of imprisonment—well below the life sentence recommended by the Guidelines and the sentence of more than 20 years sought by the government—the district court misunderstood and thus failed to consider the full scope of criminal conduct reflected in the jury verdicts and, as a result, imposed a sentence that was both procedurally and substantively unreasonable. In sentencing a defendant, a district court must, among other things, "faithfully evaluate the record to ensure that the sentence imposed accurately and adequately reflects the seriousness of the offense conduct." United States v. Mumuni, 946 F.3d 97, 106 (2d Cir. 2019). Here, the court disregarded the jury's findings that Martinez raped Maria once using physical force and threats or fear and four additional times using threats or fear and instead sentenced Martinez as though he had engaged in consensual sex with an inmate, or sexual abuse of a ward. In doing so, the district court relied on Martinez's testimony that he had a consensual and mutually desired sexual relationship with Maria;

declined to credit Maria's testimony, which, based on the verdict, was largely credited by the jury; and ignored the jury's findings of fact that the sex acts were accomplished variously through threats, fear, and physical force as opposed to being wanted and consensual acts.

The sentence is both procedurally and substantively unreasonable, constituted an abuse of discretion, and should be overturned.

I.   <u>Applicable Law</u>

Courts of appeals "examin[e] a sentence for reasonableness, which is akin to review under an 'abuse-of-discretion' standard." <u>United States v. Rigas</u>, 583 F.3d 108, 114 (2d Cir. 2009); <u>see also</u> <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007).   Under this standard, a sentence is reviewed for both procedural and substantive reasonableness.   <u>Rigas</u>, 583 F.3d at 114; <u>United States v. Cavera</u>, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

A.   <u>Procedural Unreasonableness</u>

A district court commits procedural error when it "fail[s] to calculate (or improperly calculate[es]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the § 3553(a) factors, select[s]

a sentence based on clearly erroneous facts, or fail[s] to adequately

explain the chosen sentence[.]" Gall, 552 U.S. at 51; see also Cavera, 550

F.3d at 190. "A sentence is based on clearly erroneous facts, and is

therefore procedurally unreasonable, when the court's explanation 'runs

counter to the weight of the evidence [at trial] and the jury's verdict.'"

United States v. George, No. 19-CR-4841, 2021 WL 5505404, at *3 (4th

Cir. Nov. 24, 2021) (per curiam) (quoting United States v. Curry, 461 F.3d

452, 460-61 (4th Cir. 2006)); accord United States v. Hourihan, 66 F.3d

458, 465 (2d Cir. 1995) (concluding that a sentencing court's "decision to

sentence based on its view of the evidence rather than the jury's is

reversible error"); see also United States v. Singh, 877 F.3d 107, 118-19

(2d Cir. 2017) (finding that a significant sentencing variance "must be

based on an accurate reading of the record"); United States v. Diaz, 951

F.3d 148, 159-60 (3d Cir. 2020) ("We find a sentencing court's factual

findings clearly erroneous if they are unsupported by substantial

evidence, lack adequate evidentiary support in the record, are against the

clear weight of the evidence or where the district court has

misapprehended the weight of the evidence." (internal quotation marks omitted)).

At times, courts will remand a case upon finding that the district court committed a procedural error without also considering whether a sentence is substantively unreasonable. See Cavera, 550 F.3d at 190. This Court has considered both procedural and substantive errors when it determined that one provided context for the other. See, e.g., Singh, 877 F.3d at 116.

B. Substantive Unreasonableness

Substantive reasonableness review is concerned with "assess[ing] the length of the sentence imposed in light of the § 3553(a) factors," United States v. Verkhoglyad, 516 F.3d 122, 127 (2d Cir. 2008) (internal quotation marks and alterations omitted), and it "focuses on a district court's explanation of its sentence in light of th[ose] factors," United States v. Matta, 777 F.3d 116, 124 (2d Cir. 2015) (internal quotation marks omitted). See also United States v. Ceasar, 10 F.4th 66, 79 (2d Cir. 2021) ("Review for substantive reasonableness requires that we consider only whether the length of the sentence is reasonable in light

of the § 3553(a) factors." (internal quotation marks and alterations omitted)).

