# 22-902

## 22-1136(XAP)

# United States Court of Appeals

### For the Second Circuit

———— ◆◆ ————

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—against—

CARLOS MARTINEZ,

*Defendant-Appellant-Cross-Appellee.*

———————

**On Appeal From The United States District Court
For The Eastern District of New York**

---

**GOVERNMENT APPENDIX
VOLUME I OF III
(Pages GA001 to GA264)**

---

BREON PEACE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

# TABLE OF CONTENTS

Page

Maria's Trial Testimony,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated February 10, 2020................................................................GA 1

Sentencing Transcript,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated April 13, 2022................................................................GA 193

Original Indictment,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated May 24, 2017................................................................GA 265

Danilda Osoria's Trial Testimony,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated February 14, 2020................................................................GA 277

Kiara Maldonado's Trial Testimony,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated February 13, 2020................................................................GA 310

Melva Vasquez Vargas' Trial Testimony,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated February 13, 2020................................................................GA 340

Jury Charge,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated February 19, 2020................................................................GA 376

District Court Rule 29 Motion Denial,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated February 18, 2020................................................................GA 404

Government's April 15, 2020 Sentencing Letter,
  United States v. Martinez, 17-CR-281 (ERK)
    Dated April 15, 2020................................................................GA 406

Martinez's September 26, 2021 Sentencing Letter,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated September 26, 2021 ......................................................GA 414

Martinez's Motion for a New Trial,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated November 29, 2018 ......................................................GA 423

Government's Opposition to Motion for a New Trial,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated January 19, 2019 .........................................................GA 439

District Court Decision Granting New Trial,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated July 2, 2019..................................................................GA 484

2020 Presentence Investigation Report (PSR),
    United States v. Martinez, 17-CR-281 (ERK)
        Dated March 18, 2020 ............................................................GA 501

2022 Post-Sentencing PSR,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 22, 2022...............................................................GA 530

Government Objection to Post-Sentencing PSR,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 28, 2022...............................................................GA 559

Yolanda Interview Report,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 28, 2017...............................................................GA 562

Solicitor General Approval,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated January 8, 2023 ............................................................GA 566

Statement of Reasons,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 25, 2022...............................................................GA 567

Martinez's Opposition to Government's Objections to Revised PSR,
   United States v. Martinez, 17-CR-281 (ERK)
      Dated April 28, 2022.................................................................GA 572

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
UNITED STATES OF AMERICA        *    Docket No.
                                *    17-CR-281 (ERK)
                                *
           v.                   *    U.S. Courthouse
                                *    Brooklyn, NY
                                *
CARLOS RICHARD MARTINEZ,        *
                                *    February 10, 2020
           Defendant.           *    3:44 PM
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:            RICHARD P. DONOGHUE, ESQ.
                              UNITED STATES ATTORNEY

                         BY:  ELIZABETH A. GEDDES, ESQ.
                              NADIA I. SHIHATA, Esq.
                              Asst. United States Attorney
                              United States Attorney's Office
                              271 Cadman Plaza East
                              Brooklyn, NY  11201

For the Defendant:            ANTHONY L. RICCO, ESQ.
                              20 Vesey Street, Suite 400
                              New York, NY 10007

                              CARLOS M. SANTIAGO, ESQ.
                              The Law Office of
                              Carlos M. Santiago
                              11 Broadway, Suite 615
                              New York, NY 10004

Transcription Services:       Transcriptions Plus II, Inc.
                              61 Beatrice Avenue
                              West Islip, NY 11795
                              laferrara44@gmail.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

Case 22-902, Document 84, 02/15/2023, 3469874, Page6 of 268
GA002

"M A R I A",

     having been first duly sworn, was examined and testified

     as follows:

          THE COURT:  Please be seated.

          MS. SHIHATA:  May I inquire, your Honor?

          THE COURT:  Yes.

DIRECT EXAMINATION

BY MS. SHIHATA:

GA003

"Maria" - Direct - Shihata                                    20

1      Q      Good afternoon.

2             MS. SHIHATA:  I'm showing the witness only what's

3    been marked for identification as Government Exhibit 2.

4             THE CLERK:  ELMO or laptop?

5             MS. SHIHATA:  ELMO, please.

6             THE COURT:  Ladies and gentlemen, I just want to say

7    that in Mr. Ricco's opening he referred to texts and Facebook.

8    What he's referring to is evidence that's going to be admitted

9    here.  You should not go looking, again, for anything on the

10   internet.

11            MS. SHIHATA:  I'm showing the witness only what's

12   been marked for identification as Government Exhibit 2.

13   Q    Do you recognize this photograph?

14   A    Yes.

15   Q    Who is this a photograph of?

16   A    Me.

17            MS. SHIHATA:  I move to admit Government Exhibit 2.

18            MR. RICCO:  Without objection, your Honor.

19            THE COURT:  It's admitted.

20   (Government's Exhibit 2 received into evidence.)

21            MS. SHIHATA:  May I publish it to the jury, please?

22            THE COURT:  Yes.

23            MS. SHIHATA:  May I approach, your Honor?

24            THE COURT:  Yes.  You don't ever have to ask me.  You

25   can always do it.

"Maria" - Direct - Shihata                                21

1    THE CLERK:  But you do need to remember to speak only

2  in front of the microphones.

3  Q    I'm showing you what's been marked for identification as

4  Government Exhibit 2-A.  Is this the same photograph I just

5  showed you in Government Exhibit 2 with your true name written

6  underneath?

7  A    Yes.

8            MS. SHIHATA:  I move to admit Government Exhibit 2-A.

9            MR. RICCO:  Without objection, your Honor.

10           THE COURT:  It's admitted.

11  (Government's Exhibit 2-A received into evidence.)

12           MS. SHIHATA:  And I would ask to publish it to the

13  jury.

14           THE COURT:  Doesn't it go up on the screen?  I don't

15  like --

16           MS. SHIHATA:  It has her true name, your Honor.

17  Q    Now, for the purposes of your testimony here today, we are

18  going to refer to you as "Maria."  Okay?

19  A    Okay.

20  Q    How old are you?

21  A    Thirty-three.

22  Q    Where were you born?

23  A    In the Dominican Republic.

24  Q    How far did you go in school?

25  A    Two years of college.

```
                    "Maria" - Direct - Shihata                    22
```

1   Q    In what country?

2   A    In the Dominican Republic.

3   Q    At some point in your life, did you spend time in a

4   federal prison?

5   A    Yes.

6   Q    What prison or prisons?

7   A    At the MCC Manhattan and MDC Brooklyn.

8   Q    And does "MCC" stand for Metropolitan Correctional Center?

9   A    Yes.

10  Q    And you testified that's in Manhattan?

11  A    Yes.

12  Q    And you mentioned "MDC."  Does that stand for Metropolitan

13  Detention Center?

14  A    Yes.

15  Q    And where is that located?

16  A    In Brooklyn.

17  Q    Did something happen to you while you were housed at the

18  MDC?

19  A    Yes.

20  Q    What happened?

21  A    I was raped.

22  Q    By who?

23  A    Martinez.

24        MS. SHIHATA:  I'm showing the witness only what's

25  been marked for identification as Government Exhibit 1.

GA006

                    "Maria" - Direct - Shihata                    23

1    Q    Do you recognize this -- the person in this photo?

2    A    Yes.

3    Q    Who is this a photo of?

4    A    Martinez.  Lieutenant Martinez.

5    Q    Is that the Martinez you just referred to?

6    A    Yes.

7              MS. SHIHATA:  I move to admit Government Exhibit 1.

8              MR. RICCO:  It's without objection.

9              THE COURT:  It's admitted.

10   (Government's Exhibit 1 received into evidence.)

11             MS. SHIHATA:  If we could publish it, please, on the

12   screens.

13   Q    Now you said -- you testified you went to college in the

14   Dominican Republic, correct?

15   A    Yes.

16   Q    What did you study there?

17   A    Civil engineering.

18   Q    And when did you move to the United States?

19   A    In 2008, April of 2008.

20   Q    And how old -- around how old were you at that time?

21   A    Twenty-one, twenty-two.

22   Q    What area did you move to?

23   A    Queens.

24   Q    Why did you come to the United States?

25   A    My boyfriend.

Case 22-902, Document 84, 02/15/2023, 3469874, Page11 of 268

"Maria" - Direct - Shihata                    24

1    Q    Did you come to the United States legally?

2    A    Yes.

3    Q    And after you got to the U.S., did you marry your

4    boyfriend?

5    A    Yes.

6    Q    Did you become a legal, permanent resident of the United

7    States?

8    A    Yes.

9    Q    After coming to the United States, did you work?

10   A    Yes.

11   Q    What types of jobs?

12   A    Housekeeping at the Sheraton, Hilton, Western Union, a

13   supermarket.

14   Q    And before going to prison, did you also continue your

15   education in the United States?

16   A    Yes.

17   Q    What did you study?

18   A    I was studying English to then go on to nursing.

19   Q    And did you actually go on to the nursing part?

20   A    No.

21   Q    Do you have any children?

22   A    No.

23   Q    Sometime after you moved to New York, were you contacted

24   by a man you knew from the Dominican Republic?

25   A    Yes.

GA008

"Maria" - Direct - Shihata                                      25

1    Q    What if anything did he ask you to do?

2    A    To go pick up drugs.

3    Q    From where?

4    A    Manhattan.  Vermilyea.

5    Q    Did you ultimately end up picking up drugs for this man at

6    some point?

7    A    Yes.

8    Q    Approximately how many times?

9    A    Five.  Three.  I don't remember.  I don't remember exactly

10   how many.

11   Q    Fair to say multiple times?

12   A    Yes.

13   Q    Why did you do that?

14   A    Because he told me I had to pay some money.

15   Q    How much --

16   A    And -- and I didn't have any money to pay him with.

17   Q    How much money did he say you had to pay him?

18   A    A little over 300.

19   Q    Three hundred what?

20   A    Thousand dollars.

21   Q    Why did he say you owed him $300,000?

22   A    Because the first time he asked me to go and pick up

23   drugs, I didn't go, and the drugs got lost.

24   Q    And what did you understand that to mean?

25   A    I don't know who picked up those drugs, but he said he

"Maria" - Direct - Shihata                                        26

1    wasn't going to be the only one paying for the drugs.  I had to

2    pay him for them.

3    Q    Were you scared of this man?

4    A    Yes.

5    Q    Are you still scared of him today?

6    A    Yes.

7    Q    What job did you have at the time when you were told you

8    owed $300,000?

9    A    Housekeeping.

10   Q    Could you afford to pay $300,000?

11   A    No.

12   Q    What if anything did the man say about how you could pay

13   this debt?

14   A    So you go and pick up drugs, just do that continuously.

15   And every time I did that, he would take $2,000 off.

16   Q    $2,000 off the debt?

17   A    Yes.

18   Q    I want to direct your attention to September 18th, 2013.

19   Were you arrested that day?

20   A    Yes.

21   Q    On what type of charge?

22   A    Conspiracy and possession of drugs.

23   Q    And were you planning to pick up drugs that day?

24   A    Yes.  I was -- I went out to pick it up.

25   Q    And what if any arrangement had you made with respect to

"Maria" - Direct - Shihata                                    27

1  payment for picking up drugs that day?

2  A    That he give the money to my brother, not to give me the

3  money, because -- not to take it off, because my dad was sick

4  and I wanted to put Dad in a clinic.

5  Q    Okay.  So in this -- on this occasion, did you ask to

6  actually be paid $2,000 rather than having it taken off the

7  debt?

8  A    Yes.

9  Q    Had you ever been arrested before that day?

10 A    No.

11 Q    Were you questioned by the agents who arrested you the

12 same day you were arrested?

13 A    Yes.

14 Q    Were you truthful with those agents?

15 A    No.

16 Q    Following your arrest, were you incarcerated?

17 A    Yes.

18 Q    Where?

19 A    At the MCC Manhattan.

20 Q    Are you familiar with the term "safety valve proffer"?

21 A    Yes.

22 Q    What is your understanding of what a safety valve proffer

23 is?

24 A    It's a meeting.  Your lawyer's there, the agents who

25 arrested you are there, and you have to tell the whole truth

GA011

"Maria" - Direct - Shihata                                    28

1   about what you did.

2   Q    And do prosecutors also attend that meeting?

3   A    Yes.

4   Q    Is there any condition -- I'm sorry.  You indicated you

5   have to tell the truth about what you did, at the safety valve

6   proffer.  Is that correct?

7   A    Yes.

8   Q    And for what purpose do you have to tell the truth at that

9   proffer?

10  A    So they can -- well, so they can take off two points for

11  time, from your sentence.

12  Q    And is there any condition to getting -- what is your

13  understanding of what the condition to getting less time for

14  participating in a safety valve proffer is?

15  A    Tell the truth.

16  Q    In connection with your arrest, did you plead guilty?

17  A    Yes.

18  Q    What did you plead guilty to?

19  A    Possession and a drug conspiracy.

20  Q    Before your guilty plea, did you participate in a safety

21  valve proffer?

22  A    Yes.

23  Q    Were you completely truthful in your safety valve proffer?

24  A    No.

25  Q    What if anything did you leave out?

Case 22-902, Document 84, 02/15/2023, 3469874, Page16 of 268
GA012

"Maria" - Direct - Shihata                                    29

1   A    Who the drugs belonged to, how many times I had gone out

2   to pick up drugs.  I don't remember, but --

3   Q    Why did you leave out who the drugs belonged to?

4   A    Because I was in jail at that point.  I couldn't say who

5   the drugs belonged to.  In other words, I wasn't going to put

6   my family at risk.

7   Q    Had anything happened to your family prior to that?

8   A    Yes.

9   Q    What had happened?

10  A    The house caught fire.

11  Q    Whose house?

12  A    My parents' -- my house.

13  Q    The house in the Dominican Republic?

14  A    Yes.

15  Q    And what if anything happened to your brother -- or one of

16  your brothers in that fire?

17  A    He died.

18  Q    What if anything did you learn about that fire after

19  speaking with the man who asked you to pick up drugs?

20  A    That he had been -- he had been the one who had sent it to

21  be done.

22  Q    Now, were you sentenced on January 29, 2015?

23  A    Yes.

24  Q    What sentence did you receive?

25  A    Three years in prison and two years of probation.

"Maria" - Direct - Shihata                    30

1   Q    What if any benefit did you receive from your safety valve

2   proffer?

3   A    They reduced time.

4   Q    Were you facing a mandatory minimum sentence for the crime

5   you had pled guilty to?

6   A    Yes.

7   Q    What mandatory minimum sentence were you facing?

8   A    Ten years.

9   Q    Was that based on the amount of drugs you were going to

10  pick up?

11  A    Yes.

12  Q    And were you sentenced below that, due to your safety

13  valve proffer?

14  A    Yes.

15  Q    When you were sentenced, what prison were you housed in,

16  at the time of your sentencing?

17  A    MDC Brooklyn.

18  Q    I'm sorry.  Were you -- at the time you were sentenced,

19  were you housed in Manhattan or Brooklyn?

20  A    In Manhattan.

21  Q    And were you transferred to another prison at some point

22  after that?

23  A    Yes.

24  Q    Which prison?

25  A    MDC Brooklyn.

"Maria" - Direct - Shihata                          31

1   Q    Around when did you first arrive at the MDC?

2   A    Around March or April.

3   Q    Of what year?

4   A    2015.

5   Q    And when were you released from the MDC?

6   A    29th of April, 2016.

7   Q    And had you been in prison the entire time since your

8   arrest?

9   A    Yes.

10  Q    When you were in prison, what was the most important thing

11  to you?

12  A    My time.

13  Q    What do you mean by that?

14  A    My time to get out, like my good time.

15  Q    What is "good time"?

16  A    It's the time they reduce from your sentence because if

17  you don't get tickets and you behave properly.

18  Q    What is a "ticket"?

19  A    It's -- ticket is like when you do something bad, the

20  officer gives you a ticket.

21  Q    And does that result in some form of discipline?

22  A    Yes.

23  Q    When you were at the MDC, how many units were there for

24  female inmates?

25  A    Two.

"Maria" - Direct - Shihata                                    32

1   Q    What if anything were those units called?

2   A    "South" and "North."

3   Q    What floor were they on?

4   A    Sixth.

5   Q    And generally speaking, what type of inmates were housed

6   in Unit 6 North?

7   A    The inmates who were awaiting to be sentenced.

8   Q    And what type of inmates were housed in Unit 6 South?

9   A    Those of us who were sentenced.

10  Q    What type of inmate were you when you were housed at the

11  MDC?

12  A    Sentenced.

13  Q    And for most of your time at the MCC, what type of inmate

14  were you?  In the MCC.  I'm sorry.

15  A    Awaiting my sentence.

16  Q    And while you were awaiting your sentence when you were

17  housed at the MCC, was your court case still going on for most

18  of the time you were there?

19  A    Yes.

20  Q    How often would you see your lawyer when you were at the

21  MCC?

22  A    Frequently.  When there was anything, he would just come

23  and visit.

24  Q    Would you also see him when you appeared in court?

25  A    Yes.

"Maria" - Direct - Shihata                                    33

1    Q    How if at all did that change after you were sentenced?

2    A    After I was sentenced, the lawyer didn't come back.

3    Q    Was your court case over at that point?

4    A    Yes.

5    Q    Now, you testified you were -- or I'm sorry.  Which unit

6    were you housed in at the MDC?

7    A    South.

8    Q    On the sixth floor?

9    A    Yes.

10   Q    And can you describe for the jury what the general layout

11   of Unit 6 South was?

12   A    The door.  When you entered, the kitchen was on the left.

13   The officers' office, and the counselor's office.  Then the

14   bathrooms and a little room.  And on the right side were the

15   phones, computer, and the beds.  And in the middle were the

16   chairs and the tables where we ate.  And the TV.

17   Q    I'm going to show you a series of photographs marked for

18   identification as Government Exhibits 104-A through 104-E.  Can

19   you take a moment to review these photographs and tell me if

20   you recognize them.

21   A    Yes.

22   Q    And what area of the MDC are these photographs of?  What

23   area of the MDC are these photographs of?

24   A    The officers' and the counselor's office, the bathroom,

25   the table where you eat, the phones and the computer, the beds

"Maria" - Direct - Shihata                                    34

1   -- and the beds.

2   Q    And are these all photographs of portions of Unit 6 South?

3   A    Yes.

4            MS. SHIHATA:  I move to admit Government Exhibits

5   104-A through 104-E.

6            MR. RICCO:  Without objection, your Honor.

7            THE COURT:  They're admitted.

8   (Government's Exhibits 104-A through 104-E received into

9   evidence.)

10  Q    Starting with Government Exhibit 104 --

11           THE COURT:  Could you close the light?

12  Q    -- C, what area is this?

13  A    The tables where we ate, the phones and the computer, the

14  officers' office and the counselor's office, and the kitchen.

15  Q    Okay.  And can you point out in this photograph where the

16  entrance -- where if anywhere the entrance to the unit is?

17  A    Here.

18  Q    And can you actually -- you can actually make a mark on

19  your screen.

20           THE INTERPRETER:  Nothing's happening.

21           MS. SHIHATA:  Okay.  I don't think it's working.

22  Q    I'm pointing to a door in the middle of the photograph

23  with what looks like an "exit" sign on top. Is that the

24  entrance to the unit?

25  A    Yes.

"Maria" - Direct - Shihata                              35

1   Q    Okay.  And this office next to this -- what appears to be

2   an ice machine, what is that?

3   A    The officers' office.

4   Q    Now, you testified when you were at the MDC there were TVs

5   in your unit.  Is that right?

6   A    Yes.

7   Q    Where were those?

8   A    In those -- on those columns there in the middle.

9   Q    Okay.  So affixed somewhere on these -- the top of these

10  columns?

11          THE INTERPRETER:  I'm sorry.  Can you repeat the

12  question?

13  Q    Affixed somewhere on the top of these columns?

14  A    Yes.

15  Q    Showing you Government Exhibit 104-E.  Is this a close-up

16  of the entrance to the officers' office in the unit?

17  A    Yes.

18  Q    And I'm showing you Government Exhibits 104-B and 104-A.

19  What are these photos of?

20  A    The beds.

21  Q    And when you were there, did the beds have mattresses on

22  them?

23  A    Yes.

24  Q    I'm showing you Government Exhibit -- what's in evidence

25  as Government Exhibit 104-D.  What is this a photo of?

"Maria" - Direct - Shihata                        36

1   A    The bathrooms.  The sinks.  And a little room in the rear.

2   Q    And this little room in the rear, what's in there?

3   A    It's like a slop sink where you can wash by hand, or wash

4   dishes.

5   Q    And across from the sinks, what is across from the sinks?

6   A    The bathrooms.

7   Q    And where if anywhere are the showers?

8   A    The first ones are the showers.  The second ones are the

9   bathrooms.

10  Q    And so where I'm pointing here, what are those?

11  A    The bathrooms.

12  Q    And behind them?

13  A    The toilets.

14  Q    Okay.  Which of those two is the showers?  This one or

15  this one?

16  A    The first one.

17  Q    Okay.

18  A    That one.

19  Q    Now, as an inmate at the MDC, was Unit 6 South where you

20  spent most of your time?

21  A    Yes.

22  Q    What if any privacy did you have there?

23  A    None at all.

24  Q    Who were the people that were in charge of you at the MDC?

25  A    The lieutenants, the officers, and the counselor.

GA020

"Maria" - Direct - Shihata                    37

1   Q    And were there rules that you had to follow as an inmate

2   at the MDC?

3   A    Yes.

4   Q    What kind of rules?

5   A    Keep your uniform on until 4:00 in the afternoon.  Work.

6   Be in your bed after the 10 o'clock count.  What else?

7   Q    Okay.  Were those some of the rules?

8   A    Yes.

9   Q    And if an inmate didn't follow the rules at the MDC, what

10  was your understanding of what would happen?

11  A    The officer would give you a ticket.

12  Q    And what if anything would that lead to?

13  A    Go to the SHU or some of your privileges could be taken

14  away from you, phone, computer, visits.

15  Q    Now, you mentioned phone privileges.  What type of phone

16  privileges did you have as an inmate at the MDC?

17  A    You got 300 minutes a month and you could use them during

18  the day until 10 o'clock, 9 o'clock.  I don't know.  I don't

19  remember what time.

20  Q    And those 300 minutes, were they free?

21  A    No.

22  Q    Did you have to pay for them?

23  A    You had to pay when you called, yes.

24  Q    And how did you work when you wanted to make a phone call?

25  A    You'd pick up the phone, dial the number, and then you had

GA021

"Maria" - Direct - Shihata                                    38

1   to punch in your ID number, put money in if you didn't have

2   any, and that was it.  You'd make your call.  After the --

3   after the machine would stop talking and saying your

4   information.

5   Q    Now, you mentioned the term "SHU."  What is the "SHU"?

6   A    It's like a small punishment room where you get locked in,

7   and supposedly they take you out -- I never went there -- two

8   times a week to take a shower, and they take away all of your

9   privileges.

10  Q    Now, are you familiar -- sorry.  Going back to the

11  telephone calls, you mentioned something about a machine.  When

12  you made a call at the MDC, what if anything were you informed

13  of at the beginning of each call?

14  A    Put in your name -- say your name.  That the call was

15  being recorded from a prison.  I don't remember any more.

16  Q    Are you familiar with the terms "recall" and "count"?

17  A    Yes.

18  Q    What is "recall" at the MDC?

19  A    When -- well, there was a blue line.  And you had to put

20  yourself before the line when they said "recall," and that was

21  for the count.

22  Q    I'm showing you what's in evidence as Government Exhibit

23  104-A.  Is the line you're referring to in this exhibit?

24  A    Yes.

25  Q    Which one is it?

GA022

"Maria" - Direct - Shihata                                    39

1   A    The first one.

2   Q    That I'm pointing to here?

3   A    Yes.

4   Q    What is the "count"?

5   A    It's when the officers come and count you to see if all

6   the inmates are there.

7   Q    And when you were at the MDC, how many times would the

8   "count" happen?

9   A    At 4:00 and at 10:00.

10  Q    Okay.  And was there any difference in the number of times

11  the count occurred on Monday through Friday versus the

12  weekends?

13  A    Yes.

14  Q    What difference?

15  A    Saturdays and Sundays -- well, on the weekend -- the count

16  would happen three times, 10:00, 4:00, and again at 10:00 at

17  night.

18  Q    And how about on Monday through Friday?

19  A    Twice.

20  Q    What were you permitted to wear as an inmate at the MDC?

21  A    Your uniform, gray pants with a shirt.  And weekends,

22  sweatpants.

23  Q    Okay.  So the pants and shirt you described was your

24  uniform?

25  A    Yes.

Case 22-902, Document 84, 02/15/2023, 3469874, Page27 of 268

"Maria" - Direct - Shihata                                    40

1  Q    And you testified you could wear sweats on weekends?

2  A    Yes.

3  Q    Were there times you could also wear sweats Monday through

4  Friday?

5  A    After 4:00.  After the count.

6  Q    Where did inmates change their clothes in Unit 6 South?

7  A    Right in front of your bed, right in front of the

8  bathrooms, some people inside the bathroom.

9  Q    Where did you change your clothes?

10 A    Inside the bathroom.

11 Q    Why?

12 A    Because I didn't want them to see my body.  Some women let

13 anybody see their body.

14 Q    As a sentenced prisoner at the MDC, were you required to

15 work?

16 A    Yes.

17 Q    What job or jobs did you first have when you got there?

18 A    In the unit kitchen; and in the laundry, but only a few

19 days, until they gave me my steady job which was cleaning --

20 cleaning.

21 Q    And the laundry you mentioned for a few days, was that in

22 your unit?

23 A    Yes.

24 Q    And once you got your cleaning job, what if any areas were

25 you required to clean as part of your job?

GA024

```
                    "Maria" - Direct - Shihata                    41
```

1  A    The second floor.

2  Q    And to the best of your memory, around when did you start

3  cleaning the second floor area?

4  A    Practically from when I got there.  Maybe a month later.

5  Q    Okay.  And at some point did you start cleaning the second

6  floor regularly?

7  A    Yes.

8  Q    And about how often would you clean the second floor?

9  A    Anytime they would call for me to go clean.  The doctors,

10 the legal people, or the lieutenants.

11 Q    And what specific types of cleaning did you do?

12 A    The garbage, mopping, dusting, cleaning.

13 Q    And when you first started to clean the second floor on a

14 regular basis, who if anyone did you clean with?

15 A    With Carmen Lopez and Odie de la Cruz.

16 Q    Now, did Carmen Lopez leave the MDC at some point while

17 you were there?

18 A    Yes.  She left.

19 Q    Around when did Carmen Lopez leave the MDC?

20 A    November 1st, 2015.

21      MS. SHIHATA:  Showing the witness only what's been

22 marked for identification as Government Exhibit 8.

23 Q    Do you recognize the person in this photo?

24 A    Yes.

25 Q    Who is that?

"Maria" - Direct - Shihata                                  42

1   A    Odie de la Cruz.

2   Q    And is that the Odie de la Cruz that you just mentioned

3   you sometimes cleaned with?

4   A    Yes.

5            MS. SHIHATA:  I'd move to Government Exhibit 8.

6            MR. RICCO:  Without objection, your Honor.

7            THE COURT:  It's admitted.

8   (Government's Exhibit 8 received into evidence.)

9            MS. SHIHATA:  If we could publish it on the screens.

10  Q    Now, when you got to the MDC, was Odis de la Cruz there

11  when you got there?

12  A    Yes.

13  Q    And when you left the MDC, was she still there?

14  A    Yes.

15  Q    And just to be clear, was she another inmate at the MDC?

16  A    Yes.

17  Q    After Carmen Lopez left the MDC, were there times when you

18  were called to clean the second floor alone?

19  A    Yes.

20  Q    As a general matter, how did you learn when you were

21  needed to clear -- to clean the second floor on a particular

22  day?

23  A    The officer would call you over the loudspeaker or some

24  would come over to you and they'd say get ready, you have to go

25  clean.

"Maria" - Direct - Shihata                          43

1  Q    And what if anything did you have to do to get ready to go

2  clean?

3  A    Put your uniform on, if you weren't already wearing it.

4  Get the mops, the paper towels, and the pail that you put water

5  in.

6  Q    And how -- how did you get to the second floor?

7  A    The officer had to take me down there.

8  Q    Was that by elevator?

9  A    Yes.

10 Q    I'm showing you what's been marked for identification as

11 Government Exhibits 101-A through 101-E.  Can you take a moment

12 to look at these photographs and tell me if you recognize them.

13 A    Yes.

14 Q    And are these all photographs from the second floor of the

15 MDC?

16 A    Yes.

17        MS. SHIHATA:  I move to admit Government Exhibits

18 101-A through 101-E.

19        MR. RICCO:  Without objection, your Honor.

20        MS. SHIHATA:  They're admitted.

21 (Government's Exhibits 101-A through 101-E received into

22 evidence.)

23 Q    I'm showing you what's in evidence was Government Exhibit

24 101-A.  What does this photo show?

25 A    The two elevators and the door where the officer who took

GA027

"Maria" - Direct - Shihata                                    44

1   you had to say your name.  And the control would open.

2             THE INTERPRETER:  Correction.  The officer would have

3   to say his name.

4   Q    And is this the hallway you had to go to, to get to a

5   particular area?

6   A    Yes.

7   Q    And what area was beyond the door that controlled?

8   A    The same hallway.  On the left side are the lieutenants'

9   office and the chaplain.  On the right-hand side is the

10  dentist, another office that belongs to a lady.

11  Q    Okay.  And I'm showing you Government Exhibit 101-B.  What

12  is this a photo of?

13  A    The same door.

14  Q    And what is the black square next to the door?

15  A    It's where the officer had to say his name.

16  Q    In order for what to happen?

17  A    So that the door would be opened.

18  Q    Showing you what's in evidence as 101-C.  Is that the same

19  door -- photograph of the same door open?

20  A    Yes.

21  Q    Showing you what's in evidence as Government Exhibit

22  101-D.  What does this photo show?

23  A    On the left side are the doors for the lieutenants.  The

24  second door is where you went to get water.  The third door is

25  where you waited for the doctors.  On the right side is the

"Maria" - Direct - Shihata                                    45

1    dentist's door.

2    Q    Okay.  And so the first door on the left side that I'm

3    pointing at, what is that the entrance to?

4    A    The lieutenants, the chaplain, the captain.

5    Q    Showing you what's in evidence as Government Exhibit

6    101-E.  Is this photo a close-up of the door to that same area

7    that you just described?

8    A    Yes.

9    Q    I'm showing you what's been marked for identification as

10   Government Exhibits 102-A through 102-G.  Can you look through

11   these photographs and tell me if you recognize them.

12   A    Yes.

13   Q    And are these photographs 102-A through 102-G, are they

14   all photographs of the lieutenants' office area on the second

15   floor of the MDC and the surrounding areas?

16   A    Yes.

17            MS. SHIHATA:  I move to admit Government Exhibits

18   102-A through 102-G.

19            MR. RICCO:  And that's without objection, your Honor.

20            THE COURT:  They're admitted.

21   (Government's Exhibits 102-A through 102-G received into

22   evidence.)

23   Q    Showing you what's in evidence as Government Exhibit

24   102-A.  What is this area?

25   A    The first door -- well, this area is the hall.  The first

GA029

"Maria" - Direct - Shihata                                    46

1   door belongs to the chaplain.  The second one belongs to the

2   lieutenants.  The third one in the rear is the captain, and

3   the door that is open is the bathroom.

4   Q     Okay.  When you say the first door, are you referring to

5   this one that I'm pointing at?

6   A     Yes.

7   Q     That's the chaplain area?

8   A     Yes.

9   Q     And the door with the little trash can in front of it,

10  which office is that?

11  A     The lieutenants.

12  Q     And the door next to that?

13  A     The captain.

14  Q     And you testified this open door belongs to a bathroom.

15  Is that correct?

16  A     Yes.

17  Q     Showing you what's in evidence as Government Exhibit

18  102-B.  What are the two doors that are on either side of the

19  couch in this photograph?

20  A     The two bathrooms.

21  Q     And this door that has an "exit" sign on top of it, is

22  that the entrance to this area?

23  A     Yes.

24  Q     And showing you what's in evidence as Government Exhibit

25  102-D.  What is this door on the right side of the photograph?

Case 22-902, Document 84, 02/15/2023, 3469874, Page34 of 268

1  A    The lieutenants' door.

2  Q    And on the other side of the photograph, what is this door

3  and window to?

4  A    The chaplain.

5  Q    Showing you what's in evidence as Government Exhibit

6  102-E.  What does this photo show?

7  A    That's the hallway.  At the end, there's a little room in

8  the rear where they put you if you're nervous -- if the person

9  is nervous or is sort of crazy.

10  Q    Is that the suicide watch area?

11  A    Yes.

12  Q    Showing you what's in evidence as Government Exhibit

13  102-G.  What is this?

14  A    It's the hallway, but going back to the exit.  At the very

15  end is the lieutenants' door.

16  Q    And is this -- in the front part of the photograph, is

17  this a closer-up view of that suicide watch area?

18  A    Yes.  In those little rooms, they put them there.

19  Q    And showing you what's in evidence as Government Exhibit

20  102-F, is this part of that same hallway as what was in the

21  last exhibit?