When considering the substantive reasonableness of a sentence, courts must determine "whether the District Judge abused his discretion in determining that the § 3553(a) factors supported [the] sentence[.]" Gall, 552 U.S. at 56. In making this determination, this Court considers whether "(1) . . . a sentence lacks a proper basis in the record, (2) . . . a trial judge's assessment of the evidence leaves the reviewing court with a definite and firm conviction that a mistake has been committed, or (3) . . . the reviewing court has reached the informed judgment that a sentence is otherwise unsupportable as a matter of law." Mumuni, 946 F.3d at 107. An appellate court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." United States v. Lifshitz, 714 F.3d 146, 149 (2d Cir. 2013) (internal quotation marks omitted); see also Gall, 552 U.S. at 51. The substantive unreasonableness standard "provide[s] a backstop for those few cases" where allowing the sentence to stand would "damage the administration of justice" because it is "shockingly high,

shockingly low, or otherwise unsupportable as a matter of law." <u>Rigas</u>, 583 F.3d at 123.

## II. <u>Discussion</u>

It was both procedurally and substantively unreasonable for the district court to sentence Martinez based upon a factually incorrect and legally unsupportable view of the record and jury verdict. The jury's verdict reflects that it found beyond a reasonable doubt, based on sufficient evidence, that Martinez raped Maria five times, including once by physical force, and that each of these five rapes also qualified as sexual abuse of a ward. (A 3). The court, based largely on Martinez's theory of the case, disregarded the jury's findings and sentenced Martinez as if he had only committed sexual abuse of a ward. This is not a reasonable basis for a sentence and constitutes an abuse of discretion. Accordingly, the sentence should be vacated and the case remanded for resentencing.

### A. <u>Martinez's Sentence Was Procedurally Unreasonable</u>

Martinez's ten-year sentence was procedurally unreasonable because it was based on "clearly erroneous facts." <u>Gall</u>, 552 U.S. at 51; <u>Hourihan</u>, 66 F.3d at 465; <u>Singh</u>, 877 F.3d at 118 (sentence procedurally unreasonable because, in part, appellate court was "not persuaded that

the district court's [view of the] record . . . [was] supported by the record");

see also George, 2021 WL 5505404, at *3-5 (vacating and remanding for resentencing where the district court erred by adopting a view of the evidence that "almost entirely mirror[ed] [the defendant's] defense at trial," despite the fact that "[t]he jury could not have adopted [the defendant's] theory while also rendering a guilty verdict[.]").

In sentencing Martinez, the district court largely accepted Martinez's version of the case, concluding that the sexual encounters at issue arose from a consensual relationship between a correctional officer and a ward, rather than the jury's verdict finding Martinez guilty of five instances of rape (one count of aggravated sexual abuse and five counts of sexual abuse by threats or fear), in addition to his previous convictions for sexual abuse of a ward. While the court acknowledged that it "ha[d] to accept the verdict whether [it] agree[d] with it or not," (GA 259; see also GA 221), the court's statements throughout the sentencing hearing, narrative in the SOR, and apparent instruction to the Probation Office to revise the PSR demonstrate that it did not fully accept the facts found by the jury or the counts of conviction when determining the appropriate sentence. (See, e.g., GA 203 ("The fact that he has the ability to cause

her harm, that to me is almost the same thing as a ward [situation].”); GA 226 (“[T]o what extent do I impose a sentence that would be imposed if it was simply purely consensual and it was simply a ward situation.”)); see also supra at 31-40.

Taken together, the district court’s findings—in particular, its finding that Maria’s testimony was not credible and its indication that Martinez should be sentenced as though convicted solely of abuse of a ward—were inconsistent with the weight of the evidence presented at trial and impossible to reconcile with the facts implicitly adopted by the jury.  As discussed, the jury found Martinez guilty of deprivation of civil rights and aggravated sexual abuse in connection with the forcible, vaginal rape committed against Maria on December 13, 2015.  Further, in finding Martinez guilty of sexual abuse, in violation of 18 U.S.C. § 2242(1), in connection with each of the five charged rapes, the jury necessarily found that Martinez caused Maria to engage in each of the sexual acts by “threatening or placing [her] in fear” of harm.  18 U.S.C. § 2242(1).