22  A    Yes.

23  Q    And this door with the "exit" sign on top, what is that?

24  A    The lieutenants'.

25  Q    The lieutenants' office?

```
            "Maria" - Direct - Shihata                48
 1   A    Yes.

 2   Q    And I'm pointing to a little circular object close to the

 3   ceiling.  Do you see that?

 4   A    Yes.

 5   Q    Do you know what that is?

 6   A    The camera.

 7   Q    Now, you testified earlier that an officer would escort

 8   you to the second floor to clean.  Is that right?

 9   A    Yes.

10   Q    As a general matter, when an officer escorted you to clean

11   the second floor, would he stay with you on the second floor or

12   leave?

13   A    He would leave.

14   Q    Was there a particular officer who generally stayed while

15   you cleaned?

16   A    Yes.

17   Q    And who was that?

18   A    Smith.  Officer Smith.

19          MS. SHIHATA:  I'm showing the witness -- I'm showing

20   the witness only what's been marked for identification as

21   Government Exhibit 3.

22   Q    Do you recognize the person in this photo?

23   A    Yes.

24   Q    Who is it?

25   A    Smith.
```

GA032

"Maria" - Direct - Shihata                                          49

1   Q    Is that the Officer Smith you just referred to?

2   A    Yes.

3            MS. SHIHATA:  I move to admit Government Exhibit 3.

4            MR. RICCO:  Without objection, your Honor.

5            THE COURT:  It's admitted.

6   (Government's Exhibit 3 received into evidence.)

7            MS. SHIHATA:  If we could publish it on the screen.

8   Q    Now, who were some of the lieutenants that you cleaned for

9   while you were at the MDC?

10  A    Almos (ph.), Rodriguez, Maldonado, Martinez, and an

11  African -- Afro-American lady.  I don't know her name.

12           MS. SHIHATA:  Showing the witness only what's been

13  marked for identification as Government Exhibit 9.

14  Q    Do you recognize the person in this photo?

15  A    Yes.

16  Q    Who is it?

17  A    Lieutenant Rodriguez.

18  Q    And was he a lieutenant you cleaned for at some point

19  while you were at the MDC?

20  A    Yes.

21           MS. SHIHATA:  Move to admit Government Exhibit 9.

22           MR. RICCO:  Without objection, your Honor.

23           THE COURT:  It's admitted.

24  (Government's Exhibit 9 received into evidence.)

25           MS. SHIHATA:  And may we publish it?  Thank you.

GA033

"Maria" - Direct - Shihata                                    50

1   Q    Now, are you familiar with the term "SIS" at the MDC?

2   A    Yes.

3   Q    What is your understanding of what "SIS" is?

4   A    It's the investigators at the prison.

5   Q    And at some point after you got -- after the point in time

6   when you cleaned for Lieutenant Rodriguez, did you understand

7   that he had become an SIS officer?

8   A    Yes.

9   Q    Now, you testified you also cleaned the second floor for

10  Lieutenant Martinez.  Is that correct?

11  A    Yes.

12  Q    Do you know his first name?

13  A    Yes.

14  Q    What is it?

15  A    Carlos.

16  Q    Do you see Carlos Martinez in the courtroom here today?

17  A    Yes.

18  Q    Can you point him out by an item of clothing he's wearing

19  and/or where he's sitting?

20  A    He's wearing a black jacket and white shirt.

21  Q    And is he wearing -- well, where is he seated?

22  A    To my right.

23  Q    And is he -- there are a number of people seated to your

24  right.  Where at the table is he seated?

25  A    In the middle of two people.

"Maria" - Direct - Shihata                                    51

1       MS. SHIHATA:  Indicating the defendant, your Honor?

2       THE COURT:  Yes.

3   Q    How did you first meet the defendant?

4   A    I was cleaning the lieutenants' office for Almos, I think.

5   Q    And was Almos a lieutenant?

6   A    Yes.

7   Q    And who if anyone was in the lieutenants' office while you

8   were cleaning?

9   A    Almos and Martinez.

10  Q    And what if anything did you hear the defendant say to

11  Lieutenant Almos?

12  A    If he could go and get me so that I could clean for him.

13  Q    Sometime after that, did you start cleaning the second

14  floor for the defendant?

15  A    Yes.

16  Q    Do you recall approximately when you first started

17  cleaning for the defendant?

18  A    In August or September.

19  Q    Of what year?

20  A    2015.

21  Q    And when you first started cleaning for the defendant,

22  what areas of the second floor did you generally clean for him?

23  A    Bathrooms, the lieutenants' office, the hall, and that's

24  it.

25  Q    And as a general matter, what days of the week did the

"Maria" - Direct - Shihata                                          52

1   defendant generally send for you to come clean on the second

2   floor?

3   A    Friday, Saturday, and Sunday.

4   Q    Around what time would he generally call for you to clean

5   on Fridays?

6   A    After the count, around 5:30 or 5:00, something like that.

7   Q    That's in the afternoon?

8   A    Yes.

9   Q    And how about on Saturdays and Sundays?

10  A    After 10:30 in the morning.

11  Q    Can you describe for the jury what the second floor was

12  like on Fridays after around 5:00 p.m.

13  A    No staff.

14  Q    What do you mean by that?

15  A    Well, that is there were no people around.  Sometimes the

16  chaplain was there.  But there wasn't anybody else there, just

17  the lieutenant and me.

18  Q    And what was the second floor like on Saturdays and

19  Sundays after around 10:30 in the morning?

20  A    Same way.  Empty.

21  Q    When you first started to clean for the defendant, where

22  would the officer who escorted you generally take you on the

23  second floor?

24  A    To the lieutenants' office.

25  Q    I'm showing you what's been marked for identification as

"Maria" - Direct - Shihata                                    53

1   Government Exhibits 103-A through 103-E.  Can you take a moment

2   to look through these photographs and tell me if you recognize

3   them.

4   (Pause)

5   Q    Do you recognize them?

6   A    Yes.

7   Q    Are Government Exhibits 103-A through 103-E all

8   photographs of portions of the lieutenants' office on the

9   second floor?

10  A    Yes.

11        MS. SHIHATA:  I move to admit Government Exhibits

12  103-A through 103-E.

13        MR. RICCO:  That's without objection, your Honor.

14        THE COURT:  Admitted.

15  (Government's Exhibits 103-A through 103-E received into

16  evidence.)

17  Q    Showing you what's in evidence as Government Exhibit

18  103-A.  What is this a photo of?

19  A    Inside the lieutenants' office.

20  Q    And is this from the entrance, this view?

21  A    Yes.

22  Q    Showing you 103-B.  Is this another photo from the

23  opposite view?

24  A    Yes.

25  Q    Showing you what's in evidence as Government Exhibit

"Maria" - Direct - Shihata                                    54

1   103-C.  What is this a photo of?

2   A    The lieutenants' desk.

3   Q    I'm showing you what's in evidence as Government Exhibit

4   103-D.  What is this a photo of?

5   A    The lieutenants' chair.

6   Q    Now, is there any particular area in the lieutenants'

7   office where cleaning supplies were kept?

8   A    Yes.

9   Q    What area?

10  A    There was a closet on the left.

11  Q    Showing you what's in evidence as Government Exhibit

12  103-E.  What's this a photo of?

13  A    The closet where the liquids you used for cleaning were

14  kept.  The other big one, that's where they put things that

15  they took away from inmates.

16  Q    The one to the left?

17  A    Yes.  And I don't remember what's in the last one.

18  Q    At some point did you learn that cleaning supplies were

19  also kept in another area, other than the cabinet in the

20  office?

21  A    Yes.

22  Q    And where was that?

23  A    Under the desk -- under the lieutenants' desk.

24  Q    I'm showing you Government Exhibit -- what's in evidence

25  as Government Exhibit 103-D.  Do you see that area in this

GA038

"Maria" - Direct - Shihata                                    55

1  photograph?

2  A    Yes.

3  Q    And what area is it?

4  A    Like, right under the printer.

5  Q    Under this -- in this area or around here?

6  A    Yes.

7  Q    And what if anything did you learn about who put the

8  cleaning supplies there?

9  A    The lieutenant -- that Afro-American lady, her.

10 Q    Okay.  A female lieutenant who's African-American who you

11 don't remember her name.  Is that right?

12 A    Yes.

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA      *    Docket No.
                             *    17-CR-281 (ERK)
                             *
            v.               *    U.S. Courthouse
                             *    Brooklyn, NY
                             *
CARLOS RICHARD MARTINEZ,      *
                             *    February 11, 2020
            Defendant.       *    10:50 AM
* * * * * * * * * * * * * * *

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          RICHARD P. DONOGHUE, ESQ.
                             UNITED STATES ATTORNEY

                        BY:  ELIZABETH A. GEDDES, ESQ.
                             NADIA I. SHIHATA, Esq.
                             Asst. United States Attorney
                             United States Attorney's Office
                             271 Cadman Plaza East
                             Brooklyn, NY  11201

For the Defendant:           ANTHONY L. RICCO, ESQ.
                             20 Vesey Street, Suite 400
                             New York, NY 10007

                             CARLOS M. SANTIAGO, ESQ.
                             The Law Office of
                             Carlos M. Santiago
                             11 Broadway, Suite 615
                             New York, NY 10004

Transcription Services:      Transcriptions Plus II, Inc.
                             61 Beatrice Avenue
                             West Islip, NY 11795
                             laferrara44@gmail.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

GA040

RESUMED DIRECT EXAMINATION

BY MS. SHIHATA:

Q     Now, yesterday, you testified regarding that, at some

point, you began working as a cleaner at the MDC; is that

right?

A     Yes.

Q     And was that job assignment something you got paid for?

A     Not at the beginning.

Q     At some point, did that change?

A     Yes.

"Maria" - Direct - Shihata                    63

1  Q    And when you started to clean -- work as a cleaner

2  regularly, did you get paid?

3  A    Yes.

4  Q    And about how much were you paid?

5  A    Twenty-four or 25 a month; I don't remember

6  exactly.

7  Q    And that's 24 or 25 dollars a month?

8  A    Yes.

9  Q    And how were you paid that amount?

10 A    They deposited into my commissary account.

11 Q    Okay.  Now, when you first started to clean for the

12 defendant, Lieutenant Martinez, what, if anything, did he

13 generally say to you after you arrived at the lieutenants'

14 office?

15 A    Hi, how are you?  How was your week?

16 Q    And what language did he speak to you in?

17 A    In Spanish.

18 Q    When you first started cleaning for Lieutenant Martinez,

19 was he nice to you?

20 A    Yes.

21 Q    And how did he speak to you?

22 A    Normally, like two normal people talking.

23 Q    And what, if anything, do you recall him telling you about

24 himself?

25 A    That he was divorced.  He had three daughters.  The oldest

"Maria" - Direct - Shihata                                    64

1   one had a child.  That he had one or two sisters.  His ex

2   worked as an officer, I don't remember if he said that it was

3   at a clinic or something.  That he lived near to the jail.  I

4   don't remember anything more.

5   Q    Okay.  And how, if at all, did the defendant refer to you

6   when he spoke to you?

7   A    Awilda.

8   Q    It's okay.  Did he refer to you by your first name?

9   A    Yes.

10  Q    And, the conversations, when he would tell you things

11  about himself, who initiated those conversations?

12  A    He did.

13  Q    What, if anything, did you – did the defendant discuss

14  with you regarding the unit you were housed in?

15  A    If I wanted to switch -– be switched to the other unit,

16  which was calmer.

17  Q    Which other unit are you referring to?

18  A    The north.

19  Q    6 North?

20  A    Yes.

21  Q    And what was the difference between your unit and that

22  unit?

23  A    6 North is where they housed the inmates that had not

24  been sentenced.  In 6 South, those of us who had already been

25  sentenced were housed.

"Maria" - Direct - Shihata                                    65

1   Q    And what, if anything, did the defendant say about why Six
2   North would be more -- would be better?
3   A    Because it was less dangerous.  In this one, there were
4   women who had been incarcerated for many years.
5   Q    In your unit?  In the sentenced unit?
6   A    Yes.
7   Q    Now, did you ever - did you ever take the defendant up on
8   that offer to get you transferred to the other unit?
9   A    No.
10  Q    Did there come a time when the defendant's conversations
11  with you made you uncomfortable?
12  A    Yes.
13  Q    And what kind of things did he say to you that made you
14  uncomfortable?
15  A    The first thing he told me is that when I would get back
16  to the unit, that I should touch myself.  No, I'm sorry, that's
17  a lie.  How did I satisfy my body?
18  Q    Who said that to you?
19  A    Lieutenant Martinez.
20  Q    And what did you understand him to mean?
21  A    As a woman, well, how did I get -- have an orgasm.
22  Q    And where were you in the MDC when he made this comment to
23  you or asked you that?
24  A    In the office.  In the lieutenants' office.
25  Q    Was anyone else there, other than you and him?

"Maria" - Direct - Shihata                                    66

1  A    No.

2  Q    How, if at all, did you react?

3  A    I looked at him and I said, excuse me.  He said, yeah,

4  tell me.  We're adults.

5  Q    And how -- and how did you feel when he made that -- when

6  he made these comments to you?

7  A    I was embarrassed, ashamed.

8  Q    Did you want to discuss those matters with him?

9  A    No because -- he himself told me that I got red.

10 Q    Do you recall any other sexual comments he made to you?

11 A    That when I would get back to the unit, that I should

12 touch myself in his name.

13 Q    And how did you react to that?

14 A    That I'm married.  I told him, I'm married.  And he

15 answered, what, he never comes to see you?

16 Q    Meaning your husband?

17 A    Yes.

18 Q    And had your husband come to see you at the MDC?

19 A    No.

20 Q    When you were in prison at the MCC, had you been served

21 with divorce papers?

22 A    Yes.

23 Q    And did you sign them at that time?

24 A    No.

25 Q    Apart from your husband, had anyone visited you at the MDC

"Maria" - Direct - Shihata                                    67

1  at that point?

2  A    No.

3  Q    When you were at the MCC, in Manhattan, did you meet an

4  inmate named Jenny (ph) there?

5  A    Yes.

6  Q    And did the defendant ever mention Jenny to you?

7  A    Yes.

8  Q    What, if any, understanding -- well, I'll withdraw that.

9  What do you recall the defendant mentioning to you regarding

10 Jenny?

11 A    If I had met her, and I said yes.  He said -- I said to

12 her, yeah, she's about to leave, and he said, yeah, she's about

13 to leave, and it's like Jenny didn't say anything.

14 Q    And did you have any understanding of where Jenny was

15 before she was at the MCC with you in Manhattan?

16 A    Yes.

17 Q    Where?

18 A    In Brooklyn.

19 Q    Now, you testified that the defendant made some sexual

20 comments to you that made you uncomfortable, correct?

21 A    Yes.

22 Q    Did you tell any prison officials about those comments

23 while you were at the MDC?

24 A    No.

25 Q    Why not?

"Maria" - Direct - Shihata                                    68

1   A    Because I didn't want any problems.

2   Q    What, if any, action did you take after the defendant made

3   these comments to you?

4   A    I went to the counselor and I told her that I didn't want

5   to work there.  That they should switch me to the kitchen or

6   just change my job.

7   Q    And did the counselor change your job?

8   A    No.

9   Q    And, by the way, did the counselor speak Spanish?

10  A    No.

11  Q    What language did you speak to her in?

12  A    In English.

13  Q    How was your English at the time?

14  A    Bad.

15  Q    And how is your English now?

16  A    Better.

17  Q    Since leaving prison, have you studied English a bit?

18  A    Yes.

19  Q    After you spoke to the counselor, did the Defendant

20  continue to call you down to the lieutenants' office?

21  A    Yes.

22  Q    And as a prisoner there, could you refuse to go when

23  called?

24  A    No.

25  Q    Based on your experience at the MDC, what, if anything,

"Maria" - Direct - Shihata                                    69

1    did you think would happen if you refused to go?

2    A    I would go to the SHU.  He was a lieutenant.

3            THE COURT:  What is the SHU?

4            THE WITNESS:  It's a small room.  It's a punishment

5    room.

6            MS. SHIHATA:  I'm showing the witness only what's

7    been marked for identification as Government Exhibit 5.

8    BY MS. SHIHATA:

9    Q    Do you recognize the person in this photo?

10   A    Yes.

11   Q    Who is this person?

12   A    Melva Vasquez.

13           MS. SHIHATA:  I move to admit Government Exhibit 5.

14           MR. RICCO:  Without objection, your Honor.

15           THE COURT:  It's admitted.

16   (Government Exhibit 5 received into evidence.)

17           MS. SHIHATA:  May we publish it for the jury?

18           THE COURT:  Yes.

19   Q    Where did you first meet Melva Vasquez?

20   A    At the MDC in Brooklyn.

21   Q    Was she another inmate there?

22   A    Yes.

23   Q    What unit was Melva Vasquez housed in?

24   A    In 6 South with me.

25   Q    And when you got to the MDC, was Melva Vasquez already

```
                    "Maria" - Direct - Shihata                    70
```

1    there?

2    A    Yes.

3    Q    When you first arrived at the MDC, to your knowledge, was

4    Melva Vasquez an inmate who would get visitors?

5    A    Yes.

6    Q    Did that change at some point?

7    A    Yes.

8    Q    Why did that change?  What is your understanding of why

9    that changed?

10   A    What she said is that she had -- was in a visit, and a

11   lieutenant had came by who had seen her on the camera.

12   Supposedly she had this button unbuttoned.  And they took her

13   away.

14   Q    Okay, and I think you made a movement with your hand.  For

15   the record, when you were talking about a button being

16   unbuttoned, to your shirt?  Is that what you're referring to?

17   A    Yes.

18   Q    And you testified they took her away.  What do you mean by

19   that?

20   A    To the SHU, that's where they took her.

21   Q    And how long was she in the SHU for, if you know?

22   A    I don't remember, but I don't know if it was a month.  I

23   don't remember.

24   Q    Okay.  And other than being put in the SHU for a certain

25   period of time, was there any other discipline that Melva

"Maria" - Direct - Shihata                               71

1   received for that infraction?

2   A    Yes.

3   Q    What was that?

4   A    Her visits.  They -- they took them away from her for

5   three, six months, I don't know how long that was for.  And

6   commissary, too, I think.

7   Q    Okay.  So one of the punishments she received was her

8   visits being -- not being allowed to have visits for a period

9   of months; is that right?

10  A    Yes.

11  Q    And after that period of months, was Melva able to have

12  visits again?

13  A    Yes.

14  Q    And without recalling the specific date, do you remember

15  the day that Melva had a visit after that period of months that

16  she wasn't allowed to?

17  A    What I remember is it was a Saturday or a Sunday, but I

18  don't remember the exact date.

19  Q    Okay.  But do you remember that specific day?  I'm not

20  asking you if you remember the date, just do you remember that

21  day in your mind?

22  A    Of course.

23  Q    And do you remember around what time of year it was?

24  A    Sometime in September or October.

25  Q    Okay.  Of what year?

Case 22-902, Document 84, 02/15/2023, 3469874, Page54 of 268

"Maria" - Direct - Shihata                                    72

1   A    2015.

2   Q    And you indicated you remembered it was a weekend; is that

3   fair?  Is that right?

4   A    Yes.

5   Q    And were weekends visiting days at the MDC?

6   A    Yes.

7   Q    Now, that day that Melva had a visit again after a period

8   of months, were you taken to the second floor to clean?

9   A    Yes.

10  Q    For who?

11  A    For Lieutenant Martinez.

12  Q    And do you recall around what time of day you went down to

13  the second floor?

14  A    Sometime around 10:30, something like that.

15  Q    And how did you get to the second floor?

16  A    An officer took us down.  He took me down.

17  Q    Where specifically did the officer take you?

18  A    To the lieutenants' office.

19  Q    And who, if anyone, was inside the lieutenants' office

20  when you arrived?

21  A    Lieutenant Martinez.

22  Q    After the officer took you to the lieutenants' office, did

23  he stay or leave?

24  A    He left.

25  Q    And when you first got to the office, what did you do?

"Maria" - Direct - Shihata                                    73

1   A    Clear out the garbage, get the sprays.

2   Q    And where did you go to get the sprays?

3   A    I first went over to a closet that was there, but they

4   weren't there.  And then I went to get them where that woman

5   kept them.

6   Q    Are you referring to the African-American lieutenant that

7   you testified about yesterday whose name you don't remember?

8   A    Yes.

9   Q    And where was it that she kept the supplies?

10  A    Under the desk in a sort of -- under the desk.

11  Q    I'm showing you what's in evidence as Government Exhibit

12  103C.  Do you see that area in this photo?

13  A    Yes.

14  Q    Can you describe where -- what area you're referring to?

15  A    This area.

16  Q    Okay.  And for the record, you've made a mark on the photo

17  underneath the desk that has a printer on it; is that correct?

18  A    Yes.

19  Q    And I'm showing you what's in evidence as Government

20  Exhibit 103D.  Is that a closer up photo of that area?

21  A    Yes.

22  Q    And what specifically were you doing when you went --

23  after going to that area to get the sprays?

24  A    I was pouring liquid from the bottle into the other bottle

25  that I would put water in to make it a spray.

"Maria" - Direct - Shihata                                    74

1   Q    And which way -- which direction were you facing as you

2   were doing that?

3   A    I was -- the wall.  I was crouched down, and emptying the

4   sprays.

5   Q    And where, if anywhere, was the Defendant?

6   A    Sitting in his chair.

7   Q    And which chair are you referring to?

8   A    The lieutenant's chair.

9   Q    And you've made a mark, for the record, on Government

10  Exhibit 103D on the black chair in the photo; is that correct?

11  A    Yes.

12  Q    What, if anything, happened while you were filling up the

13  spray bottle?

14  A    He turned around.  I turned around, because when he turned

15  around, I turned around and I looked at him.  I said, what are

16  you doing?

17  Q    What did you see when you turned around to look at him?

18  A    His penis.

19  Q    And how -- and how were you able to see his penis?

20  A    Because he had it out, coming out of his zipper.

21  Q    Was it erect?

22  A    Yes.

23  Q    What happened next?

24  A    What happened?  He made me give him oral sex.

25  Q    How did he do that?

"Maria" - Direct - Shihata                          75

1   A    By grabbing my head.  Even though my hands were on his

2   knees, he was pushing me.

3   Q    What, if anything, were you doing with your hands on his

4   knees?

5   A    Pushing myself, but I couldn't push myself so much,

6   because the other wall was right behind me.

7   Q    When you say "the other wall," what are you referring to?

8   A    Where the printer is.

9   Q    So the other desk behind you, you mean?

10            THE INTERPRETER:  I'm sorry, the interpreter didn't

11  hear the last part of the question.

12  BY MS. SHIHATA:

13  Q    The other desk behind you?

14  A    Yes.

15  Q    And you said he -- you testified he was pushing you.  What

16  -- what do you mean?

17  A    He grabbed my head, grabbed me here.  He grabbed my head,

18  and I was grabbing onto him on his knees.

19  Q    Trying to push him away?

20  A    Yes.

21  Q    Was he able to get his penis inside your mouth that day?

22  A    Yes.

23  Q    What, if any, physical reaction did you have to that?

24  A    What was he doing?  I didn't want any problems.  He said I

25  wasn't going to have any problems, because he could see

"Maria" - Direct - Shihata                                    76

1   everything on his computer.

2   Q    How did you feel while the Defendant's penis was in your

3   mouth?

4   A    Horrible, bad.

5   Q    And did you have any physical reaction to that?

6   A    Yes.

7   Q    What reaction?

8   A    I was crying.  I was telling him to leave me alone.  But

9   that pig didn't care.

10  Q    What happened next?

11  A    He stood me up.  And he put me down on the desk.  And he

12  penetrated me.

13  Q    You made a movement with your hands when you said he stood

14  you up, and you, for the record, made a movement towards your

15  shoulders; is that right?  Or towards under your shoulders; is

16  that right?

17  A    He stood me up like I was a little bird.

18  Q    And how did he put your body on the desk?

19  A    This part down on the desk.

20  Q    Are you referring to your chest?

21  A    Yes.

22  Q    You testified he penetrated you.  What part of your body

23  did he penetrate?

24  A    My vagina.

25  Q    What did he penetrate it with?

"Maria" - Direct - Shihata                                            77

1   A    With his penis.

2   Q    And was he behind you when that happened?

3   A    Yes.

4   Q    What, if anything, did he do with his hands while

5   penetrating you?

6   A    He grabbed me by the arm, and like keeping me down on the

7   desk.

8   Q    You mentioned something about, or you mentioned a comment

9   he made about the computer; is that right?

10  A    Yes.

11  Q    What do you remember about that?

12  A    He could -- well, there were four or six squares on the

13  computer, where he could see, well, he could see the second

14  floor, the unit, he could see the entire prison.

15  Q    I'm showing you what's in evidence as Government Exhibit

16  103C.  Do you see the computer you're referring to in this

17  exhibit?

18  A    Yes.

19  Q    Where is it?

20  A    That's it.

21  Q    And, for the record, you've made a mark on 103C at the

22  computer, the black computer on the desk; is that correct?

23  A    Yes.

24  Q    Now, before the defendant penetrated you, did he do

25  anything with respect to your pants and underwear?

"Maria" - Direct - Shihata                                    78

1   A    Yes.  He forcibly unbuttoned them, and he pulled them down

2   to here, practically to my knees.

3   Q    And you testified earlier that you had been crying, were

4   you still crying at that time?

5   A    Yes.

6   Q    Did that make him stop penetrating you?

7   A    No, not even when I was bleeding did he stop; he didn't

8   care.

9   Q    At some point, did he finish?

10  A    Yes.

11  Q    How did you feel while all of this was going on?

12  A    Dirty.

13  Q    Were you --

14  A    I felt like this was the first day of my life that I

15  really regretted having gotten into jail.

16  Q    -- were you scared?

17  A    Yes.

18  Q    Did you want to have the defendant's penis in your mouth

19  that day?

20  A    No.

21  Q    Did you want to have sex with him that day?

22  A    No.

23  Q    Did you feel like you had any choice in what happened that

24  day?

25  A    No.

"Maria" - Direct - Shihata                                        79

1   Q    How tall are you?

2   A    Five, five-one.

3   Q    And about how much do you weigh?

4   A    138.

5   Q    Pounds?

6   A    Yes.

7   Q    And is that about how much you weighed while you were at

8   the MDC?

9   A    Yes, the same.

10  Q    Is the defendant taller than you?

11  A    Yes.

12  Q    And when you were at the MDC, was he bigger than you?

13  A    Yes.

14  Q    Was he stronger than you?

15  A    Yes.

16  Q    Now, you mentioned something earlier in your testimony

17  about bleeding, what, if anything, did the defendant say to you

18  about that?

19  A    Well, that I was bleeding, and that is, well, I really

20  don't remember very well, but that sort of that's what happens

21  when women don't have sex for a long time.

22  Q    Were you menstruating that day?

23  A    No.

24  Q    After the defendant finished, did you ask him anything?

25  A    Yes.

GA058

"Maria" - Direct - Shihata                                    80

1   Q    What?

2   A    I looked at him and I said, like, you know, where's your

3   semen?

4   Q    How did he respond?

5   A    That he finished inside, he came inside.

6   Q    Inside of you?

7   A    Yes.

8   Q    And how, if at all, did you react to that?

9   A    Then I got even worse, like why did he do that?  I didn't

10  want to get pregnant there.  And he said, no, he had had

11  surgery, and he described something like when his semen goes in

12  one direction, but when you get pregnant it goes in a different

13  direction.

14  Q    That was in the context of describing the operation he had

15  had?

16  A    Yeah, because he saw that I was getting worse.  He said,

17  look, don't worry, you're not going to get pregnant because I

18  had this surgery, so a woman doesn't get pregnant.

19  Q    And what was your reaction to that?

20  A    I didn't care, I told him I didn't care about that.  I

21  told him I wanted a pill, that he should get me a pill.

22  Q    What kind of pill?

23  A    Plan B.

24  Q    What kind of pill is that?

25  A    It's the pill that a woman takes when she's had sex; you

"Maria" - Direct - Shihata                                    81

1  take it the following day.

2  Q    So that what doesn't happen?

3  A    So as not to get pregnant.

4  Q    Is that also known as the morning after pill?

5  A    Yes.

6  Q    What state were you in when you were asking the defendant

7  for the morning after pill?

8  A    I was really bad, in a bad way, I felt horrible.  So then

9  he saw that I was crying, and crying, and crying, and he said,

10 okay, fine.  I'm going to see if I can bring it to you at 12.

11 Q    12 a.m. or p.m.?

12 A    A.M.

13 Q    So midnight, around midnight?

14 A    Yes.

15 Q    At some point after the defendant penetrated you, did you

16 use the bathroom in the lieutenants' office area?

17 A    Yes.

18 Q    I'm showing you what's in evidence as Government Exhibit

19 102B.  Do you see the bathroom in this photo?

20 A    Yes.

21 Q    Where is it?  And, for the record, you've made a mark at

22 the door on the left of the photograph; is that right?

23 A    Yes.

24 Q    What, if anything, did you do when you went to that

25 bathroom?

"Maria" - Direct - Shihata                                    82

1   A    I went to press on my bellybutton, to get rid of what had

2   gone in me.

3   Q    And why did you think that would, would be effective?

4   A    In my country, that's what women always do so as not to

5   get pregnant, they press on their bellybutton.

6   Q    And you use the word "campo", what does that mean?

7   A    It's like the small town.

8   Q    So that's what people in your small town did?

9   A    Yes.

10  Q    What, if anything, did you notice while you were in the

11  bathroom?

12  A    That I was bleeding.

13  Q    And where were you bleeding from?

14  A    From my vagina.

15  Q    After penetrating you that day, what, if anything, did the

16  defendant say to you about talking about what had happened?

17  A    That I shouldn't talk to anybody.

18  Q    What, if anything, did he say about what would happen if

19  you did?

20  A    As I was leaving, he called me by my name, and he said,

21  remember, don't talk to anybody, because I was going to have

22  problems; it's like, implying that I was going to go to the SHU

23  if I spoke to anybody.

24  Q    And what would having problems mean with respect to your

25  good time?

"Maria" - Direct - Shihata                                    83

1  A    They would take away my good time.  That meant I had to do

2  more time in jail.

3  Q    Now, you testified earlier about a conversation where the

4  defendant brought up an inmate named Jenny; do you recall that?

5  A    Yes.

6  Q    And you testified that he had said something to you about

7  Jenny getting out because she didn't say anything; do you

8  recall that?

9  A    Yes.

10 Q    What did you understand him to mean when he said that to

11 you?

12 A    That she had stayed, remained silent, that she hadn't said

13 anything, about what had happened with the officer.

14 Q    Some point, did you go back to your unit that day?

15 A    Yes.

16 Q    And do you recall how you got back to your unit?

17 A    An officer took me.

18 Q    Do you recall around what time of day you got back to your

19 unit?

20 A    Between 1 and 3, something like that.

21 Q    What time was recall?

22 A    At 3:30.

23 Q    And did you get back before recall?

24 A    Yes.

25 Q    What, if anything, did you do when you got back to your

"Maria" - Direct - Shihata                    84

1   unit?

2   A    Put back like the mop, I spoke with Kiara.

3   Q    And where did you put back the mop?

4   A    In the little room that there is after the bathrooms.

5   Q    I'm showing you what's in evidence as Government Exhibit

6   104D.  Do you see the room you just described in this photo?

7   A    Yes.

8   Q    And for the record, you've made a mark at the doorway in

9   the, depicted in the middle of the photo; is that correct?

10  A    Yes.

11  Q    Now you mentioned you spoke to someone named Kiara; is

12  that right?

13  A    Yes.

14  Q    And what area of the MDC were you in when you spoke to

15  her?

16  A    First, here, and then inside those bathrooms in there.

17  Q    Okay.  And for the record, you've made two markings on

18  Government Exhibit 104D, one in the area between, the first in

19  the area between the sinks and some stalls on the other side,

20  and then a second marking in the area of stalls towards the

21  back left of the photograph; is that correct?

22  A    Yes.

23  Q    I'm showing the witness only what's been marked for

24  identification as Government Exhibit 6.  Do you recognize the

25  person in this photo?

```
                "Maria" - Direct - Shihata                    85
```

1    A    Yes.

2    Q    Who is this person?

3    A    Kiara Maldonado.

4    Q    And is this the Kiara you were just referring to?

5    A    Yes.

6              MS. SHIHATA:  I move to admit Government Exhibit 6.

7              MR. RICCO:  It's without objection, your Honor.

8              THE COURT:  Admitted.

9    (Government's Exhibit 6 received into evidence.)

10             MS. SHIHATA:  And may we publish it to the jury

11   please?

12   Q    Now, did Kiara Maldonado have a nickname among inmates at

13   the MDC?

14   A    Yes.

15   Q    What did you call her?

16   A    La menor.

17   Q    And why did you call her la menor?

18   A    Because she was the youngest.

19   Q    The youngest in the unit?

20   A    Yes.

21   Q    About how old was she when she was there?

22   A    I think 21 or 22.

23   Q    Okay.  And does la menor mean the youngest in Spanish?

24   A    Yes.

25   Q    Now I'm showing you again what's in evidence as Government

"Maria" - Direct - Shihata                                    86

1   Exhibit 104D.  When you first spoke to Kiara in the bathroom

2   area of the unit what, if anything, did you tell her?

3   A    That Martinez had penetrated me.

4   Q    And how, if at all, did Kiara react?

5   A    Fine.

6   Q    What do you mean by that?

7   A    Like she said to me what?  And I said yes.  She said to

8   her it was like a prize, and she said what do you mean, el

9   lieutenant, as if it were a prize.

10  Q    And how did you feel inside when she reacted that way?

11  A    I got pretty angry, but at the same time, I thought to

12  myself, she's just a young girl.

13  Q    Inside, were you upset?

14         THE COURT:  Please don't lead.

15  A    Yes.

16         THE COURT:  Please don't lead.

17         MS. SHIHATA:  Yes, your Honor.

18  BY MS. SHIHATA:

19  Q    What if, what if anything did you say to Kiara regarding

20  bleeding?

21  A    Well, he didn't care that I was bleeding, he just went on.

22  But at that point we were inside the stalls where the toilets

23  are.