The evidence was plainly sufficient to support these verdicts and the district court was bound to impose a sentence accordingly.  See

Hourihan, 66 F.3d at 465 ("A guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict." (internal quotation marks omitted)). The sufficiency of the evidence of the forcible rape charged in Counts Four and Five is discussed above. See supra at 40-49. The evidence also was sufficient to support Martinez's five convictions of raping Maria through threats or fear, in violation of 18 U.S.C. § 2242(1). The district court's contrary findings—including its repeated suggestion that the sexual contact between Martinez and Maria was consensual, and its statement in the SOR that it "should have granted the judgment of acquittal" on the 18 U.S.C. § 2242(1)—were clearly erroneous.[12] (See GA 570 ("Indeed, I should have granted the

---

[12] The district court itself found that there was sufficient evidence to support each of the jury's convictions when it summarily denied Martinez's motions for judgment of acquittal after the close of the government's case and then again after the close of the defense case. (GA 404-05). The court may not circumvent the proper procedure for assessing the evidence at trial by basing its sentence on factual findings contrary to both its own ruling and the jury's verdict. Cf. Mumuni, 946 F.3d at 107 (finding a sentence substantively unreasonable when a district court based its sentence upon factual conclusions contrary to its own findings in accepting a defendant's guilty plea). Notably, Martinez has not appealed any of the five convictions of sexual abuse.

judgement of acquittal, which was made during trial, as to all counts of sexual abuse[.]")).

Contrary to Martinez's argument (Br. 20-21), there was no basis for the district court to question the jury's finding that Martinez raped Maria five times by threat or fear. Maria testified that she was required to work while in the prison and understood that if at any point she refused to show up for one of her cleaning shifts—especially for a senior officer like Martinez—she would be punished by being put in the SHU, losing her privileges, or losing good time credit, which would increase the time she had to spend in prison. (GA 14, 20-21, 47, 90). Maria also testified that from the time when Martinez started making sexual comments to her, she was concerned that she (and not he) would get in trouble. (GA 43-56). After the first rape, Martinez told Maria multiple times not to tell anyone what had happened and that she would "have problems" if she did. (GA 60). Martinez emphasized this point by telling Maria about another inmate, Jenny, who "didn't say anything" and was about to be released from the prison. (GA 45, 61). The jury was free to infer that, in context, Martinez intended to suggest to Maria that she would be punished and remain in prison longer if she declined to

engage in sexual contact or if the sexual abuse was disclosed to others. Maria also understood that whenever there were disputes between an inmate and an officer, the other officers always believed the officer in question. (GA 78). Maria further testified that every time Martinez sexually abused her, she did not want to have sex with him, she was scared that she would end up in the SHU and have to spend more time in prison, she was too scared to seriously fight back against Martinez, and the efforts she did take to dissuade Martinez never worked. (GA 80, 86-90, 92-99).

The jury's findings were further supported by the clear power disparity between Maria—a sentenced prisoner nearing the end of her prison term—and Martinez, then a lieutenant with the BOP and one of the highest ranking officials at the MDC at the dates and times he committed his sexual abuse of Maria. There also was ample evidence for the jury to have concluded that Martinez "caused" Maria to engage in sexual intercourse in part because of her fear that Martinez would use additional force to overpower her if she resisted further—as he did on the first occasion that he forced her to have sexual intercourse, holding her arm to "keep[ her] down on the desk" and using such a degree of force

61

that Maria bled from her vagina.  (GA 55).  Indeed, Martinez was taller, heavier, and stronger than Maria, who then stood at 5'1" and weighed 138 pounds.