24  Q    Okay.  What led you to move your location within the

25  bathroom?

"Maria" - Direct - Shihata                    87

```
 1   A    Because he could see the units.  He could see me.

 2   Q    Who's the "he" you're referring to?

 3   A    Lieutenant Martinez.

 4   Q    And why did that concern you?

 5   A    He told me not to tell anybody.  So when I got back, I was

 6   talking to her and if he had seen me, he was going to think I

 7   was telling her.  And I said to her come on, let's go into the

 8   bathrooms.  He can see us.

 9   Q    And did you go into the bathrooms, the toilets itself?

10   A    Yes.

11   Q    Where were you and where was Kiara?

12   A    I was in one and she was in the one right next to me.

13   Q    And what, if anything, happened when you were in the

14   stalls next to each other?

15   A    I told her I was bleeding.

16   Q    Now after speaking with Kiara in the bathroom, did you

17   talk with anyone else in the unit about what had happened?

18   A    Yes.

19   Q    Who?

20   A    Nani.  I called out to her, so she could bring over a pad.

21   Q    Okay.  Before we get into the details of what you said,

22   just who were the other people you spoke with?

23   A    Nani and Melva.

24   Q    And I'm showing you what's in evidence as Government

25   Exhibit 5.  Is this the Melva you're referring to?
```

"Maria" - Direct - Shihata                                        88

1    A    Yes.

2         MS. SHIHATA:  I'm showing the witness only what's

3    been marked for identification as Government Exhibit 4.

4    Q    Who is this a photo of?

5    A    Nani.

6    Q    And is Nani a nickname?

7    A    Yes.

8    Q    That's spelled N-a-n-I?

9    A    Yes.

10   Q    What is Nani's real name if you know?

11   A    Danilda Osoria.

12   Q    And do you know if she has a middle name?

13   A    No.  I don't know.  She had another last name, but I don't

14   remember.

15   Q    Okay.

16        MS. SHIHATA:  I move to admit Government Exhibit 4.

17        MR. RICCO:  Without objection, your Honor.

18        THE COURT:  Admitted.

19   (Government's Exhibit 4 received into evidence.)

20        MS. SHIHATA:  Thank you.

21        THE INTERPRETER:  Ms. Shihata, could the interpreter

22   just clarify a previous answer?

23        THE COURT:  Yes.

24        MS. SHIHATA:  Yes.

25        THE INTERPRETER:  And by pad, sanitary pad.

GA067

"Maria" - Direct - Shihata                                        89

1           MS. SHIHATA:  Okay.

2    Q    Now after you got back to the unit that afternoon did you

3    speak with Danilda and Melva multiple times that day?

4    A    Yes.

5    Q    And do you recall what areas of the unit you were in when

6    you were speaking with them?

7    A    At Danilda's bed.

8    Q    I'm showing you what's in evidence as Government Exhibit

9    104B.  Do you recall where Danilda's bed was with respect to

10   this photograph?

11   A    In Aisle 15, the third bed, on the bottom.

12   Q    And who, if anyone else, was present when you spoke,

13   withdrawn.  Who was present when you spoke by Danilda's bed?

14   A    La menor, Nani, and Melva.

15   Q    And la menor is Kiara?

16   A    Yes.

17   Q    And Nani is Danilda?

18   A    Yes.

19   Q    And during the various conversations you had with the

20   three of them that day, to the best of your memory, what do you

21   recall telling them?

22   A    That Martinez had penetrated me and that he didn't care

23   that I was bleeding.  But Nani and la menor, well, Nani kept

24   saying to me just calm down, you're a woman.

25   Q    I'm sorry.  You said calm down.  What state were you in

"Maria" - Direct - Shihata                          90

1   when you were telling them about these things?

2   A    Crying.  She was saying, Awilda, just vulgarly speaking,

3   just fuck away.

4   Q    Just a reminder, we're going to refer to you by Maria at

5   the trial, okay?  It's all right.  How did Danilda's reaction

6   to what you told her make you feel?

7   A    Danilda was kind of, like it was nothing.  I just wanted

8   somebody to understand me, understand how I was feeling.

9   Q    And how did it make you feel that she didn't?

10  A    Bad.

11  Q    How, if at all, did Melva react?

12  A    Melva, well, she was like, she did understand me.  I think

13  she had an upbringing that was more, not like Danilda and

14  Kiara, they were women from the street.

15  Q    Now that afternoon and evening when you were back in the

16  unit, when you weren't by Danilda's bed, where generally in the

17  unit were you?

18  A    At my bed.

19  Q    And why were you at your bed?

20  A    Because I was in my bed all covered up.  I didn't want, I

21  don't know.  I don't know.

22  Q    What were you doing at your bed?

23  A    Crying.

24

25

"Maria" - Direct - Shihata                          91



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

"Maria" - Direct - Shihata                    92

1  BY MS. SHIHATA:

2  Q    Did Danilda and Kiara's reaction change at all?

3  A    Yes.

4  Q    When was that?

5  A    Well, you know, they saw what I was like and then when

6  Danilda said to me, you know, just go do it, like it wasn't a

7  big deal.  I was still crying and she said calm down, Awilda,

8  calm down.

9  Q    You testified earlier about something regarding a sanitary

10 napkin; what were you referring to?

11 A    I called Nani over so she would bring me a sanitary pad.

12 Q    Where were you when you called Nani over?

13 A    In the bathroom at the toilet.

14 Q    And what, if anything, did she do after you called her

15 over?

16 A    She went and got a pad and brought it over to me.

17 Q    Why did you need a sanitary napkin?

18 A    Because I was still bleeding.

19        MS. SHIHATA:  One moment, your Honor.

20 Q    When did you next see the defendant?

21 A    Weekends.

22 Q    After getting back to the, after the day he penetrated

23 you, and you were back in the unit, you testified earlier in

24 the lieutenants' office you asked for the morning-after pill,

25 correct?

"Maria" - Direct - Shihata                    93

1   A    Yes.

2   Q    Did the defendant ever bring that to you?

3   A    Yes.

4   Q    When?

5   A    Around 12 or one in the morning.

6   Q    And was that, in relation to the day he penetrated you,

7   when was that?

8   A    The same day.

9   Q    At 12, at what time, I'm sorry?

10  A    Around 12 or one in the morning of the next day.

11  Q    And where did, where did you first see him around

12  12:30/1:00 that morning?

13  A    Coming to the unit, through the window, and then I saw him

14  come through the door.

15  Q    Where were you when you saw him?

16  A    Sitting on my bed.

17  Q    I'm showing you what's in evidence as Government Exhibit

18  104A.  Do you see where your bed was at the time in relation to

19  this photo?

20  A    Yes.

21  Q    Where was it?

22  A    In Aisle 17, number three, on the top.

23  Q    And I'm showing you what's in evidence as Government

24  Exhibit 104C.  Where did you first see the defendant come into

25  the unit?

"Maria" - Direct - Shihata                                    94

1   A    Through this door.

2   Q    And, for the record, you've made a mark on the door in the

3   middle of the photograph; is that correct?

4   A    Yes.

5   Q    Now at around 12:30/1:00 a.m. is it dark in the unit?

6   A    Yes.  They turn off some lights.

7   Q    Do some lights remain on?

8   A    Yes.

9   Q    And were there TVs in the unit at the time you were there?

10  A    Yes.

11  Q    And where were those?

12  A    On the pillars.

13  Q    Now after you saw the defendant come into the unit, what

14  happened next?

15  A    He came in and he did like this to me.  And I got down

16  from my bed and I went towards him.

17            THE COURT:  And you went where?

18            THE WITNESS:  I went towards him.

19            THE COURT:  You went towards him.

20  BY MS. SHIHATA:

21  Q    And you made a movement when your hand, with your hand

22  when you said he did like this.  Can you describe in words the

23  movement you made with your hand?

24  A    He made a movement with his hand as if saying here it is,

25  come and get it.

"Maria" - Direct - Shihata                              95

1   Q    And, for the record, you lifted your arm and shook a

2   portion of your hand, correct?

3   A    Yes.

4   Q    And who, if anyone, was he looking at when he did that?

5   A    Me.

6   Q    And where, if anywhere, did you go after he made that

7   movement with his hand?

8   A    Over to him.

9   Q    Where was he at the time?

10  A    Around here.

11  Q    Okay.  And you've made a mark on Government Exhibit 104C

12  near the ice machine; is that correct?

13  A    Yes.

14  Q    And what, if anything, happened after you went towards the

15  defendant?

16  A    He gave me the little package.  He told the officer who

17  was there that that was my ID, that I had forgotten it.

18  Q    What did what he gave you look like?  What he actually

19  handed to you?

20  A    A little package, like plastic, like a cover where they

21  put IDs in it.  And he said it's in there.

22  Q    And the cover that he gave you, did it have an ID inside?

23  A    Yes, a temporary one.

24  Q    What do you mean by a temporary one?

25  A    It was on a piece of paper that he had printed from the

GA074

"Maria" - Direct - Shihata                                      96

1   computer.

2   Q    And was your information on that ID?

3   A    Yes.

4   Q    And you indicated you heard him say something to an

5   officer there; what did you hear him say?

6   A    He said oh, that's because she forgot her ID this morning

7   when she was cleaning.

8   Q    Had you forgotten your ID when you were cleaning the

9   second floor that day?

10  A    No.

11  Q    When the defendant, you testified the defendant told you

12  it's inside.  What did you understand him to mean?

13  A    That the pill was inside.

14  Q    What, if anything, did you do after the defendant handed

15  you the ID?

16  A    I went to my locker.  I went to get my glass.  I went to

17  the ice machine.  And then I went to the little room to drink

18  to take the pill.

19  Q    I'm showing you what's in evidence as Government's Exhibit

20  104D.  Is the little room you're referring to depicted in this

21  photo?

22  A    Yes.

23  Q    Where is it?

24  A    That one.

25  Q    And, for the record, you've made a mark on Government

"Maria" - Direct - Shihata                                    97

1   Exhibit 104D at the doorway in the middle back of the photo,

2   correct?

3   A     Yes.

4   Q     And what, if anything, did you do inside that room?

5   A     I uncovered the pill and I took it, and I kept the case

6   and I went to bed.  I went to my bed.

7   Q     And when you say you kept the case, what do you mean?

8   A     The thing that the pill was in, I kept it so that Nani

9   could read it to me so that I could know that that was the

10  pill.

11  Q     And where was Nani, to your knowledge, when the defendant

12  brought you the pill?

13  A     Working.

14  Q     Where did Nani, what was Nani's, or Danilda's, job

15  assignment at the MDC?

16  A     In the prison, at the kitchen of the prison.

17  Q     And about how many inmates worked in the prison kitchen to

18  your knowledge?

19  A     A lot.

20  Q     And generally speaking around what time would they leave

21  the unit to go to work?

22  A     Between 11:00 and 11:30.  Or from 10:30 to 11:30 around

23  then.

24  Q     And when you say 10:30 or 11:30, at night or in the

25  morning?

1   A    At night.

2   Q    And around what time would they generally come back to the

3   unit from work?

4   A    3:00/3:30.

5   Q    In the morning or afternoon?

6   A    In the morning.

7   Q    And where did Melva work at the MDC?

8   A    Also in the kitchen.

9   Q    Same job as Danilda?

10  A    Yes.

11  Q    Why did you want Danilda to read the packaging for the

12  pill?

13  A    Because it was in English.

14  Q    And how was Danilda's English?

15  A    Perfect.

16  Q    What, if anything, happened after Danilda, well,

17  withdrawn.  When the defendant brought you the pill, what was

18  your understanding of where Danilda and Melva were at that

19  time?

20  A    Working.

21  Q    And, at some point, did Danilda and Melva return to the

22  unit from work?

23  A    Yes.

24  Q    And what happened after they returned to the unit from

25  their work?

"Maria" - Direct - Shihata                99

1   A    I took my paper as if I were going to the bathroom and I

2   asked Danilda if that was the pill.

3   Q    When you say you took your paper, what are you referring

4   to?

5   A    The toilet paper for the bathroom.

6   Q    How did it work, for people that didn't spend time at the

7   MDC, how did the toilet paper situation work?

8   A    You couldn't be walking around in the unit if you were not

9   going to the bathroom.

10  Q    At what times?

11  A    After the count, after 10:00.

12  Q    10:00 p.m.?

13  A    Yes.  Well, I took my paper and I went as if I were going

14  to the bathroom.

15  Q    Okay.  Was there toilet paper available in the bathroom?

16  A    No.  They offered it, but those papers, you know, you

17  could catch an infection.

18  Q    So how did you get other toilet paper at the MDC?

19  A    You bought it at the commissary.

20  Q    Okay.  What, if anything, did you do after going to the

21  bathroom with your toilet paper?

22  A    I showed Nani, so that she could read it to me to see if

23  that was the right pill.  She told me yes.

24  Q    And what, if anything, did you do with the packaging the

25  pill had come in after that?

"Maria" - Direct - Shihata                                    100

1   A    I flushed it.

2   Q    Why did you do that?

3   A    Because if they find me with that, that's contraband.

4   Q    And what were you concerned would happen if they found

5   that?

6   A    They were going to put me in the SHU, or they could give

7   me a ticket.

8   Q    Now you testified earlier about conversations you had with

9   Kiara, Melva, and Danilda about what had happened.  Did you

10  tell any prison officials that day what had happened?

11  A    No.

12  Q    Why not?

13  A    Because, no, I didn't want to get in trouble and, you

14  know, anyway who were they going to believe?  It was a

15  lieutenant against a prisoner.

16  Q    During your time in federal prison had you seen what

17  happened in circumstances when inmates said one thing and an

18  officer said another?

19  A    Yes.

20  Q    What happened?

21  A    The officer was always right.

22  Q    After the first time the defendant penetrated you, did he

23  continue to call for you to clean the lieutenants' office area?

24  A    Yes.

25  Q    And did he rape you again?

"Maria" - Direct - Shihata                                        101

1  A   Yes.

2  Q   Do you recall exactly how many times that happened?

3  A   No.

4  Q   Was it multiple times?

5  A   Yes.

6  Q   What days of the week would this happen on?

7  A   Friday, Saturday, and Sunday.

8  Q   And each time he raped you what room did it happen in?

9  A   In the lieutenants' office.

10 Q   Was anyone else present in the lieutenants' office when it

11 happened?

12 A   No.

13 Q   Each time what part of your body did he penetrate?

14 A   My vagina.

15 Q   What did he penetrate it with?

16 A   With his penis.

17 Q   Where was his body in relation to yours when he penetrated

18 you?

19 A   Behind me.

20 Q   How would he expose his penis?

21 A   Laying me on the table or making me crouch down or in a

22 chair.

23 Q   Okay.  Those were the three positions that you described?

24 A   Yes.

25 Q   Each time this happened did the defendant use force?

"Maria" - Direct - Shihata                                      102

1   A    Yes.

2   Q    How did he use force?

3   A    Like grabbing me, twisting my arm, pulling my hair,

4   correction, grabbing me by the hair, however he could.

5   Q    Were you scared each time?

6   A    Yes.

7   Q    What about the circumstances made you scared?

8   A    That I was going to have to spend more time in jail.  That

9   I was going to end up in the SHU without me really having done

10  anything.

11  Q    Each time this happened, what, if anything, occurred with

12  respect to the computer?

13  A    He'd put on the camera in little squares.  Sometimes he

14  would turn it so that it would face him, whatever side he was

15  on.

16  Q    And what was on the screen?

17  A    If it was the second floor, the elevator, the entire

18  hallway, the whole thing.  Whatever floor he put on, you could

19  see the entire floor.

20  Q    During any of the times that the defendant penetrated you,

21  did you want to have his penis inside of you?

22  A    No.

23  Q    After the first time, did you ask the defendant for the

24  morning after pill again?

25  A    Yes, but he never brought it to me.

GA081

"Maria" - Direct - Shihata                                    103

1   Q    When the defendant penetrated you, what, if anything, did

2   he have attached to his pants?

3   A    All of his keys.

4   Q    And what, if anything, happened with respect to those keys

5   when he penetrated you?

6   A    The keys would move and they would make a lot of noise.

7           MS. SHIHATA:  One moment, your Honor.

8   BY MS. SHIHATA:

9   Q    I'm showing you what's in evidence as Government Exhibit

10  3.  Who is this again?

11  A    Officer Smith.

12  Q    And was Officer Smith someone who escorted you sometimes

13  to the second floor?

14  A    Yes.

15  Q    And when Officer Smith escorted you to the second floor,

16  did he usually stay or leave?

17  A    He would stay.

18           THE COURT:  He would what?  I didn't hear it.

19           MS. SHIHATA:  And --

20           THE WITNESS:  He would stay.

21           THE COURT:  He would stay?

22  Q    -- to the best of your recollection, about how many times

23  did Officer Smith escort you to the lieutenants' office for the

24  defendant specifically?

25  A    About three times, two, three times.

"Maria" - Direct - Shihata                                        104

1   Q    And was there ever a time when Officer Smith left you in

2   the lieutenants' office area with the defendant?

3   A    Yes.

4   Q    I'd like to direct your attention to that particular day.

5   Do you recall what day of the week it was?

6   A    It was a weekend, but I don't remember what day.

7   Q    And where were you, to the best of your memory, when

8   Officer Smith left you in the lieutenants' office area that

9   day?

10  A    In the bathroom.

11  Q    What were you doing in that area?

12  A    Cleaning the bathroom.

13  Q    I'm showing you what's in evidence as Government Exhibit

14  102B.  Can you point out the area you were cleaning that day?

15  And, for the record, you've made a mark on 102B, near the door

16  on the left side of the photograph, correct?

17  A    Yes.

18  Q    Now, who else, other than Officer Smith, other than

19  Officer Smith and you, was in the lieutenants' office area that

20  day?

21  A    I think Odis de la Cruz.

22  Q    Okay.  And was she someone that sometimes cleaned with

23  you?

24  A    Yes.

25  Q    Now, at the time, was there anyone, any lieutenant

"Maria" - Direct - Shihata                                    105

1    present?

2    A     Yes, Martinez.

3    Q     And when you were cleaning this area in 102B, where was

4    Lieutenant Martinez?

5    A     In his office, sitting in his chair.

6    Q     And, at that point in time, when you were cleaning this

7    area, was Odis de la Cruz around?  Specifically in this area in

8    the photograph?

9    A     No.

10   Q     Do you know where she was?

11   A     Over at the legal department.  Here's the thing, I'm not

12   really too sure she was there that day.  I don't remember that

13   clearly.

14

15

16

17

18

19

20

21

22

23

24

25

"Maria" - Direct - Shihata                                      106



"Maria" - Direct - Shihata                                    107

1   Q    You testified that, sitting here today, you are unsure

2   whether, on that day, Odis de la Cruz came, was also cleaning

3   the second floor; is that correct?

4   A    Yes.

5   Q    When you were cleaning, you testified also that, at some

6   point, you were cleaning the bathroom area, correct?

7   A    Yes.

8   Q    Who was in the lieutenants' office at the time?

9   A    Martinez and Smith.

10  Q    Anyone else?

11  A    No.

12  Q    Who was in this area that I'm pointing to in Government

13  Exhibit 102B?

14  A    Nobody.

15  Q    And where were you?

16  A    In the bathroom, cleaning the bathroom.

17  Q    Now, at some point while you were cleaning the bathroom

18  area, did you hear the defendant say anything to Officer Smith?

19  A    Yes.

20  Q    What did you hear him say?

21  A    Could he do him a favor, that's all I understood.

22  Q    What language was he speaking?

23  A    English.

24  Q    And what, if anything, did you see Officer Smith do next?

25  A    He came out and left.

"Maria" - Direct - Shihata                                    108

1   Q    Came out of where?

2   A    The office.  And here, he left the floor, he left.

3   Q    Do you see where he left through in Government Exhibit

4   102B?

5   A    Yes.

6   Q    Where's that?

7   A    That way.

8   Q    And you made a mark on Government Exhibit 102B, for the

9   record, that mark that you made lead to the door with the exit

10  sign over it on the photograph?

11  A    Yes.

12  Q    What, if anything, happened after Officer Smith left?

13  A    Martinez started calling out to me by my name.

14  Q    And what, if anything, did you do after he called out to

15  you?

16  A    I continued to clean.

17  Q    What happened next?

18  A    He kept calling out, calling out, and when he saw that I

19  wasn't going over, he stood up and came and he stood here.

20  Q    And, for the record, you've made a mark on Government

21  Exhibit 102B in front of the door on the left side of the

22  photograph, correct?

23  A    Yes.

24  Q    What happened when he appeared there?

25  A    He said come, I don't have a lot of time.  I sent Smith to

"Maria" - Direct - Shihata                                      109

1  deliver some papers, and, you know, to get there is 10 minutes,

2  and, well, like he didn't have a lot of time.

3  Q    What, if anything, did the defendant say about where he

4  had sent Officer Smith?

5  A    He had sent him to the other, to the west side, or east

6  side, I don't know.  I know it was to the other building.

7  Q    And while you were at the MDC, how many buildings

8  comprised the MDC?

9  A    Well, there was an east side one and a west side one.

10 Q    What was the defendant's tone when he said this to you by

11 the bathroom doorway?

12 A    Mad, because I hadn't gone over.

13 Q    What happened next?

14 A    Well, he turned around, and I followed him.

15 Q    And what direction was he headed in?

16 A    Into the lieutenants' office.

17 Q    What, if anything, did you have in your hands as you

18 followed him?

19 A    A mop.

20 Q    And what, if anything, did you do with the mop as you

21 followed him?

22 A    I tried to, well, I tried to hit him, but I didn't hit

23 him.

24 Q    And you made a movement with your hands, for the record,

25 raising both hands up; is that correct?

GA088

"Maria" - Direct - Shihata                                110

1    A    Yes.

2    Q    And did you actually hit him with the mop?

3    A    No.

4    Q    And what direction was the defendant facing when you made

5    that movement with the mop?

6    A    His back was to me.

7    Q    Why didn't you hit him with the mop?

8    A    I wasn't brave enough.

9    Q    What happened after you followed the lieutenant into the

10   lieutenants' office?

11   A    He grabbed me, and he put me on this side of his desk.

12   Q    I'm showing you what's in evidence as Government Exhibit

13   103C.  Which side of the desk are you referring to?

14   A    This side.

15   Q    And, for the record, you've made a mark on Government

16   Exhibit 103C on the right side of the desk; is that correct?

17   A    Yes.

18   Q    What happened next?

19   A    He penetrated me.  He started taking off my pants and

20   penetrating me.

21   Q    What, if anything, did he do with respect to the computer?

22   A    He turned it around, facing him.

23   Q    What part of the computer did he turn around?

24   A    The monitor.

25   Q    What part of your body did he penetrate that day?

"Maria" - Direct - Shihata                                111

1  A    My vagina.

2  Q    And what did he penetrate it with?

3  A    With his penis.

4  Q    Where was he in relation to you when that happened?

5  A    Behind my back.

6  Q    How did you feel while this was going on?

7  A    Horrible.

8  Q    Did you want to have the defendant's penis in your vagina

9  that day?

10 A    No.

11 Q    How, if at all, did the defendant use force that day?

12 A    Yes.

13 Q    How did he do so?

14 A    He would always grab my arm, and with his hand he would

15 grab me here.

16 Q    So you made a couple of movements with your hands, you

17 made a, first you made a movement with your arm, putting it

18 behind your back; is that correct?

19 A    Yes.

20 Q    And then you made a second movement towards your shoulder;

21 is that correct?

22 A    Yes.

23 Q    What did he do with respect to your shoulder?

24 A    Like push it, push me towards him.  Push me towards him,

25 but push me and at the same time for me to hold onto the table.

"Maria" - Direct - Shihata                                    112

1  Q    Were you scared that day?

2  A    Yes.

3  Q    What about the circumstances made you scared?

4  A    I just didn't want any trouble, I just wanted to leave

5  that place.

6  Q    At some point, did Officer Smith return to the

7  lieutenants' office area?

8  A    Yes.

9  Q    And do you recall where you were when that happened?

10 A    I think I was in the bathroom.

11 Q    And what, if anything, were you doing in the bathroom?

12 A    I don't know if I was still wiping off his semen, or if I

13 was cleaning; maybe I had already finished?   Because when he

14 came, he said, and you haven't finished yet?

15 Q    Do you recall who took you back to your unit that day?

16 A    Smith.

17 Q    Did you tell Officer Smith what happened inside the

18 lieutenants' office with the defendant?

19 A    No.

20 Q    Why didn't you tell Officer Smith?

21 A    Because, you know, telling him, you know, Smith was below

22 him, underneath him.

23 Q    Smith was below who?

24 A    Martinez, Lieutenant Martinez.

25 Q    Now, the day that we just discussed, that the defendant

"Maria" - Direct - Shihata                                    113

1  penetrated you when Officer Smith left for a period of time, do

2  you remember if Melva Vasquez was still at the MDC when that

3  happened?

4  A    I think she had already left.

5  Q    And how about Kiara, was she still at the MDC?

6  A    No, Kiara had left.

7  Q    Now, between the first time the defendant penetrated you

8  and the time we just discussed, when Officer Smith left, did

9  the defendant rape you between those two times?

10  A    Yes.

11  Q    I want to direct your attention to January, 2016.

GA092

"Maria" - Direct - Shihata                                     114

DIRECT EXAMINATION, CONTINUED

BY MS. SHIHATA:

Q     Now, Maria, I'd like to direct your attention to January

2016.  Was there an incident in the lieutenants' office where

you slapped the defendant?

A     Yes.

Q     And were you alone in the lieutenants' office with the

defendant when that happened?

A     Yes.

"Maria" - Direct - Shihata                                    115

1    Q    What were the circumstances that led to that?

2    A    I was on my way to get the sprays --

3    Q    From where?

4    A    That were under the desk.

5    Q    Showing you what's in evidence as Government Exhibit 103C.

6    Can you point out the area you're describing?

7    A    That's where the sprays were.

8    Q    For the record, you made a mark underneath the desk with

9    the printer on it, correct?

10   A    Yes.

11   Q    And what if anything happened as you were going to get the

12   sprays?

13   A    As I got here, he turned around and stuck out his hand.

14   Q    Just to stop you for a moment, you made a second marking

15   on Government Exhibit 103C in the area behind the desk on the

16   right side of the photograph, correct?

17   A    Yes.

18   Q    And where was the defendant at that time?

19   A    In the lieutenants' chair.

20   Q    The black chair here?

21   A    Yes.

22   Q    And what if anything happened as you were walking there?

23   A    He stuck out his hand at me.

24   Q    To do what?

25   A    As if to grab me.  He stuck out his hand and I pushed it

"Maria" - Direct - Shihata                                      116

1  down.  And he raised it again.  That's when I hit him in the

2  head.

3  Q    What happened next?

4  A    Then he stood up.  Well, he said -- he said -- "Do you

5  know how much somebody could get for hitting an officer?"  Then

6  he told me.  I think he said something about five years.  I

7  think that's what he said.

8       And I said, "That's unfair."

9  Q    What was his tone when he said this to you?

10 A    As if -- I had hit him, so -- he was speaking to me

11 loudly, you know.  Loudly.

12 Q    And why did you hit him?

13 A    Because he wanted to grab me.

14 Q    After he spoke to you loudly, what happened next?

15 A    He stood up and -- he stood up, he was grabbing me, he was

16 rubbing me, he was rubbing my tits, grabbing them.  Oh, my God.

17 Q    Did he penetrate you that day?

18       THE INTERPRETER:  Could the interpreter have the

19 question again?

20 Q    Did he penetrate you that day?

21 A    Yes.

22 Q    What did he -- what part of your body did he penetrate?

23 A    My vagina.

24 Q    And what did he penetrate that with?

25 A    With his penis.

GA095

"Maria" - Direct - Shihata                                117

1   Q    Do you recall where in the office you were when this

2   happened?

3   A    Right here.  He stood up -- right here.  He turned around

4   from his desk.  I hit him.  He stood up.

5   Q    What happened after that?

6   A    That's when he grabbed my arms and he said, "Do you know

7   how much somebody could get for hitting an officer?"  And then

8   he just started up until he penetrated me.

9   Q    How did you feel while that was happening?

10  A    Bad.

11  Q    Were you scared?

12  A    Yes.

13  Q    Did you want to have his penis inside you that day?

14  A    No.

15  Q    Now, after the various incidents you've testified about,

16  what if any steps did you take to try to make the defendant

17  stop?

18  A    I called a friend of mine --

19  Q    Who did you --

20           MS. SHIHATA:  I'm sorry.

21  A    -- so he would come to visit me.

22  Q    Who did you call?

23  A    Noel Lopez.

24  Q    And why did you want Noel Lopez to visit you?

25  A    Why?  To try to make him stop.

GA096

"Maria" - Direct - Shihata                                           118

1  Q    Can you explain what you mean by that?

2  A    He would say to me I don't have anybody.  I don't have any

3  relatives here who would come to visit me.  So he saw somebody

4  who did come visit me, he might have thought okay -- well, I

5  don't know.  I don't know.

6  Q    Who would say to you, "You have no family here, you have

7  no visitors"?

8  A    Martinez.

9  Q    How if at all did you let Noel Lopez know that you wanted

10 him to visit you?

11 A    I called him and I told him to come visit me.  And he

12 said, "So how can I go and visit you?"

13       And I said, "Well, I send you a form.  You fill it out and

14 you send it back to me."

15 Q    Now, sitting here today, do you remember Noel Lopez's

16 phone number?

17 A    No.

18 Q    Do you remember the area code of his phone number?

19 A    Yes.

20 Q    What's the area code?

21 A    203.

22 Q    And was Noel Lopez's number on your phone list at the MDC?

23 A    Yes.

24 Q    Now, generally at the MDC, after -- you mentioned some --

25 you testified about paperwork that had to be filled out before

1   a visit could happen, correct?

2   A    Yes.

3   Q    Do visitors have to be approved at the MDC?

4   A    Yes.

5   Q    And was Noel Lopez approved?

6   A    Yes.

7   Q    Did he come visit you after he was approved?

8   A    Yes.

9   Q    What did the visiting room look like that you had a visit

10  in?

11  A    As you went in, there was a little stand for the officer,

12  a long table -- two tables.  The machines were all the way at

13  the end -- the soda, the snack machines.  And after those two

14  tables were some small rooms.

15  Q    Are there any rules about contact with visitors who come

16  to see you at the MDC?

17  A    Yes.

18  Q    And what were those rules when you were there?

19  A    You could not have any physical contact.  Only when they

20  came and when they left.

21  Q    And what physical -- what if any physical contact did you

22  have when the visitor came and left?

23  A    A kiss and a hug.

24  Q    What if anything did you ask Noel Lopez to do when he came

25  to visit you?

```
                    "Maria" - Direct - Shihata                  120
```

1   A    To kiss me.

2   Q    To kiss you where?

3   A    On my mouth.

4   Q    Did he do that?

5   A    Yes.

6   Q    Why did you ask him to do that?

7   A    Because I wanted Martinez to see that I had somebody.

8   Q    And why was that important to you?

9   A    So that way he could stop if saw that I had somebody,

10  because he always said, "Oh, you don't have anybody."  Well, he

11  could stop.

12  Q    Stop what?

13  A    Raping me.

14  Q    And how if at all did you think that the defendant would

15  see that kiss?

16  A    On the computer.

17  Q    What do you mean by that?

18  A    He could see everything on his computer.

19  Q    Were there cameras in the visiting room?

20  A    Yes.

21  Q    About how long did Noel Lopez visit with you that day?

22  A    Until the visit was over.

23  Q    Well, how long was that, approximately?

24  A    A few hours.  Two to three hours.

25  Q    After Noel Lopez visited you, did the defendant stop

Case 22-902, Document 84, 02/15/2023, 3469874, Page103 of 268

1   raping you?

2   A    No.

3   Q    What if anything happened after Noel Lopez's visit?

4   A    He would grab me and kiss me.  He would say, "Is that what

5   you want?  You want to be kissed?  You want to be kissed?"

6   Q    Who would do that?

7   A    Martinez.

8   Q    At some point did the defendant make any comments to you

9   about seeing you outside of prison?

10  A    Yes.

11  Q    What do you recall him saying about that?

12  A    That when I got out I should call the prison and I would

13  just say his name.  And I said to him, "You're the last person

14  I want to see."  He said that it wasn't -- he wasn't that way,

15  that he was different, he wasn't that way.

16  Q    What did you understand him to mean by "different"?

17  A    That he wasn't like that, that he wasn't a rapist, that he

18  didn't take women by force.

19  Q    In what circumstance?

20  A    What he said is that outside he wasn't like that.

21  Q    Outside the prison?

22  A    Yes.

23  Q    What if any contact information did the defendant provide

24  you with?

25  A    His email.  His email.

"Maria" - Direct - Shihata                                    122

1   Q    And what email address did he provide you with?

2   A    He said to me Carlos Rich Martinez, and he said,

3   "Remember, Rich in Spanish."  In Spanish it means Rico in

4   Spanish.

5   Q    Carlos Rich Martinez at what?

6   A    Gmail or Hotmail.

7            MS. SHIHATA:  Sorry.  Can you just translate the last

8   part of what she said.

9   A    Gmail or Hotmail.  I don't remember which one of the two

10  it was, because he told me when he was leaving and I didn't

11  want to write it down.

12  Q    Did you have any desire to be in contact with him?

13  A    No.

14  Q    How if at all did you react when he gave you his email

15  address?

16  A    I was cleaning.  I was cleaning a room and he passed by

17  and he said it, and I kept cleaning.  I didn't really care.

18  Q    Do you know someone named Larihelys Vargas?

19  A    Yes.

20  Q    How do you know her?

21  A    She's my friend when we worked in housekeeping.

22  Q    And was that when you worked in housekeeping before going

23  to prison?