This testimony was sufficient to support the jury's verdict that Martinez caused Maria to engage in a sexual act five times by threatening her and putting her in fear.  See, e.g., United States v. One Feather, 465 F. App'x 577, 580 (8th Cir. 2012) (evidence was sufficient for sexual abuse by threat or fear conviction where victim testified that she was scared during the abuse and did not resist or report the abuse because she was afraid); Lucas, 157 F.3d at 1002-03 ("[F]ear can be inferred from the circumstances, particularly a disparity in power between defendant and victim. . . .  [A] defendant's control over a victim's everyday life can generate fear."); Denjen, 258 F. Supp. 2d at 195 (defendant, an MDC lieutenant, pled guilty to sexual abuse in violation of 18 U.S.C. § 2242(1) by "causing the victim to engage in sexual contact by placing her in fear that, if she did not comply with his sexual advances, she would receive sanctions, such as more time in disciplinary segregation").

This Court has held that a "district court's decision to sentence based on its view of the evidence rather than the jury's is reversible error." Hourihan, 66 F.3d at 465; see also Cavera, 550 F.3d at 190 ("[A district court] errs procedurally if it . . . rests its sentence on a clearly erroneous finding of fact."); Singh, 877 F.3d at 118 ("A sentencing determination based on clearly erroneous factual findings is procedurally unreasonable."). In Hourihan, the defendant was convicted of both aggravated sexual abuse and the lesser crime of abusive sexual contact. 66 F.3d at 461. Despite the jury verdict, the district court stated at sentencing that the defendant's conduct did not match the charge of aggravated sexual abuse and therefore sentenced him under the abusive sexual contact guideline rather than the guideline governing aggravated sexual abuse. Id. at 465. This Court vacated and remanded the sentence, explaining that "the district court's decision to sentence [the] defendant for a lesser crime cannot be sustained." Id. Here, though the district court agreed that the correct guideline range for Martinez was a life term, the court essentially did the same thing as in Hourihan—it sentenced Martinez for the lesser crime of sexual abuse of a ward and, based on its own assessment of witness credibility, unofficially set aside the jury's

verdict convicting Martinez of the more serious crimes of sexual abuse, aggravated sexual abuse, and deprivation of civil rights.[13]

In circumventing the jury verdict in this manner, the district court committed reversable procedural error; the sentence therefore should be vacated and the case remanded for resentencing.

B.    Martinez's Sentence Was Substantively Unreasonable

The ten-year sentence imposed by the district court also was substantively unreasonable and should be vacated and remanded on that basis as well.  See United States v. Dorvee, 616 F.3d 174, 182 (2d Cir. 2010) ("[N]othing in our existing sentencing law prevents us from reaching both the procedural and substantive reasonableness of the

---

[13]    The district court also erred in determining that Martinez was "not a violent criminal," a finding at odds with his conviction of forcible rape.  (GA 226).  The district court stated that it had "no doubt" that Martinez was "not going to go out and rape anyone if he[ was] released," and that the crime only took place because Martinez "was in a special position that enabled him to do it."  (GA 226, 258).  Such conclusions are not supported by the record and constitute erroneous findings of fact.  See Singh, 877 F.3d at 118 (finding a sentence procedurally unreasonable in part because the district court's determination that the defendant was almost certain to reoffend was not supported by the record).

64

sentence in the course of an appeal where we find both types of error."
(internal quotation marks omitted)).

The factors upon which the district court relied in imposing a
dramatically below-Guidelines sentence for Martinez's repeated rape of
Maria while she was in his custody and care cannot bear the weight
assigned to them. The court impermissibly relied on its doubts about
Maria's testimony as a mitigating factor at sentencing; based the
sentence on a misunderstanding of the elements of sexual abuse; and was
wrong as a matter of fact that Maria did not testify that she was "cause[d]
. . . to engage in a sexual act" by threats or fear. (GA 204, 230-31).
Because the court was wrong as a matter of fact and law with respect to
these factors, none of them can support any weight, much less the
extraordinary weight the court placed on them in imposing a sentence of
ten years' imprisonment.