24  A    Yes.

25  Q    Did you call Larihelys Vargas while you were at the MDC?

"Maria" - Direct - Shihata                                    123

 1  A    Yes.

 2  Q    When you make a call as an inmate at the MDC, is it

 3  recorded?

 4  A    Yes.

 5  Q    How do you know that?

 6  A    The machine tells you when you pick up the phone.

 7  Q    I want to direct your attention to February 2016.  Did you

 8  make a phone call to Larihelys Vargas around that time?

 9  A    Yes.

10  Q    Sitting here today, do you recall what number you called

11  her at?

12  A    No.

13  Q    What if anything did you ask Larihelys Vargas to do when

14  you called her?

15  A    Her to go into Facebook and she should look for Martinez,

16  that I said to her to erase me first.

17  Q    What does that mean, erase you first?

18          THE INTERPRETER:  Delete me first.

19          MS. SHIHATA:  Sorry.  What does that mean --

20          THE INTERPRETER:  Correction.

21          MS. SHIHATA:  Sorry.  Go ahead.

22  A    Because we were friends on Facebook.

23  Q    So to "un-friend" you?

24  A    Yes.

25  Q    What else?

"Maria" - Direct - Shihata                                    124

1  A    I said to her, "Larihelys, you got me on Facebook, right?"

2  And she said yes.  I said, "Delete me and look for this

3  person."  And I gave her the name and all for Martinez.

4  Q    How did you -- how did you give her the name of who you

5  wanted her to look up?

6  A    I gave her the same thing that he gave me, the email.  I

7  gave it to her.

8  Q    Carlos Rich Martinez?

9  A    Yes.

10 Q    What happened next?

11 A    She looked for him and she found him.  Oh -- and she said,

12 "Oh, he works in the military," or something like that.

13      I said, "Yes, he works here."

14 Q    What if anything did Larihelys Vargas do after looking up

15 his Facebook page?

16 A    She described me the picture.  She described me almost

17 every single picture that she saw.  She was describing them to

18 me.

19 Q    And do you remember any particular photos that she

20 described to you on that call?

21 A    She said there's a picture of him with a girl.  I said

22 that must be his daughter.  There was another -- there was

23 another picture with a dog, with a girl and a blonde woman.

24 Q    And how if at all did she describe the blonde woman?

25 A    A pharmacy blonde.  That's what he (sic) said.

"Maria" - Direct - Shihata                          125

1  Q    Why did you ask Larihelys Vargas to look the defendant up

2  on Facebook?

3  A    Because I was giving her all of the information about him

4  on the phone.  In other words, if I was giving the information

5  on the phone, he was going to hear it.  He was going to hear

6  that I was giving the information to somebody on the outside,

7  because I was giving it to Larihelys.

8  Q    When you say giving the information, what are you

9  referring to?

10 A    I gave her his name, that he worked here or there, and I

11 said to her, "Larihelys, describe him.  Describe him," so that

12 he could hear that we were talking about him.

13 Q    And what did you hope that would accomplish?

14 A    For him to stop.

15 Q    Now, at the point that this all happened, you just

16 described, had the incident you testified about earlier, about

17 when the defendant penetrated you when Officer Smith had left

18 the office, did that happen before this phone call?

19 A    Yes.

20 Q    After you made the call to Larihelys Vargas regarding the

21 defendant's Facebook page, did you see the defendant?

22 A    Yes.

23 Q    About how long after you made that call?

24 A    The following day or the day after.

25 Q    So one or two days later?

```
                    "Maria" - Direct - Shihata                    126
 1   A    Yes, at daybreak.

 2   Q    Where did you see him?

 3   A    In the unit.

 4            THE COURT:  In where?  I didn't hear.

 5            THE INTERPRETER:  In the unit.

 6   Q    6 South?

 7   A    Yes.

 8   Q    Around what time?

 9   A    It was after 12 midnight.

10   Q    Where were you when you saw him?

11   A    In my bed.

12   Q    And where did you -- what happened after you saw him?

13   A    When I got to the office, he said, "Why did you do that,

14   stupid?"

15   Q    So hold on one moment.  How was it that you ended up going

16   to the unit office?

17   A    The officer who was on the shift went to the bed -- to my

18   bed and said to me, "The lieutenant is waiting for you at the

19   office."

20   Q    And after the unit officer said that to you, where did you

21   go?

22   A    To the officers' office.

23   Q    Showing you what's in evidence as Government Exhibit 104E.

24   Can you point out where if anywhere the officers' office is in

25   this photograph?
```

"Maria" - Direct - Shihata                    127

1   A    That one.

2   Q    And for the record, you made a mark on the exhibit -- on

3   the door to the right of the ice machine.  Is that correct?

4   The door in the middle of the photograph.

5   A    Yes.

6   Q    When you walked over to the -- or when you said an officer

7   alerted you that a lieutenant wanted to speak to you, do you --

8   can you describe what that officer looked like?

9   A    He was sort of tall and heavy.  His hair was sort of like

10  this long.

11  Q    Okay.  And you made a -- for the record, you made a

12  movement with your fingers and your hair, kind of twisting your

13  hair.  Did he have dreads?

14  A    Yes.

15          MS. SHIHATA:  Showing the witness only what's been

16  marked for identification as Government Exhibit 10.

17  Q    Do you recognize the person in this photo?

18  A    Yes.

19  Q    Who is it?

20  A    The officer.

21  Q    The officer you were just describing?

22  A    Yes.

23          MS. SHIHATA:  I move to admit Government Exhibit 10.

24          MR. RICCO:  That's without objection, your Honor.

25          THE COURT:  It's admitted.

"Maria" - Direct - Shihata                                    128

1  (Government's Exhibit 10 received into evidence.)

2  Q    When you -- after the officer told you the lieutenant

3  wanted to speak with you, where did you go?

4  A    To the officers' office.

5  Q    And was any other inmate, to the best of your

6  recollection, actually in that area at the time?

7  A    Yes.

8  Q    Who was that?

9  A    Odis De la Cruz.

10  Q   And what happened when you got to the area?

11  A   Odis De la Cruz went in first.  And then I went in after

12  she came out.

13  Q   And about how long was Odis De la Cruz in the office for?

14  A   About five minutes.

15  Q   And after you went inside, who if anyone did you see

16  inside the office?

17  A   Lieutenant Martinez.

18  Q   And what if anything happened after you went inside the

19  office?

20  A   That's when he said to me, "Why did you do that, stupid?

21  Why?"

22  Q   What did you understand him to be referring to?

23  A   Deep down, I knew it was the call.

24  Q   When the defendant said that to you, was he angry?

25  A   Yes.

"Maria" - Direct - Shihata                                    129

1  Q    What happened next?

2  A    He continued, "Why did you do that?  Why did you do that?

3  Why?"

4       Because -- I said to him, "Martinez, it's because I'm just

5  tired.  I'm tired, Martinez."

6       Then he said to me, in response, "Oh, well, you know,

7  you're in trouble now.  You're going to be investigated now."

8       And then I got scared.  I got scared because -- but then

9  he saw that.

10      He said, "All right.  Calm down.  You're just going to say

11 you found my information on the computer."

12 Q    What information?

13 A    The information that I had given to Larihelys over the

14 phone.

15 Q    Which was what?

16 A    His email.

17 Q    What happened next?

18 A    I said, "You can't see that.  Somebody who does cleaning

19 can't see that on the computer."

20      So he said, "All right.  So just say you found it on some

21 piece of paper which was lying in the office."

22 Q    What happened next?

23 A    That's when he got tired of saying everything he had been

24 saying to me, so I left.  Oh, no.  The officer came in.  But he

25 said he doesn't understand Spanish.

"Maria" - Direct - Shihata                                    130

1   Q    You testified that you -- that after Lieutenant Martinez

2   asked you why you did that, you said -- you told him you were

3   tired.  What were you tired of?

4   A    Of him raping me every time he felt like it.

5   Q    Before you left the office that -- that night, what if

6   anything did the defendant say to you about his Facebook page?

7   A    I don't remember.  But he said, "You tell Larihelys --

8   Larihelys Vargas, that that blonde is my sister and she has

9   cancer."

10       I said, "Oh, I'm sorry to hear that."

11            THE COURT:  Who raised the issue of the Facebook in

12  the conversation?

13            THE WITNESS:  You mean either Martinez or me?  He

14  did.

15            THE COURT:  And what did he say?

16            THE WITNESS:  "You tell Larihelys Vargas that that

17  person who is in the photograph is my sister who has cancer."

18  Q    Now, after this incident you just described in the unit

19  office with the defendant, did any other prison officials at

20  the MDC speak to you about the phone call you had made to

21  Larihelys Vargas?

22  A    Yes.

23  Q    Who?

24  A    Rodriguez.

25  Q    I'm showing you what's in evidence as Government Exhibit

"Maria" - Direct - Shihata                                    131

9.   Who is this?

A     That's Rodriguez.

Q     And what type of officer was Rodriguez when he spoke to you about the phone call?

A     A jail investigator.

Q     And is that also known as "SIS" at the MDC?

A     Yes.

Q     About how long after the defendant spoke to you in the unit office, as you just testified -- about how long after that did Officer Rodriguez speak to you?

A     I don't remember.  I don't remember -- I don't know if it was that same day, in the morning, or one or two days later.  I know it didn't take long for him to come see me.

Q     And the day that he came to see you, around what time was it?

A     In the morning.

Q     How if at all did you learn that Officer Rodriguez wanted to speak to you?

A     I was called on the loudspeaker.  I went to the unit officers' office and that's where I was told that somebody wanted to see me in the case manager's office.

Q     And where was the case manager's office?

A     As you left the unit, on the right.

Q     So showing you what's in evidence as Government Exhibit 104C, the door I'm pointing to in the middle of the photograph,

"Maria" - Direct - Shihata                          132

1   is that how you exit Unit 6 South?

2   A    Yes.

3   Q    And after you exit Unit 6 South, which way do you go for

4   the case manager's office?

5   A    To the right.

6   Q    And when you go to the right, is there anything before you

7   get to the case manager's office?

8   A    A door, and control has to open that for you also.

9   Q    And what happened after you got to the case manager's

10  office area?

11  A    Well, there were staff people who worked there and

12  Rodriguez and another coworker.

13  Q    And what happened after you saw those individuals there?

14  A    Rodriguez said to me, "Come on.  Let's go talk here," as

15  if to say in the office -- in the case manager's office.

16  Q    And what language did Rodriguez speak to you in?

17  A    In Spanish.

18  Q    What happened after that?

19  A    We went into the office.  He closed the door.

20  Q    Who went into the office?

21  A    Rodriguez and I.

22           THE INTERPRETER:  Can the interpreter just clarify?

23  A    He closed the door.

24  Q    And what happened after you went into the office and

25  Officer Rodriguez closed the door?

"Maria" - Direct - Shihata                                    133

1    A    He said to me, "Tell me, like, what happened."

2         As if -- "Oh, well, like, I had told Larihelys to delete

3    me and to look Martinez up."

4         And he said to me, "What's going on?  What happened?"

5         And I said to him that Martinez was a pig.

6         And he said, "Calm down.  Calm down.  I took this case,"

7    as if to say nobody else was going to ask me about this.

8    "You're about to get out, right?"

9         I said, "Yes."  And I asked him if this could cause me

10   problems in immigration.

11        He said, "Yes."  He said, "Okay.  Just calm down.  I'm

12   going to tear up these pieces of paper and delete Larihelys

13   from the computer."  That's what he said.

14   Q    Now, you testified that after going in the room with

15   Officer Rodriguez he asked you about the call.  Is that

16   correct?  Or what's going on?

17             THE COURT:  Who is "he"?

18             MS. SHIHATA:  Rodriguez.

19             THE WITNESS:  Yes.

20   Q    And when he asked you that, what if any reaction did you

21   have?

22   A    I was crying.  But I was more nervous.  I was nervous.

23   Q    And you testified that he said to you a number of times --

24   Rodriguez said to you a number of times, "Calm down."  What

25   were you doing when he said that to you?

"Maria" - Direct - Shihata                                    134

1   A     I was crying, but I kept saying, "I don't want problems.

2   Rodriguez, I don't want problems, but he is a pig."

3   Q     And who were you referring to when you said, "He is a

4   pig"?

5   A     To Martinez.

6   Q     You testified a moment ago that Rodriguez said something

7   to you about ripping up the papers.

8   A     Yes.

9   Q     Did he have any papers with him at the time?

10  A     No.

11  Q     How did the conversation end?

12  A     What he said to me was to delete -- to tell -- to delete

13  Larihelys from the phone and not to tell anybody, no other

14  officer was going to now ask me questions about this because he

15  had taken the case.

16  Q     Now I'd like to direct your attention to February 27th,

17  2016.  Does that date have any significance to you?

18  A     Yes.

19  Q     What significance?

20  A     It's the Independence Day for my country.

21  Q     The Dominican Republic?

22  A     Yes.

23  Q     And did it have any significance to anyone you knew at the

24  MDC?

25            THE INTERPRETER:  I'm sorry.  Could you repeat the

"Maria" - Direct - Shihata                                  135

1   end of the question?

2           THE COURT:  Did it have any significance to anyone

3   who she knew at the MDC.

4           THE WITNESS:  Yes.

5   Q    What?

6           THE COURT:  What or who?

7           THE WITNESS:  Nani's birthday.

8   Q    What significance?

9   A    It was her birthday.

10  Q    Whose birthday?

11  A    Danilda.

12  Q    And do you recall what day of the week February 27, 2016

13  was?

14  A    I know it was either a Saturday or a Sunday, but I don't

15  remember.

16  Q    All right.  I'd like to direct your attention to that

17  weekend.  At some point during that weekend were you and

18  Danilda on the second floor in the lieutenants' office area?

19  A    Yes.

20  Q    Who took you and Danilda there?

21  A    Nunez, Officer Nunez.

22          MS. SHIHATA:  Showing the witness only what's been

23  marked for identification as Government Exhibit 7.

24  Q    Do you recognize the person in this photo?

25  A    Yes.

"Maria" - Direct - Shihata                                    136

1   Q    Who is that?

2   A    Officer Nunez.

3        MS. SHIHATA:  I move to admit Government Exhibit 7.

4        MR. RICCO:  That's without objection, your Honor.

5        THE COURT:  Admitted.

6   (Government's Exhibit 7 received into evidence.)

7   Q    And for what purpose did Officer Nunez take you and

8   Danilda to the lieutenants' office area that day?

9   A    To go get the sprays to clean on the fifth floor.

10  Q    And showing you what's in evidence as Government Exhibit

11  102A, do you see the area that Officer Nunez took you and

12  Danilda that day?

13  A    Yes.

14  Q    Where is it?

15  A    This is the -- this is the officers' door -- the

16  lieutenants'.

17  Q    And for the record, you've made a marking on Exhibit 102A

18  on the door with the little trash can in front of it, correct?

19  A    Yes.

20  Q    And what happened after Officer Nunez took you and Danilda

21  to that area?

22  A    We went into the office.

23  Q    Who went into the office?

24  A    Nunez and I.  Danilda stayed here.

25  Q    And you've, just for the record, made a marking on Exhibit

"Maria" - Direct - Shihata                              137

1   102A in the area in front of the sofa.  Is that right?

2   A    Yes.

3   Q    And is that where Danilda stayed when you and Officer

4   Nunez went inside?

5   A    Yes.

6   Q    Who if anyone was inside the lieutenants' office when you

7   and Officer Nunez went inside?

8   A    Lieutenant Martinez.

9   Q    What if anything happened inside the lieutenants' office

10  after you went inside?

11  A    I started looking for the sprays in the cabinet, and he

12  and Nunez started to talk.  Then he asked Nunez to leave the

13  office.

14  Q    What happened next?

15       THE INTERPRETER:  May I clarify please?

16  A    I don't remember the exact words that he said.  But he

17  said, well, Rodriguez told me -- as if -- he wanted to make --

18  let me know that Rodriguez had said that I hadn't talked, that

19  I hadn't said anything.

20  Q    What if anything did the defendant say about the Facebook

21  call you had made?

22  A    He said something, but I don't remember.  It was very

23  brief.

24  Q    Do you remember the substance of what he said?

25  A    No.

"Maria" - Direct - Shihata                                    138

1   Q    At some point did Officer Nunez come back inside the

2   lieutenants' office?

3   A    Yes.

4   Q    And what happened after that?

5   A    We left to clean.

6   Q    Who left?

7   A    Danilda, Nunez and I.

8   Q    And where did you go?

9   A    To the fifth floor.

10  Q    After that weekend, did you stop seeing the defendant for

11  a period of time?

12  A    Yes.

13  Q    And after you made the phone call you testified about to

14  Larihelys Vargas, did you stop being called to clean for

15  Lieutenant Martinez for a period of time?

16  A    Yes.

17  Q    And how did that make you feel?

18  A    Good.

19  Q    At some point did you see the defendant again?

20  A    Yes.

21  Q    Around when was that?

22  A    In April, at the end of April.

23  Q    Of what year?

24  A    2016.

25  Q    And do you recall what day of the week it was?

```
                    "Maria" - Direct - Shihata                    139
```

 1  A    It was a weekend day.

 2  Q    And where did you first see him?

 3  A    In the office.

 4  Q    What office are you referring to?

 5  A    The lieutenants' office.

 6  Q    Prior to going to the lieutenants' office that day, where

 7  were you?

 8  A    In the unit.

 9  Q    6 South?

10  A    Yes.

11  Q    And who if anyone did you see for the count in the unit?

12  A    Martinez.

13  Q    What if anything did he do with respect to the count that

14  day?

15  A    He counted the prisoners with the officer.

16  Q    At some point after the count did you learn that you were

17  going to clean that day?

18  A    Yes.

19  Q    And did an officer escort you to go clean?

20  A    Yes.

21  Q    Where did he escort you to?

22  A    To the lieutenants' office.

23  Q    After the officer took you there, did he stay or leave?

24  A    He left.

25  Q    And what if anything happened after he left?

"Maria" - Direct - Shihata                                    140

1    A    That was the last time that he abused -- in other words,

2    he penetrated me.

3    Q    The last time that who did that?

4    A    Lieutenant Martinez.

5    Q    Before he penetrated you that day, who if anyone else did

6    you see on the second floor?

7    A    Nunez.

8    Q    Showing you what's in evidence as Government Exhibit 7, is

9    that the Nunez you're referring to?

10   A    Yes.

11   Q    And where do you recall seeing him?

12   A    I was taking some garbage out of the hallway from a large

13   garbage basket that there was in the entrance.

14   Q    The entrance to what?

15   A    The entrance as if to go -- the hall -- to the hall on the

16   way to the lieutenants'.

17   Q    Showing you what's in evidence as Government Exhibit 101D,

18   is the area you're referring to in this photo?

19   A    Yes.

20   Q    Can you show us where it is?

21   (Witness complies)

22   Q    And for the record, you've made a mark on Government

23   Exhibit 101D by the blue trash can or recycling can there.  Is

24   that correct?

25   A    Yes.

"Maria" - Direct - Shihata                                    141

1   Q    And where in relation to that is the entrance to the

2   lieutenants' office area in this photo?

3   A    This one.

4   Q    For the record, you've made a second marking on Government

5   Exhibit 101D in -- at the door on the left side of the

6   photograph, the first door after the blue trash bin.  Is that

7   correct?

8   A    Yes.

9   Q    And what if anything happened when you saw Officer Nunez

10  in that area?

11  A    He went in and asked me who I was with.  I said Lieutenant

12  Martinez is there.  And he asked me if there was somebody else

13  cleaning, and I said no, that Odis De La Cruz was seeing a

14  visitor.  So he did like this with his head and he continued

15  on.

16  Q    I'm sorry.  What movement did you make with your head?

17  A    Did it like this, like saying no.

18  Q    Just for the --

19          MS. SHIHATA:  Sorry.

20  Q    And for the record --

21  A    It's not like saying no.  It's like -- like this.

22  Q    For the record, did you make a movement with you head from

23  right to left?

24  A    Yes.

25  Q    And what happened after that?

"Maria" - Direct - Shihata                                    142

1  A    He continued on, and he went to the lieutenants' office,

2  and I kept cleaning.

3  Q    Did you see Officer Nunez again after that?

4  A    Yes.

5  Q    And what happened when you saw him again?

6  A    He was asking about Danilda, if she had already gotten

7  out, and I said no.

8  Q    I'm sorry.  Had Danilda gotten out, left the MDC at that

9  point?

10  A    Yes, but she was in immigration.

11  Q    So what did you understand him to be asking you when he

12  was asking if she had gotten out?

13  A    That if she had gotten out of immigration.

14  Q    And to your knowledge, had she at that point?

15  A    No, she was still incarcerated.

16  Q    In immigration custody?

17  A    Yes.

18  Q    About how long did you speak with Officer Nunez for at

19  that time?

20  A    It was short, just, you know, what he asked me.  It was

21  maybe four or five minutes.

22  Q    And where if anywhere did he go after that?

23  A    To the exit.

24  Q    To which exit?

25  A    The exit that led to the elevator.

"Maria" - Direct - Shihata                    143

1   Q    Showing you what's in evidence as Government Exhibit --
2   I'm going to show you two exhibits.  101C, is this the exit
3   you're referring to?  Or do you see the exit you're referring
4   to in this photo?
5   A    Yes.
6   Q    Can you point it out?
7   (Witness complies)
8   Q    For the record, you've made a mark on Government Exhibit
9   101C at the open doorway in the photo, correct?
10  A    Yes.
11  Q    And now showing you Government Exhibit -- what's in
12  evidence as 101A.  Do you see that same doorway in this photo?
13  A    Yes.
14  Q    Can you point it out?
15  A    There.
16  Q    For the record, you've made a mark at the door in the
17  middle of the photograph, correct?
18  A    Yes.
19  Q    And what is down that hall, on the left side?
20  A    The elevators.
21  Q    What if anything happened after Officer Nunez left?
22  A    Martinez stood up, like -- and started calling out to me,
23  but he was practically outside of the office.
24  Q    Where were you at this time?
25  A    In the hall, mopping.

"Maria" - Direct - Shihata                                    144

1    Q    I'm showing you what's in evidence as Government Exhibit

2    102A.  Do you see the area you're referring to in this photo?

3    A    Yes.

4    Q    What area?

5    A    (Witness marks exhibit)

6    Q    And for the record, you've made a marking on this exhibit

7    in the area in front of the sofa.  Is that correct?

8    A    Yes.

9    Q    And what if any doorway was the defendant in?

10   A    There.

11   Q    And for the record, you've made a mark on 102A at the door

12   with the little trash can in front of it, correct?

13   A    Yes.

14   Q    What is that the door to?

15   A    The lieutenants' office.

16   Q    And what happened next?

17   A    I went in.  He was already there.  He grabbed me and he

18   was asking me what I was talking about -- what was I talking

19   about with Nunez.  And I told him he was asking me about

20   Danilda.  And he said to me, "Well, why are you talking to

21   him?"  You know, as if to say, it seemed that you're so close

22   to him, why did you talk to him like that?

23        I said I was speaking normally and asked him to let go of

24   me.

25   Q    Asked who to let go of you?

"Maria" - Direct - Shihata                                    145

1   A    Martinez.

2   Q    What happened next?

3   A    He continued to grip me.  I tried to get my arm away from

4   him, but -- and then he started rubbing me until he put me up

5   on the chair and he finished.

6   Q    Showing you what's in evidence as Government Exhibit 103C.

7   Do you see the chair you just referred to in this photo?

8   A    Yes.

9   Q    Which chair?

10  A    That one.

11  Q    And for the record, you've made a mark on Government

12  Exhibit 103C, at the blue chair on the right side of the

13  photograph.  Is that correct?

14  A    Yes.

15  Q    How, if at all, did the defendant position you on that

16  chair?

17  A    With my back to him, just like -- my back to the wall.  I

18  was facing the wall and my back was facing him.

19  Q    What happened after that?

20  A    He grabbed me.  He didn't grab me with as much force

21  because there was something wrong with one of his fingers.

22  Q    And just for the record, you made a movement with your

23  hand when you said he was grabbing me, and you motioned towards

24  your shoulders.  Is that correct?

25  A    Yes.

"Maria" - Direct - Shihata                                        146

1    Q    Is that where he grabbed you?

2    A    He mostly always grabbed me there.  There and my arm.

3    Q    What if anything did he do with your arm that day?

4    A    He would twist it back.

5    Q    And you mentioned something about his finger.  What if

6    anything did you notice about his finger that day?

7    A    That day he couldn't -- he didn't press his fingers in

8    hard the way he always did, because I think he had sprained his

9    finger.

10   Q    What if anything did you see on his hand that made you

11   think that?

12   A    The thing doctors put on you with a little splint.

13   Q    And you made some motion with your hand, what looks like a

14   piece of paper in your hand.

15   A    Yes, but it was like two splints with some cotton.

16   Q    You made a motion -- a circular motion with your hand over

17   the finger.  Is that correct?

18   A    Yes.

19   Q    Was his finger wrapped in some -- some manner?

20   A    Yes.  Yes.

21   Q    What happened after the defendant got you in that position

22   in that chair?

23   A    He penetrated me and -- until he came, that pig.

24   Q    What part of your body did he penetrate?

25   A    My vagina.

Case 22-902, Document 84, 02/15/2023, 3469874, Page129 of 268

"Maria" - Direct - Shihata                                    147

1   Q    What did he penetrate it with?

2   A    With his penis.

3   Q    And you said he penetrated you until he came.  Where did

4   he come that day?

5   A    On my back.

6   Q    What if anything did he say about that?

7   A    That since I was going to immigration he came outside of

8   me.

9   Q    Were you scheduled to leave the MDC shortly after this

10  incident?

11  A    Yes.

12  Q    When were you scheduled to leave the MDC?

13  A    April 29th, 2016.

14  Q    Now, that time he penetrated you on the chair that we --

15  that you just testified about, how did you feel while that was

16  happening?

17  A    Bad.  I knew that was going to be the last time.

18  Q    And knowing that would be the last time, how did that make

19  you feel?

20  A    Good.  I was getting out.

21  Q    Did the defendant force you to have sex with him that day?

22  A    Yes.

23  Q    Did you want to have his penis in your vagina that day?

24  A    No.

25  Q    Did you feel like you had any choice about that?

"Maria" - Direct - Shihata                                    148

 1  A    No.

 2  Q    Did you, in fact, leave the MDC on April 29th, 2016?

 3  A    Yes.

 4  Q    And where if anywhere did you go?

 5  A    Immigration.

 6  Q    Were you in immigration custody after that?

 7  A    Yes.

 8  Q    And did your federal conviction have any effect on your

 9  prior immigration status as a Green Card holder?

10  A    Yes.

11  Q    What effect did it have?

12  A    With possible deportation.

13  Q    And were you put in deportation proceedings?

14  A    Yes.

15  Q    And is that why you were transferred to immigration

16  custody?

17  A    Yes.

18  Q    While you were in immigration custody, at some point did

19  you have an immigration lawyer to help you with your

20  immigration case?

21  A    Yes.

22  Q    And did your immigration lawyer file certain documents on

23  your behalf?

24  A    Yes.

25  Q    What was the purpose of those filings or the documents

"Maria" - Direct - Shihata                                    149

1  that were filed?

2  A    So I wouldn't get deported.

3  Q    Do you recall around when your immigration attorney filed

4  those documents?

5  A    In around May of 2016.  May, June of 2016, sometime around

6  then.

7  Q    And in those documents that your immigration lawyer filed,

8  did you provide truthful information about how you had gotten

9  involved in the drug conspiracy you were convicted of?

10  A    Yes.  That time I said everything.

11  Q    Including who had gotten you involved in the drug

12  conspiracy?

13  A    Yes.

14  Q    And did that also include the approximate number of times

15  you had picked up drugs?

16  A    Yes.

17  Q    You testified earlier -- yesterday about a safety valve

18  proffer you participated in.  Do you recall that?

19  A    Yes.

20  Q    And you testified yesterday also about how you weren't

21  completely truthful in your safety valve proffer, correct?

22  A    Yes.

23  Q    Did you disclose that in your immigration documents that

24  your lawyer filed?

25  A    Of course, yes.

"Maria" - Direct - Shihata                                    150

1  Q    Are the applications or documents that your immigration

2  lawyer filed, are those still pending?

3  A    No.  It's over.

4  Q    And were any of your immigration applications granted by

5  an immigration judge?

6  A    Yes.

7  Q    As a result, are you no longer facing deportation?

8  A    No.

9  Q    Now, while you were in immigration custody, did you see

10 Danilda and Melva again?

11 A    Yes.

12 Q    And were they in the same immigration detention facility

13 as you?

14 A    Yes.

15 Q    When you first got to that detention facility, what if

16 anything did you show Melva and Danilda?

17 A    The mark I had on my arm from Martinez's fingers.

18 Q    What part of your arm?

19 A    Here.  What's that called?

20 Q    For the record, you've made a movement or a motion with

21 your arm and held the upper portion of your arm.  Is that

22 correct?

23 A    Yes.

24 Q    When was the first time you told anyone in law enforcement

25 about what Lieutenant Martinez had done to you at the MDC?

"Maria" - Direct - Shihata                              151

1   A    When the FBI came to see me at immigration.

2   Q    And do you recall the first time the FBI came to see you?

3   A    Yes.

4   Q    Prior to the FBI agents coming to see you, did you know

5   why or whether FBI agents would be coming to see you?

6   A    No.

7   Q    And that first time, was the meeting long or short?

8   A    Short.

9   Q    Why was it short?

10  A    Because I didn't say anything to them.  I didn't want to

11  talk.

12  Q    And what generally did the agents ask you about at that

13  time?

14  A    What had happened in Brooklyn.

15  Q    Did they ask you about your experience at the MDC?

16  A    Yes.

17  Q    Did you tell them what happened?

18  A    No.

19  Q    Why not?

20  A    Well, no, because -- no, I was scared and I didn't know --

21  I had been in immigration for almost a year.  What I wanted to

22  do was leave.

23  Q    Did you trust the agents who came to speak to you at that

24  time?

25  A    No.

"Maria" - Direct - Shihata                                              152

1  Q    And did you have any lawyer present with you when the

2  agents came to see you?

3  A    No.

4  Q    At some point after that, did you agree to meet with

5  federal agents again, with your lawyer?

6  A    Yes.

7  Q    And what happened at that meeting?

8  A    I told them everything that had happened.

9  Q    Did you provide information about Lieutenant Martinez?

10  A    yes.

11  Q    As well as other matters at the MDC?

12  A    Yes.

13  Q    And was this after you had already filed your immigration

14  documents or petitions?

15  A    Of course, yes.

16  Q    At some point were you released on bail from immigration

17  custody?

18            THE COURT:  Had your petitions been acted upon --

19            THE CLERK:  Judge, your microphone.

20            THE COURT:  Had your petitions been acted on --

21            THE CLERK:  Microphone, Judge.

22            THE COURT:  Had your petitions been acted upon before

23  that last -- you spoke with the FBI and told them everything

24  that had happened?

25            THE INTERPRETER:  I'm sorry, your Honor.  Could you

"Maria" - Direct - Shihata                                    153

1    repeat --

2              THE COURT:  I said had her petition -- immigration

3    petition been acted upon before she spoke to the FBI and told

4    them everything that had happened?

5              THE WITNESS:  The immigration petition was made in

6    May of 2016.  And I got out on bail.  Then my case ended last

7    year, and I won.

8              THE COURT:  I'm still not clear on the time line.  So

9    it had not been acted on by the time she had the conversation

10   and told everything to the FBI?

11             THE WITNESS:  No.  My case hadn't completely been

12   resolved.  My case ended last year.

13   Q    At some point were you released on bail from immigration

14   custody?

15   A    Yes.

16   Q    Around when was that?

17   A    April -- well, around May 2017.  Or April.  At the end of

18   April.

19   Q    Of what year?

20   A    2017.

21   Q    After you were released from immigration custody, did you

22   speak with Danilda?

23   A    Yes.

24   Q    And did you see and speak with Melva?

25   A    Yes.

"Maria" - Direct - Shihata                                      154

1   Q    And how about Kiara?

2   A    Yes.

3   Q    Did you discuss with any of those individuals the details

4   of what you would be testifying about at this trial?

5   A    No.

6   Q    Now, after meeting with federal agents and telling them

7   about what happened at the MDC, did you at some point receive a

8   phone call from Kiara Maldonado?

9   A    Yes.

10  Q    And what was her tone during that phone call?

11  A    Pissed off.

12  Q    Why was she pissed off?

13  A    Because the FBI had gone looking for her at her house.

14  Q    And was she mad at you?

15  A    Yes.

16  Q    Did you tell her what to say?

17  A    No.

18  Q    Now, apart from immigration lawyer -- well, actually,

19  withdrawn.

20       You testified that you won your immigration case, correct?

21  A    Yes.

22  Q    Who granted you relief from deportation?

23  A    A federal immigration judge.

24  Q    Did the FBI have anything to do with that?

25  A    No.

"Maria" - Direct - Shihata                           155

1    Q     Did the U.S. Attorney's Office have anything to do with
2    that?
3    A     No.
4    Q     Apart from the immigration lawyer that you've already
5    mentioned, do you have any other type of lawyer representing
6    you at this time?
7    A     Yes.
8    Q     What kind of lawyer?
9    A     A civil lawyer.
10   Q     And what is the civil lawyer representing you in
11   connection with?
12   A     A lawsuit.
13   Q     Against who?
14   A     The BOP and Martinez.
15   Q     And is BOP the Bureau of Prisons?
16   A     Yes.
17   Q     Who if anyone recommended that you get a civil lawyer?
18   A     The people who paid my bail, those were the first ones.
19   And my immigration lawyer.
20   Q     Now, when you were -- you testified earlier that you went
21   -- you were transferred from the MDC to immigration custody,
22   correct?
23   A     Yes.
24   Q     And was immigration custody in a jail setting?
25   A     Yes.