First, the district court erred in relying on its own assessment
of Maria's credibility as a mitigating factor at sentencing. As a matter of
law, the court's assessment of a victim's credibility is not among the
factors it may consider at sentencing. See, e.g., 18 U.S.C. § 3553(a); 18
U.S.C. § 3661 ("No limitation shall be placed on the information

concerning the background, character, and conduct of <u>a person convicted of an offense</u> which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." (emphasis added)). Indeed, in the context of a criminal jury trial, a district court's assessment of a trial witness's credibility is relevant only to the court's consideration of a Rule 33 motion for a new trial, and then "only in exceptional circumstances, where there is a real concern that an innocent person may have been convicted." <u>United States v. Landesman</u>, 17 F.4th 298, 330 (2d Cir. 2021) (internal quotation marks omitted). Here, Martinez did not make a Rule 33 motion following his retrial, and the court therefore was precluded from "intrud[ing] upon the jury function of credibility assessment." <u>Id.</u> (internal quotation marks omitted).

The district court's concerns about Maria's credibility were relevant, if at all, to the issue of Martinez's guilt, but the court expressly (and correctly) declined to exercise its Rule 29 or 33 authority to vacate the jury's verdict. (GA 221 ("It's ultimately a credibility determination. I couldn't set aside the verdict even if you had timely moved on that count.")). Having properly deferred to the jury's credibility assessment with respect to the verdict, the court failed to explain how its own

credibility assessment could support a downward variance, much less the extraordinary variance imposed, and there is no readily apparent relationship between the witness's credibility and any of the § 3553(a) factors.

Nor does the record support the district court's erroneous belief that Maria's testimony was somehow inconsistent with the jury's guilty verdict as to the sexual abuse counts (i.e., those counts in which the jury found that Martinez raped Maria "by threatening or placing [her] in fear," in violation of 18 U.S.C. § 2242(1)). The court's observation of this perceived inconsistency would have been irrelevant as a matter of law even if were accurate,[14] but it was not accurate. The court's mistaken perception may have arisen from a belief that sexual abuse in violation

_____

[14]    Powell, 469 U.S. at 69 ("For the reasons previously stated, however, there is no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled. Respondent is given the benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted."); see also United states v. Cerno, No. 05-CR-1603, 2006 WL 8443204 (D.N.M. Dec. 12, 2006) ("Because the inconsistency [in a jury verdict] may be the result of lenity and the government cannot invoke review, the Supreme Court ruled that inconsistent verdicts are not reviewable." (citing Powell, 469 U.S. at 66-67)).

of 18 U.S.C. § 2242(1) requires proof that the victim "consented" to a sexual act as a result of threats or fear; an understanding that, if true, might arguably be inconsistent with the use of force. But to sustain a conviction under 18 U.S.C. § 2242(1), the government must prove only that the defendant "cause[d] another person to engage in a sexual act by threatening or placing that other person in fear," 18 U.S.C. § 2242(1) (emphasis added), which does not preclude the use of force, or a finding that force caused the victim's fear, as a matter of statutory construction or common sense, see, e.g., Lucas, 157 F.3d at 1002 (finding that the evidence demonstrated that the defendant used "actual force" against his victim within the meaning of § 2241 and also "caused [the victim] to engage in a sexual act by placing her in fear within the meaning of § 2242"). Evidence supporting Martinez's sexual abuse of Maria through force or threat is discussed above. See supra 58-61.

Although the jury acquitted Martinez of several counts of aggravated sexual abuse, the district court's attempts to rationalize the jury's mixed verdict went too far in rejecting the evidence and the jury's inherent findings in support of the counts of conviction. Regarding Maria's testimony in particular—which seemed to be the main source of

the court's concern regarding the mixed verdict—all that can be fairly deduced from the jury's verdict is that, as to four of the five rapes, it did not find the Martinez used "physical force" sufficient to constitute aggravated sexual abuse, but did find that Maria's testimony was sufficient to support five counts of sexual abuse by threat or fear.  The court's declarations that the jury found Maria was "not telling the truth" and suggestions that Martinez's conduct amounted to a "simpl[e] . . . ward situation," (GA 200, 206, 226-27), thus are contrary to the facts implicit in the verdict and the weight of the evidence as described above.  See Cavera, 550 F3d at 191 ("At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it.").