"Maria" - Direct - Shihata                                    156

1  Q      And in immigration custody, were there guards that did

2  rounds?

3  A      Yes.

4  Q      Was there anything about that that affected you?

5  A      Yes.

6  Q      What was that?

7  A      Every time the officer made the rounds -- I think it was

8  every hour -- she would come by my head and her keys would make

9  a noise, and I remembered that.

10  Q      What did it remind you of?

11  A      Martinez.

12  Q      Doing what?

13  A      Every time that he raped me, the keys made a noise.  So

14  when the officer walked by, the keys also made a noise.

15         MS. SHIHATA:  One moment, your Honor.

16  (Pause)

17         MS. SHIHATA:  No further questions.

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22

23

24

25

GA135

CROSS-EXAMINATION

BY MR. RICCO:

Q    Good afternoon.

A    Good afternoon.

Q    I'd like to start, if I can -- I'd like to start with your

interview that took place with SIS Officer Thomas Rodriguez.

A    Okay.

Q    And you remember that interview, right?

A    Yes.

Q    You were speaking in Spanish with SIS Officer Rodriguez

and he was speaking in Spanish with you.

A    Yes.

Q    And I think that you told the jury this afternoon that

during that during that interview, you were crying.  You

remember that testimony?

A    I was nervous, yes.

Q    I didn't ask you if you were nervous.  I asked you, were

you crying.  Was that your testimony to the jury here today?

A    When he told me that there could be problems for me, yes.

Q    So yes, you were crying?

"Maria" - Cross - Ricco                                    166

1    A    At one point, I did cry, yes.

2    Q    Just one point, you were crying?

3    A    The conversation wasn't so long.

4    Q    I didn't ask you about the length of the conversation.  I

5    asked you, was it only at one point that you were crying?

6    A    I was, yes.

7    Q    So it was just at one point?

8    A    I was sitting with him.  He was explaining to me what in

9    other words -- it was not like I was crying as soon as I got in

10   there.

11   Q    I didn't ask you if you were crying as soon as you got in

12   there.  It's a simple question.

13        Were you just crying at one point?

14   A    Okay.

15             THE COURT:  Is that a yes?

16   BY MR. RICCO:

17   Q    Does okay mean yes?

18   A    Yes.  But I don't understand what you mean by just one

19   point.

20   Q    You used that word.  I didn't.

21   A    Are you asking was I -- did I -- actually -- are you

22   asking did I cry at a particular point?

23   Q    I'm going to ask a different question.  Okay?

24        When you testified before the jury this -- today, you said

25   that you said to SIS Officer Rodriguez that Martinez was a pig.

"Maria" - Cross - Ricco                                    167

1     First, did you testify to that here today?

2   A    Yes, yes.

3   Q    Okay.  And did you say that?  Do you remember saying that?

4   During the interview?

5            THE INTERPRETER:  Counsel, the last part of the

6   question?

7            MR. RICCO:  During the interview.

8   A    Yes.

9   Q    Okay.  Now, you were having an interview with Officer

10  Rodriguez because he overheard a telephone conversation between

11  you and your friend, Ms. Vargas, correct?

12  A    Yes.

13  Q    And in that conversation, there was a discussion about

14  Facebook, correct?

15  A    Yes.

16  Q    And Officer Rodriguez asked you questions about the phone

17  call and Facebook, correct?

18  A    I don't remember his questions.

19  Q    Is your -- your answer, you don't remember his questions?

20  A    No.

21  Q    Didn't you testify here earlier today?

22  A    What he said to me.  Wait a minute, when we were talking?

23  He told me to delete Larihelys and very intelligently, he said

24  to me, "Delete me."  He repeated the exact same thing I had

25  said on the phone.

"Maria" - Cross - Ricco                                          168

1  Q    My question to you was though, do you remember the

2  questions that he asked you about Facebook?

3  A    No.

"Maria" - Cross - Ricco                                    169

1   Q    Do you remember what you said to him?



"Maria" - Cross - Ricco                                      170

1  BY MR. RICCO:

2  Q    And I'll ask the question again.

3       Do you remember what you said to Officer Rodriguez?  Yes

4  or no.

5  A    I do remember some things, but I've said I don't remember.

6  Q    Okay.  Did you admit the following to Officer Rodriguez:

7  That you had your friend search Facebook to find out if he,

8  Martinez, was married?  Did you make that statement to SIS

9  Officer Rodriguez during the interview?  Yes or no.

10 A    To see if he was married?  No.

11 Q    I didn't understand the question -- the answer as spoken

12 to me.  I didn't hear that.  Can you --

13 A    To see if he was married?  No.

14

15

16

17

18

19

20

21

22

23

24

25

GA141

"Maria" - Cross - Ricco                                    171

1   Q    I'm going to ask you a question.

2        Did you make the following statement to SIS Rodriguez

3   during your interview?  Yes or no.

4        That you had asked your friend to search Facebook to find

5   out if he, Martinez, was married?  Yes or no.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"Maria" - Cross - Ricco                                              172

1   BY MR. RICCO:

2   Q    Did you make the statement to SIS Officer Rodriguez during

3   the interview as follows:  That you had your friend search

4   Facebook to find out if he, Mr. Martinez, was married?  Yes or

5   no.

6   A    I did not.  I did not.  That's not why I called her.

7              THE COURT:  No, the question is what you said to --

8   to SIS Rodriguez.

9              THE WITNESS:  I don't know.  I don't remember.  I

10  don't know.

11  BY MR. RICCO:

12  Q    Did you make this statement to SIS Officer Rodriguez

13  during the interview, as follows: "That you were sorry and you

14  will not do it again"?  Did you make that statement to Officer

15  Rodriguez?  Yes or no.

16  A    Yes.

17  Q    Do you recall if Officer Rodriguez asked you the following

18  question: "Did you like Officer Martinez?"  Yes or no.

19  A    No.

20  Q    Do you recall if Officer Martinez made the following

21  statement to you, as follows:  Officer Rodriguez, I'm sorry.

22  Forgive me.  I'll rephrase the question.  Move to rephrase the

23  question, make sure it's clear.

24             During the interview with Officer Rodriguez, do you

25  recall Officer Rodriguez making the following statement:

"Maria" - Cross - Ricco                                    173

1   "Staff can get into trouble if their name is related on

2   Facebook with an inmate."

3        Did he make that statement to you?

4   A    He said I could get into trouble.

5   Q    I'm going to come to that.  Okay.

6        So we'll start from there and work back.  At one point,

7   does he say to you that an inmate who is trying to send

8   messages on Facebook with staff could get into trouble?

9   A    Yes.

10  Q    And did he also tell you that staff could get into trouble

11  if their name is related on Facebook with an inmate?  Yes or

12  no.

13            THE INTERPRETER:  Mr. Ricco, what was the tag in the

14  end of the question?

15            MR. RICCO:  Yes or no.

16  A    No.  I don't remember that he said that to me.

17  BY MR. RICCO:

18  Q    Now, during your testimony, you were telling us about what

19  you said to Ms. Vargas when she should be searching on

20  Facebook.  Remember that testimony?

21  A    Yes.

22  Q    During the interview, you had told Ms. Vargas to look up

23  and see if there were pictures of Officer Martinez with other

24  women.

25  A    I asked her to describe the photos to me.  It wasn't just

"Maria" - Cross - Ricco                                    174

1    one photo.  I asked her to describe each one to me.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"Maria" - Cross - Ricco                                         175

1    Q    My question is what you asked her to look up.  Did you ask

2    her to look up photographs of Martinez with women on Facebook?

"Maria" - Cross - Ricco                                        176

1   Q    Simple question.  Did you ask your friend to look up

2   Officer Martinez with other women on Facebook?  That's a yes or

3   no.

4   A    I asked her --

5            THE COURT:  No, it's a yes or no.  It's a yes or no.

6            THE WITNESS:  No.  I didn't.

7            MR. RICCO:  Government, page 315.  Page 315, Line 19?

8            THE CLERK:  The microphone?

9            MR. RICCO:  Sorry.  This is page 315, line 19.

10           THE CLERK:  Of?  Mr. Ricco, of?

11           MS. SHIHATA:  3500M13.

12           MR. RICCO:  Thank you.  3500M13.

13           THE INTERPRETER:  Your Honor, could the interpreter

14  perhaps have a copy of what Mr. Ricco's going to read from?

15           MR. RICCO:  It's a very short question.

16           THE INTERPRETER:  Okay.

17           MR. RICCO:  The question is short.

18  BY MR. RICCO:

19  Q    Now, you remember testifying in a prior proceeding;

20  correct?  That's a yes or no, also.

21  A    Yes.

22

23

24

25

"Maria" - Cross - Ricco                                    177

1   Q    And when you testified in that prior proceeding, you put

2   your hand on the Bible and you swore to tell the truth.  Right?

3              MS. SHIHATA:  Objection as to Bible.

4              MR. RICCO:  Oh, I'm sorry.  I'm sorry.  I'll

5   rephrase.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"Maria" - Cross - Ricco                                          178

1  BY MR. RICCO:

2  Q    You swore to tell the truth.

3           THE CLERK:  Microphone.

4  A    Yes.

5  Q    Okay.  315, page 9 -- page 315, line 19.

6      Did you ask him -- her to look for photographs of him with

7  women on Facebook?  Yes or no.  Question.  Answer.  Go ahead.

8           THE INTERPRETER:  Could the interpreter have the

9  question again, please?

10  BY MR. RICCO:

11  Q    "Did you ask him -- her -- to look for photographs of him

12  with women on Facebook?  Yes or no.

13      Answer:  Yes."

14      Do you recall giving that -- being asked those questions

15  and giving those answers under oath in a prior proceeding?

16  A    If it's there, I -- that was my answer.  I can't remember

17  every detail.

18  Q    I want to move away from, for a moment, the interview with

19  Officer Rodriguez and I want to ask you about the phone call

20  that you had with Ms. Vargas.  Okay?

21      During that call, did you use the -- did you say to Ms.

22  Vargas -- withdrawn, Your Honor.

23      Question -- during that phone call with Ms. Vargas, did

24  you use a slang to refer to or describe what Lieutenant

25  Martinez had been doing to you?  Yes or no.

"Maria" - Cross - Ricco                                        179

1   A    Yes.  She used it.

2   Q    Mm-hmm.  You remember that.  What was the term?

3   A    Cheeky cheeky (phonetic).

4   Q    Okay.  And when she used that term, you responded to her

5   -- she also asked you, "Would you say, does he kiss you?"  You

6   remember that during -- during the conversation?

7   A    Yes.  Yes.

8   Q    And do you recall saying, "I go yeah, all the way.  So I

9   went, yeah.  Look him up.  Look him up."  Do you remember

10  saying that to your friend?  That "you go all the way"?

11  A    No.  She said to me, "What does he do?"  I know she used

12  the word "cheeky cheeky."  No, she said, "Cheeky cheeky."  And

13  I said, "Everything."  I didn't say kisses.  I don't know if I

14  said kisses.

15  Q    Same exhibit.  Page 317.

16  A    I know I said "everything" to her.

17           MR. RICCO:  Your Honor, 35M13, page 317, line 3.

18  BY MR. RICCO:

19  Q    Prior proceeding.  Do you remember being asked these

20  questions and giving these answers under oath?

21       "Question:  What do you remember telling her?

22       "Answer:  I don't remember exactly what I said to her, but

23  I do remember what she was saying to me in response.  She would

24  say, 'Does he kiss you?'  I go, "Yeah.  All the way.'  So I

25  want -- I went, 'Yeah, look him up.  Look him up.'"

"Maria" - Cross - Ricco                                    180

1       Do you remember being given those questions and providing

2  those answers under oath?

3  A    Yes.

"Maria" - Cross - Ricco                                    181

1  Q    And when you were saying to your friend, "Yeah, I go all

2  the way."  What does "I go all the way" mean to you?

"Maria" - Cross - Ricco                                         182

1   BY MR. RICCO:

2   Q    Simple question.  When you use the term, "I go yeah.  All

3   the way."  What did you mean when you used those words, "I go

4   all the way"?

5   A    Here's the thing.  I don't remember how she said that I do

6   that.  I don't remember that word.  I couldn't have said that

7   on the phone.

8           MR. RICCO:  Same exhibit, page 318.  Line 9.

9   BY MR. RICCO:

10  Q    Question.  I'm asking you the following question.  Do you

11  remember these questions and giving these answers under oath?

12      "Question:  What do you remember telling her?

13      "Answer:  I don't remember exactly what I said to her, but

14  I do remember what she was saying to me in response.  She would

15  say, 'Does he kiss you?'  I go 'Yeah, all the way.'  So I went,

16  'Yeah, look him up.  Look him up.'"

17      Do you recall giving that answer under oath?  Yes or no.

18      "Answer:  Yes."

19      Did you give that testimony, any recollection of that at

20  all?

21  A    Yes.  Is -- was I doing everything?  Did I do everything?

22  Q    Is that a yes?  You remember that testimony?  Or no, you

23  don't?

24           MS. GEDDES:  Asked and answered, Judge.

25           MR. RICCO:  Okay.

"Maria" - Cross - Ricco                                    183

1    BY MR. RICCO:

2    Q    I want to go back to Officer Rodriguez's interview.  You

3    told the jury today that you discussed with Officer Rodriguez

4    immigration issues that you thought you might have.  You

5    remember that testimony?

6    A    Yes.

7    Q    And you recall saying that?

8    A    Yes.

9    Q    Okay.  And you recall Officer Rodriguez telling you that

10   no other officer will speak to you?  He's the only officer

11   assigned to the issue with the telephone call.

12   A    If he had taken the case.  That he had taken the case.

13   The case.

14   Q    And he told you that he would be the only officer speaking

15   to you?

16   A    Not that he was the only officer.  But rather that nobody

17   else was going to talk to me about this.

18   Q    Okay.  Now, you were asked, I think, earlier in your

19   testimony, about the events that you said happened in December

20   of 2015 where you say this was the first time that Lieutenant

21   Martinez forced himself on you.  And the last time in April.

22   You remember giving us testimony, giving the jury testimony?

23   A    December wasn't the first time.

24   Q    Okay.  When was the first time?  Tell us.

25   A    It was before.

"Maria" - Cross - Ricco                                              184

1   Q    When?

2   A    In around October or -- in around October.  But it wasn't

3   in December.

4   Q    Okay.  Around the time, the first time, which you're

5   saying maybe was October, and the last time that you say was

6   April, you testified that he forced himself upon you many

7   times; correct?

8   A    Yes.

9   Q    Would you say that it was at least ten times between the

10  first and the last?

11  A    Yes.

12  Q    And that these ten occasions took place on Friday,

13  Saturday, or Sunday?

14  A    What was that?

15  Q    The days of the week in which these ten events happened,

16  would have been on a Friday, Saturday or Sunday; correct?

17  A    Yes.

18  Q    On the first occasion, you said that you were upset, and

19  that you asked Lieutenant Martinez to get you a morning after

20  pill.

21  A    Yes.

22  Q    And he did?

23  A    Yes.

24  Q    No question about it; right?  Right?

25  A    He bought it.

"Maria" - Cross - Ricco                                      185

1   Q    And came up to the unit and gave it to you; right?

2   A    Yes.

3   Q    And it was closed up.  You had to open it; right?

4   A    Yes.

5   Q    It was like something he got from the store or something;

6   right?

7   A    Yes.

8   Q    And you told us that at this time, you had conversation

9   with some of the women that were in your unit; right?

10  A    At what time?

11  Q    No, this first event, when --

12  A    Oh yes.

13  Q    -- when he brought the morning after pill.

14  A    But you were talking about the pill.

15  Q    I know.  Now I'm talking about the women that you had the

16  conversation with around that time.

17  A    Yes.

18  Q    I think you told us it was -- Danilda was one?

19  A    Yes.

20  Q    Kiara?

21  A    Yes.

22  Q    And Melva; right?

23  A    Yes.

24  Q    And I think you called -- you have a nickname for Melva;

25  right?

"Maria" - Cross - Ricco                                    186

1    A    No.

2    Q    Okay.

3    A    No.

4    Q    Who's Nani?

5    A    Danilda.

6    Q    Okay.  Now, you said -- your words, that when you told

7    Danilda about this, you told the jury that she used the

8    colloquial term and said, "Just fuck away."

9    A    Yes.

10   Q    Didn't what Danilda really say to you was, "What woman

11   doesn't want a piece of dick?"

12   A    She said that too.

13   Q    Also, Kiara was speaking the same way, right?

14   A    Yes.

15   Q    I want to talk to you about a couple of things.

16        I think you told us that your petition to stay in the

17   United States was granted?

18   A    Yes.

19   Q    And that you are now here and cannot be deported, right?

20   A    Yes.

21   Q    And when you were in immigration custody, some of the same

22   women you were in MDC with were also in immigration custody?

23   A    Yes.

24   Q    You also told us that in addition to your immigration

25   status being straight, you got a lawsuit pending?  Correct?

                    "Maria" - Cross - Ricco                    187

1   A    Yeah, right now that's all stopped.

2   Q    Stopped?

3   A    (No audible response)

4   Q    Is that the word you use that it's stopped?

5   A    Well, yes, well, yeah, well in other words there is a

6   lawsuit.

7   Q    Yeah, right?  It's pending, right?

8   A    Yes.

9   Q    Right.  One of the lawyers here, sitting right here in the

10  courtroom, right?

11  A    Yes.

12  Q    And you and your lawyers are suing the Bureau of Prisons

13  and Lieutenant Martinez?

14  A    Yes.

15  Q    For $20 million, correct?

16  A    Yes.

17  Q    You were in the custody of the Bureau of Prisons because

18  you were arrested for drug trafficking, correct?

19  A    Yes.

20  Q    Got locked up, right?

21  A    Yeah.

22  Q    And the day you got locked up, they took you to precinct?

23            THE INTERPRETER:  Took her to what?

24            MR. RICCO:  A precinct.  A police precinct.

25            THE WITNESS:  Yes.

"Maria" - Cross - Ricco                                    188

1   Q    And there were police officers there, correct?

2   A    Yes.

3   Q    And they asked you if you wanted to make a statement,

4   correct?

5   A    Yes.

6   Q    And there was an officer there speaking Spanish, correct?

7   A    Yes, when they took me to the MDC.

8   Q    Did you make a statement at, when you were in the custody

9   of the police when they arrested you?

10  A    Yes.

11  Q    And did you make that statement in Spanish or English?

12  A    It must have been in Spanish.

13  Q    Well, do you know?

14  A    I don't remember.

15  Q    You lied to the police, didn't you?

16  A    They were asking me what was in the bag and I didn't tell

17  them what it is or what it was.  I didn't tell them it was

18  something else.  I didn't say anything.

19  Q    Well, you lied to the police about the true identity of

20  the people that you were involved with, correct?

21  A    Not the true one.  I said nobody, I didn't mention

22  anybody.  Only one person who would go to pick up with me.

23  Q    Did you give the police the name of a person named Robert?

24  Yes or no.

25            THE INTERPRETER:  Did you say Robert?

"Maria" - Cross - Ricco                                           189

1          MR. RICCO:  Robert.

2     Q    Yes or no.

3     A    Yes.

4     Q    Did you give them the name of a person named Carlos?  Yes

5     or no.

6     A    Robert, Carlos and Max, yes.

7     Q    And how about Tatiko (ph)?

8     A    I don't remember that.  I don't remember.  Gabito? (ph)

9     Q    Okay.  Were you being truthful with them when you gave the

10    police those names?

11    A    That person, yes.  Those people, yes.  The only person I

12    didn't mention was the one from Santo Domingo.

13    Q    So, you lied to them, correct?

14    A    I didn't lie to them.  I told them the people whom I had

15    to deliver the drugs to.

16    Q    So when they asked you who the drugs belonged to and you

17    don't tell them in your mind that's not lying?

18    A    They asked me who I was going to deliver those drugs to.

19    Q    They also -- I'm sorry.

20         They also asked you who owned the drugs, didn't they?

21    A    Yes, but I didn't say.

22    Q    You also when you were arrested, the police recovered

23    about $10,000, correct?

24    A    Yes.

25    Q    And you lied about where the $10,000 came from, correct?

"Maria" - Cross - Ricco                    190

1   A    Yes.

2   Q    You told the police that the $10,000 was money from your

3   brother in the Dominican Republic who has sold property in the

4   Dominican Republic sent you the money to help you pay for a

5   cleaning franchise.  Did you tell that to the police?  Yes or

6   no.

7   A    Yes.

8   Q    And that was a lie, wasn't it?

9   A    Yes.

10  Q    And you told that lie because you didn't want to get in

11  trouble, right?

12  A    Yeah.

13  Q    So you came up with this story --

14          THE INTERPRETER:  Just a minute.

15  A    I wanted to protect my family.

16  Q    Okay.  So you came up with a story to protect your family

17  and your story was that your brother sold his property, sent

18  the money to you so you could use it for a franchise business.

19  That's the story you came up with, right?

20  A    It wasn't the story.  That money was not from that, but I

21  had actually -- I had a franchise. I had bought a franchise

22  with money that my brother had sent me.

23  Q    I'm going to ask my question again.

24          When you got busted -- excuse me -- withdrawn.

25          When you got arrested by police, you had about $10,000 on

Transcriptions Plus II, Inc.

"Maria" - Cross - Ricco                                    191

1   you, correct?

2   A    Yes.

3   Q    You told the police that that $10,000 that you had on you

4   was money that your brother sent you from the Dominican

5   Republic, correct?

6   A    Yes.

7   Q    That was a lie, wasn't it?

8   A    Yes, that money --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA162

"Maria" - Cross - Ricco                                    193

1  A     And I had sold my property in Santo Domingo.

2  Q     And so what you did, what you did was you mixed a little

3  bit of the truth with a lie to try to get what you wanted,

4  right?

5  A     Well, they were asking me where that money came from and I

6  didn't know what else to say.

7  Q     And when you came up with doing that, you didn't have no

8  lawyer, right?

9  A     No.

10 Q     You could've had one, right?

11 A     No.

12 Q     Okay.

13 A     No.  That happened right there.  They arrested me and,

14 it's where they take your fingerprints, not here in Manhattan.

15 The following day I had a lawyer.

16 Q     My question is, before the police questioned you, they

17 said to you you have certain rights, didn't they?  Yes or no.

18 A     Yes.

19 Q     And one of those rights they told you that you had was

20 that you had the right to have a lawyer.  Didn't they tell you

21 that?

22 A     They said it, but they said it in English.  When I was

23 arrested and they were putting me into their van, they were

24 reading everything they had to read.

25            THE COURT:  Did you understand it?

"Maria" - Cross - Ricco                                    194

1          THE WITNESS:  No, at that point what I was doing was

2     crying.

3     BY MR. RICCO:

4     Q    So you're able to tell us now that they said that because

5     you didn't understand it or because you did understand it?

6     A    Well, you know, when you get arrested the officer who was

7     in front of me, that's what she was reading and I imagine that

8     that's what she was reading.  But none of them spoke Spanish.

9     Q    I thought you told us you didn't remember if any of the

10    officers spoke Spanish or not?

11    A    No, when I was arrested in the van there were no officers

12    who spoke Spanish because the other officer was saying, what's

13    she saying, what's she saying.

14    Q    I'm not asking you about the van.  I'm asking you about

15    when you was in that precinct before you started making

16    statements that's what I'm asking you about.

17         Do you remember yes or no if the officers in that

18    precinct, before they started questioning you, said to you you

19    have the right to have a lawyer present?

20    A    Yes.  Not that I remember, but I imagine they said it.

21    Q    At some point, you had your own lawyer, correct?

22    A    Yes.

23    Q    Mr. Kluger.

24         THE INTERPRETER:  Mr.?

25         MR. RICCO:  Kluger, K-l-u-g-e-r.  Kluger.

"Maria" - Cross - Ricco                                              195

1   A     Yes.

2   Q     And who hired him?

3   A     The government.

4   Q     You didn't pay for the lawyer?

5   A     The last lawyer I did, yes.

6   Q     No, I'm not asking you about the last lawyer.  I'm talking

7   about the lawyer when you got arrested on the drug case?

8   A     The thing is that while I was arrested and detained for

9   the drug case, I had three lawyers.

10  Q     Who paid the three lawyers?

11  A     A friend of mine paid for only one lawyer.  The other ones

12  were from the government.

13  Q     Okay.  What's the friend's name?

14  A     Ramon Cruz.

15  Q     Did you lie to your lawyers about where the money came

16  from that you got arrested with?  Yes or no.

17          MS. GEDDES:  Objection

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.

20  BY MR. RICCO:

21  Q     And did you lie to your own lawyers about the number of

22  trips that you made in connection with this drug conspiracy?

23  A     Yes.

24  Q     Now that's the lawyer that Ramon paid for, right?

25  A     Yes.

GA165

"Maria" - Cross - Ricco                                          196

1   Q    Now yesterday and today you were asked questions about

2   something called a "safety value proffer," remember that?

3   A    Yes.

4   Q    And I think yesterday you told us that your understanding

5   was that if you told the truth you could get two points off,

6   remember saying that to the jury?

7   A    Yes.

8   Q    It's also your understanding that the crime that you were

9   arrested for carried a mandatory minimum of ten years in the

10  federal penitentiary, correct?

11  A    Yes.

12  Q    And the way that you would avoid or could avoid that

13  mandatory ten-year prison sentence would be if you went to a

14  meeting with the prosecutor and told them the truth about what

15  you did.

16  A    Yes.

17  Q    And if you told them the truth at the time of your

18  sentencing the prosecutors would write a letter to the federal

19  judge allowing you to be sentenced less than the mandatory ten-

20  year prison sentence, correct?

21  A    Yes.

22  Q    And so the first step that you had to do was you had to go

23  meet with the prosecutors and tell them the truth, right?

24  A    Yes.

25  Q    And such a meeting did take place?

"Maria" - Cross - Ricco                                    197

1   A    Yes.

2   Q    You and your lawyer -- at that time it was Mr. Kluger,

3   correct?

4   A    Yes.

5   Q    You went to the prosecutor's office, right?

6   A    Yes.

7   Q    In Manhattan?  Right?

8   A    Yes.

9   Q    To have that meeting, correct?

10  A    Yes.

11  Q    And before the meeting started, the prosecutor said to

12  you the most important thing for you to do in this meeting is

13  to be honest.  Correct?

14  A    Yes.

15  Q    And the prosecutor said if you're honest, we're gonna

16  right that letter for you.  Right?

17  A    Yes.

18  Q    Now you know that you can't get safety value if you're a

19  boss or organizer or leader in the drug conspiracy, correct?

20  A    I didn't know that, no.

21  Q    But you went into the meeting, with your lawyer, and you

22  lied.

23  A    I didn't tell them who the drugs belonged to, but I told

24  them everything that had happened that day I told them.

25  Q    But you had to tell them everything that happened in

"Maria" - Cross - Ricco                                    198

1  relationship to your plea -- I mean to the drug conspiracy not

2  just that day, correct?

3  A    Yes.  And I didn't tell them.

4  Q    You lied.

5  A    No.  In other words I wasn't going to put my family in

6  danger.  No.

7  Q    Okay.  So that's what you wanted to do and in order to

8  accomplish that you told lies.

9  A    I couldn't talk, in other words, no, I couldn't.

10 Q    Of did you tell them the truth?

11 A    I lied to them in terms of the number of times that I went

12 to pick up drugs, in terms of who the drugs belonged to, and

13 the origin of the drugs.  But I told them that I had called

14 that person on that occasion for them to reduce $2,000.

15 Q    Again, it's true that you wanted -- you were going to get

16 $2,000 from your role, correct?

17 A    From your?

18 Q    Participation?  Right?

19 A    Yes, they were going to give it to me over there in Santo

20 Domingo.

21 Q    And you mix that truth with a lie about the number of

22 trips you made?

23 A    Yes.

24 Q    Who owned the drugs?

25 A    Yes.

"Maria" - Cross - Ricco                                    199

1   Q    And that $10,000 that you had on you?

2   A    Yes.

3   Q    But it was true that your cut was supposed to be $2,000?

4   A    Well, my -- the reports from the clinic where my house --

5   where my brother was -- where my father was, are there.  They

6   exist.  And that lawyer -- and that lawyer who was doing the

7   safety valve, they sent him the days, the papers, explaining

8   that that very same day, my father had a heart attack.

9   Q    I'm asking you about your cut.  The 2,000.

10  A    Yes, I asked for the $2,000 so that they would give it to

11  my brother in Santo Domingo so that he could put my father into

12  the hospital.

13  Q    But that's a lie, though, isn't it?

14  A    No.  That's not.

15  Q    Did you tell the prosecutor during the proffer session

16  that Max was going to give you $2,000, right there?  Yes or no.

17  A    They were going to give it to me.  They called me.  They

18  -- they called me and I said to them, well, be it here, or be

19  it there, I wanted it.  They should give it to me in cash.

20         MR. RICCO:  Judge.  I'll let the answer stand.

21  BY MR. RICCO:

22  Q    I want to ask you this question.  Did you tell the

23  prosecutors yes or no, that Max was going to give you $2,000

24  right there during the transaction?  Yes or no.

25  A    I was going to deliver the drugs to Max.  When I would

"Maria" - Cross - Ricco                                        200

1   deliver, then Max would either give me the money here, or they

2   would give it in Santo Domingo.

3   Q    So your -- the answer to the question is no, you did not

4   tell the prosecutor that Max was going to give you the $2,000

5   right here?  Period.

6   A    Yes.  I said that.  But I never received the money.  I

7   could have been there and it could have -- or it could have

8   been there.

9   Q    Okay.  After the safety valve proffer -- I'll withdraw it.

10        In connection -- the safety valve proffer was in

11  connection with sentencing, correct?

12  A    Yes.

13  Q    But before you went to sentencing, you entered a guilty

14  plea, correct?

15  A    Yes.

16  Q    And you entered a guilty plea pursuant to a plea

17  agreement, correct?

18  A    Yes.

19  Q    And before you entered your guilty plea, you were required

20  to swear that the statements that you made in connection with

21  your guilty plea were truthful, correct?

22  A    Yes.

23  Q    And a federal judge put you under oath, right?  Gave you

24  the oath?

25  A    Yes.

"Maria" - Cross - Ricco                                                       201

1   Q    And told you that you had to be truthful with the Court in

2   connection with your guilty plea?

3   A    Yes.

4   Q    You lied in connection with your guilty plea?

5   A    Yes.

6   Q    But the Judge accepted your guilty plea.  Isn't that

7   correct?

8   A    Yes.

9   Q    And the Judge accepted your guilty plea based upon you

10  lying?

11  A    Yes.

12  Q    Now, you've been telling us how you were lying to protect

13  your family, right?

14           THE INTERPRETER:  Lying to who?

15           MR. RICCO:  Protect your family.  I'm sorry.

16  A    Yes.

17  Q    You wasn't lying to get up under that ten-year mandatory

18  minimum, were you?

19  A    Oh my God.  I didn't want that -- to get time.  That's the

20  reality.  But my greatest concern was my family.

21  Q    Okay.  So you told lies to a federal judge to protect your

22  family.

23           MR. RICCO:  Can we have that term interpreted on the

24  record please?

25           THE INTERPRETER:  Oh my God.

"Maria" - Cross - Ricco                                                202

1              MR. RICCO:  The witness said something.

2              THE INTERPRETER:  I just said it.  "Oh my God."

3              MR. RICCO:  Oh, I'm sorry.  We were speaking at the

4   same time.  Can -- just so we're clear, I didn't --

5              THE INTERPRETER:  Oh my God.

6              MR. RICCO:  Okay.

7   BY MR. RICCO:

8   Q    So the answer to that question that I posed to you is "Oh

9   my God"?

10  A    Because you're just asking me if I lied, if I lied, if I

11  lied.  That's all.  Yes.  I already told you.  I admit it and I

12  accept it.

13  Q    I am just asking you the questions.  You are the person

14  who's telling us that you lied and you lied and you lied.  Do

15  you understand that?

16             MS. GEDDES:  Objection, Judge.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes.  When I went to the meeting, I

19  didn't tell the truth.  And when I went before the Judge, I

20  pled guilty, yes.

21  Q    When you were in that meeting with the prosecutors, you

22  mentioned to them that your family's house had burnt to the

23  ground three years before that meeting, and that you had a

24  brother who was killed, in that meeting.  Did you tell them

25  that in -- did you tell them that during the proffer session?

"Maria" - Cross - Ricco                                    203

1    Yes or no.

2    A    He had died in the fire.

3    Q    The question is did you say --

4    A    Yes.

5    Q    You understood my question?

6    A    Yes.

7    Q    Now, later on, when you was applying for your immigration

8    status, you put in your immigration petition that some "Mr.

9    Big" -- we won't mention his name, but some Mr. Big in the

10   Dominican Republic was responsible for burning that house down,

11   correct?

12   A    Yes.

13   Q    And let's just be clear.  You put his name in that

14   immigration petition.  I'm not going to ask you what it is, but

15   you put his name in that immigration petition, isn't that

16   correct?

17   A    Yes.  But after I read that what you say in immigration is

18   confidential.

19   Q    Okay.  And what you say in the safety valve session with

20   the government, the prosecutors, is public?

21   A    Well, if I had said it there, they were going to go and

22   arrest the person who was here, and he was going to know that I

23   was the one who had told on him.

24   Q    Okay.  You did not tell the prosecutor the Mr. Big story,

25   correct?

"Maria" - Cross - Ricco                                        204

1   A    Yes.

2   Q    So I want to talk about -- we'll come back to it.  But

3   right now, I want to ask you a couple questions about the time

4   that you was in the MDC after you got locked up.  Okay?