In sum, the district court's "musings" about the purportedly inconsistent verdict and Maria's credibility are "plainly contradicted by the record, [and are] also unsupportable as a matter of law." Mumuni, 946 F.3d at 109 (vacating sentence as substantively unreasonable following government appeal).  As a result, the court "improper[ly] discount[ed] . . . the seriousness of [the defendant]'s offense conduct," id. at 110, and thereby failed to meaningfully assess "the seriousness of [the]

offenses," <u>Ceasar</u>, 10 F.4th at 83 (vacating sentence as substantively unreasonable following government appeal).

This Court determines whether a sentence is substantively unreasonable by determining whether the sentence "is based on an erroneous view of the law[,] . . . on a clearly erroneous assessment of the evidence," or is outside "the range of permissible decisions." <u>Mumuni</u>, 946 F.3d at 106 (internal quotation marks omitted). In particular, "a district court's evaluation of the evidence is 'clearly erroneous' when [the court of appeals is] left with the definite and firm conviction that the district court has misinterpreted the record and, as a result, has misweighed certain aggravating or mitigating factors." <u>Id.</u> at 106-07 (internal quotation marks omitted); <u>see</u> 18 U.S.C. § 3553(a) (listing relevant aggravating and mitigating factors that sentencing courts must consider). Here the district court's inaccurate view of the evidence colored how it assessed the nature and circumstances of the offense, resulting in a sentence that does not reflect the seriousness of the offense, promote respect for the law, or provide just punishment. <u>See</u> 18 U.S.C. §§ 3553(a)(1) and (2)(A); <u>Mumuni</u>, 946 F.3d at 110 ("We are confident that if the District Court had fully appreciated the heinous nature of this

offense . . . it would have reconsidered the weight ultimately accorded several aggravating factors"); <u>see also</u> <u>id.</u> at 106 (finding a sentence substantively unreasonable where "the District Court drastically discounted the seriousness of [the defendant's] offense conduct based on a sterilized and revisionist interpretation of the record"); <u>id.</u> at 111 ("[T]he District Court substantively erred by imposing a sentence that does not adequately reflect [the defendant's] more serious conduct."); <u>Ceasar</u>, 10 F.4th at 79 ("A sentence is substantively unreasonable if affirming it would damage the administration of justice. . . ." (internal quotation marks omitted)); <u>George</u>, 2021 WL 5505404, at * 5 (finding the sentence issued was substantively unreasonable, predominantly because "the trial court took an impermissible view of the facts."); <u>United States v. Hunt</u>, 521 F.3d 636, 650 (6th Cir. 2008) (finding sentence substantively unreasonable where district court relied in part on its view that the defendant lacked fraudulent intent despite a jury verdict convicting the defendant of fraud).

Because the district court's view of the evidence was inconsistent with the jury's verdict, and because that view colored how the court assessed the nature and circumstances of the offense, resulting

in a sentence that does not reflect the seriousness of the offense, the sentence should be vacated as substantively unreasonable and the case remanded for resentencing.

CONCLUSION

For the reasons stated above, the Challenged Convictions should be affirmed, the sentence should be vacated as both procedurally and substantively unreasonable, and the case should be remanded for resentencing.

Dated:      Brooklyn, New York
            February 14, 2023

                          Respectfully submitted,

                          BREON PEACE,
                          United States Attorney,
                          Eastern District of New York.

                    By:   /s/ Rachel A. Shanies
                          Rachel A. Shanies
                          Assistant U.S. Attorney

SAMUEL P. NITZE,
RACHEL A. SHANIES,
Assistant United States Attorneys,
      (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B)(i) and Second Circuit Rule 28.1.1(b) because the brief contains 13,720 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
        February 14, 2023

/s/ SAMUEL P. NITZE
SAMUEL P. NITZE
Assistant U.S. Attorney