5   A    Okay.

6   Q    In your immigration documents, you say that you was

7   depressed when you were in jail and because of your depression,

8   you went to get some psychological therapy, correct?

9   A    Not me.  The other prisoners found the woman and I went to

10  therapy.

11  Q    And you went to therapy because you were depressed, right?

12  A    Yes.

13  Q    And so you went there for help, correct?

14  A    Yes.

15  Q    And did you tell the therapist about the fire so you could

16  get help?

17  A    No.  She spoke English.  All she did was put some

18  headphones on me and watch some videos and hear music.

19  Q    This is another one of those yes or no questions.

20       Did you say to the therapist that there was an accident

21  which occurred two years ago at your home in the Dominican

22  Republic which you had never previously spoken about?  Did you

23  say that to the therapist?  Yes or no.

24  A    I don't know if I told her.  It would have been in my

25  broken English.  She didn't speak Spanish.

"Maria" - Cross - Ricco                                             205

1   Q    Did you also say that a two-year-old boy was playing with

2   a lighter and accidentally lit the house on fire which resulted

3   in the death of your brother and nephew?

4   A    That's what -- in other words, that's what my family

5   thought.  Until the other person confirmed it was him.

6   Q    Well, no, we're talking about the therapy session that's

7   happening inside the Metropolitan Correctional Facility.

8   That's what I'm asking you about and I'm asking about what you

9   said.  Not what your family thought.  Okay.

10       So I'm going to ask you the question again to give you the

11  opportunity to answer it truthfully.  Did you tell the

12  therapist that a two-year-old boy was playing with a lighter

13  and accidentally lit the house on fire which resulted in the

14  death of your brother and a nephew?  Yes or no.

15  A    If I told her, it would have been in my broken English.  I

16  don't know.  I don't remember.  She didn't speak Spanish.

17  Q    I'm not asking you what she said.  I'm asking you what you

18  said.  Is that a yes or no that you made that statement to the

19  therapist when you were in that session on October 30, 2014?

20       MS. GEDDES:  Objection.  Asked and answered, your

21  Honor.

22       THE COURT:  Overruled.

23       THE INTERPRETER:  Could you repeat that question

24  please?  Repeat the question?

25       MR. RICCO:  Okay.  I can try.  I'll try.

GA175

"Maria" - Cross - Ricco                                     206

1    BY MR. RICCO:

2    Q    Did you -- I'm asking you what you said, okay.  Not the

3    therapist, all right?  So for example, the therapist don't know

4    your family in the Dominican Republic, right?

5    A    No.

6    Q    Okay.  So when you were in the therapy session -- I'm

7    going to ask you again.  Did you say that a two-year-old boy

8    was playing with a lighter and accidentally lit the house on

9    fire which resulted in the death of your brother and a nephew?

10   Yes or no.

11   A    I don't remember.

12   Q    Did you say that other members of your family were burnt

13   such that they were left useless to work with their hands?  Did

14   you make that statement to the therapist?  Yes or no.

15   A    My entire family got burned.  But I don't remember having

16   spoken like that with that person.  She didn't speak any

17   Spanish.

18

19

20

21

22

23

24

25

"Maria" - Cross - Ricco                                              208

1   BY MR. RICCO:

2   Q    Did you also say that you was in Santo Domingo at the time

3   the tragedy happened?  Yes or no.

4   A    No.

5   Q    You didn't say that?  Okay.

6   A    I wasn't in Santo Domingo.

7   Q    All right.  Did you go for another session on October 8,

8   2014?  Do you remember going to a second session?

9   A    To where?  To the psychiatrist?

10  Q    Yeah.

11  A    Every Saturday or Sunday, I don't know which one, she

12  would have us listen to that because we couldn't talk.  I

13  didn't speak English and she didn't speak any Spanish.

14  Q    When you went to the second session, did you say to the

15  therapist, the following?  Yes or no.

16       There was an accident which occurred two years ago at your

17  home in Santo Domingo during which a two-year-old boy was

18  playing with a lighter and accidentally lit the house on fire.

19  Did you say that to the therapist at the second session?  Yes

20  or no.

21  A    The only time that I remember -- the only time that I

22  remember having spoken to that woman was when she called a --

23  an interpreter on the phone and the interpreter was translating

24  for us.

25  Q    Did you make that statement during the second session?

"Maria" - Cross - Ricco                                      209

1  Yes or no.

2  A    No.  I don't remember.  I didn't speak to that woman at

3  all.

4  Q    Did you go to a third session around October 29th?

5  A    I don't know.

6  Q    At the third session, did you again tell the -- withdrawn.

7       Did you tell the therapist that you started having

8  nightmares about saving your brother from the fire?  Yes or no.

9  A    I don't remember that.

10  Q    Let's go back to Court.

11  A    I want to know how it is that I explained those things to

12  her, but I don't speak English.

13  Q    One thing for sure.  We know that the therapist at the

14  MDC; you're the only person in the family that that therapist

15  spoke to, correct?

16  A    The prisoners spoke with her and that's why they came to

17  get -- look for me in my room.

18

19

20

21

22

23

24

"Maria" - Cross - Ricco                                    210

1   Q    No, no.  Were the prisoners the people in your family?

"Maria" - Cross - Ricco                                        211

1   BY MR. RICCO:

2   Q    You are the only person in your family that the therapist

3   spoke to, correct?

4   A    Of course.

5   Q    Did you tell the other women in the jail the story about

6   the house burning down and the little boy with the lighting the

7   house on fire?  Did you tell the women in the jail that?

8   A    Yes.

9   Q    So and some of those women were who?  Women that you were

10  doing time with, right?

11  A    Yes.

12  Q    You was lying to them too.

13  A    I wasn't lying to them.  That's what we thought had

14  happened.

15  Q    Okay.  And at the time of sentencing -- withdrawn.

16       When you were asked the questions about your immigration

17  application, you said that you lied during the safety valve

18  session.  And that you were now telling the truth about what

19  happened.  You just told that to the jury a few minutes ago,

20  correct?

21  A    Yes.

22  Q    And at the time of sentencing, you had to go back to Court

23  to find out what sentence you were going to receive?

24  A    Yes.

25  Q    And you recall, don't you, that at your sentencing, the

"Maria" - Cross - Ricco                                            212

1   judge asked a couple of questions about the fire.  Isn't that

2   correct?

3   A    Yes.  She spoke, but I don't remember what she said.

4   Q    But you remember her asking you questions about that fire

5   at the sentencing, right?

6   A    Yeah.  But I don't remember what.

7   Q    The Judge had told you how important it was for you to be

8   truthful, correct?

9   A    Yes.

10  Q    You never told the Judge the truth about the number of

11  drug trips that you took, correct?

12  A    No.

13  Q    And you never, you never told the Judge the truth about

14  the $10,000 that was seized at the time you were taken into

15  custody, did you?

16  A    No, no, no.  When they have the meeting I told the

17  prosecutor that Max had given me those $10,000.

18  Q    So you told the prosecutor a little truth mixed with a

19  little lie, right?

20  A    Yes.

21  Q    And when you stood before the Court for sentencing, you

22  lied to the federal judge about that fire, didn't you?

23  A    Yes.

24  Q    And with your lies, you were successful because you got

25  the sentence less than the ten years, right?

"Maria" - Cross - Ricco                              213

1  A    Yes, but the person in Santo Domingo knew that I hadn't

2  spoken.

3  Q    I'll ask the question again.

4       You got a sentence well below the mandatory minimum of ten

5  years, correct?

6  A    Yes.

7  Q    And you got that sentence by lying?

8  A    If I had told the truth I wouldn't have done so much jail

9  time because I would have told it.

10 Q    If you would have told the truth, you would have admitted

11 to being involved in even more drug transactions than just the

12 one, right?

13 A    Yes, but I would have also given them the names of all of

14 those people and they would have arrested all those people.

15 Q    Only if you wanted to, correct?

16 A    I was not going to put my family in danger, no.

17 Q    So you lied and got the sentence below the mandatory

18 minimum.

19 A    Yes.

20           MR. RICCO:  Judge, I'm going to try to finish up.

21           THE COURT:  Okay.

22 BY MR. RICCO:

23 Q    So let's take a look at the number of people that you lied

24 to so that you could get that sentence below ten years.  And

25 where you lied to get it, okay.

"Maria" - Cross - Ricco                                          214

1          THE INTERPRETER:  And what?

2          MR. RICCO:  And where you lied to get it.  The places

3    that you lied.

4    Q    So let's start with the first, you lied to the police that

5    arrested to you, right?

6    A    Yes.

7    Q    You lied to your own lawyer?

8    A    Yes, but --

9    Q    Lied to the prosecutors when you met with them?

10   A    Yes.

11   Q    And last but not least, you lied to a United States

12   District Court Judge.  Right?

13   A    Yes.

14   Q    Now we got the $20 million lawsuit pending, right?  Right?

15   A    If I were interested in that lawsuit, I wouldn't have

16   stopped it and started it a year later.  In other words, I

17   don't care about it.

18   Q    You don't care about $20 million?

19   A    $100 million dollars will not pay for what they did to me,

20   not 20 million, 100.

21   Q    I didn't ask you that.

22        My question was simple.  Are you telling the jury you

23   don't care about the $20 million, that's the question.

24   A    If they come, they come.  Anyway you can sue for $100

25   million and you get 300,000.

"Maria" - Cross - Ricco                                                    215

1  Q    Who told you that?

2  A    Are they gonna give me 20 million?

3  Q    You told us, let's stick with the $300,000 figure for a

4  second.

5       Yesterday you told us that the reason why you got involved

6  in the drug conspiracy is because some drugs was lost and you

7  was told you owed $300,000, right?

8  A    Yes.

9  Q    But you didn't tell us why the person called you in the

10 first place.  So, why did they call you in the first place?

11 A    That's a very long story.  Do you want me to tell it?

12 Q    At the time you had a boyfriend who was in jail for drugs,

13 correct?

14 A    (Laughter).

15 Q    Is that funny?

16 A    No, I didn't have one.

17 Q    Did you ever tell the agents that you had a boyfriend who

18 was serving jail time for drugs?  Yes or no.

19 A    Yes, but I went to go pick up those drugs I didn't have

20 that person, when I was arrested I did.

21 Q    So you were told that you had to pay off 300,000, right?

22 A    Yes.

23 Q    And that you were going to do that at $2,000 a pop, a

24 trip, right?

25 A    Yes.

"Maria" - Cross - Ricco                                        216

1    Q    So that means you were on the hook for 150 drug

2    transactions, correct?

3    A    Well, whenever they told me I would go and pick it up and

4    I would give it to the person on the next block.

5    Q    My question is, if we do the math, $2,000 a trip, total

6    debt 300,000, you got to do a 150 trips to pay that off, right?

7    A    Well, if you did the math and that's what it is, I guess.

8    Q    You're guessing because you made that whole story up in

9    the first place, it's not true is it?

10   A    Oh, my God.

11   Q    Is it the truth or did you make it up?  It's a simple

12   answer.

13   A    No.  Every time I would go he would discount $2,000, but

14   that time I told him to give it to me in cash.

15   Q    When -- you told us that a guy named Lopez came to visit

16   you at the jail, right?

17   A    Yes.

18   Q    Remember the thing you told us, you keep kissing him so

19   that Lieutenant Martinez would forcing himself on you?

20   A    Yes.

21   Q    Tell the truth, when the guy came to the jail, you asked

22   him to give you $8,000, isn't that right?

23   A    I told him that when I went to Immigration I was going to

24   need a lawyer, and the cost was $8,000.  Asking him to help me

25   to get it, like him and Ramon my other friend.  In other words

"Maria" - Cross - Ricco                                    217

1   for people to help me pay the bail -- I'm sorry, a lawyer, I

2   meant the lawyer.

3   Q    You didn't get any visits, correct?

4   A    No.

5   Q    And so this plan of getting everybody together to help you

6   raise this money, did you have these conversations on the phone

7   from the jail?  Yes or no.

8   A    I've been having those conversations from the time you get

9   arrested or actually from the time you get sentenced, one is

10  aware that you're going to immigration.

11  Q    If the idea of talking to Ms. Vargas was so that a

12  conversation could be overheard that would cause Lieutenant

13  Martinez to stop forcing himself on you, why didn't you have

14  the conversation with the man, Mr. Lopez?

15  A    When Noel came he started well he was happy -- Noel was

16  happy and he said when you get out I can sign for you.  I

17  didn't want to let him down when he was, you know, so happy to

18  see me.  I didn't tell him anything.

19  Q    So your answer to the question as to why you didn't have

20  the conversation with Noel Lopez over the phone is because he

21  was happy to see you when he got to the jail, that's your

22  answer?

23  A    How's that?

24  Q    I'll ask another question.

25       Isn't the truth the reason why you asked the woman to

"Maria" - Cross - Ricco                                          218

1    engage in a conversation with Lieutenant Martinez is because in

2    your mind  you felt that if a woman is getting in touch with

3    him he would start talking to her?

4             MS. SHIHATA:  Objection, mistates the testimony.

5             THE COURT:  The jury's recollection will govern, but

6    I don't know who the "he" is that you're referring to.

7             MR. RICCO:  I'll break it down.

8    BY MR. RICCO:

9    Q    You intentionally picked Ms. Vargas to get in touch with

10   Lieutenant Martinez on Facebook, isn't that correct?

11   A    No.  I didn't tell her that.  I told her to look for him

12   and that if he wasn't gonna stop then I was gonna ask her to

13   send him a message saying that she knew everything.

14   Q    And before she got -- was to get in touch with him,  you

15   told her, make sure you delete me.  Defriend me.  Correct?

16   A    Yes.

17   Q    And that's because --

18            THE COURT:  What does defriend mean?

19            MR. RICCO:  Oh, I'm sorry.

20   Q    So that when she contacts him on Facebook, you don't come

21   up as one of her friends, right?

22   A    Yes.

23   Q    And it would look like it didn't have anything to do with

24   you, correct?

25   A    Well, I know that I told her to delete me.

"Maria" - Cross - Ricco                                         219

1   Q    And you did that on purpose, right?

2   A    Yes.

3   Q    It was part of the plan, right?

4   A    Oh, my God, what plan?  What plan?  What I wanted is for

5   him to stop, I wanted him to hear me speaking.

6   Q    You wanted to see if he had pictures on Facebook with him

7   and other women that's the truth, isn't it?

8   A    So if I say, answer yes, you're not gonna ask me that

9   question again?

10  Q    I want you tell the truth as best you can.

11  A    I don't remember exactly step-by-step everything in the

12  conversation that I had with her.  I know we spoke about the

13  woman who was with him, spoke about the girl.

14  Q    Okay.  I'll move on from Facebook.

15       Since you've been out of jail you've been in touch with

16  some of the woman that you did time with, correct?

17  A    Yes.

18  Q    One of the women is Melva, correct?

19  A    When I got out I saw her.

20  Q    And there came a time when you wanted to purchase a

21  vehicle and you asked Melva would she cosign the credit

22  application to get the vehicle?  Yes or no.

23            MS. GEDDES:  Objection, relevance.

24            THE COURT:  I'll allow it.

25            THE WITNESS:  Yes.

Transcriptions Plus II, Inc.

"Maria" - Cross - Ricco                                              220

1   BY MR. RICCO:

2   Q    Did she agree to it or not?

3   A    Yes.

4   Q    Did you take Melva's identification information, without

5   her knowing it, and use it in connection with getting that

6   vehicle?  Yes or no.

7   A    No.  I was at the dealership and I called her.  The car

8   wasn't even mine, it wasn't even mine.  It belonged to another

9   friend of mine.  And they needed a cosigner so I called her and

10  I asked her, "Can you cosign for a car that's going to be used

11  for work?"  She said, yes.  And she sent me, she texted me the

12  information.  Her license, her social, it's there in my phone.

13  Q    So your testimony is that Melva gave you that information

14  so that you could use it?

15  A    Yes, she sent it to me.  Look in the phone, the

16  conversation is in there.

17  Q    That's not my question.

18          MS. GEDDES:  Objection, asked and answered, your

19  Honor.

20          THE COURT:  So ask it again.

21  BY MR. RICCO:

22  Q    My question is, not that it's in your phone, did you use

23  that information without her permission?

24  A    No.

25  Q    Okay.  One more incident involving Melva and then we'll

"Maria" - Cross - Ricco                                      221

1   almost really be done.

2        There came a time when Melva called you and said I need

3   some money, right?

4   A    Yes.

5   Q    You didn't have the money but you told her you had a

6   friend in Spain named William who had money, correct?

7   A    Yes.

8   Q    And you contacted William?

9   A    No.

10  Q    Okay.  You gave Melva the number to contact William?

11  A    Yes.

12  Q    And it was a conversation about the money, correct?

13  A    Yes.  Oh, my God.

14  Q    There's no question before you.

15  A    No, this is my private life after I got out.

16  Q    And so Melva never got the money, isn't that right?

17  A    No, because she started to tell William that I had a

18  boyfriend.  But she told him that I had gone to her house to

19  steal -- that I had stolen the information from her and that I

20  had gone to the dealer to get a car.  So I sent all the

21  information to William from the time when she sent me all of

22  her information, the license.  So William called her and said

23  to her why did you do that, why did you tell me that.  So then

24  he didn't give her the money.

25

"Maria" - Cross - Ricco                                                    223

1   BY MR. RICCO:

2   Q     So the transaction never happened, right?

3   A     No.

4           MS. SHIHATA:  Objection; asked and answered.

5           THE COURT:  I'll allow it.

6           THE WITNESS:  I don't know.  I don't know I never

7   spoke to William again.  I don't talk to William, but William

8   said that he took the money out.

9   Q     Whatever happened to the car?

10  A     I gave it to Melva.

11  Q     Why?

12  A     Because that person wasn't able to continue to pay for the

13  car so Melva told me to give it to her, and I gave it to her.

14          MR. RICCO:  Your Honor.  Thank you.

15          THE COURT:  All right.  Could you come up for a

16  minute.

17

18

19

20

21

22

23

24

25

"Maria" - Redirect - Shihata                          225

1  REDIRECT EXAMINATION:

2  BY MS. SHIHATA:

3  Q    Good evening.  I'm going to be very brief, okay.

4       You were asked some questions about your guilty plea in

5  your federal criminal case, do you recall being asked about

6  that?

7  A    Yes.

8  Q    At your guilty plea you plead guilty to a drug conspiracy

9  charge, correct?

10 A    Yes.

11 Q    And at that plea you told the Judge that you agreed with

12 others to distribute five kilograms of cocaine or more,

13 correct?

14 A    Yes.

15 Q    And that was true, correct?

16 A    Yes.

17 Q    You were also asked some questions about the lawyers you

18 had when you were first arrested and then during your criminal

19 case, do you recall being asked questions about that?

20 A    Yes.

21 Q    And you testified on cross-examination that the day after

22 you were arrested you got a lawyer, correct?

23 A    Yes.  The government assigned me a lawyer.

24 Q    That was a court-appointed lawyer, correct?

25 A    Yes.

"Maria" - Redirect - Shihata                    226

1    Q    You had that lawyer for a period of time?

2    A    Yes.

3    Q    And then you hired a different lawyer, Mr. Kluger,

4    correct?

5    A    Yes.

6    Q    And that was the one that your friend paid for?

7    A    Yes.

8    Q    You were asked a number of questions towards the end about

9    Melva and a car financing and those -- questions related to

10   that subject, correct?

11   A    Yes.

12   Q    Did all of that happen well after you left the MDC?

13   A    Yes.

14   Q    And does it have anything to do with what happened to you

15   at the MDC?

16   A    No, that was just last year.

17   Q    Now you were asked some questions about a lawsuit you

18   currently have pending?

19   A    Yes.

20   Q    Are you testifying at this trial because you want $20

21   million?

22   A    No.

23   Q    Why are you testifying at this trial?

24   A    So that justice can be done that's the only thing that I

25   want.

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK

-----------------------------X Docket#
UNITED STATES OF AMERICA,     : 17-cr-00281(ERK)
                              :
                              :
     - versus -               : U.S. Courthouse
                              : Brooklyn, New York
CARLOS MARTINEZ,              :
                              : April 13, 2022
               Defendant      : 3:19 p.m.
-----------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

For the Government:        **Breon S. Peace, Esq.**
                           United States Attorney

                    BY:    **Nadia Shihata, Esq.**
                           **Elizabeth Geddes, Esq.**
                           Assistant U.S. Attorneys
                           271 Cadman Plaza East
                           Brooklyn, New York 11201

**For the Defendant:**     **Anthony L. Ricco, Esq.**
                           **Steven Z. Legon, Esq.**
                           20 Vesey Street, Suite 400
                           New York, NY 10007

                           **Carlos M. Santiago, Esq.**
                           The Law Office of
                            Carlos M. Santiago
                           11 Broadway, Suite 615
                           New York, NY 10004

Transcription Service:     **Transcriptions Plus II, Inc.**
                           61 Beatrice Avenue
                           West Islip, New York 11795
                           RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                            Proceedings

1          THE CLERK:  We're on for Criminal Cause for

2    Sentencing in 17-cr-281, *The United States v. Carlos*

3    *Martinez*.

4          Counsel, please state your appearances for the

5    record.

6          MS. SHIHATA:  Good afternoon, your Honor.

7    Nadia Shihata and Elizabeth Geddes for the United States.

8          MR. RICCO:  Good afternoon, your Honor.

9    Anthony Ricco, Carlos Santiago, Steven Legon for Carlos

10   Martinez.

11         THE COURT:  Okay.  Well, I'm not sure whether

12   I'm going to sentence him or not, but you can call it

13   sentencing.  I just want to go through some of the legal

14   issues that have been raised so that we can get them

15   ironed out including God knows when I was getting emails

16   last night with submissions.

17         So how shall we organize this?  I guess there

18   are pending motions.  You moved for judgment of acquittal

19   and you've made other arguments.  Why don't you take the

20   lead?  I mean you want to take the lead?

21         MS. SHIHATA:  I'm just happy to answer your

22   questions and Mr. Ricco can of course correct me if I get

23   it wrong.  I don't believe any post trial motions on the

24   second trial were in fact filed so --

25         THE COURT:  I thought he was asking for the

3

Proceedings

1  paper that he filed not last night --

2          MS. SHIHATA:  I think he alluded to the fact

3  that maybe down the line he may choose to file something

4  but at this point my understanding is we're prepared to

5  proceed to sentencing and of course Mr. Ricco can --

6          THE COURT:  Maybe I didn't read it right.  Do I

7  have this?

8          MS. SHIHATA:  I have copies of everything.

9          THE COURT:  I should have copies too.  Do I

10  have his sentencing order?

11                  (Pause in proceedings)

12          THE COURT:  Or didn't mislay this document

13  which I'm talking the lawyer just sent me in April.

14  Where's the one before April 12th?  Is April 12th your

15  last and only filing in relation to this?

16          MR. RICCO:  Substantive, yes, Judge.

17          MS. SHIHATA:  There's one earlier one, Judge.

18  I think it's dated -- filed on I think it was October 1st

19  or September 30, 2021.  It's ECF docket number 129.

20          MR. RICCO:  Yes.  That's the defendant's

21  sentencing recommendation.  That's 129.  ECF document 130

22  is objections to the PSR.  The next substantive filing

23  would have been the filing on the evening of the 12th.

24          THE COURT:  Well that was yesterday.

25          MS. SHIHATA:  Yes, your Honor.

4

                              Proceedings

1          MR. RICCO:  Yes.

2          THE COURT:  But I thought I read something

3   before yesterday.  In fact, you responded to it and you

4   even threw in a line that said he had only until -- I

5   mean that --

6          MS. SHIHATA:  I'm sorry.

7          THE COURT:  You said it's too late because he

8   didn't file it by April 20th.

9          MS. SHIHATA:  Well also, he didn't file it.

10  There's a footnote or a sentence in the sentencing

11  recommendation that says something about that and the --

12         THE COURT:  Right.  And I need to see it.  I

13  mean I thought you said it was too late and I thought he

14  said something to indicate that it wouldn't have been too

15  late.  April 20, 2020 this court was for all practical

16  purposes in shutdown and it wasn't on for sentencing.  I

17  don't want to get involved if he hasn't moved.  But my

18  normal practice is invariably when a jury reaches a

19  guilty verdict, I give the defendant until the date of

20  sentencing to file any motions that have to be filed

21  within seven days of the verdict.  It's almost automatic.

22  But if he didn't move, he didn't move.  I thought I saw

23  it.

24         Okay.  So you haven't moved.  So what do you

25  want from me?

Proceedings

5

1    MR. RICCO:  Judge, we're prepared to go

2    forward.  The issues that we would have raised in the

3    motion have been preserved.  We had a sidebar about it.

4    Your Honor decided it was a legal issue and related to

5    the concept of whether or not a threat of force had to be

6    related to an exercise of force, not just a threat of

7    force.

8    THE COURT:  Look, the government has

9    unnecessarily complicated this case as they usually do.

10   There were five separate incidents involving sexual

11   contact and for each one they use four separate statutes.

12   And that sort of complicates it.  The one count, as I

13   view the verdict, the verdict was complicated by the fact

14   that there were two trials and probation used one

15   numbering and I think I had another one.  Do you have the

16   verdict sheet?  I'm just going to pull up the verdict

17   sheet that I gave to the jury because it's much easier

18   for me to deal with.

19   MS. SHIHATA:  To the extent it's helpful,

20   Judge, in the government's October 28 --

21   THE COURT:  It's not helpful the way you set it

22   out.  You gave me one set and then something on the

23   bottom of it.

24   MS. SHIHATA:  Just it shows the counts in both

25   the redacted indictment and the original.

6

Proceedings

1          THE COURT:  Yes, I know but I don't want it.

2          MS. SHIHATA:  Okay.  It's not helpful.  That's

3    fine.

4          THE COURT:  Just when I charged the jury I used

5    the verdict sheet that I gave them.  And when I went back

6    to see what I charged the jury, it was useful for me to

7    be able to use the verdict sheet I gave them.  Are you

8    going to be able to find it?  I got it.  Okay.

9          At the first trial the jury I believe convicted

10   the defendant of everything.  I set aside the verdict I

11   guess on all of the counts except what I would call the

12   count involving the --

13         MR. RICCO:  Ward?

14         MS. SHIHATA:  Sexual abuse of a ward, your

15   Honor?

16         THE COURT:  The ward, yes.  The sexual abuse of

17   the ward which was not an issue and was not affected by

18   the Brady material.

19         Of the counts that were submitted to the jury,

20   the deprivation of rights, which also coincides with the

21   aggravated special sexual abuse as it must because I

22   charged the jury that in order to find deprivation of

23   rights they ultimately have to find as one element

24   aggravated sexual abuse.  And so the verdict sheet is

25   consistent in that they found the defendant guilty on

GA199

7

Proceedings

1   count 4 which is deprivation of rights, count 5 which is

2   the aggravated special abuse which coincides with date.

3   And then they also found him guilty of sexual abuse on

4   one of the counts that did not involve penetration.  I'm

5   sorry, on one of the counts I think the second December

6   13, 2015 count only because they wanted to be consistent

7   all the way through.

8          But we're basically dealing with the same

9   element, the same critical element.  And I don't see how

10  I can set aside the jury verdict.  I don't say this is

11  not a troubling case which is why having tried the case

12  in 2019 I spent three of the last four days reading the

13  transcript.  And there are aspects of the case that are

14  troubling including the telephone call that she had, what

15  a telephone call -- the investigation, what I'll call the

16  Facebook investigation which leaves serious questions as

17  to its purpose in my own mind.  It seems to me that this

18  is a jury question.  I can't set the verdict aside under

19  the normal standards of government that govern the jury,

20  jury verdicts notwithstanding that I find they are

21  troubling aspects in this case.

22          So now the other counts don't matter to the

23  calculation of the guidelines.  They might matter if they

24  added anything to any of the guidelines in life where a

25  sentence within the guidelines would be relevant if the

GA200

Proceedings

8

1  jury had found him guilty of five counts of forcible

2  rape, which they didn't.  And I regarded the verdicts on

3  counts 3 to 15 as really -- it seems to me it doesn't

4  apply to what was charged.  I don't believe -- I believe

5  that as charged and as she testified, the victim, she did

6  not consent because she was threatened or because of

7  fear.  Possibly she may not have recorded it for that

8  reason.  But she didn't testify, and you can find it for

9  me if you can, where she testified that the reason for

10  her consent was fear or force.  In fact, if you take a

11  look at your own letter which describes in some detail

12  her testimony, let me see if I have that, it was all

13  force.  He just used force each time in order to have

14  sexual relations with her.  It wasn't caused by anything

15  other than his physical strength and his ability to rape

16  her.

17            MS. SHIHATA:  May I respond, your Honor?

18            THE COURT:  Yes.  What I'm saying is it may not

19  affect the guidelines but I don't think it adds -- that

20  is the guidelines would still be life when I say that.

21  And I'm not even sure that it affects what sentence

22  within the guideline range because it's all the same

23  basic conduct.  But go ahead.  Take a look at page 4 of

24  your letter.

25            MS. SHIHATA:  Sorry, which of the letters?

Transcriptions Plus II, Inc.

9

Proceedings

1          THE COURT:  I think it's your letter of October

2   28, 2021.

3          MR. RICCO:  Okay.  So your Honor --

4          THE COURT:  These are all forcible rapes as you

5   described them.  In your opening statement you refer to

6   them that way.  Ms. Geddes was a little bit more subtle

7   and tried to work in fear and threats.  But to the

8   extent -- I don't recall that she testified that that was

9   the reason how she came to engage in that.  And I think

10  the statute, the only way the statute could be sensibly

11  read is it's a kind of forced consent, not by physical

12  force, but by threat of force.

13          In this case, if you read what you wrote, if

14  you read what you argued to the jury and what she

15  testified to, which is what you quote, on page 4 of your

16  letter you quote all the evidence, this was simply a

17  case, if you believe the testimony, where he physically

18  raped her.  That's sort of the way I view those counts.

19          I don't know whether anybody thinks when they

20  draft an indictment about how the case is going to be

21  presented and what problems it's going to entail

22  particularly with a witness like this one.  But that's

23  sort of my view of it.

24          So you know, for the purpose of sentencing, I'm

25  looking at this as a one count indictment, one count

GA202

10
Proceedings

1  conviction, however I have to record it on whatever sheet

2  that the Sentencing Commission makes me file as their

3  bookkeeper.

4         MS. SHIHATA:  So I'll be brief, your Honor, and

5  mostly state this for the record.  But first of all, we

6  agree that the guidelines are driven by the convictions

7  regarding the deprivation of civil rights and the

8  aggravated sexual abuse that predicates it.

9         THE COURT:  It's the same thing.

10        MS. SHIHATA:  Correct.

11        THE COURT:  It's the same thing.

12        MS. SHIHATA:  I understand, Judge.  I'm not

13 disagreeing with you.  Where I do disagree is that it is

14 mutually exclusive that the assault, the sexual abuse in

15 this case could not be both through physical force, and

16 you're right, we lay out and we believe we do assert that

17 physical force was used for all of them.

18        THE COURT:  That's her testimony.  Her

19 testimony was -- the reason that I agreed to do it was it

20 was because I was afraid, he threatened to do something

21 to me if I didn't agree to, if I didn't acquiesce.

22        MS. SHIHATA:  I understand, Judge.

23        THE COURT:  And in fact I put down here -- but

24 go ahead, I don't want to delay you.

25        MS. SHIHATA:  Judge, I fully understand that

Transcriptions Plus II, Inc.

GA203

11

Proceedings

1   you disagree with me.  That's of course fine, your

2   prerogative.  But my point is simply that the case law

3   does not require just an explicit threat in order for the

4   sexual abuse counts to be well founded.

5          THE COURT:  They may not.  I'm not saying that

6   it does.  I'm talking about what you charged him with and

7   what you proved and what her testimony was.  The fact

8   that he has the ability to cause her harm, that to me is

9   almost the same thing as a ward, in the capacity of a

10  ward, in his capacity as a ward, he had the power to do

11  as (indiscernible).

12         I mean basically what you've done here is

13  totally confuse this case with the way you've charged.

14         MS. SHIHATA:  Judge, I understand that's your

15  perspective.  Respectively, the government disagrees.

16  Respectfully, Judge, there was evidence in the record

17  from which the jury could find the sexual abuse count.  I

18  understand if your Honor disagrees.

19         THE COURT:  Let me ask you this.  Maybe I

20  missed it.  Could you show me where she said that the

21  reason that I acquiesced, or she didn't acquiesce so she

22  wouldn't have even said that, but the reason that I had

23  sexual relations with him was because he threatened --

24         MS. SHIHATA:  That's not the legal requirement,

25  Judge.  It does not need to be that he said the words if

GA204

Proceedings

12

1  you don't have sex with me I will put you in the SHU.

2  That is not what the case law requires and I'm not

3  suggesting that the evidence showed that explicitly.

4  THE COURT:  No your case law that you cited to

5  me was the threat or the fear, it doesn't have to be.

6  Obviously, you know, in the way the statutes are written

7  if it's too much of a physical threat, it doesn't even

8  violate the statute that you've charged.  But the statute

9  still requires that it caused the act to take place.

10  MS. SHIHATA:  And an act can be caused to take

11  place by multiple things.  Was there physical force?  We

12  believe there was.  But there was also --

13  THE COURT:  There was, of course.  I don't want

14  to say of course.  The jury found, I accept the jury's

15  verdict.  There are aspects of her testimony and the

16  evidence in this case that are problematic.  But in terms

17  of the jury's verdict, I'm not arguing with it.

18  MS. SHIHATA:  I understand, Judge, and I won't

19  belabor the point.  I understand what you're saying.

20  THE COURT:  Good.  Mark, did I give you

21  something?  There's actually an amendment to the statute

22  that's not directly relevant that was March 22nd.  But I

23  believe one provision that was added that sort of helps,

24  it says "Engages in a sexual act that causes another

25  person to engage in a sexual act."  And now I'm skipping

Proceedings

13

1   the language we've argued about.  "Without that other

2   person's consent to include doing so through coercion."

3   So it's the causing to do the particular act through

4   threats, fear or coercion.

5           But in any event, I found this accidentally

6   just by Shepardizing some of the cases that you cited in

7   your brief.  And the Second Circuit case that you cite in

8   your brief is actually a case where I think the officer

9   testified that that was the reason why she consented.

10  I'm talking about the one in the Federal Appendix that

11  you cited in your brief.

12          MS. SHIHATA:  That was a guilty plea, your

13  Honor, yes.

14          THE COURT:  I'm sorry, guilty plea.  Even

15  better.

16          MS. SHIHATA:  I have nothing to add on this

17  point, your Honor.  I will rest on our papers and --

18          THE COURT:  Okay.  So let's deal with what's a

19  reasonable sentence here.

20          MS. SHIHATA:  Are you starting with me?

21          THE COURT:  Whoever wants to talk about it.

22          MS. SHIHATA:  Go ahead.

23          MR. RICCO:  Oh, thanks.  Judge, it's always

24  difficult to pick a place to start it sentencing.  I

25  would share with the Court that as the Court can see from

GA206

14
                    Proceedings

1   our submissions, sentencing submissions, document 129 and

2   130, we struggled with the issues that your Honor just

3   discussed as to how do the verdicts in this case

4   translate into a reasonable sentence given all of the

5   factors the 3553(a).

6          And so we laid those arguments out.  I think

7   your Honor's had that.  It's interesting, Judge, that the

8   jury in this case rejected the theory of force of the 15

9   counts that went to the jury.

10         THE COURT:  Well, they rejected her testimony.

11  They essentially, on the counts that they acquitted,

12  which were forcible counts --

13         MR. RICCO:  And your Honor --

14         THE COURT:  -- went through the deprivation of

15  rights and the aggravated sexual abuse, they found that

16  she was not telling the truth.  There's no other way to

17  explain that acquittal.

18         MR. RICCO:  So your Honor, we looked at it from

19  the standpoint of mitigation in sentencing and how does

20  this verdict, how the underlying factors as spoken by the

21  jury apply here at sentencing.  So it took a long time,

22  Judge.  It took a long time, a lot of thought, a lot of

23  work.  And I think we've laid that out.

24         So this is what I'd like to say, Judge.  It's

25  very rare that we're here for sentencing with a defendant

GA207

Proceedings

1   that we've spent so much time with.  I mean length of

2   time.  So Judge, when we started this case, Carlos

3   Santiago was just married, he had no kids.

4           THE COURT:  With a wife that he was --

5           MR. RICCO:  With a wife.

6           THE COURT:  With a wife to whom he was married.

7           MR. RICCO:  Married.  That's correct.  That's

8   Carlos Santiago.  Okay?  So here we are for sentencing.

9   He's still married but he's got three kids now.

10          THE COURT:  And a grandchild.

11          MR. RICCO:  Well, not yet.

12          THE COURT:  Not yet?  I thought there was a

13  grandchild too.

14          MR. RICCO:  No, that's -- I'm talking about my

15  co-counsel, Santiago.

16          THE COURT:  Oh, okay.

17          MR. RICCO:  And I mentioned that because of the

18  breadth of the time period that we've had on this case.

19  And I know that oftentimes people view defense

20  perspective is just adversarial.  They're just saying

21  that because they're the defendant and that's what

22  they're supposed to say.  They could think that but the

23  reality is far from that.  We've had a lot of time to

24  spend with Carlos Martinez.  He has been in Essex County

25  Jail 59 months and a few weeks.  Five years.  He's been

16

Proceedings

1  there under very harsh conditions.  He was charged with a

2  sexual offense which makes serving time difficult in and

3  of itself, compounded by the fact that he's a law

4  enforcement officer made his housing situation very

5  difficult.  And then I won't even get into COVID.  But a

6  great deal of time was spent relating to Carlos Martinez

7  about what happened to him.  How did this happen to you?

8  What's going on with your life?  Because everything that

9  we've known about Carlos Martinez is that he signed up

10  for the Marine Corps coming out of the Red Hook projects

11  one week after his 18th birthday and he went into the

12  Marine Corps and served our country with distinction in

13  three combat circumstances.  He's decorated and came out

14  of the service with post stress disorder syndrome.

15          THE COURT:  Well there were three theaters of

16  violent war that he was involved with.

17          MR. RICCO:  Yes.

18          THE COURT:  At least if I recall from your

19  submission.

20          MS. SHIHATA:  Yes, Judge.

21          THE COURT:  He was in Libya and Kuwait and what

22  was the third?

23          MR. RICCO:  He's got Sharp Edge, which was in

24  Africa.  Just Cause, which is in Panama.  And then he's

25  in Desert Storm, which is the Gulf War.

17

Proceedings

1        And he, as a teenager, he's distinguishing

2   himself from the Red Hook Projects in a way that brought

3   great pride to his grandparents that raised him for the

4   most part, and his grandfather was in the military also.

5        And then he comes out of the military and goes

6   into the Bureau of Prisons.  And Judge, the government --

7   listen, nobody is disregarding his conduct.  But he goes

8   into the Bureau of Prisons and he is respected at the

9   highest level at the Bureau of Prisons.  He's a superstar

10   there not because he wanted to be a superstar, but

11   because of his conduct and action.  And so the officers

12   that testified all said Carlos Martinez was held in the

13   highest esteem at the jail.  That testimony is there from

14   the three officers.  I mean it's in our submission.

15        But also, Judge, Ms. Otis Delacruz testified

16   and she corroborated what the officer said.  And who is

17   Ms. Otis Delacruz?  She was a lady who was in that unit

18   with Maria on the 16th of April in particular.  She had

19   been not called as a government witness and we know why

20   because she didn't support the theory.  She testified

21   here that he always treated her with respect and dignity

22   as he did the other inmates.  Now that's not to disregard

23   his criminal conduct, but it's to tell us that something

24   happened to him along the way.

25        And Judge, this is what you also don't know.

18

Proceedings

1  Ms. Otis Delacruz, your Honor, we brought her here under

2  subpoena.  We caught hell for that from one of her

3  daughters.  She was a very sickly lady and her daughter

4  gave us hell for bringing her mother down.  And so you

5  call the witness, you look at their sheet, you try to

6  figure out what's going on.  And Judge, you know what we

7  discovered after the fact?  That Ms. Delacruz shouldn't

8  have been in jail all that time period in the first

9  place.  And so one of the things that I did was I had one

10 of my classmates in Boston look into her situation and he

11 filed an application for compassionate release for her.

12 And she's released.  She's with her family.  She was

13 deported.  She's back in the Dominican Republic.  She was

14 a courier who was represented by the lawyers who

15 represented the people that she worked for.  They picked

16 her lawyer and she got the time, and they went on about

17 their business which were people dealing drugs.

18        But Ms. Delacruz was like telling the truth

19 about the officers she worked with and she was telling

20 the truth about the lady that she served time with who

21 testified here under the name of Maria.

22        So this guy who's respected by so many, and

23 while he was at the Bureau of Prisons, one day he's

24 coming to work and engaged in an act, which he received a

25 commendation for valor, a truck was ablaze dangling off

19

Proceedings

1  the BQE right up the street from the jail and Carlos

2  Martinez runs, climbs up, carries the guy out of the

3  truck.  I guess he saved his life.  We don't know.  The

4  guy didn't die.  But he certainly removed him from peril.

5            And so what we know is the man before the Court

6  for sentencing is a man who throughout his life did

7  things to make people proud of him.  His interaction with

8  Maria is not one of those things.  His criminal conduct,

9  his criminal conduct that he was convicted of, and that

10 criminal conduct resulted in the loss of everything that

11 he worked for in his entire life.  He was fired from his

12 job, divorced from his wife.  She waited until after the

13 verdict.  He's penniless.  He lost his pension.  It's all

14 gone.  Couldn't pay anybody for anything.  He's got a $20

15 million lawsuit pending against him brought by the person

16 named Maria.  And good luck on collecting.  But the

17 character of the defendant that's established at a time

18 when they're not trying to curry favor but they're just

19 doing what they think is best, you know, people don't

20 want to hear that as sentencing.  We --

21            THE COURT:  You also left out his work at the

22 World Trade Center.

23            MR. RICCO:  I did, Judge.  In addition to, he

24 was a first responder at the World Trade Center and he

25 was rewarded for that with cancer.

GA212

20

Proceedings

1      THE COURT:  How long was he working there?  It

2  was more than just a day.

3      MR. RICCO:  He was there many weeks.  He was

4  there three or four months, Judge.

5      And so he's got a lot of character.  You know,

6  Judge, Carlos Martinez didn't testify in the first trial.

7  Maybe I didn't explain that to you.  But he didn't

8  testify because he had a serious conversation with his

9  counsel about his oath, what the oath means, what he's

10  done with his life, and how he needs to go about trying

11  to redeem himself and get his life back on track.  He

12  decided not to testify.  And I think we made a record

13  about it.

14      Judge, there's a serious Brady violation and

15  that serious Brady violation caused all of that work that

16  was done in the first case to be vacated.  As we said in

17  our papers, we would have never known about it because

18  the government effectively kept that information from us

19  through motions in limine and protective orders and the

20  other cases where Jane Doe number four testified.  We

21  would have never known about it, Judge, but for the fact

22  that the defense lawyer from that case was in the

23  courtroom previewing the testimony of the very same

24  witnesses that would be testifying in his case.  And when

25  that testimony came in, he said that wasn't what happened

21

                    Proceedings

1  in the trial.

2          And so we made a Brady demand.  And on the

3  Brady demand we discovered that the government had in

4  fact interviewed Jane Doe number four about the April

5  16th incident.  In that interview, that individual who

6  testified as the name Yolanda is what she testified to,

7  provided information that was contrary to the many

8  theories of prosecution in this case.  And because of it,

9  the Court granted the motion because it brought into

10 question the whole concept of how force was done and what

11 were the honest reportings of it before people got

12 lawyered up and began thinking about the millions of

13 dollars that they're going to get one day.

14         And so we had a second trial.  And in the

15 second trial, Judge, Yolanda got on the witness stand and

16 Judge, she denied every statement that was the basis of

17 the reasons why it was vacated.  So at page 540, lines 2

18 to 4, she denied that Otis Delacruz asked her if she

19 would accompany her or go with her down to clean and the

20 woman said no.  She said I never said that.  She denied

21 that a few days after this event Yolanda asked Maria why

22 she did not want Otis Delacruz or her to go along with

23 her to clean.  She denied that that conversation ever

24 happened.  She denied that at page 540 lines 11 through

25 17.  She denied that she told the agent and the

22

Proceedings

1 prosecutors present in this courtroom that Maria told

2 Yolanda that she wanted to go along because she was

3 leaving and she was having relations with the man.

4           THE COURT:  In the testimony that my law clerk

5 typed up for me, which I asked her to do so I would have

6 it handy, there is one question that I think Mr. Santiago

7 said --

8           MR. RICCO:  Mr. Martinez, your Honor.

9           THE COURT:  You know, you're getting me

10 confused with Santiago and Martinez.

11           MR. RICCO:  I know.

12           THE COURT:  This is Mr. Santiago who's

13 questioning.

14           MR. RICCO:  Who's questioning, yes, Judge.

15           THE COURT:  Okay.  And this is Yolanda I

16 believe.

17           MR. RICCO:  Yes.

18           THE COURT:  "You also told them that you asked

19 Maria if you could go up there and clean with her and

20 Maria said no.  Correct?"  Yolanda, "Yes.  I asked her if

21 I could go and she said no," which is one of the many

22 things that troubles me about the evidence in this case

23 and the quality of the evidence in this case.

24           MR. RICCO:  Yes, it --

25           THE COURT:  Of course the jury acquitted on

23

Proceedings

1  that particular count.

2          MR. RICCO:  They did.  And Judge --

3          THE COURT:  And it still raises in the overall

4  picture why she even went down there.  She was about to

5  be released.  This was within a couple of days, a couple

6  of weeks, I don't remember her projected release date.

7  And --

8          MR. RICCO:  Well, Judge, what --

9          THE COURT:  -- being a question from her own

10  testimony (indiscernible) physically he came -- he just

11  had come back to work from what looked like some complex

12  hernia surgery, how competent he was to engage in violent

13  physical activity.  So even though she did go back on

14  what she told the FBI agent, and what she told the FBI

15  agent is in evidence, that's part of what's stipulated

16  that if the agent testified that's what she would say.

17          MR. RICCO:  Yes.

18          THE COURT:  But she did say that Yolanda said

19  that she said to Maria do you want me to come with you,

20  and I find that -- that's one of the many aspects of

21  Maria's testimony that I find troubling.

22          MR. RICCO:  And Judge, to me what makes it

23  difficult for sentencing purposes is that I don't get it,

24  I missed something here, the very statements that

25  provided the basis of us having a retrial in the first

Transcriptions Plus II, Inc.

GA216

24
Proceedings

1   place, the witness takes the stand and denies that she

2   ever made them.

3           THE COURT:  But she admits she made a

4   significant one.  The question was that she went back on

5   why did she, and I'm only paraphrasing, is essentially

6   why didn't she want you to go she may have said something

7   it's because I have a relationship with him.  That's the

8   part that I think she went back on.

9           MR. RICCO:  Yes.  But Judge, she does --

10          THE COURT:  But that was in front of the jury

11   as well because the agent's summary of notes was there.

12          MR. RICCO:  Well, yeah.  And Judge, to me that

13   is the most important part of it because it really calls

14   into question when you look at the totality of the

15   evidence, you look at the other officers who testified

16   who said we never saw any stress.  She was always

17   escorted down.  The officers escorted her back and forth

18   and they never saw any distress.

19          THE COURT:  They're talking.  Don't know what

20   to make of that.  But let's say they said that.  It's

21   still a question of this going down, stop in February

22   after the strange Facebook --

23          MR. RICCO:  Facebook call.

24          THE COURT:  -- call in which she was obviously

25   trying to find out personal information about the

25

                    Proceedings

1   defendant which would have corroborated her interest in a

2   relationship with him.  And then when he found out about

3   it and she found out about it, it stopped.  He stopped

4   calling her.  And then there was this last one and she

5   could have presumably have avoided it.  And you know,

6   we're dealing here with, I mean you know you're dealing

7   with people who are in jail who are not people of the

8   highest moral character and who all have problems.

9           But this last April 16th, April visit whenever

10  it was --

11          MR. RICCO:  April 16th.

12          THE COURT:  April 16th.  It's one of the --

13  that and the Facebook call are one of the things that I

14  have terrible qualms about.  But she was acquitted.

15          MR. RICCO:  Yes, Judge.  So I really -- I mean

16  we wrote so much about sentencing that I know that the

17  Court has a firm grasp on the points that we want to

18  make.

19          THE COURT:  Don't assume anything.

20          MR. RICCO:  I generally don't, Judge.  But I

21  will say this.  What the Court doesn't know about is the

22  many hours that were spent with Carlos Martinez, his very

23  depression that we saw after the second verdict.  He

24  looked horrible, lost.  You know, he's doing much better.

25  He's hopeful for his future.  He knows he has a lot of

                                                              26
                          Proceedings

1    building to do.  He has to rebuild his life, rebuild his

2    relationship with his daughter who, by the way, is going

3    to college now, his youngest daughter started in college.

4              And Judge, his aunt is present here today.

5    She's seated in the first row.  And there was a time when

6    we tried this case the courtroom was packed.  All the

7    correction officers were here and different people.  And

8    the one lady stayed throughout, she's been to every

9    proceeding, and Carlos, as you recall, Judge, Carlos

10   Martinez's mother died while he was detained in this

11   case.  We had made an application to try to get him there

12   and weren't able to.  And his mother's sister has

13   remained very supportive of her nephew.  She's heard the

14   testimony.  She believes in him.  She has strong

15   religious beliefs, and the defendant does too.  And he's

16   never lost that.  I could go on but I'm not.

17             THE COURT:  Well notwithstanding the fact that

18   I am concerned about whether false testimony was given by

19   the complainant and the jury found that, I still have the

20   guilty verdict which I can't set aside.

21             MR. RICCO:  That's true.

22             THE COURT:  And it's a forcible rape by a

23   prison guard and --

24             MR. RICCO:  So Judge, I have to --

25             THE COURT:  I could say, and this is not a

27

Proceedings

1  defense to him, but one of the things that's been
2  bothering me about this is I believe, and again I want to
3  repeat, that this is not a defense at all to him, that
4  the MDC has been at an enabler of these rapes.  I had one
5  case involving Clark Mullins who you didn't charge.  When
6  I say you, Ms. Geddes, I don't mean you personally, but
7  the U.S. Attorney's Office didn't charge him with
8  forcible rape.  And when I read the testimony, I mean I
9  believe it was a guilty plea, but when I read it, I
10 upwardly departed I think it was to eight and a half
11 years because it seemed to me I couldn't understand why
12 this wasn't charged as a violent rape.

13            Judge Ross's case involved five separate -- and
14 I know you divide it up and you want to make it look a
15 little less terrible in terms of comparing sentences, but
16 it involved one officer and five I believe women who were
17 subject to one form or another of sexual assaults.  We'll
18 just use the word loosely.  Two of them may have been
19 violent rapes.  And now I have this case.  So that's
20 seven.  And when I say the MDC was an enabler, it wasn't
21 that there were that many incidents, but they send women
22 to clean the office of male officers.  The officers are
23 not under close circuit surveillance.  But the setup is,
24 as you went through all the pictures, was that the
25 officer inside the office can see what was going on

28

Proceedings

1   outside and see if anybody was coming.

2          And the final step in this enabling processes

3   is when a complaint is made, whether the testimony was

4   not entirely clear whether it was temporary or more than

5   that, the complainant is put in the SHU which is solitary

6   confinement 23 hours a day.  And that's how this system

7   works or has worked.  And I don't know what's going on.

8   I mean there was some indication in a note that Mr. Ricco

9   sent me last night that there's some separate Department

10  of Justice investigation that's going on.  This is just

11  inexcusable.  They are enablers of what's going on.

12         And then I have the warden who has the nerve to

13  write me a sentencing letter in this case when I suspect

14  that the warden who was there when these things were

15  going on was probably permitted to retire without

16  consequence.  And it's just shocking, shocking degree to

17  which the Bureau of Prisons at the MDC enabled this to

18  happen.  No one had the foresight to think we shouldn't

19  send women, and in effect it's almost a degree of sexism

20  which is the least of the crimes to send a woman in to

21  clean as opposed to men.  So I just --

22         MR. RICCO:  Judge, what I wanted to add, and it

23  is --

24         THE COURT:  And I want to make it clear this is

25  not a defense to any guard who committed a rape.  It's

29

Proceedings

1  not a defense.  But these crimes were enabled by the

2  people who ran the Bureau of Prisons.  And that's one of

3  the things that's really bothered me through these cases

4  that I've had.

5          Go ahead.  I'm sorry if I interrupted you.

6          MR. RICCO:  Yes.  So Judge, along those lines,

7  and these arguments that I'm making are really in

8  mitigation of sentencing, not of guilt.

9          THE COURT:  No, no, no.  I know.

10          MR. RICCO:  And I would say this, Judge, the

11  case that --

12          THE COURT:  Well I wanted to get to that.

13  That's what I wanted to get to.  I wanted to get to the

14  issue of sentencing because these are serious crimes in

15  an institution like that, assuming it was committed, and

16  I have to accept the jury's verdict despite my own qualms

17  about her credibility.  It's ultimately a credibility

18  determination.  I couldn't set aside the verdict even if

19  you had timely moved on that count.

20          MR. RICCO:  Judge, the case that

21  (indiscernible) --

22          THE CLERK:  The microphone.

23          MR. RICCO:  Sorry.  The case that you upwardly

24  departed about that you mentioned, I'm familiar with

25  that.

30

Proceedings

1      THE COURT:  That was Clark Mullins.

2      MR. RICCO:  Yes, Judge.  And I'm familiar with

3  that case and your Honor's ruling with respect to that

4  case.

5      THE COURT:  You were the original lawyer and

6  then he was stupid enough to get somebody else.

7      MR. RICCO:  Well, I agree with that.  But I do

8  know, Judge, that having read your concerns, I get it.  I

9  mean it was.  I mean it was a prosecutorial decision was

10  made to allow a person to plead to a count just involving

11  a ward thing.  But --

12      THE COURT:  Maybe the government had their own

13  qualms about the credibility of the witness.  I don't

14  know.

15      MR. RICCO:  They may have.  I don't know,

16  Judge.

17      THE COURT:  Occasionally I think about it

18  particularly since I've immersed myself in this

19  particular case.

20      MR. RICCO:  And then Judge, the other case was

21  a case that involved many of these same, several of these

22  same witnesses involving the case in front of Judge

23  Matsumoto.  And that defendant's conduct dated back to

24  2013.  And tried by the same prosecutorial team.  His

25  guidelines were life also.  He was convicted of forcible

GA223

31

Proceedings

1    rape, multi-counts of it.  There were no acquittals in

2    that case.

3                THE COURT:  I know but --

4                MR. RICCO:  I'm just saying this, Judge.  The

5    sentence that was imposed --

6                THE COURT:  Ms. Geddes has broken it down so

7    that you can't say they're Rule 5 forcible rapes.

8                MR. RICCO:  Well there were no -- there was

9    some differences but he was convicted --

10               THE COURT:  Yes, I know.  But there were five

11   separate instances of improper, we'll just use that word,

12   neutral word, sexual contact.

13               MR. RICCO:  And even one --

14               THE COURT:  Including one at least, I don't

15   remember --

16               MR. RICCO:  Right.  And then there was one

17   count --

18               THE COURT:  -- whether it was one or two of

19   forcible rape.

20               MR. RICCO:  There was one count standing alone

21   of an attempted.  But the fact of the matter, Judge, is

22   that the kind of time that the government is requesting

23   in here is just disproportionate and disparate given

24   sentences that are imposed for the same kind of facility

25   by people who have engaged in far more egregious conduct

32

Proceedings

1  with far more women.  I'm sure that their investigation

2  is what it is involving this woman who testified here.

3          We had asked that the Court consider a sentence

4  of 60 months.  And why?  Five years in prison is a long

5  time.  It's not a light sentence.  I represented a

6  defendant here who was charged with having sex with a

7  ward and one count and she received a sentence of a year

8  and a day.  Different circumstance obviously as each

9  individual case is different.  And I'm a great believer

10  that defendants are entitled to an individual assessment

11  of who they are in their case.

12          I mention it because of fairness in sentencing.

13  We don't lose fairness at the time of sentence.  It's

14  probably the time where fairness needs to be at its

15  highest level because of the loss of liberty and

16  everything that goes along with it.

17          The last five years for Carlos Martinez have

18  been very harsh.  He's been through COVID.  And many

19  judges of this court, your Honor included, have granted

20  relief to defendants at sentencing because of it.  Carlos

21  Martinez endured that also in addition to the

22  circumstances of his detainment resulting from the type

23  of charge and the fact that he's a law enforcement

24  officer.

25          It's probably been the most difficult time -- I

33

Proceedings

1 know that it's been the most difficult time at least in

2 my career that defendants have had to endure being

3 incarcerated. And it's a factor that I would ask the

4 Court to consider.

5          I'm familiar with your Honor's sentence, Mr.

6 Mullins. And I guess I arrived at the suggestion based

7 upon the involvement of COVID and the two years that Mr.

8 Martinez endured as a result of that was not present. I

9 don't know if your Honor would have considered that as an

10 issue in the Mullins case or not or to what extent, or to

11 what extent it should be considered here. But it is a

12 factor. It is a real-time factor that affected the

13 defendant. It was a part of his punishment.

14          But I can tell the Court that my belief is that

15 the defendant before the Court, if the word atone means

16 anything, that he's gone through that process that

17 everyone would expect all of the defendants to do, and

18 that has happened for him. That I'm confident of because

19 we've had to endure such a long time with this case. Not

20 because of the government or anything. Two years of it

21 has been COVID. But if there's a such thing as

22 unintended consequences, the unintended consequences of

23 that is that it provided a time period for reflection,

24 isolation, and for Mr. Martinez to regroup.

25          And I don't have anything else to add, Judge.

GA226

34
Proceedings

1    I don't.  It's all been said.  It's all in the papers.

2            THE COURT:  One of the things that I said when

3    I departed upwardly in Clark Mullins in terms of the

4    factors that go into the sentencing guidelines, it's not

5    a question of deterring him in terms of deterrence being

6    one of those factors.  I don't think anybody thinks that

7    he's going to go out and become a serial rapist.  This

8    happened because of a particular circumstance that lent

9    itself to it.

10           But what message do I send?  And I said this to

11   guards at the MDC, I've already tried to send a message

12   to the MDC to the extent they never pay any attention to

13   what judges think.  What message do I send to people who

14   are at the MDC.  I mean that to me is I think --

15           MR. RICCO:  Judge, I think --

16           THE COURT:  -- this is a serious crime in terms

17   of the 3553(a) factors.  I don't think there's any --

18   there's no doubt in my mind that he is not going to go

19   out and rape anyone if he's released.  He's not a violent

20   criminal.  He's led an otherwise admirable life in terms

21   of the factors that we went through near the outset of

22   your presentation.  But you know, to what extent do I

23   impose a sentence that would be imposed if it was simply

24   purely consensual and it was simply a ward situation.  I

25   mean that's the thing that I'm somewhat torn by, that and

35

                        Proceedings

1  the fact that I'm concerned about her veracity as a

2  witness.

3            MR. RICCO:  Judge, I still take the position

4  that five years in prison is a powerful --

5            THE COURT:  I don't quarrel with that.  There

6  are times when I have conversations with my law clerks,

7  maybe not with this group because of COVID we haven't

8  spent as much time with each other.  But I'd say a year

9  doesn't sound like a lot unless you have to serve it.

10 And five years is an awful lot.  I'm aware of that.  But

11 you know, there are other considerations I have to take

12 into account.

13           All right.  Shall we hear from the government

14 and then your client?  Or do you want me to hear from

15 your client and then the government?

16           MR. RICCO:  Let's hear from the government and

17 then Mr. Martinez can respond to what they have to say

18 about him.

19           THE COURT:  I need to take my mask off to take

20 a drink of water.

21           MS. SHIHATA:  Should I proceed or --

22           THE COURT:  I think I can drink water and

23 listen to you at the same time.

24           MS. SHIHATA:  I'm sure you can.  I'm sure you

25 can.  Thank you, your Honor.

36

Proceedings

1          I would just like to start by indicating that

2    the government does not agree that the only reasonable

3    conclusion that the Court can draw from the jury's

4    verdict is that they did not credit Maria's testimony.  I

5    think an equally reasonable conclusion and frankly one

6    that is supported by the jury's verdict is laid out on

7    page 5 of our October 28, 2021 letter.

8               And I want to take us back for a moment to the

9    evidence and the testimony in this case regarding the

10   first incident where the jury found the defendant guilty

11   of aggravated sexual abuse.

12               THE COURT:  I'm not questioning the verdict.

13               MS. SHIHATA:  I understand, but it informs the

14   rest of what I'm going to say.  So if the Court would

15   indulge me, I'd appreciate it.

16               With respect to the factual scenario of that

17   incident, the evidence was that the defendant had called

18   Maria down to clean the second floor area and that during

19   the course of the interaction in the lieutenant's office,

20   he pinned her down on the desk, pulled her pants down,

21   and forcibly raped her from behind with such an amount of

22   physical force that ultimately resulted in her bleeding.

23               Now I think that's important --

24               THE COURT:  She testified -- I don't want to

25   get into all of this stuff.

GA229

37
Proceedings

1        MS. SHIHATA:  She did testify to that, but
2    there was --
3        THE COURT:  She testified that the bleeding was
4    due to the fact that she had not had sexual intercourse
5    in some time.
6        MS. SHIHATA:  She may believe that --
7        THE COURT:  Now I know Ms. Geddes at some
8    point in the transcript --
9        MS. SHIHATA:  -- but I don't think
10   scientifically that that's how it works.
11       THE COURT:  -- said that that wasn't so but I
12   believe it's on page 79 that --
13       MS. SHIHATA:  I believe that was in the first
14   trial if I'm remembering.  I don't think --
15       THE COURT:  No, I think it was --
16       MS. SHIHATA:  Anyway --
17       THE COURT:  Unless I have the wrong transcript.
18       MS. SHIHATA:  -- be that as it may, the jury
19   could certainly infer and conclude, as it did I
20   believe --
21       THE COURT:  They found it.  I didn't say they
22   didn't --
23       MS. SHIHATA:  Okay.  But the reason it's
24   important, Judge --
25       THE COURT:  -- credit her testimony on that

38

Proceedings

1    count.  They did.

2           MS. SHIHATA:  Understood.  But the reason it's

3    important, Judge, is because the fear element can also be

4    a fear of the use of that amount of physical force.  So

5    for example, if she is fearful that he is going to use

6    that amount to get her to submit, that's a fear under the

7    law that even though he used some lesser amount of

8    physical force, and that qualifies and is consistent with

9    the jury's verdict.  Your Honor may disagree with me.  It

10   appears that you do.  But I want to make the record clear

11   that there is a conclusion that can be drawn from the

12   evidence that entirely credits Maria's testimony.  And

13   that actually fits the verdict that was rendered by the

14   jury in this case.

15          THE COURT:  Well that's not what the jury was

16   charged and that's not the way --

17          MS. SHIHATA:  Your Honor, they were charged.

18   They were --

19          THE COURT:  It's not the way you charged it and

20   it's not --

21          MS. SHIHATA:  I disagree, but I'll move on.

22          THE COURT:  It's not clear to me that your

23   construction of the statute is correct.  She did not say

24   this.  You're putting those words in her mouth.

25          MS. SHIHATA:  A jury is permitted to draw

GA231

                                                           39
                        Proceedings
1   inferences from the evidence though, Judge.

2           THE COURT:  Could you tell me that she said

3   what you just said?

4           MS. SHIHATA:  Sorry, I didn't hear you.  I

5   apologize.

6           THE COURT:  That she gave the reason for

7   acquiescing because she was afraid that the next time he

8   was going to use force.

9           MS. SHIHATA:  Judge, it is not --

10          THE COURT:  Could you answer that?

11          MS. SHIHATA:  I don't believe she --

12          THE COURT:  That only requires a yes or no.

13          MS. SHIHATA:  No, she did not explicitly say

14  that.

15          THE COURT:  She did not say that, no.

16          MS. SHIHATA:  But it is also clearly the law,

17  Judge, that a jury can draw inferences from the evidence

18  and that is a valid inference to draw.  You may not have

19  agreed and you may not have drawn that inference but the

20  jury certainly could.

21          THE COURT:  I might have.  The question is --

22  I'm not saying I agree or disagree.  I just think that

23  the question is what caused her to consent to the extent

24  there was consent if she consented as opposed to each

25  time he approached her.

GA232

40

Proceedings

1          MS. SHIHATA:  There's a difference --

2          THE COURT:  As you described it in your letter,

3     there was no conversation.  He just violently assaulted

4     her each time.

5          MS. SHIHATA:  Your Honor, knowing the

6     consequences --

7          THE COURT:  And in each case you describe it in

8     your opening statement as rape.

9          MS. SHIHATA:  Rape is not just physical force,

10    your Honor.

11         THE COURT:  Now it's one thing if she said that

12    the reason that I -- she didn't say she acquiesced, but

13    the reason I went along, the reason I didn't fight was

14    because I was afraid.  The fact is that she actually did

15    fight on one occasion.

16         MS. SHIHATA:  She did.  And he then threatened

17    her with five years in prison.  He said do you know what

18    you could get for that?  Which is entirely consistent

19    with the government's theory, Judge.

20         THE COURT:  What you could get for assaulting a

21    federal officer, a prison guard or a prison officer.

22         MS. SHIHATA:  Yes, but it has to be looked at

23    in the context of what was going on, Judge.  And by the

24    way, she did testify that she was scared.  And there is

25    case law I believe from the Fifth or the Eighth

41

Proceedings

1 | Circuit --

2 |       THE COURT: I know she was scared. Why did she

3 | go down there on the last time?

4 |       MS. SHIHATA: Because he was -- she is an

5 | inmate, she doesn't get to decide that she's not going to

6 | go down when a lieutenant, who's the highest ranking

7 | person in jail at the time says --

8 |       THE COURT: She was asked by another prisoner

9 | whether she wanted to be accompanied. And it was also

10 | quite near the end --

11 |       MS. SHIHATA: Your Honor, Otis Delacruz did

12 | testify at the trial --

13 |       THE COURT: It was also --

14 |       MS. SHIHATA: -- and did not recall that.

15 |       THE COURT: It was also right near the end of

16 | her prison sentence. Days away.

17 |       MS. SHIHATA: Exactly, Judge. And she wanted

18 | to get out of the MDC which was a horrible place for her

19 | where these things occurred. Judge, I'm not trying to

20 | convince you at this point but I think the record is --

21 |       THE COURT: The record is that the jury found

22 | what they found and they found him not guilty.

23 |       MS. SHIHATA: And they found him guilty of

24 | sexual abuse using fear.

25 |       THE COURT: And they did, they found him --

42

Proceedings

1    MS. SHIHATA:  Of not just aggravated sexual

2 abuse.

3    THE COURT:  I don't --

4    MS. SHIHATA:  You may disagree with them but

5 that is in fact what the verdict was.  And that's all I'm

6 saying is that there is evidence from which the jury

7 could reach that verdict.  I understand that you

8 disagree.  I am simply making a record that there was in

9 fact evidence about it.

10    THE COURT:  Okay.  There was.  Let's assume

11 you're right --

12    MS. SHIHATA:  But now I will move on.

13    THE COURT:  I'm not sure what that adds to the

14 discussion we're having.

15    MS. SHIHATA:  Okay.  I think what it adds,

16 Judge --

17    THE COURT:  Because the worst part of what he

18 did was physically assaulted her each time as you

19 describe it in your letter and as you characterized it in

20 your opening statement.

21    MS. SHIHATA:  I agree, Judge, that is the worst

22 part and that is the most serious.

23    THE COURT:  I don't think that there was any

24 adequate response in the summation to the call, I keep

25 calling it a call, to the Facebook investigation.

43
Proceedings

1        MS. SHIHATA:  There was testimony.  And I'm not

2  trying to retry this case, Judge, at the sentencing but

3  there was testimony --

4        THE COURT:  No, some of the stuff is relevant.

5        MS. SHIHATA:  Understood.  And I would like to

6  remind your Honor, and I'm sure it sounds like you read

7  the transcript and are fully familiar with the records

8  are not trying to suggest otherwise, but there was

9  testimony about the reasons that she made that call in an

10  effort to make the abuse stop.  And she thought that he

11  would be listening to it and that this would help.

12        THE COURT:  Then she knew that if she -- you

13  know, you're going around in a somewhat conflicting

14  argument.

15        MS. SHIHATA:  Judge, the one thing --

16        THE COURT:  She was afraid to make a complaint

17  but in effect she was doing something that would in

18  effect be the equivalent in terms of her tormentor

19  finding out what she was doing.

20        MS. SHIHATA:  She believed he was listening to

21  her calls.  The point was not so that --

22        THE COURT:  And why was the request made about

23  whether he was married or not and why were questions

24  asked about the women who were in the pictures?

25        MS. SHIHATA:  Because she wanted him to be

44

Proceedings

1  concerned that she had made this call and concerned

2  enough that he would stop.  Your Honor, the one thing

3  that's clear from the evidence is that --

4          THE COURT:  Well, the call could have

5  indicated --

6          MS. SHIHATA:  -- she did not know --

7          THE COURT:  The call could have indicated to

8  this person, we'll call it a call, whatever, I don't know

9  from Facebook, but it could have, if that was her

10 concern, she could have said I'm being sexually assaulted

11 by a lieutenant.

12         MS. SHIHATA:  Your Honor, she believed because

13 of what he told her --

14         THE COURT:  That would put a stop to it.  In

15 fact, this call put a stop to it.

16         MS. SHIHATA:  She believed that because of what

17 he told her that if she reported that explicitly she

18 would go to the SHU as punishment.  Okay?  Now were there

19 better ways for her to report this?  Absolutely.

20         THE COURT:  Well she didn't go to the SHU and

21 it had the exact same effect.

22         MS. SHIHATA:  She didn't go to the SHU because

23 she didn't report it, Judge.  And it didn't have the

24 exact same effect.  He sexually abused her one more time.

25         THE COURT:  She knew that he would find out

Transcriptions Plus II, Inc.

GA237

45

                    Proceedings

1   about the call and he did.

2       MS. SHIHATA:  Yes, he found out about the call

3   because Tomas Rodriguez, the SIS officer, told him about

4   it which was not actually the protocol that he should

5   have followed.

6       THE COURT:  And it may be but you just told me

7   it would have the effect of putting, you know, she wanted

8   to put a stop to it.

9       MS. SHIHATA:  I told you that that's what she

10  believed.

11      THE COURT:  All right.  That's what she

12  believed.

13      MS. SHIHATA:  I think we should also

14  acknowledge, your Honor, she was in her twenties at the

15  time.  Would I have gone about things that way?  No, of

16  course not.  But she's in the situation she's in.

17      THE COURT:  Well, she had a --

18      MS. SHIHATA:  And she was doing the best she

19  could to try to make this stop.

20      Now the point, Judge, my only point in raising

21  these points is that inferences can be drawn in favor of

22  the jury's verdict and not against it and that the

23  evidence does not -- the only conclusion that one could

24  draw, which is what your Honor suggested, is that she was

25  not telling the truth.

                Transcriptions Plus II, Inc.

                                                                            46
                              Proceedings

1          THE COURT:  The jury was not charged in a way

2   that would support that verdict.  But it's neither here

3   nor there because in my view she never testified that the

4   reason that she made no effort to -- this is a case of

5   forcible rape under her testimony.  That's the bottom

6   line.  It wasn't a case where she said I was caused to do

7   this because I was in fear of threats or force and you

8   acknowledge that she never said that that was what

9   motivated her.  What motivated her throughout this was

10  that essentially forcing her.  And the jury didn't

11  believe that.

12          MS. SHIHATA:  Your Honor, I disagree.  I don't

13  acknowledge that.  What I acknowledge was that there can

14  be more than one causative element and that it was both

15  physical force and threats and fear.

16          THE COURT:  The one that you argued was the one

17  that was consistent with what I was saying.  And when I

18  say you, I'm separating you from Ms. Geddes who gave a

19  somewhat more subtle summation.  Maybe nuanced is a

20  better word.  I don't know.

21          MS. SHIHATA:  Anyway at this point, your Honor,

22  let me move on towards the --

23          THE COURT:  In fact, the person who wrote the

24  pre-sentence report said she was raped all the time.

25          MS. SHIHATA:  I would just like to note, Judge,


                       Transcriptions Plus II, Inc.

GA239

47

Proceedings

1  forcible rape does not require physical force.  A person

2  can be forced through the use of fear and threats as

3  well.

4          THE COURT:  Okay.

5          MS. SHIHATA:  And any rate, I will move on now

6  to the Section 3553(a) factors for the Court.

7          THE COURT:  But I hate to get involved with

8  these legal debates.  The deprivation of rights charge,

9  and I think I may have given what you asked for, said

10 they had to find him guilty of aggravated sexual abuse in

11 order to find him guilty of deprivation of rights.

12         MS. SHIHATA:  And in turn guilty --

13         THE COURT:  That was right in there.  That's

14 why you create problems by making up four separate

15 counts, four separate crimes for what is essentially one

16 for each discrete act.  But the specific charge on the

17 deprivation of rights was they had to find aggravated

18 sexual abuse and they didn't find it except on one count.

19         MS. SHIHATA:  I'm not disagreeing with your

20 Honor.

21         THE COURT:  Okay.

22         MS. SHIHATA:  Okay.  So moving on to the

23 section 3553(a) factors.

24         THE COURT:  And by the way, I got your

25 second -- you sent me a second victim impact statement.

Transcriptions Plus II, Inc.

48

Proceedings

1          MS. SHIHATA:  Yes, your Honor.  Thank you.

2          THE COURT:  I assume that Mr. Ricco got it.

3          MS. SHIHATA:  Yeah, it was filed on ECF, Judge.

4          MR. RICCO:  We did.

5          THE COURT:  And let me just say something about

6   that.  It sounded familiar to me.  And the reason it

7   sounded familiar to me was because of the discussion we

8   may have had at the end of what she told Immigration and

9   Naturalization in support of her claim for I guess it's a

10  T visa, that she had been sexually trafficked.  And you

11  can read the testimony yourself, it just sounded awfully

12  familiar to me in terms of statements that she was

13  making.  That's also neither here nor there.  And I don't

14  purport to be an expert on the effect that the horrible

15  claims that she made to the INS or to Immigration somehow

16  would have prevented her from the sufferings that she

17  described in the letter.  All I'm suggesting is that when

18  I read the letter I said why does this sound familiar?

19  And I went back and I read the argument about the

20  stipulation.  But go ahead.

21         MS. SHIHATA:  With respect to the Section

22  3553(a) factors, I think as the Court has recognized

23  these are serious crimes.  I would respect what the Court

24  said regarding the MDC being an enabler.  I think on that

25  you and I wholeheartedly agree.

GA241

49

Proceedings

1       THE COURT:  Well you and the Bureau of Prisons,

2  I think one of you may have even said this in the

3  transcript somewhere, are part of the Department of

4  Justice and the one good thing about this is unlike New

5  York where there is no single agency that oversees the

6  enforcement of the criminal laws where people can blame

7  each other, is that the Department of Justice has

8  oversight over you and the Bureau of Prisons.  You're not

9  separate agencies.

10       And the Bureau of Prisons in my view, not only

11  here but in many other respects, operates in a manner

12  that leaves a lot to be desired.  In fact, somebody

13  should ask for the ombudsman of the Department of Justice

14  to look into how the MDC is being run here including the

15  sexist business of sending women to be cleaners as

16  opposed to man where women make actually a relatively

17  small percentage of the population of the MDC as I

18  understand it.

19       MS. SHIHATA:  Understood, Judge.  And like I

20  said, I don't disagree with the Court what you said about

21  the MDC.

22       THE COURT:  Well, you should try and do

23  something about it.

24       MS. SHIHATA:  I actually have, Judge.  I'm

25  happy to talk to you about that offline.

Transcriptions Plus II, Inc.

GA242

                                                              50
                        Proceedings

1           THE COURT:  Not you personally.  The U.S.

2   Attorney should do it.

3           MS. SHIHATA:  Understood.

4           THE COURT:  Another good thing about the

5   Department of Justice that people don't always realize is

6   that the U.S. Attorney is an appointee of the president

7   and therefore has a certain degree of independence

8   notwithstanding the fact that there is an attorney

9   general.  Only the president can fire a U.S. Attorney and

10  that gives the U.S. Attorney one significant advantage.

11  And the other significant advantage that it gives the

12  U.S. Attorney is that he stands on the same footing as

13  presidential appointees in the Department of Justice

14  including the head of the Bureau of Prisons.  And if

15  anything is going to come of it, it should be in a letter

16  from U.S. Attorney.  But we're going off on a tangent and

17  I don't want to go off on it any further.

18          MS. SHIHATA:  So moving back to the 3553(a)

19  factors, Judge, the additional point I wanted to make on

20  that issue is that the testimony and the evidence at the

21  trial certainly established that the defendant used the

22  tools that the MDC provided him with.  And he does have

23  agency in this scenario.  He decided to call Maria to

24  clean for him.  He did that is a high ranking official at

25  the jail.  He did that at times when he knew the second

GA243

51

Proceedings

1  floor would be empty.  He used the tools he had access to

2  including the security camera systems.

3        THE COURT:  Let me ask you something.  I don't

4  mean to interrupt but I am interrupting.  There was some

5  ambiguity in the record.  I don't know if it ever got

6  straightened out in terms of the jury knowing about it.

7  He testified, or there was testimony that she had a job,

8  she had what one would describe as a full-time job five

9  days a week working in the medical unit.  And this

10 weekend work, I don't know what the truth is, but there

11 was an ambiguity in the record as to whether this was

12 quote voluntary or she had to work on weekends in

13 addition to the full-time, what I would characterize as

14 the full-time job that she had Monday through Friday.

15       MS. SHIHATA:  She didn't work Monday through

16 Friday, Judge.  Her job was actually to work at those

17 times and --

18       THE COURT:  I'm sorry I don't know what you

19 mean those times.  I thought the testimony was that she

20 worked in the medical unit and that she worked in the

21 medical unit unless she was off, she worked in the

22 medical unit five days a week and she worked for him on

23 weekends.

24       MS. SHIHATA:  There was also testimony, Judge,

25 from both MDC legal counsel I believe, Nicole McFarland,

52

Proceedings

1  as well as from Otis Delacruz, the witness the defendant

2  called, that when Maria was called on the weekends that

3  she was required to go and that she couldn't just say no.

4  And in fact --

5           THE COURT:  And maybe you could send me that

6  testimony.  I don't remember it.  I know --

7           MS. SHIHATA:  I can cite it for you now, Judge.

8           THE COURT:  My recollection was that this came

9  up in terms of the jury note, certain pages were sent in

10  to the jury from the transcript as being responsive to

11  their note, and I thought that there was an ambiguity in

12  the pages of the transcript that were sent in to the

13  jury.  Now I could be wrong.  This is a long transcript

14  and I spent a lot of time reading it.

15           MS. SHIHATA:  Your Honor, I recall that we had

16  extensive argument about it.  I recall that.  And I --

17           THE COURT:  That was a part that dealt with --

18  it was a jury note.

19           MS. SHIHATA:  Yes, your Honor.  We had --

20           THE COURT:  And it dealt with how a jury note

21  would be answered.  And ultimately an agreement was

22  reached that here are the pages in the record that are

23  responsive to your note.

24           MS. SHIHATA:  Yes.

25           THE COURT:  And I looked at those pages and it

53

Proceedings

1   didn't seem to me that they provided a clear answer.

2              MS. SHIHATA:  Included in those pages, I

3   believe your Honor, was testimony from Otis Delacruz, who

4   was called by the defendant.  And she indicated quote,

5   "You don't do what you're supposed to do they will write

6   you up."  That's at page 671 of the transcript.

7              THE COURT:  I know, but if you don't do what

8   you're supposed to do they'll write you up, depends on

9   what you're supposed to do.

10             MS. SHIHATA:  And it was in the context, Judge,

11  of Maria going down, being told to go down to clean.

12             THE COURT:  What page in the transcript?

13             MS. SHIHATA:  671.  And she also states she,

14  quote, "She had to clean it, that's what she had to

15  clean."  She also said that Maria, and I'm only focusing

16  on this because you mentioned Otis Delacruz, but Otis

17  testified that Maria would ask her in fact on the

18  weekends whether she could go down to clean with her and

19  Otis told her no, I have visits on the weekend, I'm not

20  going.

21             THE COURT:  I don't know that it was every

22  weekend but I do remember that.

23             MS. SHIHATA:  And the reason --

24             THE COURT:  But there's also testimony that on

25  the last time somebody said do you want me to go and she

Transcriptions Plus II, Inc.

GA246

54

Proceedings

1    said no.

2            MS. SHIHATA:  Yes.  And there was also an

3    explanation from Yolanda that that was in the context of

4    Maria was leaving the MDC shortly and she specifically

5    warned Yolanda don't go to the second floor.  I think a

6    reasonable inference from that testimony, from Yolanda's

7    testimony, is that Maria was warning Yolanda, because she

8    didn't want the same thing to start happening to her.

9    Yolanda was also a young attractive Spanish female at the

10   MDC.

11           Now these are certainly inferences that can be

12   drawn from the evidence and --

13           THE COURT:  Could you just wait one second?

14   Sure.  I honestly don't see on page 671 where that deals

15   with the question that I asked.

16           MS. SHIHATA:  I don't have the transcript in

17   front of me.  I had that note.

18           THE COURT:  I tried and I may have missed it

19   but --

20           MS. SHIHATA:  No, I understand, but I don't

21   want to --

22           THE COURT:  When it went into the jury, they

23   said this were the pages that are responsive to your

24   note.  And I said why don't we attach the pages and

25   somebody said well they already have the transcript.  But

GA247

55

Proceedings

1  the pages were specifically -- the record reflects that

2  the pages that were sent in to the jury.  All I'm saying

3  is is that it was unclear to me from the pages that went

4  in as to whether or not this was voluntary.

5              MS. SHIHATA:  So we submit that it was not

6  and --

7              THE COURT:  I know, but you can only submit

8  what's in the record.

9              MS. SHIHATA:  Well, if I had known, Judge, that

10  this was what your Honor was going to ask me to do to re-

11  prove the entire case, perhaps I could have but --

12              THE COURT:  Look, sentencing people is very

13  serious business --

14              MS. SHIHATA:  Of course.

15              THE COURT:  -- which I take very seriously.

16  And the amount of time that it took me to read the

17  transcript, I could have tried a short case.  So you

18  know, if I read the transcript, you should read the

19  transcript.

20              MS. SHIHATA:  I have, Judge, but I have --

21  anyway, I'll move on, Judge.

22              The point is this is a serious crime and of

23  course sentencing someone is probably the most difficult

24  task that any judge has to do in their job.  The

25  government certainly understands that.  And the

GA248

56
Proceedings
1  government also understands the mitigating factors that

2  Mr. Ricco so ably mentioned.  And of course the Court

3  should also consider the other good works that Mr.

4  Martinez has done in his life.

5           But we can also not forget that this is in fact

6  a serious crime, that there is in fact a victim of this

7  crime involved here.  And this has also had a hugely

8  detrimental effect on her life.  It is not easy for

9  someone to get up on a witness stand over the course of

10 multiple days to talk about the worst experience of their

11 lives.

12           THE COURT:  I'm not sure that it was multiple

13 days.

14           MS. SHIHATA:  It was, Judge.  It was two

15 days --

16           THE COURT:  Okay, two days.

17           MS. SHIHATA:  -- in the first trial and two

18 days in the second trial.  I think you can give me that

19 that it's multiple days.

20           THE COURT:  I'm sorry.  I was concentrating on

21 the second trial.

22           MS. SHIHATA:  Okay.  Even on the second trial I

23 believe it was more than one day.

24           THE COURT:  And her testimony was really not

25 that long.  It was a thin transcript the first time.

GA249

57

Proceedings

1  Look, I don't want to get involved in how -- I think you

2  should try --

3        MS. SHIHATA:  Judge, my only point, and you may

4  disagree with it --

5        THE COURT:  I think you should try --

6        MS. SHIHATA:  -- is that it is not easy for

7  someone to testify --

8        THE COURT:  I think you should try to not get

9  carried away.

10        MS. SHIHATA:  I don't think I'm getting carried

11  away when I say --

12        THE COURT:  She was not a stranger to the

13  criminal justice system.

14        MS. SHIHATA:  Your Honor, even people convicted

15  of --

16        THE COURT:  I don't remember all of the things

17  now that Mr. Ricco alluded to.

18        MS. SHIHATA:  Your Honor --

19        THE COURT:  But she was not a stranger to the

20  criminal justice system.

21        MS. SHIHATA:  And no one claimed that she was.

22  But even people who aren't strangers to the criminal

23  justice system deserve not to be sexually abused when

24  they're serving their sentence.

25        THE COURT:  I agree with that completely.

Transcriptions Plus II, Inc.

GA250

58

Proceedings

1        MS. SHIHATA:  Okay.  Great.  I'm glad we
2    reached agreement on that.
3        THE COURT:  And in fact, as I said earlier, who
4    is going to be in the MDC to begin with?
5        MS. SHIHATA:  Which is why it makes it so
6    hard --
7        THE COURT:  People who have been charged with
8    crimes.  Not all of them have long criminal records but
9    they are people who have been charged with crimes.  I
10   agree with that.  And in part, that's what makes this a
11   serious crime because they're subject to the control of
12   guards and the overall prison personnel.
13       MS. SHIHATA:  In that regard, Judge, I also
14   would like to point out that, as your Honor knows and I'm
15   sure has read again more recently, the defendant chose to
16   testify in the second trial and that's of course his
17   right.  But also the jury's verdict make clear that he
18   lied during that testimony.  He didn't just say this was
19   consensual, which in the government's view is not what
20   happened, and also in the jury's view, but also he went a
21   step further.  He completely negated the power
22   differential that certainly exists in a prison between a
23   lieutenant and a sentenced prisoner.  He couldn't even --
24   he suggested incredibly, I'd argue, that Maria was the
25   aggressor even though she was not the one controlling the

59

Proceedings

1  cameras.  She was not the one that knew the schedules at

2  the place.  Your Honor, it is certainly a relevant factor

3  that he did not tell the truth at the trial.  It is

4  certainly a relative factor that he was a lieutenant and

5  she was a sentenced prisoner.  It is certainly a relevant

6  factor that whether the Court believes it or not, this

7  has had an effect on her life.

8         THE COURT:  It's not a question of what I

9  believe.  I don't know what effect it's had.  I'm just

10  pointing out that when you sent me a belated, you know,

11  in the middle of the night a portion of her victim impact

12  statement that you haven't sent me before, I said this

13  sounds familiar to me.  And the familiarity was that I

14  went back to the discussion we had about what happened

15  before the immigration and how she came to have a T visa

16  and she portrayed herself as having been a victim of

17  terrible sexual abuse.

18         MS. SHIHATA:  That wasn't actually her

19  testimony, Judge.  But I'm not going to belabor --

20         THE COURT:  Look, the way this came about was

21  because I think in the ordinary course there would be

22  reason to be concerned about a witness who would not

23  normally be getting a T visa.  And one of the issues I

24  suppose that one would have been concerned about was

25  whether it had anything to do with her testimony.

Transcriptions Plus II, Inc.

60

Proceedings

1     MS. SHIHATA:  It did not, Judge.

2     THE COURT:  I'm telling you the background of

3  how it came up.  And it came up.  And you persuaded Mr.

4  Ricco not to press the issue precisely because of -- he's

5  the one who was reciting what she said.  That was the

6  irony.  But you didn't dispute it.  I can get the page

7  for you if you want.

8     MS. SHIHATA:  That's fine, Judge.  One moment,

9  your Honor.  I'll conclude, your Honor, by just asking

10  the Court given the serious nature of the crime, given

11  the power differential between a lieutenant and a

12  sentenced prisoner, and also given, as the Court in our

13  view correctly determined that the need for deterrence in

14  this case --

15     THE COURT:  I'm sorry, I didn't hear what you

16  said.

17     MS. SHIHATA:  The need for deterrence of others

18  to prevent others from engaging in precisely the same

19  type of conduct which is an issue, and a serious one,

20  that the Court should consider in fashioning a sentence.

21     And with that, your Honor, we would rely on our

22  papers and submit that a sentence of time served, which

23  is essentially what the defense is asking for, is not

24  sufficient to meet the 3553(a) factors.

25     THE COURT:  What if I don't give a sentence of

61

Proceedings

1  time served?  What is?

2          MS. SHIHATA:  Your Honor, in our papers we have

3  indicated that we are seeking a sentence of 20 years

4  imprisonment.  I think that's in line with the sentence

5  that Judge Matsumoto gave in the *Perez* case.  On the

6  aggravated sexual abuse counts she --

7          THE COURT:  No, but that case is different.

8  That case involved five different inmates who were

9  subject to inappropriate --

10          MS. SHIHATA:  Yes, but even on a single count

11  she gave --

12          THE COURT:  I know, but you can't, even on a

13  single count, you don't, when you sentence somebody, you

14  don't look at it that way.

15          All right.  Do you wish to speak?  Why don't

16  you give me a minute.  I have to step out for a minute.

17          MR. RICCO:  I do too, Judge, if you don't mind.

18                  (Off the record)

19          THE COURT:  Okay.  Everybody here?  Court

20  reporter ready?  Okay.  Mr. Martinez, do you wish to

21  speak?

22          THE DEFENDANT:  Judge Korman, I want to thank

23  you for allowing me to speak to you and address the

24  Court.

25          I'd like to start by saying that I'm not

62

Proceedings

1   perfect.  No one is.  I've done many good things in my
2   life but I have made a mistake of violating the trust
3   that I earned while working as a lieutenant for a moment
4   of pleasure.

5           Maria and I had a consensual affair, a secret
6   relationship that we both agreed on, and that's all it
7   was.  I did not forcibly rape or forcibly sexually
8   assault Maria.  I never forced, demanded, threatened.
9   That is not who I am or how I was raised.  She perceived
10  and treated me as someone that she was attracted to and
11  not someone of authority.

12          THE COURT:  You have to speak up.  I cannot
13  hear you.  That may be my fault.  I'm getting old, so --

14          THE DEFENDANT:  She perceived me and treated me
15  as someone who she was attracted to and not someone of
16  authority.

17          Your Honor, this was not worth the torment and
18  anguish I would endure.  It cost me everything.  The loss
19  of my mother, my career, my pension, my dignity, my honor
20  and now my mental and physical health as I have been in
21  solitary confinement for 59 months.  But I'm a man of
22  faith.  I have a strong belief in God who believes that
23  in life that good and bad things happen for a reason.

24          I have overcome adversity growing up.  I have
25  traveled to foreign land and witnessed the bombings on

GA255

                                                                    63
                              Proceedings

1  the battlefield proudly protecting our country.  The

2  cancer I would fight years later from search, rescue, and

3  recovery at Ground Zero also protecting our country.  But

4  this right here by far has been the toughest one because

5  there's no honor here.  I have lost focus, let my guard

6  down, and I fell on my sword.  This has sent a shock not

7  only to myself but to MDC as well.

8           I have expressed my regret, since remorse, and

9  my repentance to all this has affected and I express it

10 today to everyone here.

11          Life is a journey with many unpredictable

12 elements good and bad.  Moving forward, I will continue

13 to strive for the good and that is my promise to you,

14 your Honor, for giving me a fair trial, to my children,

15 to my community, and to our country to which I proudly

16 served whenever called, through strength of my character

17 and my commitment to overcome this challenge with

18 dignity, humility, and faith.  All of my community, my

19 family and friends and former coworkers have always been

20 supportive and stood by me because they know who I am.

21          Today, your Honor, I stand alone heartbroken,

22 extremely remorseful, and have learned a lot from this.

23 I take responsibility.  I humbly ask for your mercy and

24 compassion not only for myself but for the sake of my

25 ailing grandmother, my children, grandchildren, and

GA256

64

Proceedings

1  family to ask for a second chance to right my wrong.

2          I would also like to take this opportunity to

3  thank my lawyers for their hard work and dedication and

4  not abandoning me on the battlefield.  To my aunt, there

5  are no words that can express the love and support she

6  has shown me.  I've been truly blessed for having her by

7  my side.

8          Your Honor, I thank you for your fairness for

9  allowing me to address everyone here.  Thank you.

10          THE COURT:  Mark, Mark Gjelaj is the Mark I'm

11  referring to for the record, I don't have to impose

12  separate sentence on each count, do I?  I can give one

13  sentence here?

14          MR. GJELAJ:  You would have to apply it to

15  every one of the counts though, your Honor.  Yes.

16          THE COURT:  I can't hear you.

17          MR. GJELAJ:  You would have to impose,

18  depending on what your Honor's sentence is, you would

19  have to impose whatever the sentence your Honor is

20  imposing on each and every count to run concurrent

21  depending on what the sentence is.  Now some of them have

22  maximum sentences and then you would have to sort of

23  fashion it in that way as well just to ensure that you

24  were within each of those counts, if your Honor

25  understands.

GA257

65

Proceedings

1          THE COURT:  I think I understand what you're

2    saying.  Could you come up here for one minute?

3                    (Pause in proceedings)

4          THE COURT:  All right.  I'm going to sentence

5    the defendant to the custody of the Attorney General for

6    a period of ten years on each count to run concurrently.

7    And I impose a special assessment, I guess it must be

8    $1,000, or I can't count?

9          THE CLERK:  1,200.

10          THE COURT:  $1,200.  And the defendant shall

11   comply with any applicable state or federal sex offender

12   registration requirements.  This is a condition that --

13   I'm sorry, I should have also said five years supervised

14   release.  The defendant shall comply as a special

15   condition of supervised release, the defendant shall

16   comply with any applicable state and/or federal sex

17   offender registration requirements as instructed by the

18   probation office, Bureau of Prisons, or any state

19   offender registration agency in the state where he

20   resides, works, or may be a student.

21          The defendant shall refrain from contacting the

22   victim of the offense unless specific permission is

23   granted by the probation department.  This means that he

24   shall not attempt to meet in person, communicate by

25   letter, telephone, email, the internet, or through a

66

Proceedings

1  third party without the knowledge and permission of the

2  probation department.

3          The defendant shall participate in a mental

4  health treatment program which may include participation

5  in a treatment program for sexual disorders as approved

6  by the U.S. Probation Department.  The defendant shall

7  contribute to the cost of such services rendered or any

8  psychotropic medications prescribed to the degree he's

9  reasonably able financially and shall cooperate in

10 securing any applicable third party payment.  The

11 defendant shall disclose all financial information and

12 documents to the probation department to assess his

13 ability to pay and his part of the treatment program for

14 sexual disorders.  I actually do not think that that is

15 required.  I don't think he has a sexual disorder.  I

16 think that's sufficient.  When I say I don't think he has

17 a sexual disorder, as I indicated earlier, he's not going

18 to go out and become a serial rapist.  This crime for

19 which he was convicted was a crime that was because he

20 was in a special position that enabled him to do it.

21         I have taken seriously into account the

22 government's position but it seems to me there are a

23 number of factors here that suggest setting aside the

24 issues that are raised about my own discomfort with the

25 verdict.  I accept, as I've often said at sentencing when

67

Proceedings

1 people have raised issues about the jury's verdict that I
2 have to accept the verdict whether I agree with it or
3 not, and I'm not sure that I disagree with it. I
4 certainly would not quarrel that the jury could have
5 reached that verdict. But they did acquit him of four of
6 the five most serious offenses.

7 The considerations that I've taken into
8 account, first, the life that the defendant led, his
9 military service which began at the age of 18 which he
10 served four years in a position which often involved
11 potential risk of life that in the course of while he
12 worked at the MDC he actually helped save someone's life
13 possibly at the risk of his own.

14 In addition, the defendant worked at the World
15 Trade Center after the tragedy of 9/11. I think he
16 worked for four months. There's of course a high cancer
17 rate of people who worked during the period. He was part
18 of an emergency service unit for a week after the attacks
19 to do search, rescue, and recovery and thereafter he
20 volunteered for approximately four months to help clean
21 up the operation. And you know, he does have cancer.
22 And according to the pre-sentence report and the records
23 received from the Mount Sinai World Trade Center Health
24 confirmed that the defendant is a participant in the
25 World Trade Center medical monitoring and treatment

68
Proceedings

1  program.  So those are factors that I think deserve to be

2  taken into account.

3       In addition, he did undergo two trials himself

4  and whatever difficulties that may pose to the victim, it

5  also poses to a defendant which is of course, although

6  there was no double jeopardy violation, the

7  considerations are similar to those that underlie the

8  double jeopardy clause in terms of the effect of multiple

9  trials.

10      So I take all of those factors into account.  I

11  think that the offense is a serious one, as I've said

12  during the colloquy.  I am repeating myself I know.  The

13  deterrence is not necessary to deter him from doing this

14  again because you won't, but one has to be concerned

15  about deterring people who work at the Metropolitan

16  Correction Center that conduct of this kind will not go

17  unpunished.  This was a case involving one individual,

18  whatever the circumstances were, that led to it coming to

19  pass.  I think a sentence of ten years for someone who is

20  of his age and who has potential health problems,

21  although his cancer is in remission, is a reasonable and

22  just sentence under the sentencing guidelines.

23      I'm sorry I kept you here so long.

24      MS. GEDDES:  Your Honor, will you advise the

25  defendant of his right to appeal as well?

69

Proceedings

1          THE COURT:  Yes.  You have the right to appeal,

2    Mr. Martinez, and if you can't afford to pay the filing

3    fee that we charge, I'll let you file the notice of

4    appeal without paying the filing fee and of course Mr.

5    Ricco can file the notice of appeal if you wish to

6    appeal.

7          MR. RICCO:  Yes, Judge.  I was going to ask on

8    behalf of the defendant that you give him in forma

9    pauperis relief as he goes forward.  Your Honor gave him

10   in forma pauperis relief at the beginning of the first

11   trial because he got the transcripts and whatnot.  He

12   has --

13         THE COURT:  I granted that.  I thought I said

14   if he can't -- I mean I thought that sort of encompassed

15   it when I say if you can't afford to pay the filing fee

16   I'll let you do it without paying the filing fee.

17         MR. RICCO:  Okay, Judge.

18         THE COURT:  But yes, I grant him leave to

19   proceed in forma pauperis.

20         MR. RICCO:  Okay.  Thank you.  The magic words

21   that the Circuit likes to hear.

22         THE COURT:  Okay.  And despite our heated

23   discussion,  I thank the government lawyers for their

24   help.  It's always useful to be challenged.

25         MS. SHIHATA:  And Judge, I apologize if I

GA262

70

Proceedings

1  overstepped.

2           THE COURT:  No, I don't mind at all.  In fact,

3  I encourage my law clerks to do it.  It helps make for a

4  better outcome when you're challenged by bright people.

5  Okay.  Thank you.

6           MR. RICCO:  So Judge, normally I would ask that

7  the Court make a recommendation that the defendant be

8  housed in the metropolitan area.  However, because of his

9  law enforcement status, his housing is problematic.  So I

10  would just ask to the extent that the Bureau of Prisons

11  can, given its other concerns, that the defendant be

12  housed in the metropolitan area as close to it as

13  possible.

14           THE COURT:  Okay.  I'm going to rely on Mark

15  Gjelaj to help me formulate this.  Where he is now is in

16  the metropolitan area.  I gather you're not enamored of

17  it.

18           MR. RICCO:  Well, it's a county detention

19  facility.

20           THE COURT:  I know.

21           MR. RICCO:  Yeah.  But he would --

22           THE COURT:  Because they're the Bureau of

23  Prisons, I assume they'd want to house him at a Bureau of

24  Prisons facility.

25           MR. RICCO:  Yeah.  They don't sentence federal

Transcriptions Plus II, Inc.

GA263

71
Proceedings

1   prisoners in Essex.  It's just a detention facility.

2             THE COURT:  Right.  I'll recommend -- if you

3   want to send me a letter with a recommendation, fine.  If

4   not, I'll work out something with Mark Gjelaj.

5             MR. RICCO:  No, that's fine, Judge.  Because of

6   his law enforcement status, they have a special protocol

7   for that.

8             THE COURT:  Well, I don't know, there are law

9   enforcement people in various federal --

10            MR. RICCO:  Yes, Judge.

11            THE COURT:  Okay.  Thank you.

12            MS. SHIHATA:  Thank you, your Honor.

13            MS. GEDDES:  Thank you, your Honor.

14                     (Matter concluded)

15                        -oOo-

16

17

18

19

20

21

22

23

24

25

72

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **19th** day of **April**, 2022.

*Rosalie Lombardi*
**Transcriptions Plus II, Inc.**
**Rosalie Lombardi**
**AAERT# CET-656**