# 22-902

## 22-1136(XAP)

# United States Court of Appeals

### For the Second Circuit

◆—◆

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—against—

CARLOS MARTINEZ,

*Defendant-Appellant-Cross-Appellee.*

**On Appeal From The United States District Court
For The Eastern District of New York**

**GOVERNMENT APPENDIX
VOLUME II OF III
(Pages GA265 to GA500)**

BREON PEACE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

# TABLE OF CONTENTS

Page

Maria's Trial Testimony,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated February 10, 2020..................................................................GA 1

Sentencing Transcript,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated April 13, 2022..................................................................GA 193

Original Indictment,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated May 24, 2017..................................................................GA 265

Danilda Osoria's Trial Testimony,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated February 14, 2020..................................................................GA 277

Kiara Maldonado's Trial Testimony,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated February 13, 2020..................................................................GA 310

Melva Vasquez Vargas' Trial Testimony,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated February 13, 2020..................................................................GA 340

Jury Charge,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated February 19, 2020..................................................................GA 376

District Court Rule 29 Motion Denial,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated February 18, 2020..................................................................GA 404

Government's April 15, 2020 Sentencing Letter,
    <u>United States v. Martinez</u>, 17-CR-281 (ERK)
        Dated April 15, 2020..................................................................GA 406

Martinez's September 26, 2021 Sentencing Letter,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated September 26, 2021 ......................................................GA 414

Martinez's Motion for a New Trial,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated November 29, 2018 ........................................................GA 423

Government's Opposition to Motion for a New Trial,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated January 19, 2019 ..........................................................GA 439

District Court Decision Granting New Trial,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated July 2, 2019...................................................................GA 484

2020 Presentence Investigation Report (PSR),
    United States v. Martinez, 17-CR-281 (ERK)
        Dated March 18, 2020 .............................................................GA 501

2022 Post-Sentencing PSR,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 22, 2022................................................................GA 530

Government Objection to Post-Sentencing PSR,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 28, 2022................................................................GA 559

Yolanda Interview Report,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 28, 2017................................................................GA 562

Solicitor General Approval,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated January 8, 2023 ............................................................GA 566

Statement of Reasons,
    United States v. Martinez, 17-CR-281 (ERK)
        Dated April 25, 2022................................................................GA 567

Martinez's Opposition to Government's Objections to Revised PSR,
   United States v. Martinez, 17-CR-281 (ERK)
      Dated April 28, 2022...............................................................GA 572

TM:NMA:NS
F. #2016R01322

FILED
CLERK

2017 MAY 24 PM 4:00

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

CARLOS RICHARD MARTINEZ,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

**I N D I C T M E N T**

**CR 17 281**

Cr. No. _____

(T. 18, U.S.C., §§ 242, 2241(a)(1),
2242(1), 2243(b) and 3551 et seq.)

THE GRAND JURY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

        At all times relevant to this Indictment, unless otherwise indicated:

        1.      The defendant CARLOS RICHARD MARTINEZ was employed by the Federal Bureau of Prisons ("BOP") as a Lieutenant and was assigned to the Metropolitan Detention Center ("MDC"), a BOP facility, in Brooklyn, New York.

        2.      In or about and between December 2015 and April 2016, both dates being approximate and inclusive, Jane Doe, an individual whose identity is known to the Grand Jury, was incarcerated at the MDC as a sentenced federal prisoner.

<u>COUNT ONE</u>
(Deprivation of Civil Rights)

        3.      Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

        4.      On or about December 13, 2015, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ, while acting under color of the laws

2

of the United States, did knowingly and willfully deprive Jane Doe of a right and privilege

secured and protected by the Constitution and laws of the United States, to wit: the right to

be free from cruel and unusual punishment, which includes the right to be free from

aggravated sexual abuse by one acting under color of law, by causing Jane Doe to engage in

a sexual act, as defined in Title 18, United States Code, Section 2246(2)(B), to wit: contact

between the mouth and the penis, by using force against Jane Doe.

(Title 18, United States Code, Sections 242 and 3551 et seq.)

<u>COUNT TWO</u>
(Aggravated Sexual Abuse)

5.      Paragraphs 1 and 2 are hereby realleged and incorporated by reference

as though fully set forth in this paragraph.

6.      On or about December 13, 2015, within the Eastern District of New

York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD

MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as

defined in Title 18, United States Code, Section 2246(2)(B), to wit: contact between the

mouth and the penis, by using force against Jane Doe.

(Title 18, United States Code, Section 2241(a)(1) and 3551 et seq.)

<u>COUNT THREE</u>
(Sexual Abuse)

7.      Paragraphs 1 and 2 are hereby realleged and incorporated by reference

as though fully set forth in this paragraph.

8.      On or about December 13, 2015, within the Eastern District of New

York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD

MARTINEZ, did knowingly and intentionally cause Jane Doe to engage in a sexual act, as

3

defined in Title 18, United States Code, Section 2246(2)(B), to wit: contact between the mouth and the penis, by threatening and placing Jane Doe in fear.

(Title 18, United States Code, Sections 2242(1) and 3551 et seq.)

## COUNT FOUR
### (Sexual Abuse of a Ward)

9.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

10.     On or about December 13, 2015, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(B), to wit: contact between the mouth and the penis, with Jane Doe, who was in official detention at a Federal prison, to wit: the MDC, and who was under the defendant's custodial, supervisory and disciplinary authority.

(Title 18, United States Code, Sections 2243(b) and 3551 et seq.)

## COUNT FIVE
### (Deprivation of Civil Rights)

11.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

12.     On or about December 13, 2015, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ, while acting under color of the laws of the United States, did knowingly and willfully deprive Jane Doe of a right and privilege secured and protected by the Constitution and laws of the United States, to wit: the right to be free from cruel and unusual punishment, which includes the right to be free from aggravated sexual abuse by one acting under color of law, by causing Jane Doe to engage in

4

a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 242 and 3551 et seq.)

## COUNT SIX
(Aggravated Sexual Abuse)

13.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

14.     On or about December 13, 2015, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 2241(a)(1) and 3551 et seq.)

## COUNT SEVEN
(Sexual Abuse)

15.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

16.     On or about December 13, 2015, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by threatening and placing Jane Doe in fear.

(Title 18, United States Code, Sections 2242(1) and 3551 et seq.)

GA269

5

### COUNT EIGHT
(Sexual Abuse of a Ward)

17.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

18.     On or about December 13, 2015, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, with Jane Doe, who was in official detention at a Federal prison, to wit: the MDC, and who was under the defendant's custodial, supervisory and disciplinary authority.

(Title 18, United States Code, Sections 2243(b) and 3551 et seq.)

### COUNT NINE
(Deprivation of Civil Rights)

19.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

20.     In or about and between December 2015 and February 2016, both dates being approximate and inclusive, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ, while acting under color of the laws of the United States, did knowingly and willfully deprive Jane Doe of a right and privilege secured and protected by the Constitution and laws of the United States, to wit: the right to be free from cruel and unusual punishment, which includes the right to be free from aggravated sexual abuse by one acting under color of law, by causing Jane Doe to engage in a sexual act, as defined in Title

GA270

6

18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 242 and 3551 et seq.)

## COUNT TEN
(Aggravated Sexual Abuse)

21.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

22.     In or about and between December 2015 and February 2016, both dates being approximate and inclusive, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 2241(a)(1) and 3551 et seq.)

## COUNT ELEVEN
(Sexual Abuse)

23.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

24.     In or about and between December 2015 and February 2016, both dates being approximate and inclusive, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined by Title 18, United

States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by

threatening and placing Jane Doe in fear.

(Title 18, United States Code, Sections 2242(1) and 3551 et seq.)

## COUNT TWELVE
(Sexual Abuse of a Ward)

25.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference

as though fully set forth in this paragraph.

26.     In or about and between December 2015 and February 2016, both dates

being approximate and inclusive, within the Eastern District of New York, the defendant

CARLOS RICHARD MARTINEZ did knowingly and intentionally engage in a sexual act,

as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the

penis and the vulva, with Jane Doe, who was in official detention at a Federal prison, to wit:

the MDC, and who was under the defendant's custodial, supervisory and disciplinary

authority.

(Title 18, United States Code, Sections 2243(b) and 3551 et seq.)

## COUNT THIRTEEN
(Deprivation of Civil Rights)

27.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference

as though fully set forth in this paragraph.

28.     In or about January 2016, within the Eastern District of New York, the

defendant CARLOS RICHARD MARTINEZ, while acting under color of the laws of the

United States, did knowingly and willfully deprive Jane Doe of a right and privilege secured

and protected by the Constitution and laws of the United States, to wit: the right to be free

from cruel and unusual punishment, which includes the right to be free from aggravated

sexual abuse by one acting under color of law, by causing Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 242 and 3551 et seq.)

## COUNT FOURTEEN
(Aggravated Sexual Abuse)

29.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

30.     In or about January 2016, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 2241(a)(1) and 3551 et seq.)

## COUNT FIFTEEN
(Sexual Abuse)

31.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

32.     In or about January 2016, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by threatening and placing Jane Doe in fear.

(Title 18, United States Code, Sections 2242(1) and 3551 et seq.)

## COUNT SIXTEEN
### (Sexual Abuse of a Ward)

33.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

34.     In or about January 2016, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, with Jane Doe, who was in official detention at a Federal prison, to wit: the MDC, and who was under the defendant's custodial, supervisory and disciplinary authority.

(Title 18, United States Code, Sections 2243(b) and 3551 et seq.)

## COUNT SEVENTEEN
### (Deprivation of Civil Rights)

35.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

36.     In or about April 2016, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ, while acting under color of the laws of the United States, did knowingly and willfully deprive Jane Doe of a right and privilege secured and protected by the Constitution and laws of the United States, to wit: the right to be free from cruel and unusual punishment, which includes the right to be free from aggravated sexual abuse by one acting under color of law, by causing Jane Doe to engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 242 and 3551 et seq.)

## COUNT EIGHTEEN
(Aggravated Sexual Abuse)

37.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

38.     In or about April 2016, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined by Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by using force against Jane Doe.

(Title 18, United States Code, Sections 2241(a)(1) and 3551 et seq.)

## COUNT NINETEEN
(Sexual Abuse)

39.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

40.     In or about April 2016, within the Eastern District of New York and in a Federal prison, to wit: the MDC, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally cause Jane Doe to engage in a sexual act, as defined by Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, by threatening and placing Jane Doe in fear.

(Title 18, United States Code, Sections 2242(1) and 3551 et seq.)

## COUNT TWENTY
(Sexual Abuse of a Ward)

41.     Paragraphs 1 and 2 are hereby realleged and incorporated by reference as though fully set forth in this paragraph.

11

42. In or about April 2016, within the Eastern District of New York, the defendant CARLOS RICHARD MARTINEZ did knowingly and intentionally engage in a sexual act, as defined in Title 18, United States Code, Section 2246(2)(A), to wit: contact between the penis and the vulva, with Jane Doe, who was in official detention at a Federal prison, to wit: the MDC, and who was under the defendant's custodial, supervisory and disciplinary authority.

(Title 18, United States Code, Sections 2243(b) and 3551 et seq.)

A TRUE BILL

FOREPERSON

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. # 2016R01322

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*CARLOS RICHARD MARTINEZ,*

Defendant.

# INDICTMENT

(T. 18, U.S.C., §§ 2241(a)(1), 2242(1), 2243(b) and 3551 et seq.)

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____*day*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

_____

*Nadia I. Shihata, Assistant U.S. Attorney (718) 254-6295*

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA      *    Docket No.
                              *    17-CR-281 (ERK)
                              *
          v.                  *    U.S. Courthouse
                              *    Brooklyn, NY
CARLOS RICHARD MARTINEZ,      *
                              *    February 14, 2020
             Defendant.       *    10:42 AM
* * * * * * * * * * * * * * *

        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
           BEFORE THE HONORABLE EDWARD R. KORMAN
                UNITED STATES DISTRICT JUDGE
APPEARANCES:

For the Government:           RICHARD P. DONOGHUE, ESQ.
                              UNITED STATES ATTORNEY

                         BY:  ELIZABETH A. GEDDES, ESQ.
                              NADIA I. SHIHATA, Esq.
                              Asst. United States Attorney
                              United States Attorney's Office
                              271 Cadman Plaza East
                              Brooklyn, NY  11201

For the Defendant:            ANTHONY L. RICCO, ESQ.
                              20 Vesey Street, Suite 400
                              New York, NY 10007

                              CARLOS M. SANTIAGO, ESQ.
                              The Law Office of
                              Carlos M. Santiago
                              11 Broadway, Suite 615
                              New York, NY 10004

                              STEVEN ZACHARY LEGON, ESQ.
                              Steven Zachary Legon,
                              Attorney At Law
                              20 Vesey Street, Suite 400
                              New York, NY 10007

Transcription Services:       Transcriptions Plus II, Inc.
                              61 Beatrice Avenue
                              West Islip, NY 11795
                              laferrara44@gmail.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

Osoria - Direct - Shihata                                    542

D A N I L D A  O S O R I A,

      Having been called as a witness, having been first

      duly sworn, was examined and testified as follows:

      (Testimony through a Spanish interpreter.)

DIRECT EXAMINATION

BY MS. SHIHATA:

Q      Good afternoon.  Ms. Osoria, do you have a middle name?

A      Yes.

                    Osoria - Direct - Shihata                    543

1   Q   And what is it?

2   A   Lora.

3   Q   L-o-r-a?

4   A   Yes.

5   Q   Now, is Spanish your native language?

6   A   Yes.

7   Q   Do you also read and understand and speak English?

8   A   Yes.

9   Q   Is it your second language?

10  A   Yes.

11  Q   Are you more comfortable testifying in this federal

12  criminal proceeding in Spanish?

13  A   Yes.

14  Q   How old are you?

15  A   Thirty-eight.

16  Q   You go by any nicknames?

17  A   Yes.

18  Q   What nickname?

19  A   Nani.

20  Q   Where were you born?

21  A   Dominican Republic.

22  Q   When did you move to the US?

23  A   '88 going on '89.

24  Q   How old were you at the time?

25  A   Seven years old.

GA280

Osoria - Direct - Shihata                                    544

1    Q    Did you move to the United States legally?

2    A    Yes.

3    Q    Did you get what's known as a "green card?"

4    A    Yes.

5    Q    How far did you go in school?

6    A    Around 11th or 12th grade.

7    Q    Why did you stop going to school?

8    A    Because I -- I became pregnant.

9    Q    How many kids do you have?

10   A    Four.

11   Q    How old are they?

12   A    Twenty-two, fifteen, and two seven-month old twins.

13   Q    After you stopped going to school, did you work?

14   A    Yes.

15   Q    What jobs did you have?

16   A    Sales.  And home health aide.

17   Q    When you say sales, do you mean retails?

18   A    Yes.

19   Q    Now, I want to direct your attention to June 28, 2012.

20   Were you --

21           THE INTERPRETER:  Sorry.

22   BY MS. SHIHATA:

23   Q    Were you arrested that day?

24   A    Yes.

25   Q    What for?

Osoria - Direct - Shihata                                      545

1   A    For intent to distribute narcotics.

2   Q    Had you ever been arrested before?

3   A    No.

4   Q    Following your arrest, were you released on bail?

5   A    Yes.

6   Q    And while you were out on bail, did you continue to work

7   as a home health aide?

8   A    Yes.

9   Q    Directing your attention to August 1, 2012, did you plead

10  guilty to a crime that day?

11  A    Yes.

12  Q    What crime did you plead guilty to?

13  A    Conspiracy.

14  Q    Drug conspiracy?

15  A    Yes.

16  Q    Were you sentenced to prison time in connection with that

17  guilty plea?

18  A    Yes.

19  Q    What sentence did you receive?

20  A    Twenty-seven months.

21  Q    Did you serve a full 27 months?

22  A    No.

23  Q    How long did you serve?

24  A    Twenty-three-and-a-half months.

25  Q    And why did you not serve a full 27 months?

Osoria - Direct - Shihata                           546

1   A   For good time, good behavior.

2   Q   When did you start serving your prison sentence?

3   A   April 30, 2014.

4   Q   What federal prison did you surrender to on April 30,

5   2014?

6   A   MDC in Brooklyn.

7   Q   Did you serve your entire sentence at the MDC?

8   A   Yes.

9   Q   When did you leave the MDC?

10  A   March 17, 2016.

11  Q   And at that time, how many kids did you have?

12  A   Two.

13  Q   What was the most important thing to you while you were in

14  prison?

15  A   My release date and my daughters.

16  Q   I'm showing you what's in evidence as Government Exhibit

17  4, do you recognize this photo?

18  A   Yes.

19  Q   Who is this a photo of?

20  A   Of me.

21  Q   And was this photo taken when you were in federal prison?

22  A   Yes.

23  Q   When you were at the MDC, what unit were you housed in?

24  A   6 South.

25  Q   Did you have a job assignment at the MDC?

Osoria - Direct - Shihata                          547

1   A    Yes.

2   Q    What job assignment?

3   A    Kitchen.

4   Q    What does that mean?

5   A    I made food for the entire jail.

6   Q    And where did that job take place?

7   A    In the building next door from the building I was in.

8   Q    Was that known as the West Building?

9   A    I don't know which one it was, but I know we had to cross

10  over to go in it.

11  Q    And as a general matter, around what time did you go to

12  work to do that job?

13  A    At 11:30 at night.

14  Q    Were there times when it was later than that?

15  A    Yes.

16  Q    And around what time would you work until or come back to

17  the unit?

18  A    Four, five in the morning.

19  Q    How did you get the job in the kitchen?

20  A    All female inmates must have an assigned job.

21  Q    And are you referring to sentenced prisoners there?

22  A    Yes.

23  Q    Could inmates have visitors at the MDC?

24  A    Yes.

25  Q    Did you have visitors there?

Osoria - Direct - Shihata                          548

1   A      Yes.

2   Q      What days did those visits take place on?

3   A      Wednesdays, Saturdays, Sundays.

4   Q      What were visiting hours on Wednesdays when you were

5   there?

6   A      From 5, 5:30 until 7 in the evening.

7   Q      And were they -- those visits in the same building you

8   were housed in?

9   A      Yes.

10  Q      What were visiting hours on Saturday and Sunday?

11  A      8, 8:30 in the morning until 3 in the afternoon.

12  Q      And where did the visits on weekends take place?  Which

13  building?

14  A      The -- in a building that was right next door.  The one I

15  worked in.

16  Q      Now, when you had visits at the MDC on weekends, on

17  Saturdays and Sundays, around what time did your visitors come?

18          THE COURT:  Could you come up to the sidebar for a

19  minute?

20

21

22

23

24

25

Osoria - Direct - Shihata                                    551

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15    BY MS. SHIHATA:

16    Q    I'm showing you what's in evidence as Government Exhibit

17    2, do you recognize this person?

18    A    Yes.

19    Q    And where do you recognize this woman from?

20    A    From the MDC.

21    Q    Without saying her name, do you know her name?

22    A    Yes.

23    Q    For purposes of your testimony here today, we will be

24    referring to this woman as Maria, okay?

25    A    Okay.

Osoria - Direct - Shihata                          552

1  Q      You testified that you knew Maria from the MDC, is that

2  right?

3  A      Yes.

4  Q      And did she arrive there after you?

5  A      Yes.

6  Q      At some point did you -- did the two of you become

7  friends?

8  A      Yes.

9  Q      About how long after she got there, did that happen?

10 A      Two months later.

11 Q      What job did she have at the MDC?

12 A      Cleaning.

13 Q      Do you know what area she cleaned?

14 A      The second floor.  The lieutenants' office.

15 Q      I'm showing you what's in evidence as Government Exhibit

16 1, do you recognize that person?

17 A      Yes.

18 Q      Who is that?

19 A      Lieutenant Martinez.

20 Q      Where do you know him from?

21 A      From the MDC.

22 Q      Now, you testified that after a couple months, you -- you

23 became friends with Maria, correct?

24 A      Yes.

25 Q      What was she like when you first became friends with her?

Osoria - Direct - Shihata                                   553

1   A    Happy.  Normal.

2   Q    I'm showing you what's in evidence as Government Exhibit

3   5, do you recognize that person?

4   A    Yes.

5   Q    Who is that?

6   A    Melva Vasquez.

7   Q    Where do you know her from?

8   A    MDC.

9   Q    Did she arrive there before or after you?

10  A    After.

11  Q    When she first arrived, did she regularly have visits?

12  A    Yes.

13  Q    Did that stop at some point?

14  A    Yes.

15  Q    And was there a period of time where she was not permitted

16  to have visits?

17  A    Yes.

18  Q    About how long was that?

19  A    Six months.

20  Q    Do you recall the day that Melva was permitted to have a

21  visit after those six months?

22  A    I don't remember the exact date but it was a few days

23  before she got out.

24  Q    Okay.  And aside from remembering the exact date, do you

25  recall what day of the week it was?

```
                    Osoria - Direct - Shihata                    554
```

1   A    Sunday.

2   Q    Did you have a visit that day?

3   A    Yes.

4   Q    And around what time did you get back to unit 6 South

5   after your visit?

6   A    At around 3:20.

7   Q    Did Melva Vasquez come back at the same time as you?

8   A    Yes.

9   Q    And did you get back before recall?

10  A    Yes.

11  Q    What's recall?

12  A    Just when it's about to be time for the count, they make

13  us all gather together in the area where our beds are.

14  Q    Did you see Maria after you got back to the unit from your

15  visit?

16  A    Yes.

17  Q    And did you speak with her?

18  A    Yes.

19  Q    When you first saw Maria after you got back to the unit,

20  how did she appear to you at that time?

21  A    She was frenzied, a little agitated.  She wanted to talk

22  to us.

23  Q    When you say, "us," who are you referring to?

24  A    Me.  Me, Melva Vasquez, and Kiara Maldonado.

25  Q    Showing you what's in evidence as Government Exhibit 6,

                    Osoria - Direct - Shihata                    555

1  who is that?

2  A    Kiara Maldonado.

3

4

5

6

7

8  BY MS. SHIHATA:

9  Q    Now where did you first see Maria in the unit after you

10  returned?

11  A    In the aisle right in front of my bed.

12  Q    And who else was there?

13  A    Melva, Kiara and me.

14  Q    And about how long did you speak to her at that time?

15  A    Maybe 20 minutes.

16  Q    And what, if anything, do you recall Maria saying to you?

17  A    That Lieutenant Martinez had penetrated her.

18  Q    And what else do you recall her saying?

19  A    She said that she had crouched down to get the cleaning

20  detergents and then as she turned around the lieutenant had his

21  member out.

22  Q    And by member do you mean his penis?

23  A    Yes.

24  Q    What else do you recall her telling you?

25  A    That was the day he penetrated her.  I don't remember

GA290

Osoria - Direct - Shihata                                        556

1    every detail.

2    Q    What, if anything -- well withdrawn.

3         What, if anything, did Maria say about where Lieutenant

4    Martinez had ejaculated?

5    A    I don't remember.  I don't remember.

6    Q    When Maria told you these things, what state was she in?

7    A    She was nervous.  She was doing a lot of this with her

8    hands (indicating), rubbing them.

9    Q    What motion did you make with your hands?

10   A    Like this (indicating).

11        MS. SHIHATA:  For the record, the witness made a

12   motion, rubbing one hand into the other.

13   BY MS. SHIHATA:

14   Q    How did you initially react to what Maria told you?

15   A    I didn't take it seriously.  I didn't think it was

16   something -- I didn't think it was something that she should be

17   so dramatic about.

18   Q    And what do you mean by dramatic?  What was she like?

19   A    Because she was nervous.  She wanted to talk to us about

20   it.  And I personally I wasn't focusing on that.

21   Q    Why not?  What were you focused on?

22   A    My release.  My daughters.

23   Q    Now after initially not taking it seriously, did that

24   change at some point?

25   A    Yes.

Osoria - Direct - Shihata                                              557

1  Q    Why did that change?

2  A    Because she wouldn't stop crying.  And she wanted to talk

3  to us all the time, venting with us.

4  Q    Now, apart from the periods of time where you were talking

5  to her in the unit that afternoon and evening, where else did

6  you see Maria in the unit?

7  A    In the area near at my bed.  At my bed and at her bed.

8  Q    And when you saw her at her bed, what, if anything, was

9  she doing?

10 A    She was -- at one point, I sat up and turned around.  She

11 was sitting in her bed, on her bed, crying.

12 Q    At some point did you see Maria go to the bathroom?

13 A    Yes.

14 Q    What, if anything, happened at that point?

15 A    She called out to me, asking me to bring her a sanitary

16 pad.

17 Q    What, if anything, did you do?

18 A    I brought her over one.

19 Q    Did she have her period?

20 A    No.

21 Q    About how long after you had gotten back to the unit from

22 your visit did that occur?

23 A    It was not at night.  It happened almost right away when I

24 got there when I arrived.

25 Q    So in the afternoon?

Case 22-902, Document 85, 02/15/2023, 3469894, Page32 of 240

1   A    Yes.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Osoria - Direct - Shihata                                   559



Osoria - Direct - Shihata                                  560

1   BY MS. SHIHATA:

2   Q    How, if at all, did Maria react when you initially didn't

3   take what she said seriously?

4   A    She got really mad.  She was always looking for support.

5   She was looking for a hug, but I didn't interact with her like

6   that.  I -- I -- I didn't do it.  I didn't take it seriously in

7   that moment.

8   Q    Now, did you have a shift in the kitchen that night?

9   A    Yes.

10  Q    Around when did you go to your kitchen job that night?

11  A    If I'm not mistaken, 11:30.

12  Q    And around when did you get back to the unit?

13  A    Between 4 and 5 in the morning.

14  Q    After you returned to the unit, did you see Maria?

15  A    Yes.

16  Q    What, if anything, did she show you?

17  A    She was waiting for me.  She was awake and she showed me

18  the packaging that -- where the lieutenant had brought a pill

19  for her in.

20  Q    And what, if anything, did Maria ask you to do when she

21  showed you the packaging?

22  A    She wanted me to see if that was the right pill so that

23  she wouldn't get pregnant.

24  Q    And what did you do after she showed it to you?

25  A    I translated it for her and I told her that was the pill.

Osoria - Direct - Shihata                                    561

1  Q    What kind of pill was it?

2  A    I don't remember.  I know it was one individual pill in

3  the package.  And I know it was the pill for the morning after.

4  Q    Now, shortly after the events we just discussed, did Melva

5  Vasquez leave the MDC?

6  A    Yes.

7  Q    And did Kiara Maldonado also leave the MDC?

8  A    Yes.

9  Q    Did Maria continue to have her job assignment of cleaning

10 the second floor after that?

11 A    Yes.

12 Q    And did you ever speak to her after times that she had

13 gone to clean for Lieutenant Martinez?

14          THE COURT:  At what point?

15 BY MS. SHIHATA:

16 Q    I'm sorry.  After that -- after Kiara Maldonado and Melva

17 Vasquez had left the MDC?  You testified that Maria continued

18 to clean the second floor, correct?

19 A    Yes.

20 Q    And did she clean the second floor for a number of

21 lieutenants?

22 A    Yes.

23 Q    Including Lieutenant Martinez?

24 A    Yes.

25 Q    Did you ever see and speak to her after she cleaned for

Osoria - Direct - Shihata                                    562

1    Lieutenant Martinez?

2    A    Yes.

3    Q    And how did she appear on those occasions?

4    A    When she would come upstairs, she said -- she would say

5    that she didn't want to go back down.

6              MR. SANTIAGO:  Objection.  Unresponsive.

7              THE COURT:  I'm sorry.

8              MR. SANTIAGO:  Unresponsive to the question.

9              MS. SHIHATA:  That was directly responsive to the

10   question.

11             THE COURT:  Overruled.

12   BY MS. SHIHATA:

13   Q    Was she happy to go clean for him?

14   A    When she would go down, she didn't know who she was going

15   to clean for.  When she would come back up, I know who she had

16   cleaned for and she wasn't happy.

17

18

19

20

21

22

23

24

25

```
                    Osoria - Direct - Shihata                    563
 1   Q    Was she upset?

 2              MR. SANTIAGO:  Objection.

 3              THE COURT:  I'm sorry.  I didn't hear what you said?

 4              MS. SHIHATA:  I asked if she was upset.

 5              THE COURT:  You know, we're getting into areas --

 6   you've been leading a lot.  So try --

 7              MS. SHIHATA:  I'll move on.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Osoria - Direct - Shihata                                    564

1  BY MS. SHIHATA:

2  Q    I want to direct your attention to a time period --

3  withdrawn.

4       Was there a time when you were in Unit 6 South when two

5  inmates, Yesenia and Latoya got in a fight?

6  A    Yes.

7  Q    And directing your attention that time period when that

8  incident occurred, in the days that followed, was there an

9  occasion where you saw Lieutenant Martinez come to the unit

10 late at night?

11 A    Yes.

12 Q    What, if anything, did you see Lieutenant Martinez do at

13 that time?

14 A    He sent the officer to get two inmates?

15 Q    Which two inmates?

16 A    Maria and Odis De La Cruz.

17 Q    What, if anything, did you see after that?

18 A    Odis De La Cruz went into the office, a few minutes later

19 she came out and then Maria went in.

20 Q    And did you see approximately how long Maria was in the

21 unit office?

22 A    Five to six minutes, less than ten.

23 Q    Showing you what's in evidence as Government Exhibit 9, do

24 you recognize this person?

25 A    Yes.

GA299

Osoria - Direct - Shihata                          565

1   Q    Who do you recognize it to be?

2   A    Rodriguez.

3   Q    Where do you know Rodriguez from?

4   A    From the MDC.

5   Q    What, if any, understanding did you have of what type of

6   officer he was at the MDC?

7   A    He was in charge of investigating what happened.

8   Q    What do you mean by that?

9   A    He was in charge of investigating any complaint that there

10  might have been.  He was in charge of investigating it that

11  day.

12  Q    So, investigating matters at the jail?

13  A    Yes.

14  Q    Now you just testified about a time when you saw

15  Lieutenant Martinez in the unit and Odis De La Cruz and Maria

16  going into the unit office after he called for them, is that

17  correct?

18  A    Yes.

19  Q    At some point after that did you see, in this time period,

20  at some point after that, did Maria tell you about a meeting

21  she had with Officer Rodriguez?

22  A    Can you repeat the question, please?

23  Q    Sure.  After what you just testified about, about Martinez

24  coming to the unit late at night.  At some point after that,

25  did there come a time when Maria told you about a meeting she

GA300

Osoria - Direct - Shihata                                      566

1   had with Officer Rodriguez?

2   A    Yes.

3   Q    About how long after?

4   A    The following day in the morning.

5   Q    And what was Maria's demeanor when she told you about that

6   meeting?

7   A    She was super nervous.

8   Q    What do you mean by that?

9   A    She thought that she was being called to find out about

10  the fight that had happened.  But it was in reference to a call

11  that she had made.

12  Q    Okay.  And apart from that, what -- was there anything in

13  her physical demeanor that made you think she was super

14  nervous?

15  A    Yeah, she came into the unit and she tapped like this

16  (indicating) for me to wake up, she was nervous.

17  Q    Like what do you mean by nervous?

18  A    She was -- she was on edge.

19  Q    Now you said something about a phone call, is that

20  correct?

21  A    Yes.

22  Q    And what, if any, phone call did she refer to?

23  A    She made a call and during the conversation she spoke the

24  name of the lieutenant so that it would be recorded in that

25  conversation.

Osoria - Direct - Shihata                          567

1   Q    Now after you learned about this phone call from Maria, to

2   your knowledge did Maria stop going to clean the second floor

3   for Lieutenant Martinez for a period of time?

4   A    Yes.

5   Q    When did you leave the MDC?

6   A    March 17, 2016.

7   Q    Directing your attention to February 27, 2016, does that

8   date have any meaning to you?

9   A    Yes.

10  Q    What meaning does it have to you?

11  A    It's my birthday and it's the Dominican Republic's

12  Independence Day.

13  Q    Now do you recall what day of the week February 27, 2016

14  was?

15  A    If I'm not mistaken it was a Saturday.

16  Q    Okay.  Are you certain it was a Saturday?

17  A    Not certain.

18  Q    To the best of your memory was it a weekend?

19  A    Yes.

20  Q    Now I'd like to direct your attention to that weekend.  At

21  some point that weekend were you and Maria on the second floor

22  in the Lieutenants' office area?

23  A    Yes.

24  Q    Who took you there?

25  A    Officer Nunez.

Osoria - Direct - Shihata                                    568

1  Q    I'm showing you what's in evidence as Government Exhibit

2  7, who is this?

3  A    Officer Nunez.

4  Q    Why did Officer Nunez take you and Maria to the second

5  floor?

6  A    Too get the cleaning products.

7  Q    Where were you going to clean that day?

8  A    Fifth floor.

9  Q    What's on the fifth floor?

10 A    Education.

11 Q    I'm showing you what's in evidence as Government Exhibit

12 102A.  Do you see the area where Officer Nunez took you that

13 weekend in this photograph?

14 A    Yes.

15 Q    Where?

16 A    The second door on the left  side.

17 Q    The one with the trash can in front of it?

18 A    Yes.

19 Q    And what, if anything -- withdrawn.

20      What, if anything, happened when Officer Nunez took you to

21 that area?

22 A    When we got there in front of the office, Maria and the

23 officer went into the office.  And I could hear that there were

24 people talking.  And I got close to the edge of the door and I

25 heard or I saw that the Lieutenant was sitting there.

                    Osoria - Direct - Shihata                    569

1   Q    Which lieutenant?

2   A    Martinez.

3   Q    And you said an officer went in the office with Maria,

4   which officer?

5   A    Officer Nunez.

6   Q    And what happened next?

7   A    The three of them were talking and at a certain point

8   Nunez came outside and he stayed out there with me.

9   Q    In this area (indicating)?

10  A    Yes.  Right there next to the door.

11  Q    And while you were outside in that area, outside the door,

12  could you hear what was being said inside the office?

13  A    I didn't hear what they were saying, but I could hear that

14  they were having an argument.

15            MR. SANTIAGO:  Objection.

16  Q    What makes you say that?

17  A    The tone of their voice.

18            THE COURT:  You have to speak up when you make an

19  objection.  But the objection is, you know, I barely heard it.

20  It's overruled, but keep the microphone close to you.

21            MR. SANTIAGO:  Yes, Your Honor.

22  BY MS. SHIHATA:

23  Q    Now about how long were you and Officer Nunez in the area

24  outside while Maria and Lieutenant Martinez were inside the

25  office?

GA304

Osoria - Direct - Shihata                                     570

1    A    Not too long, about eight minutes or ten.

2    Q    At some point, did Officer Nunez go back inside the

3    Lieutenants' office?

4    A    Yes.

5    Q    And what happened next?

6    A    After that he came out with Maria and the cleaning

7    products and we left.

8    Q    And who had the cleaning products?

9    A    I don't remember exactly, but Maria and I were carrying

10   them.

11   Q    Did Maria leave the office with cleaning supplies?

12   A    Yes.  And bucket for the mop.

13   Q    You testified earlier you left the MDC on, in late March

14   2016, correct?

15   A    Yes.

16   Q    Where did you go after that?

17   A    To Immigration.

18   Q    Were you in Immigration detention?

19   A    Yes.

20   Q    Did your federal conviction have an effect on your status

21   as a green card holder?

22   A    Yes.

23   Q    What effect did it have?

24   A    A deportation proceeding was started.

25   Q    Did you lose your green card?

Transcriptions Plus II, Inc.

Osoria - Direct - Shihata                                    571

1        THE INTERPRETER:  I'm sorry.  The interpreter didn't

2   hear, could you or did you?

3   Q    Did you lose your green card?

4   A    Yes.

5   Q    And were you put in deportation proceedings?

6   A    Yes.

7   Q    And did you hire an Immigration lawyer to help you with

8   your Immigration case?

9   A    Yes.

10  Q    While you were in Immigration detention, did you see Maria

11  again?

12  A    Yes.

13  Q    Around when was that?

14  A    I left in March, she left in April.

15  Q    What year?

16  A    2016.

17  Q    And when you first saw Maria in Immigration detention,

18  well was she at the same facility as you?

19  A    Yes.

20  Q    When you first saw her there did she show you anything?

21  A    Yes.

22  Q    What did she show you?

23  A    She had -- I'm not sure what to call it, but she had a

24  mark that the Lieutenant had left on her.

25  Q    Where was the mark?

Osoria - Direct - Shihata                                    572

1   A    I don't know which arm, but it was a mark on the upper

2   part of her arm.  Left or right, I don't know which arm.

3   Q    How long were you in Immigration detention for?

4   A    One year.

5   Q    At some point while you were in Immigration detention did

6   federal agents interview you?

7   A    Yes.

8   Q    And were you asked about your experience at the MDC?

9   A    Yes.

10  Q    And did you provide information about Lieutenant Martinez

11  and others?

12  A    Yes.

13  Q    At some point were you released from Immigration

14  detention?

15  A    Yes.

16  Q    Around when was that?

17  A    April 17, 2017.  The 17th, well I don't know about the

18  date, but it was April.

19  Q    Okay.  At some point, did you have an appeal of your

20  deportation pending with an Immigration Court?

21  A    Yes.

22  Q    What happened with that appeal?

23  A    It was denied.

24  Q    Are you familiar with the term "deferred action?"

25  A    Yes.

```
             Osoria - Cross - Santiago                    573
 1   Q    Do you currently have deferred action?

 2   A    Yes.

 3   Q    Did the FBI apply for that for you?

 4   A    Yes.

 5            THE COURT:  Could you tell us what your understanding

 6   is of deferred action?

 7            THE WITNESS:  It's just, well it's temporary.  While

 8   I work with the FBI.

 9            THE COURT:  And what's deferred, your deportation?

10            THE WITNESS:  Yes.

11   Q    And is your deferred action status is what allow you to

12   stay in the United States right now?

13   A    Yes.

14   Q    Including to testify at this trial?

15   A    Yes.

16            MS. SHIHATA:  No further questions.

17   CROSS-EXAMINATION

18   BY MR. SANTIAGO:

19   Q    Good afternoon.

20   A    Good afternoon.

21   Q    You spoke with Maria after she had that conversation with

22   Officer Rodriguez, correct?

23   A    Yes.

24   Q    And she appeared nervous and scared, correct?

25   A    Yes.
```

Osoria - Cross - Santiago                                        574

1  Q    And you used the word "super-nervous."

2  A    Because she was really nervous, super-nervous.

3  Q    And you knew it was over a telephone call that Maria had

4  made, correct?

5  A    I found out right then, when she came back, all nervous to

6  wake me up.

7  Q    But you didn't hear the actual call, correct?

8  A    No.

9  Q    You weren't standing next to her when she made the call,

10 correct?

11 A    No.

12 Q    Everything you know about the call is from what Maria told

13 you about the call, correct?

14 A    Yes.

15 Q    You also spoke about a bruise you saw on Maria's arm,

16 correct?

17 A    Yes.

18 Q    And you weren't there when Maria got the bruise, correct?

19 A    No.

20 Q    So everything you know about the bruise Maria has, you got

21 from what Maria told you, correct?

22 A    Yes.

23 Q    Maria was the only one who told you about any sexual

24 contact between her and Lieutenant Martinez, correct?

25 A    Yes.

                    Osoria - Cross - Santiago                    575

1   Q    You weren't there during any sexual contact between her

2   and Lieutenant Martinez, correct?  "Her" being Maria.

3   A    No, I wasn't there.

4   Q    So you're relying on everything that Maria told you about

5   it, when you're speaking today, correct?

6   A    Yes.

7   Q    You're aware that detainees and guards speak to each other

8   socially, correct?

9   A    Yes.

10  Q    While you were there, you spoke to guards socially,

11  correct?

12  A    Yes.

13  Q    And you gave your number to a guard so that he could speak

14  to you after you got released, correct?

15  A    Yes.

16          MR. SANTIAGO:  Thank you.  No further questions.

17          MS. SHIHATA:  Nothing further, your Honor.

18          THE COURT:  You can step down.

19  (Witness excused)

20

21

22

23

24

25

<pre>
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA        *      Docket No.
                                *      17-CR-281 (ERK)
                                *
          v.                    *      U.S. Courthouse
                                *      Brooklyn, NY
                                *
CARLOS RICHARD MARTINEZ,        *      February 13, 2020
              Defendant.        *      10:47 AM
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
</pre>

<pre>
            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE EDWARD R. KORMAN
                  UNITED STATES DISTRICT JUDGE
</pre>
APPEARANCES:

<pre>
For the Government:             RICHARD P. DONOGHUE, ESQ.
                                UNITED STATES ATTORNEY

                          BY:   ELIZABETH A. GEDDES, ESQ.
                                NADIA I. SHIHATA, Esq.
                                Asst. United States Attorney
                                United States Attorney's Office
                                271 Cadman Plaza East
                                Brooklyn, NY  11201

For the Defendant:              ANTHONY L. RICCO, ESQ.
                                20 Vesey Street, Suite 400
                                New York, NY 10007

                                CARLOS M. SANTIAGO, ESQ.
                                The Law Office of
                                Carlos M. Santiago
                                11 Broadway, Suite 615
                                New York, NY 10004

                                STEVEN ZACHARY LEGON, ESQ.
                                Steven Zachary Legon,
                                Attorney At Law
                                20 Vesey Street, Suite 400
                                New York, NY 10007

Transcription Services:         Transcriptions Plus II, Inc.
                                61 Beatrice Avenue
                                West Islip, NY 11795
                                laferrara44@gmail.com
</pre>

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

9   K I A R A   M A L D O N A D O ,

10      called as a witness, having been first duly sworn, was

11      examined and testified as follows:

12  DIRECT EXAMINATION

13  BY MS. GEDDES:

14  Q    How old are you?

15  A    Twenty-six.

16  Q    Where did you grow up?

17  A    In Brooklyn.

18  Q    Where is your family from?

19  A    Puerto Rico.

20  Q    You speak English -- you speak English, right?

21  A    Yup.

22  Q    Do you speak any other languages?

23  A    Spanish.

24  Q    How far did you go in school?

25  A    To the tenth grade.

Maldonado - Direct - Geddes                    353

1   Q    Do you have any children?

2   A    Yes, two.

3   Q    How old are they?

4   A    Six and three.

5   Q    I'd like to direct your attention to 2013.  Were you

6   arrested that year?

7   A    Yes.

8   Q    What were you arrested for?

9   A    Possession.

10  Q    Possession of drugs?

11  A    Yes.

12  Q    Were you charged in federal or state court?

13  A    State.

14  Q    How did you resolve that case, pleading guilty or going to

15  trial?

16  A    Guilty.

17  Q    You pled guilty?

18  A    Yes.

19  Q    What was your sentence?

20  A    A year and a day.

21  Q    When you were released, were you serving a term of parole?

22  A    Yes.

23  Q    How long was that parole term, if you know?

24  A    A year.

25  Q    I'd like to direct your attention to 2014.  Were you

Maldonado - Direct - Geddes                    354

1  arrested again?

2  A    Yes.

3  Q    What were you arrested for that time?

4  A    Conspiracy.  Conspiracy.

5  Q    Did that also involve drugs?

6  A    Yes.

7  Q    And when you were arrested, were you on parole still?

8  A    Yes.

9  Q    Were you charged in federal or state court?

10 A    Federal.

11 Q    How was your -- that case resolved, by guilty plea or

12 trial?

13 A    Guilty.

14 Q    Do you remember what you pled guilty to?

15 A    Sixteen months and four years' probation.

16 Q    That was your sentence, right?

17 A    Mm-hmm.

18 Q    Do you remember what charge you pled guilty to?

19 A    Conspiracy.  I'm not sure.  No, I don't remember.

20 Q    Was it also a drug offense?

21 A    Yes.

22 Q    And you testified that you were sentenced to 16 months

23 plus four years' probation.  Is that right?

24 A    Yes.

25 Q    And did you also receive a sentence for violating your

Maldonado - Direct - Geddes                                    355

1   parole?

2   A      Yes.

3   Q      How much time did you receive --

4   A      Three to four months.

5   Q      -- for that?

6   A      Three to four months.

7   Q      Where did you serve your federal sentence?

8   A      The last place was MDC.  So I was like in Vermont, Rhode

9   Island, and then I went to MDC.

10  Q      Where was MDC located?

11  A      In Brooklyn.

12  Q      When were you incarcerated at the Brooklyn MDC?

13  A      Hmm?

14  Q      Do you remember when you were incarcerated at the Brooklyn

15  MDC?

16  A      From October to December.

17  Q      Of what year?

18  A      2016, I think.

19  Q      What year was it?

20  A      2016.

21  Q      Do you remember what year you were released from prison?

22  A      No, I -- 2016 I was released, and I think I was in there

23  2015.

24  Q      You were in the --

25  A      In MDC.

Maldonado - Direct - Geddes                              356

1   Q    -- MDC from October to December of 2015?

2   A    Yeah.

3   Q    And after you served your term at the MDC, where did you

4   go?

5   A    To Rikers Island to finish my parole -- probation.

6   Q    And you were then released from that term in 2016.  Is

7   that right?

8   A    Yeah.

9   Q    When you were at that Brooklyn MDC, where were you housed?

10  A    In the sentenced unit.

11  Q    With other sentenced female prisoners?

12  A    Yes.

13  Q    Was there another dorm at the MDC that housed female

14  inmates at that time?

15  A    Yeah, it was the pretrial.

16  Q    So pretrial inmates, people who had not yet been

17  sentenced.

18  A    Yes.

19  Q    Is that right?

20  A    Mm-hmm.

21  Q    When you were an inmate at the MDC, who was in charge of

22  you?

23  A    The officers.

24          MS. GEDDES:  I'm showing the witness what's in

25  evidence as Government Exhibit 2.

Maldonado - Direct - Geddes                    357

1          THE CLERK:  Witness only, Counsel?

2          MS. GEDDES:  You can show it to the jury as well.

3    Thank you.

4    Q    Without saying this individual's name, do you recognize

5    her?

6    A    Yes.

7    Q    And do you know her name?

8    A    Yes.

9    Q    I'm now showing the witness and the jury only what's in

10   evidence as Government Exhibit 2A.  Is the name written on

11   Government Exhibit 2A below the photograph that I just showed

12   you, is that the true name of that individual?

13   A    Yes.

14   Q    For today's purpose, I would like you to just refer to her

15   as "Maria."  Okay?

16   A    Yes.

17   Q    Where did you meet Maria?

18   A    In the dorms.

19   Q    What dorms?

20   A    In MDC.

21   Q    In Brooklyn?

22   A    Yeah.

23   Q    Were you housed in the same unit as Maria?

24   A    Yes.

25   Q    What was your relationship with her?

Maldonado - Direct - Geddes                      358

1   A    We were friends.

2   Q    What language or languages did Maria speak?

3   A    Spanish.

4   Q    How was her English?

5   A    Not good.

6   Q    Who were your other friends at the MDC?

7   A    Danilda and Melva.

8   Q    In the time that you knew Maria at the MDC, what if any

9   job did she have?

10  A    She was a medical porter.

11  Q    And what did you understand that she did as a medical

12  porter?

13  A    She cleaned the medical offices and stuff.

14  Q    What if any job did you have while you were at the MDC?

15  A    I didn't have any.

16  Q    Why didn't you have a job?

17  A    Because I was ready to go home.

18  Q    Because you were only there for a short period?

19  A    Mm-hmm.

20  Q    Did you ever see Maria leave your unit to go to clean?

21  A    Yes.

22  Q    Who if any other inmates did you see going with her?

23  A    This older lady.

24  Q    Can you describe the older lady?

25  A    She was white, with like long hair, Spanish speaking.

GA318

Maldonado - Direct - Geddes                                    359

1   Q    I'm showing you what's in evidence as Government Exhibit
2   8.  Do you recognize the individual in Government Exhibit 8?
3   A    Yes.
4   Q    Who is that?
5   A    I don't remember her name.
6   Q    How do you know her?
7   A    From seeing her go to the medical -- I mean, to go clean
8   with Maria.
9   Q    Is she the woman that you were just describing, whose name
10  you don't recall?
11  A    Yeah.
12  Q    And I'm now showing you what's in evidence as Government
13  Exhibit 4.  Do you recognize the individual in Government
14  Exhibit 4?
15  A    Yes.
16  Q    Who is that?
17  A    Nani.
18  Q    Is Nani a nickname?
19  A    Yes.
20  Q    Do you know her full name?
21  A    Just Nani -- Danilda --
22  Q    You know her as "Nani"?
23  A    Yeah.
24  Q    Okay.  Do you know her full first name?
25  A    Danilda.

Maldonado - Direct - Geddes                                    360

1   Q    Danilda?

2   A    Mm-hmm.

3   Q    And is she the Danilda you testified earlier about, one of

4   your friends at the MDC?

5   A    Yeah.

6   Q    Where did you meet Nani?

7   A    In the -- in MDC.

8   Q    Was she housed in the same unit as you and Maria?

9   A    Yes.

10  Q    By the way, where was Maria from?

11  A    DR.

12  Q    Is that the Dominican Republic?

13  A    Yeah.

14  Q    How about Nani?  Where was she from?

15  A    DR, too.

16  Q    What languages did Nani speak?

17  A    English and Spanish.

18  Q    Did she have a job at the MDC, Nani?

19  A    Yes.  She worked in the mess hall overnight.

20  Q    And you said she worked in the mess hall overnight.  Do

21  you recall what hours she worked?

22  A    From, like, 11:00 to 6:00, till 5:00.  I'm not sure.

23  Q    So was that from 11:00 in the evening till 5:00 or 6:00 in

24  the morning?

25  A    Yes.

GA320

Maldonado - Direct - Geddes                    361

1   Q    And I'm showing you now what's in evidence as Government

2   Exhibit 5.  Do you recognize the individual in Government

3   Exhibit 5?

4   A    Yes.

5   Q    Who is that?

6   A    Melva.

7   Q    Do you know Melva's last name?

8   A    Uhn-uh.  I forgot.

9   Q    How did you meet Melva?

10  A    In the dorm.

11  Q    Also at the MDC?

12  A    Yeah.

13  Q    And was she housed in the same unit as you, Maria, and

14  Nani?

15  A    Yes.

16  Q    Where was she from?

17  A    DR.

18  Q    What languages did Melva speak?

19  A    Spanish.

20  Q    Did she have a job while at the MDC?

21  A    She was in the mess hall.

22  Q    And what hours did she work?

23  A    Overnight, too.

24  Q    So same hours as Nani?

25  A    Yeah.

GA321

Maldonado - Direct - Geddes                                    362

1    Q    I'd like to direct your attention to December of 2015.  Do

2    you recall an incident where Maria returned to the unit upset?

3    A    Yes.

4    Q    Do you recall what day of the week it was when you saw

5    Maria upset?

6    A    I think it was the weekend because we have visits --

7    Q    You think that there were -- it was a day that inmates

8    received visits?

9    A    Yes.

10   Q    And that happened on the weekends?

11   A    Yes.

12   Q    What happened when you saw Maria return to the unit?

13   A    She looked a little freaked out and she just called --

14   told me come over.

15   Q    Where were you when Maria called for you?

16   A    I was on the top bunk.

17   Q    And where was Maria?

18   A    She was like walking into the dorm.

19   Q    And you said -- you testified that she called for you to

20   come over.  Where did she want you to go, or where did she

21   say --

22   A    To the bathroom with her.  To the bathroom stall.

23   Q    Did you go to the bathroom area?

24   A    Yes.

25   Q    What happened?

GA322

Maldonado - Direct - Geddes                                363

1    A    She told me to come into the bathroom stall and then she

2    freaked out and told me to get out, because someone might be

3    watching.  And she told me to go into the next stall.

4    Q    Did you go into the other stall?

5    A    Yes.

6    Q    What if anything did she say to you when you were in the

7    stall next door to her?

8    A    That she was bleeding.

9    Q    Did she tell you where she was bleeding?

10   A    Yeah, from her vagina.

11   Q    She was bleeding from her vagina?

12   A    Yeah.

13         THE COURT:  Could you pull the mic down a little

14   bit?

15   Q    Now, when you saw -- when you first saw Maria, how did

16   Maria appear to you?

17   A    She looked like startled, freaked out.  I don't know.

18   Q    You testified that she initially asked you to go into the

19   bathroom stall with you.  Is that right?

20   A    Yes.

21   Q    Was that unusual?

22   A    Yes, because she was really conservative about her body

23   and herself --

24   Q    What do you mean by that?

25   A    Because like other girls will change, like, in the dorm,

GA323

Maldonado - Direct - Geddes                              364

1   by their beds.  But she would always go to, like, the bathroom

2   stall.  She was, like, private about herself.

3   Q    Where would you change when you had to change clothes at

4   the MDC?

5   A    By my bed.  Front of my bed.

6   Q    And where would Maria -- where did you see Maria change

7   when she had to change?

8   A    At the bathroom stalls, in the bathroom.

9   Q    What did you understand Maria to be referring to when she

10  mentioned that someone was watching, or could be watching?

11  A    She was talking about the officer.

12  Q    Can you explain?

13  A    She said that she had sex with Officer Martinez and that

14  she was bleeding.  She wanted to show me the panty, but I

15  didn't want to see it because it was nasty, so -- I told her

16  no, I didn't want to see --

17  Q    She wanted to show you her underwear, where she --

18  A    Mm-hmm.

19  Q    -- had been bleeding?

20  A    Yeah.

21  Q    Now, going back to her statement about he's probably

22  watching, what did you understand Maria to -- referring to?

23  A    Because the cameras are facing the bathroom stalls, so --

24  Q    Where was there a camera?

25  A    They're facing the bathroom stalls.  So --

Maldonado - Direct - Geddes                    365

1  Q    You testified that she told you that she had had sex with

2  Martinez.  Is that right?

3  A    Yes.

4  Q    Did you understand who she was referring to, by

5  "Martinez"?

6  A    Yes.

7  Q    Who is that?

8  A    The sergeant.  He was a sergeant in MDC.

9  Q    Did you learn his first name?

10 A    No.

11 Q    I'm showing you what's in evidence as Government Exhibit

12 104D.  Do you recognize the area that's shown in 104D?

13 A    Yes.

14 Q    What is that?

15 A    That's the bathroom area.

16 Q    Can you describe where you went when Maria first asked you

17 to go to the bathroom area?

18 A    We were in the two middle stalls.

19 Q    All right.  Can you use -- if you could use your finger,

20 could you make a mark where you went?

21 A    Like right -- oh, sorry -- around there.

22 Q    Did you make a mark on it?

23 A    Yeah.

24 Q    Oh, yes.  You did.  All right.  And there are some stalls

25 back there, as well as some stalls here.  What are the

Maldonado - Direct - Geddes                                    366

1    different --

2    A    Those are showers.

3    Q    Where are the showers?

4    A    In the front.

5    Q    And then in the back where you put a mark, that's where

6    the bathrooms are?

7    A    Yeah.

8    Q    And you indicated that you were in those back stalls.  Is

9    that right?

10   A    Yes.

11   Q    Now, looking at Government Exhibit 104D, do you -- can you

12   show the jury where there is a camera, if you see one?

13   A    No, it's not there.  It's on the other side.

14   Q    Okay.  What happened after you and Maria talked while you

15   were in next -- stalls next door to each other?

16   A    She started telling me and then she was, like, you know

17   what?  Just stop.  Because he's probably watching from the

18   cameras.  So just wait till after second shift comes on.

19   Q    What did you understand her to mean by "second shift"?

20   A    After the first shift leaves, the second shift, recall.

21   Q    Okay.  Do you know what time the first shift is?

22   A    Like 9:00 to 3:00.

23   Q    Okay.  --

24   A    Or like 8:00 to 3:00.

25   Q    And you said at some point there is recall.  What is

```
                    Maldonado - Direct - Geddes                    367
 1   "recall"?
 2   A     When they do the count for us, to see who's there.
 3   Q     What time does recall happen?
 4   A     Like 3:00.
 5   Q     Is that 3:00 in the afternoon?
 6   A     Yeah.
 7   Q     Where did Maria go after you left the bathroom stall?
 8   A     She went to go take a shower.
 9   Q     Did you have an opportunity to speak with Maria again that
10   evening -- that day?
11   A     Yeah.
12   Q     When did that happen?
13   A     In the late afternoon.
14   Q     Where did you speak with her?
15   A     On Nani's bed.
16   Q     Why were you -- who else was there?
17   A     Just me, Nani, and Maria.
18   Q     Why were you in Nani's bed?
19   A     To talk about what happened.
20   Q     Is there a particular reason why you congregated on Nani's
21   bed as opposed to anywhere else?
22   A     Because me and her had top bunks, so it wasn't
23   comfortable.  So she had the bottom bunk, so we were just
24   chilling there.
25   Q     Who had the bottom bunk?
```

GA327

Maldonado - Direct - Geddes                          368

1   A    Nani.

2   Q    And when you said "me and her had top bunks," are you

3   referring to yourself and Maria?

4   A    Yes.

5   Q    When you talked to Maria on Nani's bed, with you, Nani,

6   and Maria, how did she appear?

7   A    She looked, like, sad.

8   Q    What did she tell you happened?

9   A    She told me she had oral sex with the officer and sex.

10  Q    And vaginal sex.  Is that right?

11  A    Yes.

12  Q    What was your initial reaction?

13  A    We was, like, damn, bitch.  You know.  You had sex with an

14  officer.  That was really it.

15  Q    Fair to say that you didn't take it very seriously at

16  first?

17  A    No.

18  Q    And you said "we."  Who were you referring to?

19  A    Me and Nani.

20  Q    How did Maria react when you and Nani were not taking her

21  very seriously?

22  A    She just -- she just kept telling us, like, you know, what

23  happened.  And then, as she started telling the story, she

24  started to cry.

25  Q    Did your reaction change at some point?

Maldonado - Direct - Geddes                    369

1   A    Yeah, I kind of felt bad because, you know, we was taking

2   it as a joke and she was, like, sad -- stuff.

3   Q    What if anything did Maria say she was concerned about?

4   A    Like getting pregnant or whatever.

5   Q    Did she say why she thought she could get pregnant?

6   A    Because they didn't use protection.

7   Q    What if anything did Maria say that Martinez was going to

8   do?

9   A    Bring a Plan B pill.

10  Q    He told her he was going to bring a Plan B pill, to whom?

11  A    To Maria.

12  Q    What did you understand Maria to mean by a "Plan B pill"?

13  A    The pill so you won't get pregnant, like the after morning

14  pill.

15  Q    Later that evening, what happened?

16  A    He came around 12:00 to bring it and --

17  Q    And when you say "he," who are you referring to?

18  A    Martinez.

19  Q    Did you see him come to the unit that night?

20  A    Yes.

21  Q    Where were you?

22  A    On my top bunk.

23  Q    I'm showing you what's in evidence as Government Exhibit

24  104B, as in boy.  And can you just tap -- well, I can do it.

25       Do you recognize the area shown in Government Exhibit

Maldonado - Direct - Geddes                              370

1   104B?

2   A    Yes.

3   Q    What is that?

4   A    That's the dorm area.

5   Q    And do you remember where your bunk was when you were at

6   the MDC?

7   A    Yeah.

8   Q    Where was it?

9   A    It was, like, over here.

10  Q    And do you remember which row you were in?

11  A    It's, like, the front row.

12  Q    And you're referring to this row over there?

13  A    Yes, in the back.

14  Q    And at the top you can see there's a number where it says

15  "12" on the pedestal.  Is that right?

16  A    Yes.

17  Q    Was your row around that pedestal?

18  A    That was my row.

19  Q    And you said you had a top bunk?

20  A    Yeah.

21  Q    When did you see Martinez that night?

22  A    He was by the entrance.

23  Q    Do you recall what time of -- what time in the evening it

24  was that you saw him?

25  A    It was, like, third shift -- the beginning of third shift.

                    Maldonado - Direct - Geddes                    371

1   Q    And do you know what time third shift begins,

2   approximately?

3   A    Like, after 11:00.

4   Q    After 11 o'clock at night?

5   A    Yeah.

6   Q    And what did you see?

7   A    When he came, he called her over and they had a -- like,

8   they exchanged a few words and he passed her something.

9   Q    Did you see him pass her something?

10  A    Yeah.

11  Q    Now, how was it that you saw the defendant that evening?

12  A    Hmm?

13  Q    How was it that you saw the defendant that evening?

14  A    After he passed the pill.

15  Q    Why were you focused on the defendant that evening?

16  A    Oh, because I was waiting to see if he was going to come.

17  Q    Why?

18  A    Because I was being nosy.

19  Q    Do you recall how Martinez called Maria over that evening?

20  A    He called her by her last name.

21  Q    I'm showing you what's in evidence as Government Exhibit

22  104C.  Do you recognize the area shown in Government Exhibit

23  104C?

24  A    Yes.

25  Q    Can you indicate where on Government 104C, anywhere, you

Maldonado - Direct - Geddes                                      372

1   saw the defendant that evening -- or you saw Martinez, excuse

2   me, that evening?

3   A      Around there.

4   Q      And let the record reflect that you have made a mark where

5   the door underneath the "exit" sign is.  Is that correct?

6   A      Yeah.

7   Q      After that evening, what if anything did Maria ask you not

8   to do?

9   A      Not to tell anyone.

10  Q      What did she say to you?

11  A      She told me not to say anything because he said that she

12  can go to the box for it.

13  Q      And when you're referring to "he" in that sentence, who

14  are you referring to?

15  A      To the officer.

16  Q      Which officer?

17  A      Martinez.

18  Q      And you said that Maria told you not to say anything

19  because Martinez had said she could go to the box.  What do you

20  mean by the "box"?

21  A      Solitary confinement.

22  Q      Is that also known as the "SHU"?

23  A      Yeah.

24  Q      How long after that incident did you leave the MDC?

25  A      Two weeks later.

Maldonado - Direct - Geddes 373

1 Q    Before you left, what if any changes did you see in Maria

2 between the time of that -- that we just talked about, and when

3 you left the MDC?

4 A    She just, like, wasn't hanging out with us anymore.  She

5 was always sleeping, like, she kept to herself.

6 Q    Where was she spending her time?

7 A    On her top bunk.

8 Q    You testified earlier that after you left the MDC you

9 served additional time in connection with your parole

10 violation.  Is that right?

11 A    Yes.

12 Q    And that you were released from custody in about April

13 2016.  Is that what you testified to?

14 A    Yeah.

15 Q    After you were released, did you stay in touch with Maria?

16 A    Barely.

17 Q    When is the first time you told anyone in law enforcement

18 what Maria told you?

19 A    When they came to my house.

20 Q    Who is "they"?

21 A    The federal agents.

22 Q    After you found out that you would have to testify about

23 this, how did you feel?

24 A    I was upset.

25 Q    What did you do?

Maldonado - Cross - Ricco                     374

1   A    I called her and asked her --

2   Q    Who did you call?

3   A    Maria.

4   Q    And what did you say to Maria?

5   A    Why would she put me in -- get me involved in this.

6   Q    Why?

7   A    Because I didn't want to be involved.  I have too much

8   going on.

9   Q    Do you want to be here today?

10  A    No.

11  Q    Did you receive a subpoena to testify here today?

12  A    Yes.

13  Q    What if any benefit are you receiving from testifying here

14  today?

15  A    Nothing.

16       MS. GEDDES:  One moment.

17       Nothing further.

18  CROSS-EXAMINATION

19  BY MR. RICCO:

20  Q    Good afternoon, Ms. Maldonado.

21  A    Hey.

22  Q    How are you?

23  A    Good.  And you?

24  Q    Good.  How's things going?

25  A    It's okay.

Maldonado - Cross - Ricco                    375

1  Q    Working?

2  A    Mm-hmm.  Yes.

3  Q    You have two kids?

4  A    Yes.

5  Q    Taking care of them?

6  A    Yes.

7  Q    No more contact with law enforcement, right?

8  A    Nope.

9  Q    You went to jail way too young, right?

10 A    Yes.

11 Q    Once, right?

12 A    Mm-hmm.

13 Q    State, and then feds?

14 A    Yes.

15 Q    Enough, right?

16 A    Yep.

17 Q    I just want to ask you a couple of questions.  When the

18 agents came to your home, you were upset and you called Maria

19 and said, "Why are you dragging me into this," right?

20 A    Right.  Yes.

21 Q    And even though you were upset, you spoke --

22        THE COURT:  I'm sorry.  Did you answer that question?

23        THE WITNESS:  Yes.

24 Q    Okay.  If you talk into the mic, it would be helpful.

25 A    Okay.

Maldonado - Cross - Ricco                                        376

1    Q    There you go.  And even though you were upset, you

2    answered the questions that they had to you about your

3    interactions with the person that we are calling "Maria."

4    Isn't that correct?

5    A    Yes.

6    Q    And also the person Martinez, correct?

7    A    Yes.

8    Q    And you told them that Martinez was a serious staff

9    person --

10   A    Yes.

11   Q    -- who did not talk with the female inmates, correct?

12   A    Yes.

13   Q    Now, some of those staff people are always talking and up

14   in women's faces, right?

15   A    Right.

16   Q    Martinez was not one of those staff persons, correct?

17   A    Nope.

18   Q    And you told that to the agents when they came to your

19   house.

20   A    Mm-hmm.  Yes.

21   Q    You told the agents that Maria was flirting with Martinez,

22   correct?

23   A    Yes.

24   Q    And that Maria talked about Martinez in a flirtatious way

25   often, correct?

GA336

Maldonado - Cross - Ricco                    377

1    A    Yes.

2    Q    You told them that Maria told you that she gave Martinez

3    oral sex, and that Martinez penetrated her on the desk -- or on

4    the chair, in the lieutenants' office, correct?

5    A    Yes.

6    Q    You told them that Maria told you -- you told the agents

7    that Maria told you that she, Maria, felt as if she had cheated

8    on her husband, correct?

9    A    Yes.

10   Q    And that Maria told you that since she was feeling guilty

11   about cheating on her husband, she didn't want to have sex with

12   Martinez again, correct?

13   A    Yes.

14   Q    Now, she told you that Martinez had ejaculated into her

15   and that Martinez later brought her a Plan B pill so that Maria

16   would not get pregnant.  You told the agents that, right?

17   A    Yes.  Mm-hmm.

18   Q    And Martinez did show up with that?

19   A    Yes.

20   Q    You told them that Maria was bleeding because she had not

21   had sex in a long time, right?

22   A    Yes.

23         MS. GEDDES:  Objection.

24   Q    Well, that's what Maria told you, correct?

25   A    Yes.

GA337

Maldonado - Cross - Ricco                                378

1   Q    You've got to talk into the --

2   A    Yes.

3   Q    Now, also you informed the agents that Maria did not tell

4   Melva because Melva was friendly with a lot of other people in

5   the jail, correct?

6   A    I said because Melva was overprotective of us, so --

7   Q    Okay.

8   A    Yeah.

9   Q    Now, you're here testifying under oath, right?

10  A    Yep.

11  Q    You don't have no multimillion dollar lawsuit pending

12  nowhere.

13  A    Nuh-uh (negative).

14  Q    You've got to say yes or no.

15  A    Oh, no.

16  Q    Okay.  You're a single mom.

17  A    Yes.

18  Q    Taking care of your kids.

19  A    Yes.

20  Q    Right?  And you were asked to come here to tell the truth,

21  right?

22  A    Yes.

23  Q    Did you just tell the truth about what happened at the

24  jail on the day that you were present?

25  A    Yes.

GA338

Maldonado - Redirect - Geddes                    379

1   Q     Thank you.

2              MR. RICCO:  No further questions.

3   REDIRECT EXAMINATION

4   BY MS. GEDDES:

5   Q     On cross-examination you were asked some questions about

6   whether you saw Maria flirting with Martinez.  Do you recall

7   that?

8   A     I didn't see her.  She used to talk to me about him all

9   the time.

10  Q     After that incident when you saw Maria upset, did she

11  continue to talk about Martinez in a flirtatious way?

12  A     No.

13  Q     What did you see instead?

14  A     She was just -- like, she didn't want to go to work.  She

15  was sleeping all the time, or writing in her notebook.

16  Q     Did you say she didn't want to go to work?

17  A     No, she didn't.

18  Q     And where did she work?

19  A     In the -- in the medical part.

20  Q     As a medical porter, right?

21  A     Yeah.

22  Q     And did you ever see her in the proximity of Martinez

23  after that?

24  A     No.

25              MS. GEDDES:  Nothing further.

Maldonado - Redirect - Geddes                          380

1           MR. RICCO:  Just from here, Judge.

2    RECROSS-EXAMINATION

3    BY MR. RICCO:

4    Q    You left the jail two weeks after that, right?

5    A    Mm-hmm.

6    Q    So you didn't really see her that much after that --

7    A    No.

8    Q    -- in the first place, correct?

9    A    Correct.

10          MR. RICCO:  Thank you. No further questions.

11          THE COURT:  Okay.  You can step down.

12          Next witness.

13   (Witness excused)

14

15

16

17

18

19

20

21

22

23

24

25

```
                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA       *      Docket No.
                               *      17-CR-281 (ERK)
                               *
            v.                 *      U.S. Courthouse
                               *      Brooklyn, NY
                               *
CARLOS RICHARD MARTINEZ,       *      February 13, 2020
              Defendant.       *      10:47 AM
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

              TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
                 BEFORE THE HONORABLE EDWARD R. KORMAN
                    UNITED STATES DISTRICT JUDGE
APPEARANCES:

For the Government:            RICHARD P. DONOGHUE, ESQ.
                               UNITED STATES ATTORNEY

                          BY:  ELIZABETH A. GEDDES, ESQ.
                               NADIA I. SHIHATA, Esq.
                               Asst. United States Attorney
                               United States Attorney's Office
                               271 Cadman Plaza East
                               Brooklyn, NY  11201

For the Defendant:             ANTHONY L. RICCO, ESQ.
                               20 Vesey Street, Suite 400
                               New York, NY 10007

                               CARLOS M. SANTIAGO, ESQ.
                               The Law Office of
                               Carlos M. Santiago
                               11 Broadway, Suite 615
                               New York, NY 10004

                               STEVEN ZACHARY LEGON, ESQ.
                               Steven Zachary Legon,
                               Attorney At Law
                               20 Vesey Street, Suite 400
                               New York, NY 10007

Transcription Services:        Transcriptions Plus II, Inc.
                               61 Beatrice Avenue
                               West Islip, NY 11795
                               laferrara44@gmail.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

GA341

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    M E L V A   V A S Q U E Z   V A R G A S ,

23        called as a witness, having been first duly sworn, was

24        examined and testified as follows:

25    DIRECT EXAMINATION

Vasquez Vargas - Direct - Geddes                          381

1   BY MS. GEDDES:

2   Q    Do you speak English?

3   A    No.

4   Q    What language do you speak?

5   A    Spanish.

6   Q    How old are you?

7   A    Thirty-two.

8   Q    Where were you born?

9   A    The Dominican Republic.

10  Q    How far did you go in school?

11  A    Until number 11.

12  Q    Is that eleventh grade?

13  A    Eleventh grade.

14  Q    When did you move to the United States?

15  A    In 2007.

16  Q    How old were you?

17  A    Nineteen.

18  Q    When you moved to the United States, what did you do for a

19  living?

20  A    I worked at a company.

21  Q    What kind of company?

22  A    I packed jewelry, things like that.

23  Q    What do you do now?

24  A    I work in maintenance.

25  Q    Who do you live with?

Vasquez Vargas - Direct - Geddes                    382

1    A    With my mother, my brother, and my son.

2    Q    I'd like to direct your attention to 2011.  What happened

3    then?

4    A    I was arrested.

5    Q    Were you charged with a crime?

6    A    Yes.

7    Q    What crime were you charged with?

8    A    Drug trafficking.

9    Q    How did you plead, guilty or not guilty?

10   A    Guilty.

11   Q    Were you sentenced to jail time?

12   A    Yes.

13   Q    How long?

14   A    A year and a day.

15   Q    And was this in a federal or a state court?

16   A    Federal.

17   Q    Where did you serve your jail sentence?

18   A    MDC -- Metropolitan Federal in Brooklyn.

19   Q    It was the Brooklyn MDC?  Is that right?

20   A    Yes.

21   Q    How long were you at the Brooklyn MDC?

22   A    Eleven months.

23   Q    Do you recall when you were at the Brooklyn MDC?

24   A    From February to December, beginning of December.

25   Q    Of what year?

Vasquez Vargas - Direct - Geddes                          383

1   A      '15.

2   Q      2015?

3   A      Yes.

4   Q      Back when you were housed at the MDC, in 2015, how many

5   units were there for female prisoners there?

6   A      Two.

7   Q      How if at all were the two units different?

8   A      One was for women who had been sentenced.  The other one

9   was for women who were waiting to be sentenced.

10  Q      And which one were you in?

11  A      In the one for sentenced women.

12  Q      As a sentenced prisoner, were you required to work?

13  A      Yes.

14  Q      During your time at the MDC in Brooklyn, what jobs were

15  women able to hold?

16  A      Work in the kitchen, cleaning, in the laundry.  That's it.

17  Q      I'm showing you what's in evidence as Government Exhibit

18  2.  Without saying this individual's name, do you recognize

19  her?

20  A      Yes.

21  Q      Do you know the name of the individual in Government

22  Exhibit 2?

23  A      Yes.

24  Q      All right.  For today's purpose, I would like you to refer

25  to the individual in Government Exhibit 2 as "Maria."  But

GA345

Vasquez Vargas - Direct - Geddes                            384

1  before I do, I'm going to show you and the jury what's in

2  evidence as Government Exhibit 2A.  Is the name written

3  underneath the photograph shown in 2A the true name of that

4  individual that you know her by?

5  A    Yes.

6  Q    All right.  Again, for today, let's refer to her as

7  "Maria."  Okay?

8  A    (No audible response)

9  Q    Which inmates at the MDC were you closest to?

10 A    With Maria, Nani, and La Menor, Kiara.

11 Q    Are La Menor and Kiara the same person?

12 A    Yes.

13 Q    Where was Maria from?

14 A    The Dominican Republic.

15 Q    Did she speak English?

16 A    No.  A little bit.

17 Q    What language did she speak more regularly?

18 A    Spanish.

19 Q    What if any job did Maria have at the MDC?

20 A    Cleaning.

21 Q    I'm showing you what's in evidence as Government Exhibit

22 4.  Do you recognize that individual?

23 A    Yes.

24 Q    Who is that?

25 A    Nani.

GA346

Vasquez Vargas - Direct - Geddes                    385

1   Q    Is Nani a nickname or her real name?

2   A    A nickname.

3   Q    Do you know her real name?

4   A    Yes.

5   Q    What is it?

6   A    Danilda.

7   Q    Do you know Danilda's last name?

8   A    I don't remember.

9   Q    Where was Nani or Danilda from?

10  A    She was Dominican.

11  Q    From the Dominican Republic as well?

12  A    Yes.

13  Q    What language did she speak?

14  A    English and Spanish.

15  Q    Did she have a job at the MDC?

16  A    Yes.

17  Q    What job did she have?

18  A    Kitchen.

19  Q    Is that also known as the "mess hall"?

20  A    Yes.

21  Q    And what -- when would Nani go to work?  What part of the

22  day?

23  A    Well, first she served food during the day, and then she

24  changed to work in the kitchen at night.

25  Q    And what part of the night did she work in the kitchen

Vasquez Vargas - Direct - Geddes                    386

1   for?

2   A    From 11:00 until 6:00, 5:00, 4:00.  It depended on

3   whatever time they finished, but it was before 6:00 in the

4   morning.

5   Q    So you worked -- so she worked from about 11:00 p.m. at

6   night till sometime that could be as late as 6:00 in the

7   morning.  Is that right?

8   A    Yes.

9   Q    Did you have a job while you were at the MDC?

10  A    Yes.

11  Q    What was your job?

12  A    Kitchen.

13  Q    And did you work the same hours that you just testified

14  Nani worked to?

15  A    Yes.

16  Q    Once you were assigned a job at the MDC, could you refuse

17  to go to work?

18  A    No.

19  Q    I'm showing you what's in evidence as Government Exhibit

20  6.  Do you recognize the individual shown in Government Exhibit

21  6?

22  A    Yes.

23  Q    Who is that?

24  A    Kiara.

25  Q    Did you have any nickname for Kiara?

Vasquez Vargas - Direct - Geddes                              387

1   A     La Menor.

2   Q     Why did you call her "La Menor"?

3   A     Because she was the youngest of everybody.  It was kind of

4   a joke.

5   Q     Where was Kiara or La Menor from?

6   A     I remember she was Puerto Rican Dominican.

7   Q     What language did she speak, or languages did she speak?

8   A     Spanish and English.

9   Q     And you testified that she was the youngest of all of you.

10  Is that right?

11  A     Yes.

12  Q     What if any job did Kiara have at the MDC?

13  A     Not that I remember, none.

14  Q     Do you know why she didn't have a job?

15  A     I remember her coming and she stayed for a very short

16  time.

17  Q     Now, you testified earlier that Maria had a job.  What did

18  you testify Maria's job was?

19  A     Cleaning.

20  Q     Was there anyone else with -- was there anyone else that

21  she cleaned with on a regular basis?

22  A     Yes.

23  Q     Who?

24  A     First it was with Carmen Lopez.  That was at the

25  beginning.  And an older woman, Odie, but I don't remember her

GA349

Vasquez Vargas - Direct - Geddes                          388

1  last name.

2  Q    Why did she stop cleaning with Carmen Lopez?

3  A    They left the jail.

4  Q    Carmen Lopez left the jail.  Is that right?

5  A    Yes.

6  Q    I'm showing you what's in evidence as Government Exhibit

7  8.  Do you recognize that individual?

8  A    Yes.

9  Q    Who is that?

10 A    Odie.

11 Q    And is that the Odie that Maria sometimes cleaned with?

12 A    Yes.

13 Q    When you were incarcerated at the MDC, who was in charge

14 of the inmates?

15 A    The guards.  The lieutenants.  I don't know their exact

16 names.

17 Q    But generally the guards and lieutenants were in charge.

18 Correct?

19 A    Yes.

20 Q    When you were at the MDC, did you receive visits?

21 A    Yes.

22 Q    Did you receive visits for the whole time that you were at

23 the MDC?

24 A    No.

25 Q    When you were receiving visits, who visited you?

Transcriptions Plus II, Inc.

GA350

Vasquez Vargas - Direct - Geddes                                389

1   A    My mother, my sister, my son, and my domestic partner.

2   Q    At some point did you get in trouble while you were at the

3   MDC?

4   A    Yes.

5   Q    When was that?

6   A    At the beginning of May, June.  I don't remember exactly.

7   Q    What happened?

8   A    I was accused of acting sexually with my partner, touching

9   her sexually.

10  Q    How did you learn that you were -- you had been accused of

11  this?

12  A    When I was in a different jail, much worse than the one we

13  were in, that was the SHU.

14  Q    All right.  You said that you were accused of something

15  sexual with your domestic partner.  Is that right?

16  A    Yes.

17  Q    Where did this -- where were you accused of this

18  happening?

19  A    At the visit.

20  Q    And when did you find out that you were in trouble?

21  A    Something like two days after I had been punished.

22  Q    All right.  You said that you went to -- where did you go

23  after the visiting room?

24  A    To the SHU.

25  Q    And what is the "SHU"?

GA351

Vasquez Vargas - Direct - Geddes                    390

1    A    It's a small room, all by itself.  They take all of your

2    belongings away from you.  The stuff you have, your personal

3    stuff in your unit, you don't get to take that with you.

4    Q    Were you taken from the visitor room to the SHU?

5    A    Yes.

6    Q    How long were you in the SHU for?

7    A    For a little over a week.  I can ask -- I can be asked

8    about that a thousand times, and a thousand times I feel bad.

9    Q    About remembering what it's like in the SHU?

10   A    No.  Because they took my family away from me without any

11   reason whatsoever.

12   Q    All right.  When you were in the SHU, did you receive --

13   were you able to place phone calls?

14   A    No.

15   Q    Were you able to work?

16   A    No.

17   Q    And did you have your stuff with you?

18   A    No.

19   Q    You said you were accused of something.  Were you

20   eventually found responsible for that?

21   A    Yes.  I was accused.  They didn't find me -- well, yes.

22   Q    Did you receive a punishment?

23   A    Yes.

24   Q    What was your punishment?

25   A    About four months without visitors.

Vasquez Vargas - Direct - Geddes                              391

1   Q    Now, you testified that you were accused of doing

2   something sexual.  Do you believe that you did anything wrong

3   in the visitor room that day?

4   A    No.

5   Q    Do you recall when you started to have visits again after

6   you lost your visits for a period of about four months?

7   A    Yes.

8   Q    When was that?

9   A    About three weeks before I was leaving the jail in

10  November.

11  Q    And do you recall the day that you left the MDC?

12  A    Not exactly.

13  Q    What days were you allowed to have visits?

14  A    Saturday and Sunday, Wednesdays, and I don't remember

15  exactly what other days.

16  Q    Do you remember the first time that you were allowed to

17  have visits after losing it for a period of time?

18  A    Yes.

19  Q    Did you actually have a visit that day?

20  A    No.

21  Q    What happened?

22  A    They hadn't put me in the system saying that everything

23  had been fixed.

24  Q    Who if anyone came to visit you that day?

25  A    My mother, my son, and my sister.

GA353

Vasquez Vargas - Direct - Geddes                           392

1   Q    But you didn't actually see them that day.  Is that right?

2   A    No.

3   Q    What happened the next day?

4   A    I was able to see them.

5   Q    Who came that day?

6   A    My mother, my son, and my partner.

7   Q    And you testified that that visit happened a couple weeks

8   before you were released from the MDC.  Is that right?

9   A    Yes.

10  Q    When you got back to the unit after your visit that day,

11  what if anything did you see?

12  A    I went -- I got to the unit and I went over to Danilda's

13  bed, and Maria was there.

14  Q    When you got there, how --

15            THE INTERPRETER:  I'm sorry.

16            THE WITNESS:  She was crying.

17  Q    What if anything did Maria tell you?

18  A    That she had been with someone.

19  Q    Do you recall what she said?

20  A    Yes.

21  Q    What did she say to you?

22  A    That she was not well because she had had sex with a man.

23  Q    Did she tell you who she had sex with?

24  A    Yes.

25  Q    Who did she tell you?

Vasquez Vargas - Direct - Geddes                    393

1   A    With a lieutenant.  Yes.

2   Q    Did she tell you which lieutenant she had sex with?

3   A    With Lieutenant Martinez.

4   Q    Did she tell you about any physical reaction that she had?

5   A    Yes.

6   Q    What?

7   A    They had had sex in his office and that he had penetrated

8   her.  We didn't talk a lot at that point because it was time

9   for the count.

10  Q    When you first had that conversation with Maria, do you

11  recall who else was present, if anyone?

12  A    Yes.

13  Q    Who else was there?

14  A    Kiara and Danilda.

15  Q    How were Kiara and Danilda reacting to what Maria said to

16  you?

17  A    Neither good nor bad.  Just joking.  You know, women.

18  Q    Can you describe what you mean by that?

19  A    Perhaps in that moment they didn't take it so seriously.

20  Q    How about you?

21  A    I didn't like it.  I didn't like it.  I didn't like it.  I

22  don't see it that way.  It didn't look good to me.  She wasn't

23  well, and she was crying, and they were joking.

24  Q    Did you convey that to them?

25  A    "Convey" is like telling them?

Vasquez Vargas - Direct - Geddes                    394

1   Q    Yeah.  Did you make clear to them that you were angry that

2   they were responding --

3              THE COURT:  What did you say to them?

4              THE WITNESS:  That that wasn't right, because I

5   didn't -- I didn't see that being right.  I didn't like it.

6   Q    Now, did you have other conversations with Maria about

7   what happened with Martinez that day?

8   A    Yes.

9   Q    During the course of those conversations, what did Maria

10  tell you about what had happened between her and Martinez?

11             THE INTERPRETER:  Between?  I'm sorry.  I didn't

12  catch the end.  Between?

13  Q    What did -- during those conversations, what did Maria

14  tell you about what had happened between her and Martinez?

15  A    That she -- she did not feel well and she kept crying for

16  what had happened.  She told me everything that happened in

17  that moment, with Mr. Martinez.

18

19

20

21

22

23

24

25

Vasquez Vargas - Direct - Geddes                396

1  Q    What did -- what did Maria tell you happened with

2  Martinez?

3  A    That they had sexual relations in his office, that he had

4  penetrated her, that she had bled.

5  Q    Where was she bleeding?  Where did she tell you she was

6  bleeding?

7  A    Through her vagina.

8  Q    What if anything did she tell you about where this

9  happened?

10 A    Yes.

11 Q    What did she tell you?

12 A    In Martinez' office on his table.

13 Q    What else did she tell you about how it happened?

14 A    That he had penetrated her without protection, and she was

15 scared because of that.

16 Q    What was she scared of?

17 A    That they had had sex without protection.

18 Q    What if anything did she tell you he told her what would

19 happen if others found out about this?

20 A    That she and he could have problems, that she could have

21 to do -- for her it would mean that she would have to do maybe

22 more time, that they would take away some of her good time so

23 she would have to spend more time in jail.

24 Q    You said that she was worried about getting pregnant.

25 What if anything else did she say about that?

GA357

Vasquez Vargas - Direct - Geddes                           397

1   A    That she was worried about it, and that he had told her

2   that he could give her something to take.

3   Q    What if anything did Maria tell you about cameras?

4   A    That he could see everything.

5   Q    What do you mean by that?

6   A    That he could see -- from his office, he could see who was

7   in the unit, and he could see who was coming when she and he

8   were together.

9   Q    And when you say that he could see who was in the unit,

10  what unit are you referring to?

11  A    Ours.

12  Q    Now, had you interacted with Lieutenant Martinez before?

13  A    Only one time.

14  Q    When?

15  A    The first day that they took away -- the first day that my

16  visits were canceled.

17  Q    Are you referring -- which visit -- which day are you

18  referring to?

19  A    The first day that my family went and they didn't let them

20  in.

21  Q    And was this the day before the incident you've just

22  testified about between Maria and Martinez?

23  A    yes.

24  Q    You testified that Maria told you that he -- that Martinez

25  -- Lieutenant Martinez had told her he could bring her

GA358

Vasquez Vargas - Direct - Geddes                    398

1  something.  Did you learn whether Lieutenant Martinez did ever

2  bring her anything?

3  A    Yes.

4  Q    What did you learn?

5  A    He took her some medication, a pill.

6  Q    Now, how did you learn about that?

7  A    Maria told me so.

8  Q    Did she tell you when he brought it to her?

9  A    Yes.

10  Q    When was it?

11  A    The night of that day.

12  Q    Where were you that night?

13  A    Working.

14  Q    In the kitchen?

15  A    Yes.

16  Q    When was it that Maria told you about that?

17  A    The following day in the morning.

18  Q    What if anything did she show you?

19  A    The packaging that it was in.

20  Q    The packaging that what was in?

21  A    The pill.

22  Q    Is that the pill that she told you Martinez brought to

23  her?

24  A    Yes.

25  Q    What if anything did you tell Maria to do?

Vasquez Vargas - Direct - Geddes                    399

1   A    That she should throw away the packaging in a place where

2   it couldn't be found.  Through the toilet.

3   Q    Why did you tell her that?

4   A    Because it had come from outside, and there you couldn't

5   have anything from outside.  We could have all had problems.

6   Q    And when you're talking about "it" had come from outside,

7   are you referring to the pill?

8   A    Yes.

9   Q    Now, when again did you have that conversation with Maria?

10  A    The day -- the following day.  The day after what had

11  happened.

12  Q    Was that after you returned from working at the kitchen

13  that morning?

14  A    Yes.

15  Q    Do you know what Maria did with that wrapping?

16  A    Yes.

17  Q    How do you know?

18  A    Because I saw it.

19  Q    What did you see her do?

20  A    I told her to throw it in the toilet.

21  Q    And what did you see Maria do?

22  A    Exactly that.

23  Q    When did you leave the MDC in relation to that day?

24  A    I remember two weeks or a week -- the first two weeks in

25  December.

Vasquez Vargas - Direct - Geddes                    400

1    Q    After you left the MDC, did you see Maria again?

2    A    Yes.

3    Q    When?

4    A    I don't remember the month, but we saw each other a couple

5    of months later in immigration.

6    Q    Were you in a jail together?

7    A    Yes.

8    Q    When you saw Maria again, what if anything did she tell

9    you about whether she and Martinez had sex again?

10   A    She did, yes.

11   Q    What did she tell you?

12   A    Well, you know, it was normal, right?  She came.  She was

13   new.  We talked about everything.  And she told me she had had

14   sex again with Martinez.  It happened every time she went to

15   his office to clean.

16   Q    When were you released from immigration jail?

17   A    In May.

18   Q    Of what year?

19   A    2016.

20   Q    When did you first tell someone in law enforcement about

21   what happened or what Maria told you happened between Maria and

22   Lieutenant Martinez?

23   A    I don't remember exactly what month it was, but it was

24   2016, towards the end of the year.  But I don't remember

25   exactly when.

GA361

Vasquez Vargas - Cross - Santiago                    401

1   Q    Did agents come to meet with you?

2   A    Yes.

3   Q    And after federal agents came to meet with you, did you

4   see or talk to Maria again?

5   A    Yes.

6   Q    How about Nani?

7   A    Yes.

8              MS. GEDDES:  One moment.

9              No further questions.

10  CROSS-EXAMINATION

11  BY MR. SANTIAGO:

12  Q    Good evening, Ms. Vasquez.

13  A    Hello.

14  Q    You were charged with a drug crime.  That's how you got

15  into MDC, correct?

16  A    Yes.

17  Q    And if you got convicted of that crime, you were looking

18  at facing ten years in jail.

19  A    Yes.

20  Q    But you were able to get under ten years in jail time,

21  right?

22  A    Yes.

23  Q    You got a lot lower than ten years, right?

24  A    Yes.

25  Q    You were sentenced to a year and one day?

GA362

Vasquez Vargas - Cross - Santiago                402

```
 1  A     Yes.

 2  Q     And that's because you were able to get what's called a

 3  "safety valve," right?

 4  A     Yes.

 5  Q     And in order to get a safety valve, you've got to meet

 6  with prosecutors, right?

 7  A     Yes.

 8  Q     And you have to tell them about your whole involvement in

 9  the crime, right?

10  A     Yes.

11  Q     Not part of it?

12  A     Excuse me?

13  Q     You couldn't tell them just parts of the story.

14  A     No.

15  Q     You couldn't leave things out of the story.

16  A     No.

17  Q     You couldn't take some truths and mix them with some lies.

18  A     No.

19  Q     You have to say the whole truth.

20  A     Yes.

21  Q     And that's because being truthful is the most important

22  part.

23  A     Yes.

24  Q     They tell you that before you meet with the government.

25  A     What do you mean?
```

GA363

                    Vasquez Vargas - Cross - Santiago                    403

1   Q    You had lawyers representing you on that case, right?

2   A    Yes.

3   Q    And those lawyers told you that you had to be truthful

4   when you were going to go meet with the prosecutor, right?

5   A    Yes.

6   Q    And you followed their advice.

7   A    Yes.

8   Q    You were truthful to your own lawyers.

9            MS. GEDDES:  Objection.

10           THE COURT:  Overruled.

11           THE WITNESS:  Yes.

12  Q    And then at the beginning of the meeting with the

13  government, the government told you you had to tell the truth.

14  A    Yes.

15  Q    And you told the truth.

16  A    Yes.

17  Q    Because lying during your meeting with the prosecutors

18  would have been wrong.

19  A    Yes.

20  Q    Lying against the -- lying to the government would have

21  been against the agreement that you were making with them.

22  A    Yes.

23  Q    And if you lied, you can get in trouble.

24  A    Yes.

25  Q    So you told the truth.

Vasquez Vargas - Cross - Santiago                          404

1   A    Yes.

2   Q    And then, when you got sentenced, you told the truth to

3   the judge.

4   A    Yes.

5   Q    The whole truth to the judge.

6   A    Yes.

7   Q    And that was in front of Honorable Deborah Batts, wasn't

8   it?

9   A    Yes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vasquez Vargas - Cross - Santiago                    406

1  Q   She asked you to be honest.

2  A   Yes.

3  Q   And you were honest.

4  A   Yes.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA366

Vasquez Vargas - Cross - Santiago                    408

1  Q    Now, you worked in the kitchen.  When you were at MDC, you

2  worked in the kitchen, right?

3  A    Yes.

4  Q    You didn't clean up the lieutenants' office.

5  A    No.

6  Q    You never went up with Maria to clean up the lieutenants'

7  office.

8  A    No.

9  Q    So everything you know about the lieutenants' office you

10 heard from Maria.

11 A    Yes.

12 Q    You were never in a room alone with Maria and Lieutenant

13 Martinez.

14 A    No.

15 Q    You never saw Maria and Lieutenant Martinez have sex.

16 A    No.

17 Q    And Maria told you that Lieutenant Martinez wanted to have

18 a relationship with her.

19 A    What relationship?

20           THE COURT:  Well, did she use those words?  Did she

21 say that?

22           THE WITNESS:  No.

23 Q    In connection with this case, you remember meeting with

24 agents, correct?

25 A    Yes.

Vasquez Vargas - Cross - Santiago                    409

1   Q    And when you met with those agents about this case, you

2   told them the truth.

3   A    Yes.

4   Q    And when you met with them, you told them that in the

5   beginning Lieutenant Martinez tried to convince Maria that they

6   should be in a relationship.

7   A    No.

8   Q    And at some point Maria and Lieutenant Martinez had sex.

9   A    Yes.

10  Q    And you knew Maria had a husband back in the Dominican

11  Republic.

12  A    No.

13  Q    Do you remember meeting with the government on March 24th,

14  2017?

15  A    Not the date, but -- I don't know.

16  Q    You remember meeting with them, though, right?

17  A    Yes.  I had many meetings.

18  Q    And during one of those meetings you remember telling them

19  that Maria had a husband back home and regretted having sex

20  with Lieutenant Martinez?

21  A    No.

22  Q    But you do remember that Maria was worried that she was

23  going to get pregnant, right?

24  A    Yes.

25  Q    And Maria also told you that Lieutenant Martinez gave you

GA368

Vasquez Vargas - Cross - Santiago                    410

1  the morning after pill, right?  I mean, gave Maria the morning

2  after pill.

3  A    He gave it to her the next morning or day after or what?

4  Q    I'll rephrase that.  You remember Maria telling you that

5  Martinez gave Maria a pill so that she wouldn't get pregnant.

6  A    Yes.

7  Q    And in your mind things just didn't seem right on

8  Lieutenant Martinez's end, and they also didn't seem right on

9  Maria's end either.

10  A    Yes.

11  Q    And when Maria first told you the story, there were other

12  people there, right?

13  A    Yes.

14  Q    Danilda was there.

15  A    Yes.

16  Q    Kiara was there.

17  A    Yes.

18  Q    And you said they both took the news normally?

19  A    Yes.

20  Q    They were both relaxed about the news?

21  A    Yes.  Yes.  They didn't care.  They -- well, they did

22  care, but it was normal.

23  Q    It almost seemed like a joke to them, right?

24  A    Yes.

25  Q    Now, you don't have a lawsuit against the Bureau of

Vasquez Vargas - Cross - Santiago                              411

1    Prisons, right?

2    A    No.

3    Q    You're also not really friends with Maria anymore, are

4    you?

5    A    No.

6    Q    And that was over a car, right?

7    A    Yes.

8    Q    You helped finance a car for her friend.

9    A    No.  For her.

10   Q    Okay.  So you're telling me that you financed a car for

11   Maria herself.

12   A    Yes.

13   Q    Not for a friend of Maria's?

14   A    No.

15   Q    And that's because that's what Maria told you?

16   A    Yes.

17   Q    But the payments on that car were never made.

18   A    No.

19   Q    So Maria had to end up giving you the car, right?

20   A    Yes.

21   Q    Because she put you in debt.

22   A    Yes.

23   Q    You helped her get the car because you were friends with

24   Maria.

25   A    No.

Vasquez Vargas - Cross - Santiago                                413

1   Q    Ultimately, that car wasn't paid of the way it was

2   supposed to be.

3              MS. GEDDES:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  No.

6   Q    Like Maria promised it would be --

7              MS. GEDDES:  Objection.

8              THE COURT:  Asked and answered.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vasquez Vargas - Cross - Santiago                    414

1  Q    So Maria wasn't the kind of person you thought she was.

2          MS. GEDDES:  Objection.

3          THE COURT:  Asked and answered.  And argumentative.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
              Vasquez Vargas - Cross - Santiago                415
```

1   Q    But at some point you needed money, so you asked Maria for

2   help.

3                MS. GEDDES:  Objection.

4                THE COURT:  Overruled.

5                THE WITNESS:  I didn't ask her.  I made a demand

6   because I -- I demanded -- I didn't ask her -- to solve her own

7   problems.

8   Q    Okay.  So you demanded that Maria get your money?

9   A    Yes.

Vasquez Vargas - Cross - Santiago                        416

1  Q   And she put you in touch with a man named William?

2          MS. GEDDES:  Objection.  This is totally irrelevant.

3          THE COURT:  Yeah, we're going far afield here.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vasquez Vargas - Redirect - Santiago                                420

1  Q    In order to get financing for the car, did Maria take your

2  financial information without your permission?

3  A    Can I explain things, more or less, so that the car topic

4  doesn't go too far?

5  Q    Please.

6  A    She didn't take my information.  I gave it to her.

7         MS. GEDDES:  And with that, I think anything further

8  is irrelevant here.

9         MR. RICCO:  Well, you shouldn't be making a speaking

10 objection --

11        MS. GEDDES:  I apologize.

12        THE COURT:  Overruled.  Do you have anything more?

13 Q    Did you --

14        MR. SANTIAGO:  No.  No, your Honor.

15        THE COURT:  Okay.

16        MR. SANTIAGO:  No further questions.  Thank you.

17 REDIRECT EXAMINATION

18 BY MS. GEDDES:

19 Q    On cross-examination, you were asked questions about a

20 car.  Does that have anything to do with what you talked about

21 with Maria involving Martinez?

22 A    No.

23 Q    On cross-examination you were also asked about Nani and

24 Kiara's reaction when they heard what Martinez -- what Maria

25 told them had happened with Lieutenant Martinez.  Why wasn't it

Proceedings                                                    421

1    a joke to you?

2    A    Perhaps because, number one, she felt bad.  Mr. Martinez

3    should have never enamored her.  These are women in jail.  As

4    far -- I thought it wasn't right.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Proceedings                                                      949

1        Ladies and gentlemen now that the evidence has been

2   presented and the attorneys for the government and the

3   defendant have concluded their closing arguments, it is my

4   responsibility to instruct you on the law that governs this

5   case.  My instructions will be in three parts:

6        First, I will instruct you regarding the general

7   rules that define and govern the duties of a jury in a criminal

8   case;

9        Second, I will instruct you as to the legal elements

10  of the crimes charged in the indictment, that is, the specific

11  elements that the government must prove beyond a reasonable

12  doubt to warrant a finding of guilt; and

13       Third, I will instruct you as to some general rules

14  regarding your deliberations following these instructions.

15       To begin with, it is your duty to find the facts from

16  all the evidence in this case.  You are the sole judges of the

17  facts, and it is therefore for you and you alone to pass upon

18  the weight of the evidence, to resolve such conflicts as may

19  have appeared in the evidence, and to draw such inferences as

20  you deem reasonable and warranted from the evidence.

21       With respect to any question concerning the facts, it

22  is your recollection of the evidence that controls.

23       You must apply the law to the facts as you find them

24  in accordance with my instructions.  You must only be guided,

25  you must be guided only by what I instruct you about them.  You

Proceedings                                              950

1   must follow all the rules -- you must follow all the rules as I

2   explain them to you.  You may not follow some and ignore

3   others; even if you disagree or don't understand the reasons

4   for some of the rules, you are bound to follow them.

5           The fact that this prosecution is brought in the name

6   of the United States Government does not entitle the United

7   States to any greater consideration than the defendant.  By the

8   same token, it is entitled to no less consideration.  All

9   parties, the United States Government and the defendant, are

10  equal before this Court and are entitled to equal

11  consideration.  Neither the government nor the defendant is

12  entitled to any sympathy or favor.

13          I instructed you earlier that the indictment filed

14  against the defendant is the means by which the government

15  gives notice to the defendant of the charges against him, and

16  brings him before the Court.  It is nothing more.  The

17  indictment is an accusation and nothing more.  The indictment

18  is not evidence, and you are to give no weight to it in

19  arriving at your verdict.

20          The defendant, in response to the indictment, pleaded

21  "not guilty."  He is presumed to be innocent until his guilt

22  has been proven beyond a reasonable doubt, and that presumption

23  alone, unless overcome, is sufficient to acquit him.

24          The defendant is presumed innocent until you, the

25  jury, decide unanimously that the government has proven him

Proceedings                                         951

1  guilty beyond a reasonable doubt.

2          Since the law presumes the defendant to be innocent,

3  the burden of proving his guilt beyond a reasonable doubt is on

4  the government throughout the trial.  The defendant never has

5  the burden of proving his innocence or producing any evidence

6  at all.

7          Proof "beyond a reasonable doubt" does not mean proof

8  beyond all doubt.  It is not necessary for the government to

9  prove the guilt of a defendant beyond all possible doubt.  The

10 test is one of reasonable doubt.

11         A reasonable doubt is based upon reason and common

12 sense, the kind of doubt that would make a reasonable person

13 hesitate to act.  Proof beyond a reasonable doubt must,

14 therefore, be proof of such a convincing character that a

15 reasonable person would not hesitate to rely and act upon it in

16 the most important of his or her own affairs.

17         A reasonable doubt, however, is not a doubt that

18 arises out of whim or speculation.  A reasonable doubt is not

19 an excuse to avoid the performance of an unpleasant duty.

20         If, after a fair and impartial consideration of all

21 the evidence in this case, you can honestly say that you have

22 such a doubt as would cause prudent persons to hesitate to act

23 in matters of importance in their lives, then you have a

24 reasonable doubt and, in that event, it is your duty to acquit.

25         If, on the other hand, after a fair and impartial

Proceedings                                              952

1   consideration of all the evidence, you can honestly say that

2   you have such an abiding belief in the guilt of the defendant

3   that you would be willing to act upon a similarly strong

4   conviction in important matters in your own lives, then you

5   have no reasonable doubt, and, in that circumstance, you should

6   convict.

7           I wish to instruct you now as to what is evidence and

8   how you should consider it.  The evidence upon which you are to

9   decide what the facts are comes in several forms:

10          Sworn testimony of witnesses, both on direct and

11  cross-examination, and regardless of who called them; exhibits

12  that have been received by the Court in evidence; and facts to

13  which all the lawyers have agreed or stipulated.

14          In the course of your considerations, you will

15  consider both direct and circumstantial evidence.  Both types

16  of proof are evidence upon which a jury rely -- may rely in

17  deciding the issues of fact presented.  Direct evidence is the

18  evidence of testimony of witnesses as to what they heard, saw

19  or touched, matters of their own knowledge and observations,

20  that bear directly on a factual issue in the case.

21          Direct evidence in other words if it comes directly

22  through the witness, through a witness's senses -- senses.

23          Let me give you a very simple but nevertheless

24  concrete example of direct evidence.  I want all of you to

25  watch me.

Proceedings                                                953

1          Now, if any you -- if one of the fourteen of you were

2     called upon to testify under oath what I said on the 18th of

3     February, you would be able to testify that I raised my hand.

4     That is direct evidence.  Each one of the fourteen of you saw

5     it.  You all learned it directly through one of your senses.

6     That's direct evidence.  That is all there is to direct

7     evidence.  Evidence learned directly through one of your

8     senses.

9          Now, circumstantial evidence is a little different.

10    It consists of proof and circumstances from which in terms of

11    common human experience one may reasonably infer the ultimate

12    fact sought to be established or the absence of ultimate fact.

13         Circumstantial evidence can be relied upon by both

14    the government and the defense.  Such evidence, if believed, is

15    of no less value than direct evidence.  But in either case,

16    whether you are relying on direct or circumstantial evidence,

17    the essential elements of the crimes charged must be

18    established by the government beyond a reasonable doubt.

19         Now, let me give you an example of circumstantial

20    evidence.  Again it is rather simplistic, but it points out

21    what I am talking about.  Let's assume that all of you either

22    listened to the radio or had the television on this morning and

23    that you heard or saw the weather reports and every weather

24    report on every station that every one of you listened to or

25    watched on every channel was that it was going to rain, it was

Proceedings                                                          954

1   going to pour today, February 18, 2020 (sic), particularly in

2   the downtown Brooklyn area.

3            Let's assume further that when you left your homes it

4   was gray; it was dark, although it was daytime, but it hadn't

5   started to rain yet.  You each bought a newspaper on your way

6   to Court, and you looked at the weather forecast in the

7   newspaper and every newspaper, the Times, the Post, and, if the

8   Wall Street Journal has a weather forecast, even the Wall

9   Street Journal said that it was going to rain today.

10           You got here this morning, you got here right at

11  10:30 a.m.  It still wasn't raining yet.  Now, as happens

12  during the course of this trial, spectators coming in through

13  the doors here of the courtroom to watch the trial -- started

14  coming in through the doors here of the courtroom to watch the

15  trial.

16           Everybody that came in had a raincoat on, starting at

17  about 11:00, and everybody's raincoat was wet, and they were

18  all shaking water off their raincoats, and they had hats, and

19  they were shaking water off their hats, and several of them had

20  umbrellas, and they were shaking water off their umbrellas.

21  Now, you didn't see outside, but what is the natural human

22  conclusion based on your experiences of life?  It's very

23  simple.  Circumstantial evidence convinces you that it's

24  raining outside.  That is all there is to it.  That is all

25  circumstantial evidence is.  It consists of facts and

Proceedings                                                     955

1   circumstances from which you may infer other connected facts.

2          The existence of certain circumstantial evidence may

3   also lead you to infer that other facts do not exist.  Some

4   circumstantial evidence may be susceptible of more than one

5   inference, perhaps with one inference tending to prove guilt

6   and the other the absence of guilt.  In such a case, in

7   selecting any particular inference, you must keep in mind the

8   presumption of innocence and that the government has the burden

9   of proving the defendant guilty beyond a reasonable doubt.

10         Now certain things are not evidence and ought to be

11  disregarded by you in deciding what the facts are.  The

12  following are not evidence:  arguments or statements by

13  lawyers; questions put to the witnesses; objections to the

14  questions or to offered exhibits.

15         In this regard, attorneys have a duty to their

16  clients to object when they believe evidence should not be

17  received.  You should not be influenced by the objection or my

18  ruling on it.  If the objection was sustained, ignore the

19  question.  If the objection was overruled, treat the answer

20  like any other answer.

21         Testimony that has been excluded, stricken, or that

22  you have been instructed to disregard is not evidence and must

23  be disregarded.  Obviously, anything you may have seen or heard

24  outside the Courtroom is not evidence.  Nothing I have said or

25  done should be used by you in inferring innocence or guilt.  I

Proceedings                                                    956

1   have no view of the guilt or innocence of the defendant.  And

2   even if I did and somehow conveyed it to you, it would be your

3   duty to disregard it.

4           Obviously, anything you may have seen or heard

5   outside the courtroom is not evidence.  Nothing I have said or

6   done should be used in inferring innocence or guilt, I have no

7   view of the guilt or innocense of the defendant.

8           Finally, I have allowed one piece of evidence for a

9   limited purpose.  You have heard testimony that the defendant

10  had a consensual sexual relationship with another MDC employee.

11  The parties may argue about the inferences that you should draw

12  from this testimony.  One inference, however, that you may not

13  draw from this testimony about a consensual sexual relationship

14  with that employee is that the defendant would engage in non-

15  consensual sexual acts with an inmate.

16          Your verdict must be based solely on the evidence

17  developed at trial, or the lack of evidence.  It would be

18  improper for you to consider, in reaching your decision as to

19  whether the government sustained its burden of proof, any

20  personal feelings you may have about the defendant's race,

21  religion, national origin, ethnic backgroru1d, sex, or age.

22  All persons are entitled to the presumption of innocence, and

23  the government has the same burden of proof in all cases.

24          It would be equally improper for you to allow any

25  feelings you might have about the nature of the crimes charged

Proceedings                                                    957

1    to interfere with your decision-making process.

2            To repeat, your verdicts must be based exclusively

3    upon the evidence or the lack of evidence in the case.

4            Now you are the sole judges of the credibility of the

5    witnesses and the weight that their testimony deserves.  Any

6    assumption that a witness will speak the truth may be dispelled

7    by the appearance, conduct and conduct of the witness, by the

8    manner in which the witness testifies, by the character of the

9    testimony given, or by evidence contrary to the testimony

10   given.

11           You should carefully scrutinize all the testimony

12   given, the circumstances under which each witness has

13   testified, and any other matter in evidence that tends to

14   indicate whether a witness is worthy of belief.  Consider each

15   witness's intelligence, motive, state of mind, partisanship in

16   the prosecution or defense of the case, and his or her demeanor

17   while on the stand.

18           The testimony of a witness may be discredited or

19   impeached by showing that he or she previously made statements

20   that are inconsistent with his or her present testimony.  It is

21   your province to determine the credibility, if any, to be given

22   the testimony of a witness who has been impeached.

23           If a witness is shown knowingly to have testified

24   falsely concerning any material matter, you have a right to

25   distrust such witness's testimony in other particulars, and you

Proceedings                                                    958

1  may reject all the testimony of that witness or give it such

2  weight as you may think it deserves.

3          You may consider any demonstrated bias, prejudice, or

4  hostility of a witness in determining the weight to be accorded

5  his or her testimony.

6          The law does not require any party to call witnesses

7  or persons who may have been present at any time or place

8  involved in the case, or who may appear to have some knowledge

9  of the matter in issue at this trial.  Nor does the law require

10 any party to produce as exhibits all papers and things

11 mentioned during the course of the trial.

12         There was testimony at trial that attorneys for the

13 government interviewed witnesses when preparing for trial.  You

14 should not draw any unfavorable inference from that testimony.

15 To the contrary, the attorneys were obligated to prepare this

16 case as thoroughly as possible and might have been derelict in

17 the performance of their duties if they failed to interview

18 witnesses before this trial began, and as necessary throughout

19 the course of the trial.

20         During the trial, you have heard testimony from

21 law-enforcement witnesses.  The fact that a witness is a member

22 of law enforcement does not mean that his or her testimony is

23 entitled to any greater weight by reason of her employment.

24         By the same token, his or her testimony is not

25 entitled to less consideration simply because he or she is a

Proceedings 959

1 member of law enforcement.

2 You should consider the testimony of members of law

3 enforcement just as you would consider any other evidence in

4 the case and evaluate its credibility just as you would that of

5 any other witness. It is your decision, after reviewing all

6 the evidence, whether to accept the testimony of a

7 law-enforcement witness, and to give it whatever weight of

8 evidence of any it deserves.

9 Occasionally trials will attract the attention of the

10 media, the public, casual and interested onlookers, and others.

11 The level of public and media interest is often unpredictable

12 and, of course, not within the Court's control.

13 After consideration of the subject matter and

14 possible media interest in this case, the Court has decided

15 that one witness can testify and be identified in open Court by

16 a pseudonym, instead of her real name. Her real name is, of

17 course, known to the Court, to you, and the parties.

18 However, allowing a witness to testify by a pseudonym

19 is simply meant to, protect that witness's privacy. It is also

20 meant to ensure a fair trial to both parties.

21 In a criminal case, the defendant cannot be required

22 to testify, but, if he chooses to testify, he is, of course,

23 permitted to take the witness stand on his own behalf. In this

24 case, the defendant decided to testify. You should examine and

25 evaluate his testimony just as you would the testimony of any

Proceedings                                                      960

1   witness with an interest in the outcome of this case.  You

2   should not disregard or disbelieve his testimony simply because

3   he is charged as a defendant in this case.

4           I will now turn to the second part of this charge and

5   I will, as I indicated at the outset, instruct you as to the

6   legal elements of the crimes charged in the indictment.  That

7   is to say, I will now instruct you as to the specific elements

8   of the crimes charged, which the government must prove beyond a

9   reasonable doubt to warrant the finding of guilt.

10          The defendant is formally charged in an indictment.

11  As I instructed you at the outset of the case, an indictment is

12  a charge or accusation.  The indictment in the case contains

13  fifteen separate counts, on each of which you will be called

14  upon to render a separate verdict.  You may find the defendant

15  guilty of some counts without necessarily finding him guilty of

16  others.  The fact that you find the defendant guilty or not

17  guilty of any particular count does not affect your duty to

18  consider every element of every count.

19          The indictment alleges five acts of sexual contact

20  and charges the same three crimes with respect to each of those

21  acts.  The alleged sexual acts occurred on four different

22  dates.  Often, one particular act can violate more than one

23  criminal statute.  Thus, as you will see in a moment, there are

24  ten charges relating to aggravated sexual abuse: five for

25  aggravated sexual abuse and five more alleging the deprivation

Proceedings                                                    961

1    of Maria's right during her imprisonment to be free of

2    aggravated sexual abuse by someone acting under color of law.

3            The conduct that constitutes aggravated sexual abuse

4    in this case is the same conduct that, as a practical matter,

5    constitutes a deprivation of rights.  Stated another way, there

6    are effectively ten counts of aggravated sexual abuse, five for

7    deprivation of rights and five for aggravated sexual abuse, for

8    alleged conduct that supports only five counts of aggravated

9    abuse.

10           This is an example of why I caution you that your

11   decision must not be influenced by the number of counts in the

12   indictment, but, again, only by your consideration of every

13   element of every count.

14           The indictment uses the name "Jane Doe" rather than

15   "Maria," but when the indictment refers to Jane Doe, it means

16   the woman who testified under the name Maria.

17           As a general rule, the law holds individuals

18   accountable only for conduct in which they knowingly and

19   intentionally engage.  A person acts knowingly and

20   intentionally if he acts while aware that particular conduct is

21   reasonably certain to result and not because of ignorance,

22   mistake, or accident.  Thus, before you can find the defendant

23   guilty of the crimes charged, you must find that he was acting

24   knowingly and intentionally.

25           These issues of knowledge and intent require you to

Proceedings                                                           962

1   make a determination about a defendant's state of mind,

2   something that can rarely be proved directly.  A wise and

3   careful consideration of all the circumstances before you,

4   however, may permit you to make a determination as to the

5   defendant's state of mind.  Indeed, in your everyday affairs,

6   you are frequently called upon to determine a person's state of

7   mind from his or her words and actions in a given set of

8   circumstances.  You are asked to do the same here.

9           Counts One, Four -- I will now turn to Counts One,

10  Four, Seven, Ten, and Thirteen of the indictment, each of which

11  charges the defendant with depriving Maria of a civil right

12  under color of law by committing aggravated sexual abuse

13  against her, in violation of Section 242 of Title 18 of the

14  United States Code.  Count One reads as follows:

15                  "On or about December 13, 2015, within the

16                  Eastern District of New York, the defendant

17                  Carlos Richard Martinez, while acting under

18                  color of the laws of the United States, did

19                  knowingly and willfully deprive Jane Doe of

20                  a right and privilege secured by and

21                  protected by the Constitution and laws of

22                  the United States; to wit: the right to be

23                  free from cruel and unusual punishment,

24                  which includes the right to be free from

25                  aggravated sexual abuse by one acting under

Proceedings                                             963

1          color of law, by causing Jane Doe to engage

2          in a sexual act, as defined in Title 18,

3          United States Code, Section 2246(2)(B); to

4          wit: contact between the mouth and the

5          penis, by using force against Jane Doe."

6          Counts Four, Seven, Ten, and Thirteen have the same

7    legal structure.  Unlike Count One, they refer to contact

8    between the penis and the vulva on the following dates:

9          Count Four, on or about December 13, 2015;

10          Count Seven, in or about and between December 2015

11   and February 2016, both dates being approximate and inclusive,

12   on a specific date unknown to the grand jury, other than the

13   acts with which the defendant is charged in Courts Four and

14   Ten;

15          Count Ten, in or about January 2016, on a specific

16   date unknown to the grand jury, other than the act with which

17   the defendant is charged in Count Seven; and

18          Count Thirteen in or about April 2016.

19          Congress enacted Section 242 to provide for the

20   imposition of criminal penalties on anyone who, under color of

21   law, willfully deprives another of a right protected by the

22   Constitution.  The statute protects the rights of individuals

23   under the Constitution and laws of the United States, against

24   violations by the government and its authorized agents.

25          In order to prove the defendant guilty of Counts One,

Proceedings                                                    964

1    Four, Seven, Ten, and Thirteen, which each charge the defendant

2    with depriving a person of single -- of a right, rather, under

3    the color of law, the government must prove the following four

4    elements beyond a reasonable doubt.

5              First, that on or about the date specified in the

6    count you are considering, the defendant acted under color of

7    law;

8              Second, that in so doing, the defendant deprived, or

9    caused to be deprived Maria of her right to be free from cruel

10   and unusual punishment, which right is secured by the

11   Constitution and laws of the United States;

12             And third, that the defendant acted willfully; and

13             Fourth, that the defendant's conduct resulted in

14   aggravated sexual abuse of Maria.

15             Acting "under color of law" means that the defendant

16   acted pursuant to, or was clothed with, authority to perform

17   the act under federal law.  If an official misuses the power

18   vested in him by law in order to deprive someone of her right,

19   his misconduct is "under color of law," even if the law forbids

20   what the official has done.  The "color of law" may also be

21   satisfied by the fact that an individual gains access to the

22   victim in the course of his official duty.

23             If you find, therefore, that, on or about the date

24   specified in the count you are considering, the defendant was a

25   Federal Bureau of Prisons lieutenant and that the conduct

Proceedings                                                    965

1   charged in Counts One, Four, Seven, Ten, and Thirteen was

2   performed by the defendant while the defendant was acting, or

3   purporting to act, in the performance of his official duties,

4   this first element will be satisfied.

5           With respect to the second element that the defendant

6   deprived the victim of a federal right, the rights encompassed

7   by Section 242 include those protected or guaranteed by federal

8   law or the United States Constitution.  I instruct you that the

9   right to be free from cruel and unusual punishment is such a

10  right secured by the Eighth Amendment to the Constitution.  The

11  Eighth Amendment guarantees the right to be free from

12  aggravated sexual abuse by one acting under color of law

13  through individuals serving a term of imprisonment after having

14  been convicted of a crime (i.e., sentenced prisoners).

15          If you find, therefore, that the act performed by the

16  defendant caused Maria to be deprived of her federal right to

17  be free from cruel and unusual punishment, the second element

18  will be satisfied.

19          With respect to the third element that the defendant

20  acted "willfully" to find that the defendant acted willfully,

21  and to convict the defendant on any of Counts One, Four,

22  Seven, Ten, or Thirteen, you must find that the defendant had

23  the specific intent to deprive Maria of the right to be free

24  from cruel and unusual punishment, conferred by the Eighth

25  Amendment to the Constitution.

GA393

Proceedings                                                          966

1           This does not mean, however, that the government must

2    show that the defendant acted with knowledge of the particular

3    provisions of the Constitution or federal law, or that the

4    defendant was even thinking in these terms.  It is enough if

5    the defendant knowingly and willfully engaged under color of

6    law in conduct that resulted in the aggravated sexual abuse of

7    a sentenced prisoner.

8           "Aggravated sexual abuse" means to engage knowingly in

9    a sexual act with another person by using force against that

10   person.

11          One may be said to act willfully if one acts in open

12   defiance or in reckless disregard of a known and definite

13   federal right in this case, the right to be free from cruel and

14   unusual punishment.  This specific intent to deprive another of

15   a federal right need not be expressed; it may at times be

16   reasonably inferred from the surrounding circumstances of the

17   act.  Thus, you may look at the defendant's words, experience,

18   knowledge, acts, and their results in order to decide this

19   issue of willfulness.

20          Finally, with respect to the fourth element, in order

21   to establish that the defendant's conduct resulted in

22   aggravated sexual abuse of Maria, the government must prove

23   beyond a reasonable doubt that the defendant's actions caused

24   Maria to suffer aggravated sexual abuse and to satisfy this

25   element, the government must prove beyond a reasonable doubt

GA394

Proceedings                                                    967

1    that the defendant committed aggravated sexual abuse of Maria.

2              Again, aggravated sexual abuse means to engage

3    knowingly in a sexual act with another person by force against

4    that person.

5              The term "sexual act" means, in relevant part,

6    contact between a penis and the vulva that occurs upon

7    penetration, however slight, or contact between the mouth and

8    the penis.  The use of force means the use of  physical force

9    as is sufficient to overcome, restrain, or injure a person.

10             Now Counts Two, Five, Eleven, Eight -- I'm, sorry --

11   Counts Two, Five, Eight, Eleven and Fourteen each charge the

12   defendant with aggravated sexual abuse in a federal prison,

13   specifically that the defendant caused Maria to engage in a

14   sexual act by using force against her.  Count Two reads as

15   follows:

16             "On or about December 13, 2015, within the

17             Eastern District of New York and in a

18             Federal prison, to wit: the MDC, the

19             defendant Carlos Richard Martinez did

20             knowingly and intentionally cause Jane Doe

21             to engage in a sexual act, as defined in

22             Title 18 of the United States Code, Section

23             2246(2)(B), to wit: contact between the

24             mouth and the penis, by using force against

25             Jane Doe."

1      Counts Five, Eight, Eleven, and Fourteen have the

2  same legal structure.  Unlike Count Two, however, they refer to

3  contact between the penis and the vulva on the following dates:

4      Count Five, on or about December 13, 2015;

5      Count Eight, in or about and between December 2015

6  and February 2016, both dates being approximate and inclusive,

7  on a specific date unknown to the grand jury, other than the

8  acts with which the defendant is charged in Counts Five and

9  Eleven;

10     Count Eleven, in or about January 2016, on a specific

11 date unknown to the grand jury, other than the act with which

12 the defendant is charged in Count Eight; and

13     Count Fourteen, in or about April 2016.

14     To prove the defendant committed Counts Two, Five,

15 Eight, Eleven, and Fourteen, the government must prove each of

16 the following evidence (sic) beyond a reasonable doubt:

17     First, that the defendant caused the victim to engage

18 in a sexual act, as I have defined the term for you;

19     Second, that the defendant acted knowingly in causing

20 the victim to engage in that sexual act;

21     Third, that the defendant did so by using force

22 against the victim; and

23     Fourth, that the offense was committed in a federal

24 prison.

25     The term "sexual act" means, in relevant part,

Proceedings                                                    969

1   contact between the penis and the vulva that occurs upon

2   penetration, however slight, or contact between the mouth and

3   the pelvis (sic).

4          As I previously instructed you, to act knowingly

5   means to act while that particular conduct is reasonably

6   certain to result, and not because of ignorance, mistake,

7   accident, or carelessness.  Whether the defendant acted

8   knowingly may be proven by the defendant's conduct and by all

9   the surrounding facts and circumstances.

10          The use of force means the use of such physical force

11  as is required to overcome, restrain or injure a person.  The

12  government is not required to show that the victim resisted.

13          Finally, with respect to the fourth element, the

14  indictment alleges that the offenses charged in Counts Two,

15  Five, Eight, Eleven, and Fourteen occurred at the Metropolitan

16  Detention Center, or the MDC.  You are instructed that the MDC

17  is a federal prison.  Thus, if you find that the offenses

18  charged in Counts Two, Five, Eight, Eleven, and Fourteen

19  occurred at that location, this element is satisfied.

20          Counts Three, Six, Nine, Twelve, and Fifteen charge

21  the defendant with sexual abuse in a federal prison,

22  specifically that the defendant caused Maria to engage in a

23  sexual act by threatening and placing Maria in fear.

24          Count Three reads as follows:

25          "On or about December 13th, within the

1          Eastern District of New York and in a

2          Federal prison, to wit: the MDC, the

3          defendant Carlos Richard Martinez, did

4          knowingly, and intentionally cause Jane Doe

5          to engage in a sexual act, as defined in

6          Title 18 of the United States Code, Section

7          2246(2)(B), to wit: contact between the

8          mouth and the penis, by threatening and

9          placing Jane Doe in fear.

10          Counts Six, Nine, Twelve, and Fifteen have the same

11   legal structure.  Unlike Count Three, however, they refer to

12   contact between the penis and the vulva on the following dates:

13          Count Six, on or about December 13, 2015;

14          Count Nine, in or about and between December 2015 and

15   February 2016, both dates being approximate and inclusive, on a

16   specific date unknown to the grand jury, other than the acts

17   with which the defendant is charged in Counts Six and Twelve;

18          Count Twelve, in or about January 2016, on a specific

19   date unknown to the grand jury, other than the act with which

20   the defendant is charged in Count Nine; and

21          Count Fifteen, in or about April 2016.

22          To prove Counts Three, Six, Nine, Twelve, and

23   Fifteen, the government must prove each of the following

24   elements beyond a reasonable doubt:

25          First, that the defendant caused the victim to engage

Proceedings                                                           971

1    in a sexual act as I will define that term for you;

2              Second, that the defendant acted knowingly in causing

3    the victim to engage in that sexual act; and

4              Third, that the defendant did so by threatening the

5    victim or by placing the victim in fear; and

6              Fourth, that the offense was committed in a federal

7    prison.

8              I've already instructed you -- as I have already

9    instructed you, the term "sexual act" means, in relevant part,

10   {1) contact between the penis and the vulva that occurs upon

11   penetration, however slight, or contact -- and (2) contact

12   between the mouth and the penis.

13             As I previously instructed you, to act "knowingly"

14   means to act while aware that particular conduct is reasonably

15   certain to result and not because of ignorance, mistake,

16   accident, or carelessness.  Whether the defendant acted

17   knowingly may be proven by the defendant's conduct and by all

18   the surrounding facts and circumstances.

19             With respect to the third element, the government

20   must prove that the defendant threatened the victim or placed

21   the victim in fear.  Although it may seem odd, a threat or fear

22   that a person will be subject to death, serious bodily injury,

23   or kidnaping does not qualify.  This is because threat or fear

24   of these more serious consequences falls under a different

25   vision (sic) of the criminal law that is not charged here.  As

1    such, the threat or fear must be of a harm other than these

2    three.

3            Finally, with respect to the fourth element, the

4    indictment alleges that offenses charged in Counts Three, Six,

5    Nine, Twelve, and Fifteen occurred at the Metropolitan Center

6    -- Detention Center, or the "MDC." You are instructed that the

7    MDC is a federal prison. Thus, if you find that the offenses

8    charged in Counts Three, Six, Nine, Twelve, and Fifteen

9    occurred at that location, this element is satisfied.

10           Now I'm going to give you a verdict sheet, ladies and

11   gentlemen, which will go into the jury room along with the

12   charge that each of you have a copy of. You will record your

13   verdict on a verdict sheet. As you will see, unlike the

14   indictment, the counts in the verdict sheet are not arranged in

15   precise chronological order. Instead, the counts in the

16   verdict sheet are organized by elements of the legal offense.

17           For example, the first five counts in the verdict

18   sheet all refer to deprivation of rights. This is the same

19   order that I just explained the counts to you, and I recommend

20   you consider your verdict in that same order. But you are not

21   required to, and you·may render your decisions by addressing

22   the counts chronologically, numerically, or in any other order

23   you wish.

24           Now I come to some general instructions for your

25   deliberations. You're entitled to your own opinion, but you

Proceedings                                                    973

1  should exchange views with your fellow jurors and listen

2  carefully to each other.  While you should not hesitate to

3  change your opinion if you are convinced that another opinion

4  is correct, your decision must be your own.

5         Under your oath as jurors, you cannot allow a

6  consideration of the sentence that may be imposed upon a

7  defendant to enter into your deliberations or to influence your

8  verdict in any way.  In the event of a conviction, the duty of

9  imposing sentence rests solely with me.

10        In your deliberations, you're not to consider whether

11  you approve or disapprove of the statutes that the defendant is

12  charged with violating.

13        The only question for you to consider is whether the

14  government has proved beyond a reasonable doubt the essential

15  elements of the crimes charged as I explained them.

16        The charges here are most serious.  A just

17  determination of this case is important to the public; it is

18  equally important to the defendant.

19        If it becomes necessary during your deliberations to

20  communicate with me, you may send a note by a Marshal, signed

21  by your foreperson, or by one or more members of the jury.  No

22  member of the jury should ever attempt to communicate with me

23  by any means other than a signed writing.  And I will never

24  communicate with any member of the jury on any subject touching

25  on the merits of the case, other than in writing or orally here

Proceedings                                                    974

1    in open Court.

2              Now as I've told you before the testimony in this

3    case was recorded and transcribed.  If you wish to read or hear

4    some portions of the testimony, you may make the request by a

5    note to the Marshal, I'll send the relevant portion of the

6    transcript to you, or play the relevant portion of the

7    recording, or both.  I suggest that you be specific so I can

8    identify what testimony you are requesting and share it with

9    you as quickly as possible.

10             Similarly, if you wish to see any of the exhibits in

11   evidence, you may make the request by note to a Marshal, and I

12   will send the exhibit to you.

13             You will also receive a copy of these instructions.

14   If you have any questions about the instructions, you may ask

15   those questions by a note to the Marshal.  I will then answer

16   your questions, either in writing or in open Court.  I will

17   consult with the parties first, so that the answer may not be

18   immediate.

19             You will note from the oath that is about to be taken

20   by the Marshal that he or she, too, as well as other persons,

21   is forbidden to communicate in any way or in any manner with

22   any member of the jury on any subject touching on the merits of

23   the case.

24             Bear in mind that you should not reveal to any

25   person, not even to me, how you stand on the question of guilt

Proceedings                                                 975

1    or innocense of the accused until after you've reached an

2    unanimous verdict and announced it here in Court.

3            Now what I mean buy that ladies and gentlemen is

4    never send me out a note saying that vote is seven-to-five, or

5    eight-to-four, or nine-to-three.

6            Now I want to remind you that any verdict that you

7    reach has as to each count of the indictment, whether guilty or

8    not guilty, must be unanimous.  And I will poll the jury after

9    you have returned a verdict to ensure that the verdict, that is

10   every answer on the verdict sheet, reflects that you're

11   unanimous of view.

12           Now your oath, ladies and gentlemen, that you took

13   only last week, sums up your duty, and that is without fear or

14   favor you will well and truly try the issues between these

15   parties according to the evidence given to you in Court and the

16   laws of the United States.

17           Do you want to come up?

18           THE CLERK:  Sidebar counsel?

19           MR. RICCO:  Yes.

20

21

22

23

24

25

GA403

Sidebar 976

1  (Conference held at sidebar)

2         THE COURT:  Are there any objections on the charge?

3         MS. GEDDES:  No, Judge.

4         THE COURT:  Other than, I know there were none

5  before.

6         MS. GEDDES:  What?

7         THE COURT:  There were none before I gave it, I mean

8  now.

9         MR. RICCO:  No objections, Judge.

10         THE COURT:  Okay.

11  (Conference concludes at sidebar)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                         658

1          THE COURT:  All right.  The exhibit is admitted.

2          MR. RICCO:  Yes, that's without objection.

3   (Government Exhibit 250 received into evidence.)

4          MS. GEDDES:  The government rests.

5          MR. RICCO:  No, I'll be talking to her about that.

6          THE COURT:  All right.  Whatever, I will let you make

7   whatever motions are --

8          MR. RICCO:  Yes, sir.

9          THE COURT:  -- whatever motions would be deemed made

10  at this point pursuant to Rule 29, I deny.

11         MR. RICCO:  Yes.  Thank you, Judge.  Judge, we're

12  just waiting for the witness to be brought up.  She's on her

13  way.

14         THE CLERK:  We have our Spanish interpreter for the

15  witness.  Give your name to the Court reporter, please.

16         MR. RHODES:  Yes.  Nathan Rhodes.  Or do you want me

17  to write it?  R-h-o-d-e-s.

18  (Pause)

19         THE COURT:  Are you going to swear the interpreter?

20         THE CLERK:  You need to swear the interpreter, Judge.

21  (Interpreter sworn)

22         THE INTERPRETER:  Nathan Rhodes, R-h-o-d-e-s.  I'm a

23  certified court interpreter by the Administrative Office of the

24  United States.

25

Sidebar                                    816

1   (Conference held at sidebar)

2           THE COURT:  All right.  Do you want to make your Rule

3   29 motion at the end of the case?

4           MR. RICCO:  Yes.

5           THE COURT:  Go ahead.

6           MR. RICCO:  I move to dismiss all the counts in the

7   indictment on the grounds that there's insufficient evidence

8   that would support a verdict of beyond a reasonable doubt with

9   respect to each element of every count of the indictment.

10          THE COURT:  Okay.  The motion is denied.

11          How long is your summation going to be?

12          MR. RICCO:  20 minutes.

13          MS. GEDDES:  Your Honor, we have a --

14          THE COURT:  You're going to go on for an hour.

15  You've got a half hour on Plan B.

16          MS. GEDDES:  We have a brief rebuttal witness that

17  will be about two questions and I'm ready to go on my

18  summation, not 30 minutes on Plan B.

19          MS. GEDDES:  But longer than 20 minutes.

20  (Conference concludes at sidebar)

21

22

23

24

25



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NS/EAG
F.#2016R01642

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 15, 2020

<u>By ECF</u>

The Honorable Edward R. Korman
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: United States v. Carlos Martinez
       <u>Criminal Docket No. 17-281 (ERK)</u>

Dear Judge Korman:

    The government respectfully submits this letter memorandum in advance of defendant Carlos Martinez's sentencing, currently scheduled to take place on April 22, 2020.[1]  For the reasons set forth below, the Court should sentence the defendant to a significant term of imprisonment in excess of 20 years.

---

    [1] In light of the COVID-19 pandemic, the government also requests that the sentencing be adjourned.  <u>See</u> Admin. Order 2020-13, dated March 30, 2020, available at https://img.nyed.uscourts.gov/files/general-ordes/AdminOrder_2020-13.pdf ("Pursuant to § 15002(b)(2) of the CARES Act, I further specifically find that … felony sentencings under Rule 32 of the Federal Rules of Criminal Procedure cannot be conducted in person without seriously jeopardizing public health and safety. As a result, if judges in individual cases find, for specific reasons, that felony … sentencings in those cases cannot be further delayed without serious harm to the interests of justice, judges may, with the consent of the defendant… after consultation with counsel, conduct those proceedings by video conference, or by telephone conference if video conferencing is not reasonably available.").

I.     Background

        The Indictment charged the defendant with 20 counts involving victim Jane Doe, who testified under the pseudonym "Maria" at trial:[2] five counts of deprivation of civil rights, in violation of 18 U.S.C. § 242 (Counts One, Five, Nine, Thirteen, and Seventeen); five counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1) (Counts Two, Six, Ten, Fourteen, and Eighteen); five counts of sexual abuse, in violation of 18 U.S.C. § 2242(1) (Counts Three, Seven, Eleven, Fifteen, and Nineteen); and five counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b) (Counts Four, Eight, Twelve, Sixteen and Twenty).  On January 19, 2018, following a jury trial, the defendant was convicted on all counts.  Thereafter, the Court granted a new trial on all of the charges other than those charged in Counts Four, Eight, Twelve, Six and Twenty.  On February 20, 2020, following a jury trial, the defendant was convicted of one count of depriving Maria of her civil rights (Count Five), one count of aggravated sexual abuse (Count Six) and five counts of sexual abuse (Counts Three, Seven, Eleven, Fifteen and Nineteen).

        A.     The Offense Conduct

        The charged conduct spanned a period of five months from December 2015 to April 2016.  Presentence Investigation Report dated March 18, 2020 ("PSR") ¶ 17.  During this time period, the defendant used physical force and fear to repeatedly rape Maria, a sentenced female prisoner at the Metropolitan Detention Center in Brooklyn, New York ("MDC").  At the time of the defendant's crimes, he was an active-duty United States Bureau of Prisons Lieutenant at the MDC, with supervisory authority over other correctional officers and supervisory and disciplinary authority over inmates.  Id.  More specifically, as a Lieutenant, the defendant had responsibility for (1) operational aspects of the Correctional Department and supervision of correctional officers assigned to given areas of the MDC; (2) providing day-to-day counseling of subordinates and resolving work-related problems; (3) evaluating the performance of subordinates; (4) maintaining order between both officers and inmates; and (5) handling disciplinary matters.  Id.  As a Lieutenant, the defendant was also responsible for conducting rounds at the MDC to identify and deter staff sexual abuse and sexual harassment.  According to his performance reviews, the defendant was also involved in educating MDC staff regarding the Prison Rape Elimination Act ("PREA") protocols and incidents.  Id.

        While serving as a Lieutenant at the MDC, the defendant regularly directed Maria and other female inmates to clean areas on the second floor of the MDC's East Building, including the Lieutenants' Office and surrounding areas.  Id. ¶ 18.  Maria first began to clean for the defendant in or about September 2015.  Initially, the defendant was friendly to Maria and told Maria information about his family and where he lived.  He referred to Maria by her first name, which she found unusual, since MDC staff generally referred to prisoners by their last names.  Thereafter, the defendant began making comments

_____

        [2]     For purposes of this sentencing memorandum, the government refers to the victim as "Maria" herein.

to Maria that made her uncomfortable.  Specifically, his overtly inappropriate behavior commenced when he began making sexually explicit comments to Maria, including asking Maria how she "satisfied" herself and suggesting that she masturbate while thinking of him.  Id.  At the time, Maria was an inmate in her late 20s, who spoke minimal English.  Id.  The defendant, a former marine, was in his late 40s and communicated with Maria in Spanish, his second language.  Id.  These comments were unwanted by Maria and made her feel ashamed and embarrassed.

In early December 2015, the defendant's behavior escalated to serious, violent criminal conduct.  Id. ¶ 19.  Specifically, while Maria prepared to clean the Lieutenants' Office area on a weekend,[3] the defendant exposed his erect penis through the zipper of his pants and then forcibly grabbed the back of Maria's head with his hands and pulled her head towards his penis to insert his penis into Maria's mouth.  Id.  Maria attempted to push herself away, but the defendant ultimately was able to insert his penis into her mouth.  Id.  Thereafter, the defendant forcefully lifted Maria up, pinned the top portion of her body against the top of a desk, pulled Maria's pants and underwear down and penetrated Maria's vagina with his penis from behind, roughly thrusting his penis inside Maria multiple times.  Id.  As this occurred, Maria was crying, but the defendant did not stop.  The defendant ultimately ejaculated inside of Maria and his actions caused Maria to bleed from her vagina.  Id.

Put simply, the defendant used his superior position, authority, and strength, to overpower and rape Maria, a petite female prisoner under his control and care.  The defendant did not use a condom when he raped Maria, leaving her terrified that, among other things, she would get pregnant.  Id. ¶ 20.  Maria begged the defendant to bring her a morning-after pill.  The defendant assured Maria that she would not get pregnant because he had undergone a vasectomy, rendering him incapable of impregnating others.  Id.  Medical records confirm that the defendant underwent a vasectomy in 2013.  Id.  Eventually, after Maria continued to cry and beg, the defendant agreed to bring her a morning-after pill later, around midnight.  Before allowing Maria to return to the unit where she was housed, the defendant warned Maria not to tell anyone what had happened, telling her that she could receive additional time in prison if anyone found out.  Id.

After returning to her housing unit, Maria was upset and distraught.  She confided parts of what occurred with the defendant to three other inmates – Kiara Maldonado, Danilda Lora, and Melva Vasquez – including that the defendant "penetrated" her, but did not provide them with the full details of what transpired.  Kiara Maldonado and Danilda Lora initially reacted in a manner that upset Maria further, indicating that she should be happy and that it was not a big deal.

Thereafter, at approximately 12:30 am, the defendant came to Maria's housing unit, gestured to her to come to him, and handed Maria a copy of her ID with the morning-

---

[3]    The trial testimony established that on Friday afternoons and weekends, the second floor of the MDC's East Building was generally empty.

after pill hidden inside, which pill she thereafter took while in the bathroom. Maria saved the packaging of the morning-after pill after taking it in order to show the packaging to Danilda Lora, who reads and speaks English, when Lora returned from kitchen duty later that morning, to confirm that the pill was, in fact, the morning-after pill. After Lora confirmed that the packaging was for the morning-after pill, Maria got rid of the packaging because items from outside of the prison are considered contraband.

Following this initial rape, the defendant continued to rape Maria repeatedly in the Lieutenants' Office in the months that followed. Id. ¶ 21. Maria does not recall the exact number of times this occurred, but estimates that the defendant had sex with her at least 10 times, including an occasion in January 2016 (Counts Nine through Twelve), an occasion in February 2016 (Counts Thirteen through Sixteen) and an occasion in April 2016 (Counts Seventeen through Twenty). Id. During each of these incidents, the defendant vaginally penetrated Maria with his penis from behind. Throughout this period, the defendant also made clear to Maria that he knew details about her familial circumstances and the fact that she rarely, if ever, received visitors at the MDC. Id. The defendant also provided Maria with his email address, which began with "CarlosRichMartinez," and told Maria that he would be "different" once she was out of prison and that she should contact him. In or about February 2016, the defendant learned that Maria made a phone call to a friend in which she, inter alia, mentioned the defendant's name in a context that could bring scrutiny to the inappropriate nature of his contact with Maria. Id. ¶ 22. Specifically, Maria called her friend Larihelys Vargas and asked her to look the defendant up on Facebook using the name from his email address, "CarlosRichMartinez," knowing that the call was recorded and hoping that the defendant would hear it so he would leave Maria alone and stop raping her. The defendant then angrily confronted Maria about the phone call and, among other things, (1) warned Maria that an investigation could follow, which would result in her receiving an additional, significant prison sentence, and (2) admonished Maria to lie to investigators if they spoke to her. Id. Thereafter, the defendant ceased calling on Maria to clean the second floor for him and ceased raping Maria, until in or about April 2016. Id.

In or about April 2016, shortly before Maria was scheduled to be released from the custody of the Bureau of Prisons to the custody of Immigration and Customs Enforcement ("ICE"), the defendant again sought Maria's assistance in cleaning the Lieutenants' Office area and used that opportunity to forcibly penetrate Maria's vagina with his penis one last time before she left the MDC. Id. ¶ 23. On this final occasion, the defendant ejaculated on Maria's lower back, stating, in substance and in part, that he did so in case "immigration" were to "check" her medically. Id.

During the multiple rapes, the defendant used the computer on his desk to access video surveillance camera footage of various areas on the MDC to ensure that no one was coming and that his conduct would remain undetected.

II.     The Sentencing Guidelines

        The government agrees in substantial part with the Probation Department's Guidelines calculation.[4]  The Probation Department has determined that the defendant's total offense level is 46 and his Criminal History Category is I, resulting in a Guidelines range of life imprisonment.  PSR ¶¶ 108, 112, 151.

III.    Discussion

        The government respectfully submits that, in this case, a sentence of a significant term of imprisonment in excess of 20 years is appropriate in light of all relevant factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

I.      Legal Standard

        The Sentencing Guidelines are advisory, not mandatory.   United States v. Booker, 543 U.S. 220, 258-60 (2005).  However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence.  Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

        [A] district court should begin all sentencing proceedings by
        correctly calculating the applicable Guidelines range.  As a
        matter of administration and to secure nationwide consistency,

_____

        [4]     The government disagrees with the Probation Department's Guidelines calculation in two respects.  First, a two-level enhancement for serious bodily harm should apply.  Application Note M to U.S.S.G. § 1B1.1 provides that "'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law."  Second, Counts Eleven and Twelve should not be grouped with Counts Three through Eight because, notwithstanding that the counts involve the same victim and two or more acts or transactions constituting part of a common scheme or plan, they do not represent one composite harm. See U.S.S.G. § 3D1.2, Application Note 4 (§ 3D1.2(b) "does not authorize the grouping of offenses that cannot be considered to represent essentially one composite harm (e.g., robbery of the same victim on different occasions involves multiple, separate instances of fear and risk of harm, not one composite harm)").  However, neither affects the effective Guidelines range of life and accordingly, the government submits that neither objection needs to be resolved by the Court.

the Guidelines should be the starting point and the initial
benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the
§ 3553(a) factors to determine whether they support the sentence requested by a party.  In so
doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district
court] must make an individualized assessment based on the facts presented." Id. at 49-50
(citation and footnote omitted).

II.     A Significant Sentence of Imprisonment Is Appropriate In This Case

        Based on the factors set forth in 18 U.S.C. § 3553(a), a significant sentence of
imprisonment – one in excess of 20 years –  is appropriate in this case, and a more lenient
sentence is not warranted.

        A.      The Nature and Circumstances of the Offenses and The Defendant's History
                and Characteristics

        The nature and circumstances of the offenses and the defendant's history and
characteristics warrant a significant sentence of imprisonment.  The nature and circumstances
of the instant offenses, see 18 U.S.C. § 3553(a)(1), are extremely serious.  The defendant
committed the instant offenses as a sworn law enforcement officer.  The defendant
committed his crimes in a particularly brazen fashion in the Lieutenants' Office in the East
Building of the MDC, while he was the East Activities Lieutenant on duty, responsible for
the safety and security of all those housed there, including his victim, as well as other staff.
His outrageous conduct evinces a belief that he was above the law and could act with
impunity.  While the defendant has no prior criminal history, the breadth and sustained
nature of the defendant's criminal acts – committed on multiple occasions – demonstrate that
these crimes were in no sense aberrational or simply the result of a momentary lapse in
judgment.  His crimes were the result of conscious choices made repeatedly by a man in his
late 40s who simply did not believe he would get caught or be prosecuted for his crimes.

        The impact of the defendant's crimes on Maria have also been severe.  During
her trial testimony at the first trial, Maria described how she felt after the first incident in
December 2015, when the defendant forced her to give him oral sex and vaginally raped her:
"It's the worst thing that ever happened to me.  It killed me inside." Tr. 107.  The defendant,
on the other hand, noting that Maria was bleeding, joked, "that's what happens . . . I turned a
girl into a woman," treating the worst thing that happened to Maria "like it was nothing." Tr.
108.  After the subsequent rapes, Maria continued to feel "[p]owerless," "miserable," and
"horrible." Tr. 149, 178.  As Maria testified, the defendant's crimes "continue to affect me
and they will always affect me.  I don't think I'll be able to get over that." Tr. 237.  Indeed,
the lasting effect the defendant's crimes have had on Maria was palpable during her
testimony at trial, where she had to relive these horrendous experiences by recounting to the
jury in a public courtroom the graphic details of what the defendant did to her.  At the second

6

trial, Maria made clear that she continues to be haunted by the defendant's crimes and there is little doubt that she will continue to endure this trauma for the remainder of her life.[5]

The defendant has also made clear that he continues to believe he is above the law and has no remorse or understanding of the gravity of his criminal actions. On a much lesser level, the defendant's actions during the March 2016 road rage incident (PSR ¶ 110) provide another example of the defendant's disregard for others, his belief that he is above the law and his willingness to lie when it serves his interest. In the road rage incident, the defendant brazenly punched a woman and destroyed the side-view mirror of her car, and then when confronted months later, incredibly claimed for the first time that he was simply acting in self-defense. At the second trial, when the defendant took the stand and testified on his own behalf, the defendant repeatedly lied – both about the March 2016 road rage incident and his repeated rapes of Maria. The sentence imposed by the Court should reflect the defendant's utter lack of remorse.

B.     Reflecting the Seriousness of the Offenses, Promoting Respect for the Law and Providing Just Punishment

A significant sentence of imprisonment is also necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). While Maria committed a crime of her own, she deserved the right to serve her time in federal prison without having her civil rights or her body violated by a lieutenant whose job it was to protect her. The sentence imposed by the Court must provide just punishment for the serious, lasting harm the defendant has caused to Maria.

C.     Affording Deterrence and Protecting the Public

Finally, the sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010). A sentence within the applicable guidelines range is warranted in light of both of these considerations.

Specific deterrence is a significant concern. While the defendant will no longer have the opportunity to sexually abuse, assault, and rape inmates entrusted to his care, the brazen manner in which the defendant committed his crimes suggests that he will commit other crimes, unless deterred from doing so by a significant sentence, which will also protect the public from further crimes by this defendant.

General deterrence is also of particular concern in this case. A Guidelines sentence is warranted to ensure that federal correctional officers, particularly those that work

---

[5] Maria submitted victim impact statements after each of the defendant's two trials, which have been translated from Spanish to English and are attached hereto as Exhibit A.

at the MDC, know that they will not only be prosecuted, but will receive lengthy prison sentences, should they choose to sexually victimize inmates in their custody and care by engaging in such serious and egregious criminal conduct.

***

Given the defendant's serious, sustained criminal conduct committed as a supervisory federal law enforcement officer, which involved the sexual victimization of a sentenced federal prisoner in the defendant's custody and care, multiple times, over and over and over again, a significant sentence of imprisonment in excess of 20 years is appropriate.

III.    Conclusion

For the foregoing reasons, the Court should sentence the defendant to a significant sentence of imprisonment in excess of 20 years.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    ___/s/_____
Elizabeth A. Geddes
Nadia I. Shihata
Assistant U.S. Attorneys
(718) 254-6430/6295

cc:    Clerk of Court (ERK) (by ECF)
Anthony Ricco, Esq. (by ECF and E-mail)
U.S. Probation Officer Patricia A. Sullivan (by E-mail)

September 26, 2021

Carlos R. Martinez Reg. 90166-053
354 Doremus Ave
Essex County Correctional Facility
Newark, New Jersey   07105

Honorable Edward R. Korman
United States District Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York  11201

RE: Sentencing Letter -  Criminal Case: 1:17-c-00281-erk

Honorable Judge Korman, I want to thank you for allowing me to speak to you and address the court. I woud like to start by saying that I'm not perfect, no one is. I have done many good things in my life but I have made a mistake. I violated the trust that I earned while working as a lieutenant for a moment of pleasure. Maria and I had a consensual affair, a secret relationship that we both agreed on and that's all it was. I did not forcibly rape or forcibly sexually asssault Maria. I never forced, demanded, threatened or ever put Maria in harms way. That is not who I am or how I was raised. She perceived and treated me as someone whom she was attracted too and not someone of authority.

At trial, it was difficult and distressing to see how Maria devised a perfect plan to manipulate her close friends to lie and to also manipulate the judicial system that created an injustice by giving false testimony and being deceptive. The lies were blended seamlessly with the truth to make her story believable. Maria has a history of lying and has once again capitalized on an opportunity to be given power for her false testimony to let her dishonesty be valued over a defandant which makes it particularly dangerous to those who are falsely and wrongfully accused. I have been receiving discovery material and legal documents from the civil suit that Maria has filed against myself and the government for 20 million dollars. In those documents were adept lies and contradictory statements. Incident reports of her stealing and lying to staff that we never seen in connection with the criminal trial.

Your honor I did not sexually force or ever place Maria in fear. Nor did I want to go to trial I would have accepted responsibility for what I did, but not to false allegations. I was given draconian stacked charges to be given decades in prison for something I was falsely accused of.  I was not going to allow Maria to do this to me for money nor the prosecutors brazen malfeasance in their misconduct of hiding excuplatory evidence in their ambition to win this case at all cost.  With what I seen what was happening to me I had no choice but to go to trial and important for me to go on the witness stand and tell my side of story, refute the lies and shed some light on what really happened. At first I didn't understand why Maria would be doing this to me because I never mistreated her.  I should of recognized the consequences of having an affair with Maria to let the lure of temptation and manipulation cloud my judgement that created opportunity for her financial gain at the expense of my freedom while she is allowed to stand behind a cloak of anonymity while I was wrongfully vilified by lies and slander.

This was not worth the torment and anguish I would endure, it cost me everything. The loss of my mother, My career, pension, my dignity, my honor and now my mental and physical health as I have been in solitary confinement for 52 months. But I am a man of faith that has a strong belief in God and beliefs that in life that good and bad things happen for a reason. I have overcome adversities growing up. I have traveled to foreign land and witnessed the violence on the battlefields proudly protecting our country, the cancer I would fight years later from search, rescue and recovery at Ground Zero also protecting our country. But this right here by far has been the toughest one because there is no honor here. I have lost focus, let my guard down and fell on my sword.

I have expressed my regret, sincere remorse and my repentance to all this has affected and I express it today to everyone here. Life is a journey with many unpredictable elements (Good &Bad) moving forward I will continue to strive for the good and that is my promise to you your honor for giving me a fair trial, to my children, my community and our country to which I will proudly serve whenever called.  To strenghten my character and commitment to overcome this challenge with dignity, humility and faith. Although my community, my family, friends and former co-workers have always been supportive and stood by me because they know who I am.

Today your honor I stand alone,  heartbroken, extremely remorseful and have learned alot from this. I humbly ask for your mercy and compassion not only for myself but for the sake of my ailing grandmother, my children, grandchildren and family. To ask for a second chance to right my wrong.

I also would like to take this opportunity to thank my lawyers for their hard work and dedication for not abandoning a wounded soldier on the battlefield. To my aunt there are no words I can express for the love and support she has shown me I have been truly Blessed to have them by my side. Your Honor, I thank you for your fairness and for allowing me to address everyone here. Thank You.

Sincerely,

*Carlos R. Martinez*

Carlos R. Martinez

DV DANIELS NJ 070 07 00

29 SEP 2021 PM 3 L

Carlos R. Martinez Reg. 90166-053
Essex County Correctional Facility
354 Doremus Ave
Newark, New Jersey 07105

Honorable Edward R. Korman
United States District Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201

11201-163299

INTENTIONALLY LEFT BLANK

GA418

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

     - against -                      Docket. No.  17 Cr. 281 (ERK)

CARLOS RICHARD MARTINEZ,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF
# CARLOS MARTINEZ'S RULE 33 MOTION FOR A NEW TRIAL


]


Anthony L. Ricco, Esq.
Attorney For *Carlos Richard Martinez*
20 Vesey Street, Suite 400
New York, New York 10007
(212) 791-3919

Steven Z. Legon, Esq. and Carlos Santiago, Esq.
Of Counsel and on the Memorandum of Law

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

    - against -                              Docket. No.  17 Cr. 281 (ERK)

CARLOS RICHARD MARTINEZ,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>Preliminary Statement</u>

       This memorandum of law is submitted in support of Carlos Richard Martinez's notice of motion which seeks a new trial on the grounds that the government failed to timely disclose crucial information related to a witness which violated his right's to a fair trial protected under the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, in particular *Kyles v. Whitley*, 514 U.S. 413 (1995). In particular, Carlos Martinez asserts that the suppression of the April 18, 2017 interview of Jane Doe No. 4 who, provided the government with material information to acts relevant to counts 17 through 19 of the indictment, served to undermine the confidence in the jury verdict reached in this case as to all counts of conviction.

<u>Statement of Facts</u>

<u>Background</u>

       As this court is aware, the government's theory in this case alleged that Carlos Martinez committed multiple acts of rape upon an individual known as "Maria" on various dates from December 2015 to April 2016.

       The government proceeded to trial on a twenty count indictment which charged that from December 2015 through February 2016 and on one date in April 2016, Carlos Martinez, a supervisor with the Bureau of Prisons, used his position of authority, coupled with physical force and fear to

repeatedly rape "Maria," a sentenced female prisoner detained at the Metropolitan Detention Center in Brooklyn, New York ("Metropolitan Detention Center").   Fifteen of the indictment's twenty counts contained an essential element that required the jury to make a specific finding, beyond a reasonable doubt, that Carlos Martinez used *physical force* to commit various acts of aggravated sexual abuse.[1] See, *The Courts Jury Instructions*, set forth in the Trial Transcript at pages 1084, 1087, 1088, 1089 and 1090. Each of these fifteen counts required a finding of forcible rape.

In order to support its theory, and to establish the element that Carlos Martinez used physical force to commit various acts of aggravated sexual abuse, the government relied upon testimony of a female detainee known as "Maria."   'Maria' testified that she had a job at the jail as a cleaner, and that part of her job responsibilities was to clean the Lieutenant's Office on the second floor of the Metropolitan Detention Center.   During the trial, "Maria" testified that Carlos Martinez used physical force to cause her to engage in various sexual acts with him against her will on multiple occasions.  See, Trial Transcript, page 107, line 11; page 149, line 8; 162, line 4; page 179, line 7; page 220, line 24; page 221, line 1; page 321, line 19; page 322, line 3; page 322, line 10; page 328, line 22; page 329, line 7; page 330, line 18; page 332, line 4; page 333, line 21; and page 396, line 13.   "Maria" testified that each forcible act of sexual abuse took place inside the Lieutenant's Office on the 2d floor of Metropolitan Detention Center, where she had been summoned to clean, but that each encounter took place outside the presence of any other person.

---

[1]      Specifically, the indictment charged Carlos Martinez with the deprivation of the civil rights of a detainee identified as Jane Doe, by using force to commit various aggravated acts of sexual abuse against her in violation of 18 U.S.C.§ 242 (Counts 1, 5, 9, 13, 17, 18).  The indictment also charged Carlos Martinez with multiple counts of aggravated sexual abuse in a federal prison, by causing Jane Doe to engage in various sexual acts, by using force against her. 18 U.S.C. § 2241(a)(1)(counts 2, 3, 6, 7, 10, 11, 14, 15, 19).  Finally, the indictment charged Carlos Martinez with multiple counts of sexual abuse of a ward by causing Jane Doe to engage in various sexual acts, while she was in official detention at a federal prison and when she was under custodial, supervisory and disciplinary authority in violation of 18 U.S.C. §2243(b)(counts 4, 8, 12, 16, 20 - no finding of force required).

The government did not call any other person who testified that they actually observed "Maria's" being physically forced to engage in sexual acts with Carlos Martinez.  See, e.g., Trial Transcript, page 459, line 13 to 15.   Although the government called several Bureau of Prisons staff members and civilian employees, in order to establish corroboration that "Maria" was subjected to unwanted physically forced sexual encounters, the government relied upon the testimony of sentenced female inmates who were also detained at the Metropolitan Detention Center.  During the trial, "Maria" testified that she discussed the forced sexual encounters with female inmates at various times, sometimes before, and/or after the forced sexual encounters.   See, Trial Transcript, page 126, line 11; pages 118, line 23 through 124, line 23.   "Maria" identified the female detainees who she engaged in those conversations as Danilda Osorio, Melva Vasquez and Kiara Maldonaldo.  The government called Danilda Osorio, Melva Vasquez and Kiara Maldonaldo to provide corroborative evidence to support "Maria's" testimony that she was subjected to unwanted forcible sexual acts while she was cleaning the Lieutenant's office.

Each female detainee testified that they, in fact, had conversations with "Maria" wherein she discussed the sexual encounters that "Maria" had with Carlos Martinez.     Danilda Osorio, Melva Vasquez and Kiara Maldonaldo each testified to conversations that they had with "Maria" wherein she complained of unwanted sexual contact with Carlos Martinez.   The women testified that "Maria" said she was forcibly penetrated; (Trial Transcript, page 633, line 4 to page 634, line 24 - Kiara Maldonaldo); that "Maria" showed them bloody panties (Trial Transcript, page 633, line 4, page 634, line 18 - Kiara Maldonaldo); that "Maria" was upset and constantly crying - something had happened to her; (Trial Transcript, page 561, line 4 to 12 - Danilda Osorio; page 563, line 4 to 20 - Danilda Osorio; page 446, line 25 to page 449, line 24 - Melva Vasquez); that "Maria" was sadden by the encounters, and changed her social habits, staying in bed and not socializing as she did previously (Trial Transcript, page 640, line

17 to 21); that 'Maria" had anxiety and fear (Trial Transcript, page 560, line 23 to 25 - Danilda Osorio);

that she was often crying (Trial Transcript, page 563, line 19 to 20 - Danilda Osorio); that on one

occasion "Maria" spoke of being grabbed and penetrated from behind and that she appeared to be

"freaked out;" (Trial Transcript, page 633, line 4 to 25; page 636, line 13 to 16 - Kiara Maldonaldo); that

during a conversation the day after one such encounter, "Maria" stayed in bed and did not want to work,

(Trial Transcript, page 640, line 17 to 21); and finally, that on an occasion, in Immigration custody,

"Maria" showed them bruises, finger marks on her arm, where Carlos Martinez had forcibly grabbed

her and penetrated her during the April 2016 sexual encounter; (Trial Transcript, page 229, line 7 to 20 -

"Maria"); page 593, line 17 to 21 - Danilda Osorio).

    Finally, government established that "Maria" loathed and feared going to clean the Lieutenant's

office.   Danilda Osorio testified that she would see "Maria" before going to clean Lieutenant's office

and that she was not happy to go, that she would be upset and tired of going. See, Trial Transcript, page

567, 10 to 18.   "Maria" testified that she did not want to go clean the Lieutenant's office, because she

"knew that going to start cleaning meant that she was going to be raped again, and that's is what

happened."   See, Trial Transcript, page 169, 17 to 25.

Testimony Which Gives Rise To A Brady Violation In This Case

    In relation to counts 17, 18 and 19 of the indictment, "Maria," testified at trial about a sexual

encounter which she said took place between her and Carlos Martinez prior to her departure from the

Metropolitan Detention Center toward the end of April of 2016, just prior to her discharge from

custody at the Metropolitan Detention Center and transfer into the custody of Immigration. See, Trial

Transcript, page 209, line 1 to 16.   "Maria" provided explicit details of the sexual encounter itself, along

with the events which immediately proceeded the sexual encounter and immediately thereafter. "Maria"

testified at trial that on a single occasion in the month of April 2016, she was grabbed and forcibly raped

by Carlos Martinez, while she was cleaning the Lieutenant's office.  Based upon this testimony, on January 19, 2018, the jury returned a guilty verdict on all twenty counts of the indictment.

<u>Post-Verdict Brady Investigation</u>

On August 22, 2018, Carlos Martinez wrote to the government and made an inquiry into whether the government failed to provide the defense with information which should have been disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v United States*, 405 US 150 (1972) and *Kyles v. Whitley*, 514 U.S. 419 (1995).   Specifically, Carlos Martinez made an inquiry into whether, at anytime during the proceedings against Carlos Martinez, did the government provide Carlos Martinez with the disclosure of *any* interviews between the government prosecutors and/or the case agents and an inmate/detainee named Jane Doe No. 4 concerning the events of the April 2016 sexual encounter, as alleged in  alleged in counts 17 through 20 of the indictment and which was subject of the trial testimony of "Maria."

On September 5, 2018, the government responded that it "inadvertently" failed to disclose to Carlos Martinez, that prior to his trial that there was, in fact, an interview with an individual known as Jane Doe No. 4, and provided Carlos Martinez with a copy of the memorandum of the interview which was dated April 27, 2017.   The memorandum of the interview revealed that the government withheld from the Carlos Martinez that Jane Doe No. 4 provided relevant and material information related to whether "Maria" was forcibly raped as she claimed on a date in April of 2016.

The memorandum of the April 18, 2017 interview revealed that Jane Doe No. 4's provided an account of the circumstances surrounding the April 2016 sexual encounter that was inconsistent with, and contrary to, the trial testimony of "Maria." The suppression of the information that the government "inadvertently" failed to disclose: (1) precluded Carlos Martinez from impeaching "Maria" during cross examination on prior inconsistent statements; (2) thwarted Carlos Martinez from affirmatively

presenting testimony of a witness which materially contradicted the testimony of 'Maria;" (3) concealed from Carlos Martinez material information that his counsel could further investigate and develop to additional facts to demonstrate that the encounter with "Maria" was not a forcible act; and (4) prevented Carlos Martinez's counsel from information upon which to provide  arguments to the jury during closing arguments challenging the government's theory of the case.  Set forth in detail below, in constitutional terms, the government's failure to disclose this highly relevant and material *Brady* evidence, violated Carlos Martinez's Sixth Amendment right to cross examination and his Sixth Amendment right to present evidence on his behalf, resulting in a violation of Fifth Amendment right to due process of law.  As a result of the suppression of *Brady* evidence in this case, Carlos Martine has filed a motion seeking an order for a new trial.

In summary, since the interview and statements made by Jane Doe No. 4 was required to be disclosed pursuant to  *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 419 U.S. 514 (1995), its suppression by the government deprived Carlos Martinez of his due process rights to a fair trial and undermined confidence in the jury's verdict.  Accordingly, this Court must, for the reasons set forth in the supporting declaration, vacate the conviction on all counts and order a new trial.[2]

## II.  Applicable Legal Standards

Applicable Legal Standard Under Fed. Rule of Crim. Proc., Rule 33

The district court has broad discretion in deciding whether to grant a new trial pursuant to Fed. Rule of Crim. Proc, Rule 33.  Rule 33 specifically provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." *Fed. R. Crim. P. 33(a).*  This rule by its terms gives

---

[2]        The declaration in support of the motion, provides a detailed analysis for manner in which the withheld testimony deprived Carlos Martinez of a fair trial, and how the withheld testimony resulted in undermining the confidence of the jury verdict in relation to all counts.   Since that analysis was provided in the Declaration, this memorandum simply sets forth the legal authorities for granting the Rule 33 motion for a new trial.

the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001)(internal quotation marks and citations omitted). The ultimate test in a *Rule 33* motion is whether letting a guilty verdict stand would be a manifest injustice. *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. Generally, the trial court has broader discretion to grant a new trial under *Rule 33* than to grant a motion for acquittal under *Rule 29*, but it nonetheless must exercise the *Rule 33* authority sparingly and in the most extraordinary circumstances. *United States v. Ferguson*, supra, 246 F.3d at 133-34.

The Second Circuit has recognized that the suppression of *Brady/Giglio* evidence may be raised via a Rule 33 motion seeking a new trial. See, *United States v. Amadou Djibo*, Docket No. 16-3956-cr (Summary Order, May 23, 2017. A denial of a motion for a new trial pursuant to Rule 33 is reviewed for abuse of discretion. See, *United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000).

Brady Violation - The Standard

In this case, Carlos Martinez asserts a violation of his constitutional rights protected under the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, in particular *Kyles v. Whitley*, 514 U.S. 413 (1995). The United States Supreme Court case authority clearly supports a finding that the observations and statements made by Jane Doe No. 4 constitute *Brady* material, and as such, triggers the prosecution's obligation to provide the corresponding identification and contact information to the defense. *Kyles v. Whitley*, 514 U.S. 419 (1995). Although there is no precise deadline for when *Brady/Giglio* information must be disclosed, the Second Circuit has held that Brady requires disclosure "in time for its effective use at trial." See, *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (internal quotation marks omitted); *accord DiSimone v. Phillips*, 461 F.3d 181, 196–97 (2d Cir. 2006).

The Supreme Court has long ago held that the prosecutor's failure to turn over *Brady* information is prosecutorial misconduct, notwithstanding the "good faith or bad faith" of the prosecutor. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In this case, the government has stated bye letter dated September 5, 2018, that it "inadvertently" failed to disclose the interview of Jane Doe No. 4.  However, the impact of the failure to disclose the existence of this *Brady* witness thwarted and deprived Carlos Martinez of his right to investigate and develop his defense, to present evidence via his right to compulsory process, and his right to effective cross examination.

The Supreme Court's decision in **Brady** imposes a constitutional duty on the government to disclose evidence favorable to the accused where such evidence is material either to guilt or to punishment. See, *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995).

Under *Kyles v. Whitley*, 514 U.S. 419 (1995), the government's *Brady* obligation was extended to include the disclosure of statements of any individual interviewed by law enforcement personnel and/or prosecutors which are:  (1) inconsistent or contradictory with a prior statement made by that individual, regardless of whether the government intends to call that individual in its direct case; (2) inconsistent or contradictory with the statements of others interviewed; and (3) inconsistent or contradictory with the theory of government's case against the defendant as set forth in the indictment.  Under **Giglio**, the government's *Brady* obligation was extended to include any "evidence that is useful to impeach the credibility of a government witness." See, *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  The United States Supreme Court has long held that a defendant has a Fifth Amendment due process right to any evidence that may be used to challenge the credibility of such witnesses.  *Giglio v. United States*, 405 U.S. 150 (1972).

However, *Giglio* material is distinguished from *Kyles* material.  While both *Kyles* material and *Giglio* material are discoverable under *Brady v. Maryland*, 427 U.S. 83 (1963), they are conceptually distinct.  In

*Kyles* the Supreme Court held that a *Brady* violation exists where the prosecution fails to furnish the defense with inconsistent and contradictory statements of an informant which have a "reasonable probability" to impact the jury's consideration of the *charged conduct*.  In *Giglio*, the Supreme Court held that when the reliability of a witness is central to the case, evidence affecting the credibility of that witness falls within the rule of *Brady v. Maryland*, 427 U.S. 83 (1963).  In *Brady v. Maryland*, 427 U.S. 83 (1963), the Supreme Court affirmed the reversal of a state court homicide conviction because the prosecution, despite the defendant's attorney's request to produce statements, withheld a co-defendant's statement that the co-defendant, not the defendant, had actually killed the victim.

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland, Id.*, 427 U.S. at 87.

Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even where that has been no specific disclosure request is made by the defense. *United States v. Bagley*, 473 U.S. 667, 678 (1985); *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995).

This rule encompasses both exculpatory and impeachment evidence.  The evidence is material, and constitutional error results from its suppression, if there is a reasonable probability that disclosure of the evidence to the defense would have changed the result of the proceeding. *Cf. Wood v. Bartholomew*, 516 U.S. 1 (1995).  And, a defendant demonstrates a reasonable probability of a different outcome, by showing that the government's suppression of evidence "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

Materiality

In this case, it is undisputed that the government failed to disclose the interview with Jane Doe No. 4 which could have been used to impeach "Maria," and used to present affirmative evidence on the

9

issue of whether physical force was employed as set forth in the government theory of the case. Therefore, the only remaining issue is whether the information set forth in the Jane Doe No. 4 interview was sufficiently "material" to establish a *Brady* violation.

In *United States v. Bagley,* 473 U.S. 667 (1985), the Supreme Court held that favorable evidence is material, and constitutional error results from its suppression by the Government, "'if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" See, *Kyles v Whitley,* supra, 514 U.S. at 433-434, (quoting *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.)).  In *Kyles,* the Supreme Court elaborated on the meaning of materiality under *Bagley,* stressing that a reviewing court must focus on the fairness of the trial the defendant actually received rather than on whether a different result would have occurred had the undisclosed evidence been revealed:

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.... *Bagley* 's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v Whitley,* supra, 514 U.S. at 434.   *Kyles* also made it clear that, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Kyles v Whitley,* supra, 514 U.S. at 435.  As the Court pointed out, no *Bagley* error can ever be harmless because a

reasonable probability of a different result "necessarily entails the conclusion that the suppression must have had a substantial and injurious effect or influence in determining the jury's verdict." *Id* at 435. (internal quotation omitted).

Initially, this Court should reject any suggestion that even if Jane Doe No. 4's statements from the interview had been disclosed, the result would have been the same.  There is no way to know this; in fact, the suggestion defies common sense, since there were no other witnesses to corroborate the testimony that "Maria" was subjected to an unwanted forcible sexual encounter.  More importantly, however, is that this argument would completely misinterpret the relevant inquiry.  As the Supreme Court made clear in *Kyles,* the test for materiality is *not* a sufficiency-of-the-evidence test.  "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."  *Kyles v. Whitley,* supra, 514 U.S. at 434-435.  Indeed, a sufficiency-of-the-evidence test would require courts to usurp the function of the jury, forcing judges to guess, based on a cold record, as to how the jury might have weighed the remaining evidence, standing alone, in a hypothetical error-free trial.  Because such an inquiry is inherently unreliable, *Kyles* rightly focuses attention instead on the potential impact the undisclosed evidence might have had on the fairness of the proceedings.

Accordingly, the amount of additional evidence indicating guilt should not be dispositive of this Court's inquiry.  Instead, what must be decided is whether the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict.  While the government may argue that further cross-examination of "Maria" would have been cumulative, "the fact that other impeachment evidence was available to defense counsel does not render additional impeachment evidence immaterial." *United States v. O'Conner,* 64 F.3d 355, 359 (8th Cir.1995) (citing *Napue v. Illinois, 360 U.S. 264, 270(1959)).*

And besides - as set forth in the supporting declaration - there was no evidence presented in the case or disclosed to defense that could be used to challenge "Maria's" testimony about the events which took place during April of 2016.  Jane Doe No. 4's testimony, if presented, would have established that "Maria" willfully and purposefully went to clean the Lieutenant's Office alone, and that "Maria's" testimony about Odis De La Cruz not accompanying her due to a visit was false.  Jane Doe No. 4's testimony that both she and Odis De La Cruz offered to go with "Maria" to clean, and the reasons that "Maria" later gave to Jane Doe No. 4, as to why she wanted to go alone, would have influenced a jury determination as to whether the sexual encounter in April 2016, was an unwanted forcible sexual encounter.

This Court must not look to the ways defense counsel was able to impeach "Maria," but rather to the ways in which "Maria's" testimony in relation to the April 2016 sexual encounter was allowed to stand unchallenged at trial.  As stated in the declaration in support, "Maria" provided specific testimony of the events which took place during the forced rape, including the names of the individuals she spoke with prior to going to the Lieutenant's Office, the conversation that she had with Lieutenant Nunez when she arrived at the Lieutenant's Office, and those individuals she spoke with upon her return to her housing unit after the forcible rape.  However, at no time did "Maria" testify as to a conversation with Jane Doe No. 4 on that date, before or after the sexual encounter.  Nor did "Maria" provide any testimony that a female inmate named Jane Doe No. 4 was even present in the housing unit on that date.  Notwithstanding the contents of the observations and accounts set forth in the memorandum of the April 18, 2017 interview, the prosecutors never even asked "Maria" whether there was any other female inmate present, or whom engaged her in a conversation either prior to or after the April 2016 sexual encounter.  Neither this court, the defense nor the jury was ever made aware of material information in the possession of the government prosecutors; to wit: that there was, in fact, another female inmate who engaged "Maria" in conversation both before and after the April 2016 sexual

12

encounter.

In this case, the suppression of the Jane Doe No. 4's interview allowed the government to secure favorable evidentiary rulings, which permitted "Maria" to testify on direct examination to the April 2016 episode and several events without impeachment, and prevented the defense from calling an important witness who disputed "Maria's" account of relevant and material events, or making an argument that these sexual encounters engaged in by "Maria" were not the result of physical force.  The potential impact of such cross-examination, along with the potential impact that the presentment of Jane Doe No. 4 as a witness may have had, serves to undermine confidence in the jury's verdict, thereby satisfying the threshold for materiality as discussed by the Supreme Court in *Kyles*.

Although defendant has discussed one area of cross-examination that could have been pursued, the Supreme Court has cautioned that in making a *Brady* materiality determination, the focus should be upon an evaluation of whether the suppression of the evidence, when viewed collectively, resulted in a verdict unworthy of confidence. See, *Kyles v. Whitley*, supra, 514 U.S. at 436 *(noting that the materiality of "suppressed evidence [is to be] considered collectively, not item-by-item")*.  As noted above, several pieces of withheld evidence could have been used by the defense to undermine the credibility of "Maria's" testimony and the government's case.  Because the credibility of the government witnesses was so central to the government's case, the jury very well could have reached a different verdict had Carlos Martinez been armed with Jane Doe No. 4's suppressed evidence.

The Second Circuit and other courts have long recognized that *Brady* violations obscure a trial's truth-seeking function and, in so doing, place criminal defendants at an unfair disadvantage. When the government impermissibly withholds *Brady* material, "its case [i]s much stronger, and the defense case much weaker, than the full facts would . . . suggest[]." See, *Kyles v. Whitley*, supra, 514 U.S. at 429. Where, as here, "the government suppressed evidence in its possession which was both exculpatory and impeaching, . . . there is a reasonable probability that if the evidence had been disclosed, the outcome

of the proceeding would have been different." See, *United States v. Triumph Capital Grp.,* 544 F.3d 149, 164 (2d Cir. 2008); *United States v. Rivas,* 377 F.3d 195 (2d Cir. 2004)(*a new trial was ordered where the suppressed evidence was inculpatory as well as exculpatory, because its exculpatory character harmonized with the theory of the defense case*).  Even if "[i]t is by no means certain that" arguments based on wrongfully withheld evidence "would have swayed the jury, . . . it is a real enough possibility to undermine confidence in the verdict." See, *United States v. Triumph Capital Grp.,* supra, 544 F.3d at 163.  In light of the fact that "Maria" was the government's only witness who testified that she was the subject of an unwanted sexual encounter in April 2016, there is a reasonable probability that the jury would not have been convicted Carlos Martinez on the counts that he physically forced "Maria" to engage in sexual encounters.

Wherefore, in light of the government's suppression of exculpatory and impeachment material, a new trial is warranted.

Dated: New York, New York
        November 29, 2018

                                Respectfully submitted

                                *Anthony L. Ricco*
                                Anthony L. Ricco, Esq.
                                Counsel for *Carlos Richard Martinez*
                                20 Vesey Street, Suite 400
                                New York, New York  10007
                                (212) 791-3919

Steven Z. Legon, Esq.
Of Counsel and on the Memorandum

14

NS
F. #2016R01322

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                              Docket No. 17–CR–281 (ERK)

CARLOS RICHARD MARTINEZ,

                Defendant.

– – – – – – – – – – – – – – – – – –X

THE GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTION

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nadia I. Shihata
Assistant U.S. Attorney
    (Of Counsel)

1

<u>INTRODUCTION</u>

The government respectfully submits this memorandum of law in opposition to the defendant Carlos Richard Martinez's post-trial motion, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial.  The defendant was convicted, following a jury trial, of all 20 counts of the Indictment.

The defendant now moves for a new trial, arguing that the government withheld material information in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  <u>See generally</u> Defense Declaration dated November 29, 2018 ("Defense Decl.") and Memorandum of Law in Support of Defendant's Rule 33 Motion for a New Trial ("Defense Memo").  For the reasons set forth below, the defendant's motion should be denied.

<u>BACKGROUND</u>

I.      <u>The Indictment</u>

On May 24, 2017, a grand jury in the Eastern District of New York returned a 20-count sealed indictment charging the defendant with (1) five counts of deprivation of civil rights under color of law, in violation of 18 U.S.C. § 242; (2) five counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1); (3) five counts of sexual abuse, in violation of 18 U.S.C. § 2242(1); and (4) five counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b).

II.     <u>The Trial</u>

A.      <u>The Evidence</u>

At trial, the government presented the testimony of 16 witnesses and entered over 100 exhibits into evidence.  The defense presented the testimony of one witness:

Matthew Kluger, the victim's former criminal defense lawyer.  The trial evidence established

the following facts.

On March 2, 2015, following her sentencing on a drug conspiracy charge,

Maria[1] was transferred from the Manhattan Correctional Center ("MCC") to the

Metropolitan Detention Center in Brooklyn, New York ("MDC") and housed in Unit 6 South

of the MDC's East Building – a unit that housed sentenced female prisoners.  (T.57-59, 726,

GX200)  She was released from the MDC on April 29, 2016.  (T.58, 726, GX200)  As a

sentenced inmate, Maria was required to work at the MDC.  Initially, she worked doing

laundry for the unit, then in the unit kitchen.  (T.67-68)  In approximately May 2015, she

began to work regularly as a cleaner who cleaned areas on the second floor of the MDC's

East Building, including the medical area, the legal department area and the Lieutenants'

area.  (T.68-69, 552, 630)  Maria generally cleaned several times a week, whenever she was

called upon to do so.  (T.68-69)  When Maria first began working as a cleaner, she generally

cleaned with inmates Odis De La Cruz and Carmen Lopez.  (T.69, 439, 442, 630, GX8)

Carmen Lopez left the MDC on November 1, 2015.  (T.69)  Odis De La Cruz remained at

the MDC after Maria left.  (T.70)  Odis De La Cruz generally cleaned with Maria on the

second floor unless she had a visit.  (T.70)

As a general matter, Maria learned she needed to clean the second floor on a

particular day from the assigned unit officer, who called her last name out over the loud

speaker, after which the officer told Maria to get ready as another officer would come to take

her to the second floor to clean.  (T.70-71, 478-79)  Apart from Officer D'Anello Smith, the

_____

[1] The victim testified at trial using the pseudonym "Maria."

2

escorting officer left after escorting Maria to the second floor and turning her over to the

Lieutenant who had called for a cleaner.  (T.78-79, GX3)  During her time at the MDC,

Maria was called to clean the second floor by a number of Lieutenants, including the

defendant, Lt. Carlos Martinez, and Tomas Rodriguez, when he was assigned as a temporary

lieutenant.  (T.79, 477-78, GX1)  Rodriguez testified that when Maria cleaned for him, "[s]he

would just do her job normally and then she would leave."  (T.478)

        Maria first met the defendant while cleaning the Lieutenants' Office for Lt.

Almos, while Lt. Almos and the defendant were both inside.  (T.80)  Thereafter, in

approximately September or October 2015, Maria began cleaning the Lieutenants' Office

area, including the bathrooms, for the defendant.  (T.81)  The defendant generally had Maria

clean for him on Fridays, Saturdays or Sundays.  (T.82)  On Fridays, the defendant called for

Maria after 4:30 or 5 p.m.  (T.82)  On the weekends, he generally called for her between 11

am and 1 pm  (T.82)  On Friday afternoons and evenings, as well as on the weekends, the

second floor was generally empty, apart from the lieutenant and the escorting officer.  (T.82,

477)

        The defendant and Maria spoke to each other in Spanish.  (T.87)  When Maria

first began cleaning for him, the defendant was nice to her.  (T.87-88)  He told Maria about

himself, including that he had daughters, one of whom was almost Maria's age and who had

a son, and two others who were younger from a different mother, who worked security at a

medical facility, that he lived in staff housing about 10 minutes away from the MDC, and

that he was divorced.  (T.88, 375)  The defendant referred to Maria by her first name, which

was unusual, as officers and lieutenants at the MDC usually referred to inmates by their last

names.  (T.88)  Eventually, the defendant's conversations with Maria began to make her

uncomfortable.  (T.92)  While in the Lieutenants' Office, as Maria was retrieving cleaning liquids from one of the cabinets, he asked her "how do you satisfy your body"?  (T.93).  Maria responded, "I beg your pardon" and the defendant again asked how she satisfied herself, indicating "we're all adults here[;] don't be embarrassed."  (T.93)  The defendant further told Maria that she "should play with [her]self" while thinking about him when she went back to her unit.  (T.93-94)  Maria told the defendant she was married.  (T.94)  The defendant then commented that Maria's husband loved her so much that he had not come to visit her at the MDC.  (T.94)  As a Lieutenant, the defendant had access to Maria's visitor records.[2]  (GX227)  These sexual comments made Maria feel "embarrassed" and "ashamed."  (T.94)  She did not want the defendant to make these comments to her or to discuss these matters with him.  (T.94)

---

[2] Those records showed that Maria only had one visit during her entire stay at the MDC, which occurred later – on January 31, 2016 – with Noel Lopez, discussed further below.  (GX205)

4

1.      The December 13, 2015 Incident[3] (Counts 1 – 8)

On Sunday, December 13, 2015, the defendant worked as the East Activities Lieutenant on Day Watch shift 4, from 8 am to 4 pm.  (T.746-47, 856-57; GX241)  The next shift the defendant worked was as the East Activities Lieutenant on the Morning Watch Shift 1, from midnight to 8 am on December 14, 2015.  (T.717, 857, GX241)  The East Activities Lieutenant is "in charge of" the East Building, including the Special Housing Unit ("SHU"). (T.748-49, 789)

On December 13, 2015, the defendant was in Maria's unit at 10:10 am doing "PREA rounds."  (GX208)  Around 11 am or 12 pm, an officer escorted Maria to the second floor to clean for the defendant.  (T.100-01)  While Maria did not recall whether Odis De La Cruz came with her to clean the second floor that day, MDC visitor records showed that two visitors came to see Odis that day at 11:42 am and 11:45 am, respectively.  (T. 101, 125, 738-39, GX8, GX235)  After escorting Maria to the Lieutenants' Office (where the defendant was), the officer left.  (T.101)  After entering the Lieutenants' Office, Maria went to an area near the Lieutenants' desk – underneath the side desk with the printer on it – where

---

[3] The government proved the date of this incident at trial through a combination of evidence.  Multiple witnesses, including Maria, testified that the incident occurred the day Melva Vasquez was able to have a visit for the first time in six months, following the lifting of a disciplinary sanction she received.  (T.99-100, 466, 555)  The trial evidence established that the incident for which Melva received a disciplinary sanction took place on May 23, 2015, that she was first housed in the Special Housing Unit ("SHU") for two weeks from May 23, 2015 to June 3, 2015 and then lost her visiting privileges for 180 days for "unauthorized physical contact with female," starting June 8, 2015 until December 4, 2015. (T.443-46, 727-28, 739-740, GX202, GX222)  Melva testified that, after the visitor sanction was lifted, a visitor came to the MDC to visit her one day, but Melva was not authorized to see her so the visitor returned the following day and visited with Melva.  (T.446)  Visitor records showed a visitor was logged into the MDC system to see Melva on December 12 and 13, 2015; the last visitor logged for Melva prior to that was on June 6, 2015.  (T.737-38; GX210)

Lt. Veronica Metzger had previously stored certain cleaning supplies. (T.101-02, 792, 798-99, GX103C) Maria went there to "get the sprays," specifically to pour "pure spray into another container" that she could add water to. (T.102) The defendant was seated on the chair behind the Lieutenants' desk at the time. (T.102) While Maria was crouched down preparing the cleaning supplies, the defendant swiveled his chair around to Maria; she looked up and observed the defendant's erect penis out through the fly of his pants. (T.103) The defendant then grabbed Maria's head and shoulder with his hands to push Maria towards his penis and get his penis inside her mouth. (T.103) Maria put her hands on the defendant's knees in an effort to push herself away from him, but hit her head on the edge of the desk with the printer on it. (T.103-04) The defendant told Maria she was not going to get in trouble because his computer had access to all the cameras. (T.104, GX103(f)) Ultimately, the defendant inserted his penis inside Maria's mouth. (T.103) The defendant then stood Maria up and put her chest-down on the Lieutenants' desk, pulled her pants down and penetrated her vagina from behind with his penis. (T.105-06) While this was happening, Maria was crying and asked the defendant to use "protection," but the defendant did not do so. (T.106) The defendant moved Maria to the area to the right of the Lieutenants' desk, "where he finished" and took his penis out of Maria's vagina. (T.106-07) During this encounter, Maria was scared. (T.107) Maria did not want the defendant's penis in her mouth or to have sex with the defendant. (T.107) The defendant forced her to do so and she felt like she had no choice.[4] (T.107)

---

[4] Maria is five feet tall and weighed approximately 138 pounds when she was housed at the MDC. (T.107-08) The defendant was taller, bigger and stronger than her. (T.108; GX213)

After he finished, the defendant told Maria she was bleeding and commented "that's what happens.  Well, I turned a girl into a woman."  (T.108)  Maria "asked [the defendant] when he was finished where the semen was" and the defendant told her that "he came inside of [her]."  (T.108)   Worried she might get pregnant, Maria asked the defendant to get her the morning-after pill.  (T.108-09)  The defendant refused to do so and eventually informed Maria that he had undergone a vasectomy and so could not impregnate her.  (T.109-10)  Medical records confirmed that the defendant had, in fact, undergone a vasectomy in August 2013 at Maimonides Medical Center.[5]  (T.650, GX215)  Maria was "very upset" and was crying and begging him for the pill.  (T.109)  To calm her down, the defendant reluctantly agreed to get Maria the morning-after pill and said he would try to come by Maria's unit around midnight to give it her.  (T.109-10)  At some point after the defendant had sex with her, Maria went to women's bathroom in the area outside the Lieutenants' Office.  (T.110-11)  While inside, Maria noticed she was bleeding from her vagina. (T.111)  Maria did not have her period that day.  (T.108)

The defendant told Maria not to tell anybody what happened, that she would have "a problem" if she did so, and that she would serve more time in prison.  (T.111-15)

### 2.    The Aftermath of the First Incident

Thereafter, an officer arrived to escort Maria back to her unit, as was the usual procedure for inmates taken out of their housing unit for cleaning details.  (T.115)  Maria arrived back in Unit 6 South sometime between 2:40 pm and 3:30 p.m.  (T.115)  Maria went

---

[5] As expert witness Dr. Jonathan Vapnek testified, a man who has undergone a vasectomy still ejaculates and his semen is virtually unchanged, with the exception of the fact that there's no more sperm.  (T.649)

to the bathroom area in the unit and called out to Kiara Maldonado, a young inmate who was

approximately 21 or 22 years old at the time, who then came into the bathroom area.  (T.115-

17, 632, GX6)  Kiara then met Maria in the area in front of the toilet stalls.  (T.118, 632,

GX104D)  Maria looked "freaked out."  (T.633)  Maria told Kiara that the defendant

"penetrated" her, which Kiara understood to mean that the defendant and Maria had sex.

(T.118-19, 634-35)  Kiara reacted "[l]ike it was something, you know, happy.  Like it was

something good."  (T.119)  Maria was upset by Kiara's reaction, but did not say anything to

her about it.  (T.119)  Maria then went into one toilet stall, while Kiara went into the stall

next to hers, because Maria thought that the defendant might be watching her as there was a

security camera that captured the area in front of the toilet stalls.  (T.119, 632-34, 787)  The

two continued talking to each other while in adjoining stalls.  (T.119, 633-34)  Maria told

Kiara that every time she "wiped [her]self [she] was still bleeding."  (T.119, 634)  Kiara then

went back to her bed.  (T.635)

        Thereafter, Maria spoke with two other inmates who had returned from having

visits, Danilda Lora Osoria (also known as "Nani") and Melva Vasquez, along with Kiara, in

the area near Danilda's bottom bunk in row 15.[6]  (T.119-21, 447, 558, 636, 737-39, GX4,

GX5, GX104B, GX201, GX209, GX210)  Maria appeared sad, nervous and was fidgeting;

she was anxious and it seemed like "[t]here was something in her that she wanted to get out."

(T.559, 636)  Danilda had never seen Maria like this before.  (T.559)  Maria told them that

the defendant had penetrated or "stuck it in" her and that he did not care that she had bled,

---

[6] The women testified that they congregated near Danilda's bed because she was the
only one of them who had a lower, rather than an upper, bunk at the time, which was
confirmed by MDC records.  (T.726-28, GX200-203)

and that she gave the defendant oral sex.  (T.122, 559, 563, 636)  Melva recalled that Maria was crying and that she said that she had sex with the defendant, she had bled, and the defendant did not use protection.  (T.447-48, 560, 563-64)  Danilda's initial reaction was to not take the situation seriously (T.448, 560); she said, in substance, "hey, we're in jail.  So like what woman doesn't want a piece of dick."  (T.122)  She took it "just like Kiara." (T.122)  Kiara "thought it was funny at first, but then as she started like telling the story she started like really crying and stuff, so [Kiara] felt bad after."  (T.636)  Danilda's reaction made Maria feel bad and she told Danilda "it's not the same thing," but Danilda just responded, in substance, "just take it easy.  Calm down.  What are you crying about?  You're a woman."  (T.122, 561)  Maria "was looking to [Danilda] for support [but Danilda] didn't know how to give her that."  (T.561)  Melva reacted differently; she was angry.  (T.122, 448)

After this conversation, Maria went to her bed, but she was not able to sleep because she "couldn't stop crying." (T.123)  At some point, she left her bed and went back to the area near Danilda's bed.  (T.123, 561-62)  Maria was crying and even more upset than earlier.  (T.123, 562)  At this point, Danilda and Kiara took her more seriously.  (T.123, 560-61)  Maria said that at one point "she crouched down to get the chemicals to clean with, and as she was about to turn the lieutenant had his penis out."  (T.562)   She also said that the defendant has ejaculated inside of her and that she had asked him for the morning-after pill and he told her he was "going to try to come tonight" (T.124, 564, 637)  Maria also told Melva that the incident transpired in the Lieutenants' Office and that the defendant had access to "a camera so that he could check and see whether or not someone was coming." (T.449)  At some point, Maria went to the bathroom again.  (T.124, 562)  While in the bathroom, she called out for Danilda because she was still bleeding and wanted a sanitary

napkin.  (T.124, 563)  Danilda came to the bathroom area and Maria asked her for a sanitary

napkin, which Danilda subsequently brought her.  (T.124, 563)

During her interactions with Danilda, Melva and Kiara the day of the first

incident with the defendant, Maria did not tell them all of the details of what transpired in the

Lieutenants' Office.  (T.126)  Maria also did not tell any prison officials what transpired

because she "didn't want any problems, [she] didn't want to be there a single day longer."

(T.137) and "no matter what the circumstances are, I'm a criminal.  He's a man, he's a man

who has a certain position.  Who's going to believe a criminal compared to a person who has

a position, who has his life?" (T.138)

At 9:29 p.m. on December 13, 2015, the defendant purchased one "Plan B,

One-Step, one count" pill over the counter for $44.99 using his USAA debit card  and his

Rite Aid Wellness Rewards card, receiving a $5 discount, at a Rite Aid store located at 6423

Fort Hamilton Parkway in Brooklyn, between his home and the MDC.  (T.468, 530-31,

GX214, GX218, GX242, GX243)

At approximately 12:30 am on December 14, 2015, Maria saw the defendant

in Unit 6 South.  (T.126-27; GX242)[7] Kiara also saw the defendant come to the unit at that

time.  (T.638)  Maria was sitting on her bed, which was on a top bunk in the 17th row.

(T.127, GX104A)  Maria first saw the defendant as he entered the unit.  (T.128, GX104C)

After the defendant entered the unit, he gestured to Maria with something in his hand.  Maria

had been waiting for the defendant that night because he told her earlier that he would try to

bring her the morning-after pill.  (T.130)   Maria then walked over from her bed to the

---

[7] MDC records showed that the defendant conducted "PREA rounds in Unit 6 South
as 12:19 am on December 14, 2015.  (T.864-65, GX242)

10

defendant, who was in the area by the ice machine, near the guard's office at the time.

(T.130-32, 638, GX104E)  The defendant then gave Maria a copy of her MDC identification

(printed on a piece of paper) inside a plastic cover and told her "it's inside," referring to the

morning-after pill, while the unit officer was in the area.  (T.130-32, 639-40)  Maria then

heard the defendant tell the unit officer that Maria had forgotten her ID when she was

cleaning downstairs, which was not true.  (T.132)  After receiving the ID in a plastic cover

with the morning-after pill inside, Maria returned to her locker by her bed to get a cup and

then went to the ice machine to obtain ice and water.  (T.132)  She then went to the bathroom

area and inside the small room in the back with a sink.  (T.133; 638, GX104D)  There, Maria

retrieved the folded packaging of the morning-after pill, unfolded it, got the pill out and took

it.  (T.133-34)  Maria then returned to her bed, keeping the packaging the pill had come in so

that Danilda could read it to her after Danilda returned to the unit from her overnight job

shift in the MDC's kitchen, which generally began at 10:30 or 11 pm and continued until

anywhere between 3 and 6 am.  (T.134-35, 547-48)  Maria wanted Danilda to read what was

written on the packaging because it was in English and Danilda knew and could read

English.  (T.135, 566)

When Danilda returned to Unit 6 South from her work shift, Maria showed her

the pill packaging in the bathroom area and asked Danilda if it was, in fact, the morning-after

pill.  (T.136, 565-66)  Melva was also present.  (T.136, 450)  Danilda read the packaging and

confirmed it was the morning-after pill.  (T.136, 566)  Melva instructed Maria to get rid of

the packaging.  (T.450)  Maria flushed the packaging down the toilet, so she would not get in

trouble for having contraband in the prison.  (T.136-37, 451)  Later that day, Maria told

Kiara she was worried about getting in trouble because the defendant told her that "he'll take

11

her to the SHU and give her more time" and Maria told Kiara not to tell anyone what had happened.  (T.636-37, 640)

Just days later, on December 16, 2015, Melva left the MDC.  (T.727; GX202) Shortly thereafter, on December 21, 2015, Kiara also left the MDC.  (T.728, GX203)  In the week before she left the MDC (which was also the week immediately following the December 13, 2015 incident), Kiara noticed a change in Maria.  (T.640)  Kiara testified that Maria was not socializing and "she didn't want to go to work[;] [s]he was always in bed." (T.640)

### 3.    Other Incidents and Maria's Efforts to Stop the Defendant

Following the December 13, 2015 incident, the defendant continued to call Maria to clean the Lieutenants' Office and continued to rape her by penetrating her vagina with his penis while in the Lieutenants' Office multiple times; though Maria could not recall the exact number of times, she recalled it occurred "at least" ten times.  (T.138-39, 161-62) Each time, the defendant used the computer on the Lieutenants' desk to monitor the video feeds from security cameras to ensure no one was coming.  (T.163)[8]   After the first incident,

---

[8] As Officer Nicole Pappadio testified, the defendant did the same while engaging in consensual sexual activity with her while on duty in the Lieutenants' Office in November 2015.  (T.697-703)  The defendant suggested to Pappadio that they have sex in the Lieutenants' Office "[b]ecause of the camera system that he had access to" through the computer monitor on the desk in the Lieutenants' Office.  (T.698)  Indeed, on November 18, 2015 at 7:22 am, while both he and Pappadio were on duty, the defendant sent an email to Pappadio stating "I was going to have you come this morning here, but the video system on the computer system is down."  (T.699-700, GX216)  Pappadio understood that "the video cameras weren't working in that area and he would not be able to watch the videos" so he was not going to have her come meet him.  (T.699-700)  Special Agent Laura Riley testified that she accessed the camera system from the same computer in the Lieutenants' Office as part of her investigation.  (T.850)  She was able to view a 16-grid screen, which showed a multi-view of areas located on the second floor of the East Building, with the ability to also choose to show just one camera on the screen.  (T.850-53, GX103(f); GX103(g); GX103(h))

Maria asked the defendant for the morning-after pill again, but he did not bring it to her. (T.139)  Prior to Danilda's departure from the MDC on March 18, 2016, Danilda saw Maria after these incidents.  (T.567)  Maria appeared "tired of going downstairs" and was upset that she had to go to the second floor for the defendant.  (T.567)

(a)    The Incident Where Officer Smith Was the Escort Officer[9]<br>(Counts 9 – 12)

During the period between July 2015 and December 2016, Officer D'Anello Smith was periodically assigned as the East Internal Officer, working the Day Watch 4 shift from 8 am to 4 pm and reporting to the East Activities Lieutenant.  (T.664-65)  The defendant was among the East Activities Lieutenants Officer Smith worked for in that time period. (T.665)  Officer Smith's duties as East Internal Officer included transporting inmates within and outside the MDC and generally assisting the East Activities Lieutenant as necessary.  (T.657-58, 664, 749, 789-90)  In this role and during this time period, Officer Smith escorted female inmates to clean the second floor of the East Building, including the Lieutenants' Office area.  (T.667)  Officer Smith particularly recalled escorting two female inmates to the second floor to clean during this time period, "[o]ne was an older Hispanic lady and the other was a younger Hispanic lady."  (T.668)  Maria was the younger inmate who Officer Smith escorted to clean the second floor.  (T.139-40, 668, GX3)  Officer

---

The defendant was also able to access cameras from other floors of the MDC using this camera system, including in Unit 6 South.  (T.852)

[9] Maria testified this incident occurred after the first rape on December 13, 2015 and before the Facebook call described below.  The evidence showed this incident took place on one of three possible days when Officer D'Anello Smith was assigned as East Internal Officer and the defendant was assigned as East Activities Lieutenant during the same shift: January 16, 2016, January 30, 2016, or February 6, 2016.  (GX207, GX225)

Smith's practice was to supervise the inmates as they cleaned the second floor unless he had an immediate assignment. (T.668) If he had another assignment to do, Officer Smith would leave the inmates in the custody of whoever was present at the time – either another officer or the lieutenant. (T.668-69)

Officer Smith escorted Maria to the second floor to clean for various lieutenants approximately ten times. (T.669-70) Officer Smith observed that she "wasn't talkative. She came down. She did what she was ordered to do. She did her assignment. And there wasn't much talking, much of anything. She just came down and did what she was, you know, assigned to do." (T.670) She did not cause any problems. (T.670)

Officer Smith escorted Maria to the second floor for the defendant approximately three times. (T.140, 670)[10] Maria recalled that Officer Smith was the one escort officer who generally stayed on the second floor with her while she was cleaning, except for one time when he left Maria alone with the defendant in the Lieutenants' Office area. (T.140) It was either a Friday, Saturday or Sunday. (T.140-41) On that particular day, Officer Smith escorted Maria from Unit 6 South to the Lieutenants' Office. (T.141) When they arrived, the defendant was inside the Lieutenants' Office. (T.141) Maria began cleaning – taking out the trash and sweeping the area in front of the bathrooms. (T.141, GX102A-B) She then began cleaning the bathrooms. (T.142) While cleaning the bathrooms, Maria heard the defendant ask Officer Smith to do him a favor, to which Officer Smith responded, "sure, . . . of course." (T.142) Maria next saw Officer Smith leave, exiting

_____

[10] MDC records confirmed that there were three occasions between December 13, 2015 and February 7, 2016 when the defendant worked as East Activities Lieutenant and Officer Smith worked as East Internal Officer during the same shift: January 16, 2016, January 30, 2016 and February 6, 2016. (T.859-61; GX207, GX225)

the door out of the Lieutenants' Office area.  (T.142-43, GX102B)  The defendant was

Officer Smith's superior and, as the East Internal Officer, it was Officer Smith's

responsibility to do any tasks assigned to him by the defendant as East Activities Lieutenant.

(T.671-72)

   After Officer Smith left, the defendant then called Maria by her first name

from the Office.  (T.143)  Maria did not respond or go to the Lieutenants' Office.  (T.143)

The defendant then came to the door of the bathroom that Maria was cleaning and said,

"walk, I don't have a lot of time."  (T.143-44)  The defendant told Maria that he had sent

Officer Smith to the West Building and that it would take Officer Smith 20 minutes to go

there and come back.  (T.144)  The East and West Buildings of the MDC are connected

through "a link or a tunnel" that allows an individual to go from one building to the other

without going outside.  (T.661, 717, 790-91) There are approximately six locked metal doors

operated by the control room that one must cross to get from one building to the other.

(T.672, 717)  Each door must be unlocked by the control room to grant access to the

individual who wishes to pass through once they are recognized as authorized through a

camera system. (T.672-73, 717)  Sometimes it takes time for the control room to unlock the

doors, depending on what else is happening.  (T.673)  It can take 20 minutes to walk from

one building to the other and back.  (T.717)

   The defendant was angry because Maria had not come when he called her

name.  (T.145)  He then turned around and Maria followed him towards the Lieutenants'

Office.  (T.144-45)  She had a mop in her hands at the time and, as she followed the

defendant, she raised the mop as if she were going to hit the defendant while his back was

towards her, but did not actually hit him.  (T.145-46)  She knew she "would have gotten a lot of time" for hitting a lieutenant.  (T.146)

Once the two of them were in the Lieutenants' Office, the defendant grabbed Maria and groped her in front of the Lieutenants' desk, putting his hand in her vagina. (T.146-47, GX103C).  The defendant turned the computer monitor on the desk toward him; it displayed multiple video feeds from various cameras on the second floor.  (T.147-48)  The defendant then moved Maria to the right side of the Lieutenants' desk where he had a better view of the computer monitor since he was unable to turn it all the way.  (T.148)  The defendant then pushed Maria's body so that her chest was on the desk, groped her, pulled down her pants and penetrated her vagina with his penis from behind.  (T.148)  Maria felt "powerless, miserable.  [She] would rather have been killed."  (T.149)

After the defendant finished, Maria went to the bathroom to try to get his semen out of her and to wash herself off.  (T.159-60)  While she was in the bathroom, Officer Smith returned to the Lieutenants' Office area.  (T.160)  Thereafter, Officer Smith escorted Maria back to Unit 6 South.  (T.160).  Maria did not tell Officer Smith what happened because he was an officer under the defendant's command and she just wanted her time to end and "to get out of that hell hole."  (T.160-61)

(b)     The January 2016 Incident (Counts 13 – 16)

On one occasion in January 2016, an officer escorted Maria and Odis De La Cruz to the second floor to clean.  (T.165-66; GX8)  The officer took Maria and Odis to the entrance to the Lieutenants' Office, where the defendant was, and then left.  (T.166)  Maria left Odis at the doorway to take the trash out of two trash cans in the hallway outside the Lieutenants' Office area.  (T.166-67, GX101D)  Maria then checked if the door to the dental

16

office was open so she could clean it, but it was locked.  (T.168)  Maria then returned to the

Lieutenants' Office.  (T.168)  Odis was still there, speaking with the defendant.  (T.168-69)

Maria did not want to be in the Lieutenants' Office because she knew the defendant would

rape her again, so she asked the defendant if he could go to control to get the keys to the

dental clinic so she could clean it.  (T.169)  The defendant refused.  (T.169)  Maria then went

to a small room in the hallway outside the Lieutenants' Office area to get a mop and a bucket

of water before returning to the Lieutenants' Office area.  (T.170-71, GX101D)  Odis

indicated she was going to clean the area by the Legal Department, which was located at the

other end of the hallway, and that Maria should clean "here."  (T.171-72)  Odis then left the

Lieutenants' Office area and Maria began cleaning.  (T.172)

       Maria entered the Lieutenant's Office and the defendant was inside.  (T.173)

Maria began walking to the area where Lt. Metzger had stored cleaning liquids under the side

desk with the printer on it, next to the Lieutenants' desk.  (T.173-74, GX103C)  The

defendant was seated at the desk.  (T.174)  As Maria walked towards the cleaning supplies,

behind the Lieutenants' desk, the defendant turned in his chair and stuck his arm out to block

Maria's way.  (T.174-75, GX103C)  Maria pushed the defendant's arm down, but he put it

back up and then pulled Maria towards him, at which point Maria hit his head with her hand.

(T.175-76)  Maria hit the defendant because she "didn't want him to grab [her].  [She] didn't

want him to rape [her] again.  [She] was so tired of the same thing happening over and over

and over again."  (T.176)

       After Maria hit him, the defendant stood up – angry – and said, in substance,

"you know how much time you could get for hitting a lieutenant, don't you."  (T.176)  He

then grabbed Maria, turned her around, put her chest against the desk, and twisted her arm

behind her back, raising it up.  (T.177-78)  Maria said it hurt and he then let go of her arm.

(T.177)  The defendant then touched her vagina, "pressing in hard with his fingers."  (T.178)

He then lowered Maria's pants and penetrated her vagina with his penis from behind.

(T.178)  While the defendant was penetrating Maria, he said "wait a minute" and did

something on the computer to that the monitor only showed the video feed from one camera,

which depicted the area where Odis was cleaning.  (T.179)

　　　　　During this encounter, Maria was scared and felt "horrible."  (T.178-79)  As

she explained:  "At that point I was so, so tired.  There was nothing for me to do at that

point."  (T.178)  After the defendant finished, Maria went to the bathroom and again tried to

get his semen out of her and washed herself.  (T.180)  When Maria exited the bathroom, she

saw that Odis had returned to the Lieutenants' Office area.  (T.180)  Odis noticed that Maria

had not finished cleaning, so the two then cleaned the area together.  (T.180)  Thereafter, an

officer came to escort Maria and Odis back to Unit 6 South.  (T.180)

> (c)　　Maria's Efforts to Stop the Defendant
>
> i.　　January 31, 2016 Visit by Noel Lopez

　　　　　In an effort to make the defendant stop sexually abusing her, Maria called her

friend Noel Lopez, asked him to come visit her, and told him to kiss her when he came for a

visit.  (T.181, 186, 304-05)  She did so because the defendant had commented to Maria that

she was alone and no one visited her at the MDC.  (T.181)  Maria wanted Noel to visit so

that the defendant "would see that [she] had one person at least."  (T.181)  On the phone,

Maria "sounded nervous, scared, afraid and she sounded like she needed to talk to someone."

(T.304)  Noel agreed to visit Maria at the MDC and filled out the necessary paperwork to get

approved to do so.  (T.182, 305)  Once approved, Noel visited Maria on January 31, 2016 at

approximately 11:56 am and visited with her for approximately three hours.  (T.306, 735-36; GX205)  Notably, the defendant worked as the East Activities Lieutenant on January 21, 2016 from 8 am to 4 pm.  (T.857, GX241)  During the visit, Maria was at first happy to see Noel, but then seemed "sad," "lonely," and "desperate."  (T.306, 311)  Maria again asked Noel to kiss her on the lips when he came to visit her, which Noel did, though he found it odd since Maria was just his friend, not his girlfriend.  (T.184, 186, 306)[11]  Maria was hoping that the defendant would stop raping her if he saw that.  (T.184)  But after Noel's visit, the defendant did not stop and things got worse.  (T.184)  The defendant told Maria, "if that's what you want, I'll kiss you" and began grabbing her and kissing her.  (T.185)

### ii.    The Facebook Call with Larihelys Vargas

The defendant told Maria he would be "different" when she got out of prison and told her she should get in touch with him when she was released, providing her with his email address Carlos.Rich.Martinez@gmail.com.  (T.185-87, 842-43 GX211)  Maria told the defendant "When I get out of here, I don't want to hear from anybody and certainly not you. You are the last one I want to hear from when I get out."  (T.188)

Maria knew inmate phone calls at the MDC were recorded and monitored. (T.189)  On February 7, 2016 at 1:44 pm, Maria called Larihelys Vargas, a friend she previously worked with cleaning hotels, and asked her to go on Facebook, unfriend Maria, and look the defendant up on Facebook.  (T.190, 289, 291-92, GX204)  Maria provided Larihelys with the name "CarlosRichMartinez" to do so.  (T.190, 291)  Maria did this,

---

[11] Notably, Noel testified that when he first met with the government he did not tell the truth about Maria asking him to kiss her when he visited because he was "married and [he] felt this was going to cause [him] an issue."  (T.307)

hoping the defendant would listen to the call, hear her conversation with Larihelys, and get

worried and stop sexually abusing her.  (T.190)  The defendant's Facebook account name is

"Carlos Rich Martinez."  (T.608-09; GX213)  Larihelys found the defendant's Facebook

page.  (T.190, 292)  Maria told Larihelys that the defendant was a "boss" or guard at the

MDC.  (T.190-91, 291)  Larihelys then described some of the photographs on the

defendant's Facebook page.  (T.191, 292-93)  Maria recalled that, during a conversation with

Larihelys, Larihelys asked Maria if the defendant "kissed" her.  (T.317)  Maria responded

"yes" and Larihelys asked "all the way?", using a Dominican slang term "chiqui, chiqui," to

which Maria responded "yes."  (T.317)  At 1:53 pm, Larihelys sent the defendant a friend

request and, later that day, corresponded with the defendant via Facebook messenger.

(T.292, 614-16, GX213, GX300)

       The TruPhone system records all inmate phone calls and keeps the calls for

180 days (six months), after which the calls are deleted or written over, unless a call is saved

for a specific purpose by an individual physically "lock[ing]" the call, a procedure that can

be done by SIS officers.  (T.729-30, 472-73)  The TruPhone system captures the number the

inmate dialed, the date and time the call was made, and the length of the call.  (T.473, 730-

31)  The system also captures which staff member, if any, monitored a particular call

(through the unique "TF" number the staff members used to log onto the system) and on

what date and time the monitoring took place, as well as the duration of the monitoring.

(T.474, 731-32)  Inmates are aware that their calls are monitored.  (T.473)

       On February 8, 2016, SIS Officer Tomas Rodriguez listened to recorded calls

made by Maria to Larihelys Vargas on [dates] using the TruPhone system.  (T.473-74, 478;

GX204).  The calls were in Spanish and Officer Rodriguez speaks Spanish.  (T.478)  At the

time, Officer Rodriguez's official title was that of "SIS Technician." (T.470-71, 482)  In that

capacity, Officer Rodriguez investigated prisoner infractions, monitored inmate prison calls

and electronic correspondence, and read inmate mail. (T.471)  At 9:37 am, Officer

Rodriguez listened to an "odd call" where Maria asked her friend "to do her a favor," namely

to "look up some information" about somebody "inside," i.e., in the prison, on Facebook and

spelled out the defendant's name, which caught Officer Rodriguez's attention. (T.478-80)

Officer Rodriguez recalled Maria asking her friend to "[f]ind out if he was married.  If he

was with somebody, a woman, a girlfriend.  Find out." (T.480)  Officer Rodriguez has

known the defendant since he first started working at the Bureau of Prisons in November

2001 and Officer Rodriguez respected and looked up to the defendant, who had a higher rank

than him. (T.471, 480-82)  Officer Rodriguez lived in the same staff housing complex as the

defendant and knew the defendant's wife. (T.482)  After listening to this call, on February 8,

2016 at 10:06:25 am, Officer Rodriguez called the defendant on his cell phone (718-490-

8719) using the phone at the SIS office with telephone number 718-840-5129, which appears

as 718-840-5000 on phones receiving his calls. (T.482-84, 843-47, GX212A, GX212B;

GX228, GX300)  The call was over nine minutes long. (T.846, GX212B)  Officer Rodriguez

told the defendant that he had been monitoring a call made by Maria and that she was trying

to get information about him on Facebook. (T.485)  The defendant responded, "are you

sure?", to which Officer Rodriguez responded "Yes.  If you don't believe me, listen to the

call." (T.485)  At 10:10 am, Officer Rodriguez then played the call for the defendant.

(T.485, GX204)  After listening to the call, the defendant stated, "oh, shit.  I'm not going to

bring these women down anymore.  I don't want problems." (T.485)  When he said, "oh

shit," the defendant sounded surprised and scared. (T.485)  At 10:21:02 a.m., Officer

Rodriguez called the defendant on his cell phone again.  (T.846; GX212B; GX300)  That call lasted 77 seconds.  (T.846; GX212B)

In interviews with the government, Officer Rodriguez initially hid information from the government.  (T.521)  Initially, he incorrectly stated that he had not told the defendant about this call or that Maria was the inmate who made the call.  (T.486-87)  He also initially did not tell the government that he had played the call for the defendant. (T.487)  Officer Rodriguez withheld this information from the government because he was concerned that he "would be called a rat and that [he] would have problems at work." (T.487, 521)

Sometime after playing the call for the defendant over the phone, possibly the same day, Officer Rodriguez spoke to his supervisor, Timothy Geier, about the call.  (T.487, 496)  More specifically, Officer Rodriguez told Mr. Geier that "there was an inmate who was trying to get information from [the defendant's] Facebook page."  (T.488)  Mr. Geier told Officer Rodriguez to talk to Maria, which he did, as set forth below.  (T.488)

On February 9, 2016, Maria saw the defendant in Unit 6 South sometime between midnight and 1 am.  (T.192, GX209)[12]  The defendant was working as East Activities Lieutenant on the Morning Watch shift from midnight to 8 am.  (T.857-58, GX241)  Danilda also saw the defendant in the unit at this time.  (T.568)  The defendant arrived and went straight into the unit office.  (T.194, 569)  Maria was in her bed when the

_____

[12] MDC records showed that the defendant logged that he conducted "PREA rounds" in Unit 6 South at 12:43 a.m. on February 9, 2016.

22

unit officer (Officer Raymond King) told her that the defendant wanted to speak with her.[13]
(T.192-93, GX10)  Maria got ready and then went to the unit office.  (T.194, GX104E)  Odis
De La Cruz also went to the unit office.  (T.194, 570).  Odis went into the unit office first and
spoke with the defendant while Maria and the officer remained outside the unit office.
(T.194, 570)  After a couple of minutes, Odis exited the unit office and Maria went in.
(T.194-95, 570)  The defendant was angry and said, "what did you do, idiot?  What did you
do, you damn idiot?  What are you doing?" and asked "why did you do that?", referring to
her call with Larihelys Vargas.  (T.195-96)  Maria responded, "I am so tired.  I am so tired.  I
just don't know what to do at this point."  (T.195)  The defendant then told Maria that she
was "in an investigation now" and that people were "going to come and investigate you
now."  (T.196)  The defendant told Maria she could "get more time" as a result of the
investigation.  (T.197)  At this point, Maria had about two to three months left on her
sentence.  (T.197-98)  She was scared and told the defendant she did not want any problems.
(T.197-98)  The defendant told Maria to lie to "jail detectives" who would come to speak to
her and tell them that she "saw [his] email on the computer screen" or "on some piece of
paper on the floor or something."  (T.196)  Maria felt "bad" after this conversation.  (T.198)
What she had "wanted was [for the defendant] to hear [the call] and stop.  [She] didn't want
to get [her]self in an investigation."  (T.198)  She "didn't want to get into trouble" and "sent
to the SHU," which she described as "a punishment room where you have a little bed.
There's no space for anything.  They give you your food as if you were a dog and get taken
out twice a week to wash."  (T.198, GX245(c), GX245(d))

---

[13] Officer Raymond King began his shift as the unit officer for Unit 6 South on
February 9, 2016 at midnight.  (T.858, GX208)

The following day, SIS Officer Tomas Rodriguez spoke with Maria on the sixth floor of the MDC's East Building.  (T.198-99, 488)  Officer Rodriguez asked the unit officer in Unit 6 South to send Maria to the counselor or case manager's office, which the unit officer did.  (T.200, 488)  When she first got there, SIS Officer Rodriguez was there with others, but he told them he would speak to Maria on his own since he spoke Spanish.  (T.200)  The others left the office and Officer Rodriguez closed the door, with just him and Maria in the office.  (T.201)  Officer Rodriguez told Maria he had listened to the call, referring to her call with Larihelys Vargas regarding the defendant's Facebook page.  (T.201, 488)  Maria "started to shake."  (T.488)  She got emotional and was crying.  (T.201-02, T.488)  Officer Rodriguez asked Maria if she liked the defendant, and she responded "no." (T.488)  Officer Rodriguez told Maria she could get in trouble for discussing a lieutenant on the phone and that she could be sent to the Special Housing Unit ("SHU").  (T.202, 329-30, 489)  Indeed, Officer Rodriguez told Maria that his supervisor wanted to put her in the SHU. (T.489-90)  Maria looked "really nervous.  She couldn't move.  She could hardly walk." (T.490)   Maria told Officer Rodriguez that she "[didn't] want trouble" and did not want to go to the SHU.  (T.202, 490)  Officer Rodriguez told Maria to "cut the shit" and that "[i]f she continued to act like this, trying to get information, then Mr. Geier would decide to put her in the SHU" and there would be an investigation.  (T.490-91, 502)  Maria recalled that Officer Rodriguez indicated he could prevent that from happening and that the matter would not go any further if Maria promised not to tell anyone; he also instructed Maria not to call Larihelys again.  (T.202-03)  Officer Rodriguez told Maria to go back to her unit.  (T.491) "She could hardly walk.  She was really nervous.  She was [shaking] at the door."  (T.491) Afterwards, Maria told Danilda about her meeting with Officer Rodriguez and the phone call

she made to Larihelys.  (T.571-72)  She appeared "scared and nervous" when doing so.
(T.571)

 After meeting with Maria, Officer Rodriguez went to the SIS office and spoke
with Mr. Geier.  (T.491)  Officer Rodriguez told Mr. Geier that Maria admitted making the
call, that there was nothing between the defendant and Maria, and that Maria "didn't want
any problems."  (T.492)  Officer Rodriguez did not tell Mr. Geier that he suspected that there
was something inappropriate going on between the defendant and Maria.  (T.501, 516-17)
The call was in Spanish and Mr. Geier did not speak Spanish.  (T.517)  Officer Rodriguez
also made no efforts to save the call, even though he knew how to do so.  (T.517)  Mr. Geier
told Officer Rodriguez to continue to monitor Maria's calls, which he did.  (T.492)
Thereafter, no other prison officials spoke to Maria about the Facebook call.  (T.203)  The
next day, Maria called Larihelys to tell her to "delete" the defendant from Larihelys's
Facebook and to let it go because she did not want any problems.  (T.293, 492)  Maria
sounded scared and nervous on this call.  (T.492)  After listening to this call, Officer
Rodriguez told Mr. Geier about it. (T.493)  No BOP investigation into the matter was
opened.  (T.493)

 One or two weeks later, Officer Rodriguez spoke with the defendant again
about Maria's call to Larihelys regarding the defendant's Facebook page, this time at the
MDC.  (T.493)  Officer Rodriguez asked the defendant whether anyone had tried to "friend"
him on Facebook.  (T.493)  The defendant said yes, but he did not know who.  (T.493)
Officer Rodriguez responded, "Carlito, report it."  (T.494)  Officer Rodriguez referred to the
defendant as "Carlito," which he explained, "as a Latino you use that when it's somebody
you esteem.  It's an affectionate term."  (T.494)

On the morning of Saturday, February 27, 2016, Maria and Danilda were asked to clean the fifth floor for Officer Nunez.  (T.205-06, 573, GX7)  The three went to the second floor to obtain cleaning supplies from the Lieutenants' Office area.  (T.205-06, 572-73)  When they arrived, the defendant was inside.  (T.206, 574)  Officer Nunez and Maria went inside the Lieutenants' Office, while Danilda waited outside.  (T.206, 574-75)  Maria went to the cabinet to obtain cleaning supplies.  (T.206)  The defendant asked Maria "why [she] had done that," referring to mentioning the defendant's name on the Facebook call.  (T.206)  Maria was nervous and embarrassed by the way the defendant was speaking to her in front of Officer Nunez.  (T.207)  Officer Nunez then left the office and waited outside with Danilda.  (T.207, 575)  The defendant asked Maria again why she made the Facebook call and Maria responded that she was "tired," referring to being tired "of him doing what he wanted to do with me every time."  (T.207-08)  Maria finished obtaining the cleaning supplies and then left the second floor with Officer Nunez and Danilda.  (T.207, 575-76)  Thereafter, Maria did not see the defendant for several weeks until April 2016, which made her feel "good."  (T.208-09, 572)  From March 9, 2016 to April 14, 2016, the defendant did not work as East Activities Lieutenant.  (T.863, GX242)

(d)     The April 2016 Incident (Counts 17 – 20)

Maria was scheduled to leave the MDC on April 29, 2016.  (T.209)  On April 16, 2016,[14] Maria saw the defendant in Unit 6 South and helped with the count.  (T.209, GX208)  The defendant did not speak with Maria at that time.  (T.209)  Later that day, Maria

---

[14] April 15 and 16, 2016 were the only two days in April 2016 that the defendant and Officer Nunez worked overlapping shifts at the MDC.  (T.863-64, GX242)  MDC records indicate that on April 16, 2016 at 10:25 am, the defendant was in Unit 6 South, consistent with Maria's testimony.  (GX208)

26

learned that she had been called to clean the second floor.  (T.210)  Maria initially thought

she would be cleaning with Odis, but learned from others that Odis expected to have a visit

that day so would not be cleaning.  (T.210-11)  An officer ultimately escorted Maria alone to

the Lieutenants' Office that day. (T.211)  The defendant was inside the Lieutenants' Office

when she arrived.  (T.211)  The escort officer then left.  (T.211)  Maria knocked on the door

to the Lieutenants' Office and then entered and went to the cabinet to obtain trash bags.

(T.211-12, GX103B)  Maria then went to the bathrooms to pick up the trash there, and then

changed the trash bags in the containers in the hallway outside the Lieutenants' Office area.

(T.212, GX101D)  While in the hallway, Maria saw Officer Nunez, who asked Maria who

she was on the second floor with.  (T.212-13)  Officer Nunez asked Maria which lieutenant

she was on the second floor with.  (T.213)  Maria responded that she was there with the

defendant.  (T.213)  Officer Nunez shook his head from left to right.  (T.213)  Maria

shrugged and Officer Nunez then went to the Lieutenants' Office as Maria continued to clean

up the trash in the hallway.  (T.213-14)   Maria then cleaned the bathroom's in the

Lieutenants' Office area.  (T.214, GX102(b))  While Maria was cleaning one of the

bathrooms, Officer Nunez exited the Lieutenants' Office, briefly engaged in conversation

with Maria, and then left the Lieutenants' Office area.  (T.214-15)  Thereafter, while Maria

continued cleaning, the defendant called out to her while he was in the Lieutenants' Office.

(T.215)  Maria asked the defendant to wait, but he proceeded to come towards the

Lieutenants' Office and Maria walked over to him.  (T.216)  The defendant grabbed Maria

by the arm and demanded to know why she had spoken to Officer Nunez in a "friendly" way.

(T.216)  Maria responded and then the defendant let go of her arm.  (T.216-17)

27

Inside the Lieutenants' Office, Maria proceeded to change the trash bag in a small trash can by the Lieutenants' desk.  (T.217-18)  While she was doing so, the defendant came over from the computer and grabbed Maria, started to kiss her, groped her, and tried to pull her pants down.  (T.218)  He then took Maria to a chair by the back wall of the office and put her "on all fours" and grabbed her shoulder, but was unable to do so "as tightly as he usually did" because he had an injury to his hand and had some type of cast on one of his fingers.[15]  (T.218-19)  The defendant then penetrated Maria's vagina with his penis from behind.  (T.219)  While this was happening, Maria felt "bad" but "thought to [her]self, at least this is the last time" because she was leaving the MDC shortly.  (T.220)  When the defendant finished, this time, the defendant ejaculated on Maria's back and then wiped his semen off her back with a paper towel, stating, in substance, "[s]ince you're going to immigration [custody], it could be that they give you a checkup."  (T.219-20)  Thereafter, an officer escorted Maria back to Unit 6 South.  (T.220)  There, Maria saw Odis De La Cruz in the unit and learned that she did not end up having a visit that day.  (T.220-21)

4.    Maria's Release From the MDC

Upon her release from the MDC on April 29, 2016, Maria was transferred to immigration custody.  (T.223-24)  Danilda Lora Osoria and Melva Vasquez were also in immigration custody and housed in the same facility.  (T.228, 577)  Maria showed them a mark or bruise on her arm that the defendant gave her.  (T.228, 577)  Melva recalled that

---

[15] Notably, the defendant submitted a document to the MDC reporting that he had sustained an injury to his hand outside of the MDC on April 7, 2016 and that he had gone to the hospital to have it treated.  (T.865, 869)

Maria told her that she "had been with [the defendant] again" after Melva left the MDC. (T.454)

In December 2016, federal agents met with Maria while she was in immigration custody at an Immigration and Customs Enforcement ("ICE") office on Varick Street in Manhattan.  (T.838-39)  Prior to the meeting, Maria did not know that federal agents were going to meet with her or why and she had never reached out to federal agents seeking to speak to them.  (T.229, 839)  She met with the agents without a lawyer present. (T.839)  Maria "looked confused to come out and to see, see all these people there to see her. She looked very nervous and she was scared."  (T.839)  The agents explained to her why they were there and said they were interested in knowing about her time at the MDC, however Maria did not tell the agents about the defendant sexually abusing her at the MDC because she "didn't want problems."  (T.229, 839)  As Maria explained, "You know, when the FBI comes looking for you, I thought they were going to send me back to jail and to be honest, I didn't trust them.  I didn't tell them anything.  I didn't want any trouble."  (T.229-30)  The meeting was short, as Maria was reluctant to speak with the agents.  (T.839-40) Nonetheless, Maria agreed to meet with the agents again with a lawyer present.  (T.230) Maria met with the agents again in January 2017, this time with her immigration lawyer present.  (T.230, 840)  At that second meeting, Maria told federal agents about the defendant sexually abusing her at the MDC.  (T.230)[16]  After this meeting, the government's investigation of the defendant began.  (T.840)

---

[16] Notably, this was well after Maria's unrelated immigration petitions had been filed by her immigration attorney.  (T.230)

B.    The Jury Charge and Verdict

In its jury charge, the Court instructed the jury on the elements of each type of crime charged in the Indictment.  With respect to the deprivation of civil rights charges, the Court instructed the jury that the government had to prove beyond a reasonable doubt:

> First, that on or about the date specified in the count you are considering, the defendant acted under color of law.  Second, that in so doing the defendant deprived, or caused to be deprived, Maria of her right to be free from cruel and unusual punishment, which right is secured by the Constitution of the United States.  Third, that the defendant acted willfully.  And fourth, that the defendant's conduct resulted in aggravated sexual abuse of Maria.

(T.1085)  With respect to the aggravated sexual abuse charges, the Court instructed the jury that the government had to prove the following elements beyond a reasonable doubt:

> [F]irst, that the defendant cause the victim to engage in a sexual act, as I will define that term for you.  Second, the defendant acted knowingly in causing the victim to engage in that sexual act.  Third, the defendant did so by using force against the victim.  And fourth, that the offense was committed in a federal prison.

(T.1089-90)  With respect to the sexual abuse charges, the Court instructed the jury that the government had to prove the following elements beyond a reasonable doubt:

> First, that the defendant caused the victim to engage in a sexual act, as I will define that term for you.  Second, that the defendant acted knowingly by causing the victim to engage in that sexual act.  And third, that the defendant did so by threatening the victim or placing the victim in fear.  And fourth, that the offense was committed in a federal prison.

(T.1092)  Finally, with respect to the sexual abuse of a ward charges, the Court instructed the jury that the government had to prove the following elements beyond a reasonable doubt:

> First, that the defendant caused the victim to engage in a sexual act, as I will define that term for you, even if the victim

30

> consented to the act.  Second, that the defendant acted
> knowingly in causing the victim to engage in that sexual act.
> Third, that at the time alleged in the indictment, the victim was
> in official detention at the Metropolitan Detention Center in
> Brooklyn, New York.  And fourth, that the victim was under the
> custodial, supervisory, or disciplinary authority of the
> defendant.

(T.1095)  In his declaration, defense counsel wrongly asserts that "[f]ifteen of the

indictment's twenty counts contained an essential element that required the jury to make a

specific finding, beyond a reasonable doubt, that [the defendant] used *physical force* to

commit various acts of aggravated sexual abuse."  Defense Decl. at 4 (emphasis in original).

As set forth above, however, only ten of the 20 counts required a finding that the defendant

caused Maria to engage in a sexual act using force, namely Counts One, Two, Five, Six,

Nine, Ten, Thirteen, Fourteen, Seventeen, and Eighteen.

On January 19, 2018, the jury reached its verdict and found the defendant

guilty of all 20 counts in the Indictment.  (T.1163-68)  With respect to the sexual abuse

counts, the jury found that the defendant caused Maria to engage in the charged sexual acts

by placing her in fear.  (T.1165-66)

III.   The Defense's Post-Trial Request

By letter dated August 22, 2018, defense counsel requested that the

government inform the defense whether it disclosed any interviews between the government

and an inmate referred to in the defendant's motion for a new trial as "Jane Doe #4"[17]

---

[17] Jane Doe #4 was a victim in a separate trial against defendant Eugenio Perez, who
recently convicted of sexual abusing five different women at the MDC, some of them
multiple times.  See United States v. Eugenio Perez, 17-CR-280 (S-2) (KAM).  As a
testifying victim in the Perez trial, Jane Doe #4's name was not publicly disclosed and she
testified under this pseudonym.

"concerning the events of the April 2016 sexual encounter which is alleged in counts 17 through 20 of the indictment and/or the nature of Maria's relationship with Carlos Martinez." The government received this letter by electronic mail while the undersigned Assistant United States Attorney was overseas. By letter dated September 5, 2018, the government responded to the defense request, stating that in connection with the receipt of the August 22, 2018 letter, "the government believes that it inadvertently did not provide you with the attached Memorandum of Interview of [Jane Doe #4] prior to trial in the above-captioned matter" and provided defense counsel a copy of the report dated April 28, 2017[18] (hereinafter, the "Report"). With respect to the defense request, the Report states:

> [Maria] told [Jane Doe #4] that something was going on between her and Lieutenant Martinez. A few days before [Maria] left the MDC, she was called to clean the hospital area. Inmate Odis Delacruz asked [Maria] if she wanted her to go with her to clean. [Maria] said no. [Jane Doe #4] asked [Maria] if she wanted her to go with her to clean and [Maria] said no and that she will go alone. [Maria] went to clean and returned approximately two hours later. A few days after this happened, [Jane Doe #4] asked [Maria] why she did not want Delacruz or her to come along to clean. [Maria] told her that it was because she was leaving and was having relations with that man. This was the first time [Maria] told [Jane Doe #4] about this. [Maria] told [Jane Doe #4] that the Chinese lady (BOP medical staff member) asked [Maria] to have a Pap smear test. [Maria] did not agree to take the test because she was having relations with Martinez. [Maria] did not tell [Jane Doe #4] how the relations between her and Martinez started.

---

[18] The date of the Report reflects the date the Report was initially drafted, not the date it was approved by a DOJ-OIG supervisor and ultimately finalized.

ARGUMENT

I.     Legal Standards

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate

any judgment and grant a new trial if the interest of justice so requires."  The Second Circuit

has repeatedly identified the standard of decision for a Rule 33(a) motion as extremely

stringent and requires denial of the motion unless it would be a "manifest injustice" to let the

verdict stand — that is, that absent a new trial there would be a real concern that an "innocent

person" was convicted.  For example, in United States v. Guang, 511 F.3d 110 (2d Cir.

2007), the Second Circuit reiterated this basic rule of decision for Rule 33(a) motions:

> The test is whether "it would be a manifest injustice to let the
> guilty verdict stand."  United States v. Sanchez, 969 F.2d 1409,
> 1414 (2d Cir. 1992) (quoting United States v. Reed, 875 F.2d
> 107, 114 (7th Cir. 1989)).  For a trial judge to grant a Rule 33
> motion, he must harbor "a real concern that an innocent person
> may have been convicted."  United States v. Parkes, 497 F.3d
> 220, 232 (2d Cir. 2007) (quoting United States v. Ferguson, 246
> F.3d 129, 134 (2d Cir. 2001)).

Guang, 511 F.3d at 119; see also United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005)

("The 'ultimate test' [for a Rule 33 motion to vacate] is 'whether letting a guilty verdict stand

would be a manifest injustice.'" (quoting Ferguson, 246 F.3d at 133)).  In other words,

"[t]here must be a real concern that an innocent person may have been convicted."  United

States v. Snype, 441 F.3d 119, 140 (2d Cir. 2006) (internal quotation marks omitted).

Indeed, the court "must exercise [its] Rule 33 authority sparingly and in the most

extraordinary circumstances."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)

(internal quotation marks omitted).

To establish a <u>Brady</u>/<u>Giglio</u> violation, the defendant must show that (1) the undisclosed evidence was favorable to the defense either because it was exculpatory or impeaching; (2) the prosecution either willfully or inadvertently suppressed the evidence; and (3) as a result, he suffered prejudice. <u>See</u> <u>United States v. Jackson</u>, 345 F.3d 59, 71 (2d Cir. 2003) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)). Evidence is favorable to the defendant if it either "tends to show that the [defendant] is not guilty or impeaches a government witness." <u>Id.</u> To establish prejudice, the defendant must show the evidence is material, meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Madori</u>, 419 F.3d 159, 169 (2d Cir. 2005) (quoting <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 57 (1987)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> (citations and internal quotation marks omitted); <u>see</u> <u>also</u> <u>United States v. Agurs</u>, 427 U.S. 97, 112 (1976) (if the omitted evidence creates reasonable doubt that did not otherwise exist, constitutional error has been committed; thus, the omission must be evaluated in the context of the entire record). "This is not a test for sufficiency of the evidence; the defendant must show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Jackson</u>, 345 F.3d at 73-74 (internal quotation marks omitted). The Supreme Court has ruled that "[t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt" and has rejected as "unacceptable" the argument that the standard of materiality "should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." <u>Agurs</u>, 427 U.S. at 112 & n.20.

34

"[W]here ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." United States v. Orena, 145 F.3d 551, 559 (2d Cir. 1998). See, e.g., Tankleff v. Senkowski, 135 F.3d 235, 250-51 (2d Cir. 1998) (additional impeachment evidence not material where witness's "credibility was already thoroughly undermined on cross-examination"); United States v. Wang, 78 F.3d 73, 80 (2d Cir. 1996) (undisclosed evidence not material where defense already had sufficient evidence of witness's "mendacity, interest and bias"); United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (where government witness admitted numerous crimes, including murders, "[t]he addition of a few more allegations would not have materially affected the defense's cross-examination of him."); United States v. Gilbert, 668 F.2d 94, 96 (2d Cir. 1981) (additional impeachment evidence "could hardly have transformed the jury's image of [the witness] from paragon to knave").

A district court's denial of a Rule 33 motion is reviewed for abuse of discretion. United States v. Stewart, 433 F.3d 273, 295 (2d Cir. 2006).

## II.   Analysis

As set forth above, the government inadvertently did not disclose the Report to the defendant prior to trial.[19]  As a result, the second component of the test to determine whether or not a Brady/Giglio violation occurred is not at issue.  The issues that remain are (1) whether the undisclosed information was favorable to the defendant, either because it was

---

[19] To the extent the defendant argues that the government's failure to disclose the Report prior to trial was intentional, rather than inadvertent, he is mistaken.  In any event, the governing law makes clear that the distinction is not relevant to the analysis of whether a Brady/Giglio violation occurred.  See, e.g., United States v. Agurs, 427 U.S. 97, 110 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.").

exculpatory or impeaching; and (2) even if favorable, whether the evidence was material for Brady purposes.

### A.   The Report Does Not Provide Material Exculpatory Information

The defendant's assertion that the Report is exculpatory because it provides an account "contrary to [Maria's] testimony that she was forcibly raped" in April 2016 (Defense Decl. at 2) is inaccurate.  As set forth above, the Report is consistent with Maria's testimony that (1) the defendant sought Maria specifically to clean on the date of the April 2016 incident; (2) no other inmate went to the second floor with Maria that day, (3) the defendant's April 2016 interaction with Maria was sexual in nature; and (4) the defendant had previously engaged in sexual intercourse with Maria.  The Report is silent regarding whether force or fear were used in the April 2016 sexual encounter or any previous such encounter.   Indeed, the Report indicates that Jane Doe #4 was not present in the Lieutenants' Office when the April 2016 incident took place.  Nor was she present for any of the previous incidents and the Report discloses that she had no information about "how the relations between [Maria] and [the defendant] started."  As a result, contrary to the defendant's claims, the Report does not provide information that exculpates the defendant; it inculpates him.

Jane Doe #4's account in the Report that Maria indicated days after the April 2016 incident, in response to questioning from Jane Doe #4, that she wanted to go to the second floor alone "because she was leaving and was having relations with" the defendant does not alter this conclusion.  The defendant's assertion that the Report shows Maria went to the second floor that day "for the purpose of a wanted sexual encounter," Defense Decl. at 13, overstates and mischaracterizes the information in the Report.  First, the Report – consistent with the trial record – does not indicate that Maria had an independent desire to go

36

to the second floor that day.  The Report states that Maria "was called to clean the hospital area."  As confirmed by multiple witnesses who testified at trial, as an inmate assigned to cleaning duties, Maria was required to report for work on the second floor when a Lieutenant called for her.  It was not a choice or a desire on her part; it was a requirement.  A decision by Maria to go to the second floor alone, knowing she had been called by the defendant and was required to go, "because she was leaving and having relations with" him is not the same as, and does not establish or suggest that, Maria "purposefully orchestrated [the encounter] for the purpose of a wanted sexual encounter,[20] and not for the purpose of forcible rape."[21] Defense Decl. at 13.  As the Court's jury charge made clear, to prove aggravated sexual abuse, the government "[was not] required to show that [Maria] resisted" to establish that the defendant caused the sexual acts by using force against her.  (T.963)

Even assuming, arguendo, that the Report did tend to exculpate the defendant (which it does not), it is not material for Brady purposes when  assessed in the context of the entire trial record, as the Supreme Court requires.  See United States v. Agurs, 427 U.S. 97, 112 (1976) (holding that the omitted evidence . . . must be evaluated in the context of the

---

[20] As reflected in the Court's jury charge set forth above, while it may be relevant to the extent it negates the required causation for certain of the charged crimes, lack of consent is not an element of any of the crimes charged in the Indictment.

[21] Moreover, even if one assumes for argument's sake that the defense is correct in this regard, the material would only be exculpatory as to the April 2016 incident, not any of the prior incidents, and only with respect to the civil rights, aggravated sexual abuse, and sexual abuse charges related to that incident (Counts 17, 18 and 19).  Although in parts of his declaration and memorandum the defendant appears to claim otherwise, it is clear that this argument would have no bearing on the defendant's sexual abuse of a ward conviction related to the April 2016 incident (or otherwise), as that crime does not have the use of force or fear as an element, and simply requires that the defendant engaged in a sexual act with Maria while she was in his custodial, supervisory, or disciplinary authority.

entire record"). Maria provided credible, compelling testimony about how the defendant's

conduct escalated from being friendly, to unwanted sexual comments, to using force and fear

to cause her to engage in oral and then vaginal sex with him on December 13, 2015 and at

least nine times thereafter. Her testimony was extensively corroborated by other witnesses

and documentary evidence. While no one else was in the Lieutenants' Office when the

defendant sexually abused Maria, her testimony was not the only evidence linking him to the

charged crimes. For example, the circumstances of the first incident were corroborated by

other evidence, including the inmates who saw the state Maria was in afterwards, the fact

that she was bleeding, and the records and testimony showing that the defendant purchased

the Plan B pill and delivered it to her after midnight.

As the trial evidence showed, her reaction to the first rape was the most

outwardly severe and noticeable, which is unsurprising, given the continuous and inevitable

nature of the sexual abuse that ensued. Maria testified that the defendant raped her at least

ten times while she was an inmate at the MDC, including on occasions when she was

accompanied by Odis De La Cruz to the second floor to clean. (See, e.g., T.166) Having

another inmate accompany Maria to the second floor did not in any way dissuade, impede, or

prevent the defendant's sexual abuse of Maria, given, among other things, (1) his facile

ability to get Maria inside the Lieutenants' Office alone, while the other inmate was cleaning

another area on the second floor (in Odis's case, the area on the other end of the hallway by

the Legal Department), and (2) his effective use of the computer's camera system to monitor

the area while abusing Maria. Even Officer Smith's presence in the Lieutenants' Office was

no impediment, as the defendant simply sent him on an errand to the West Building to ensure

he was not present during the ensuing 20 minutes, which the defendant used to sexually

abuse Maria on one occasion.  In this way, the evidence presented at trial did not show (and the government never argued) that the April 2016 incident resulted "from happenstance or bad luck," Defense Decl. at 13, it was instead the result of the knowing and intentional actions of the defendant.

Moreover, in assessing the Report in the context of the entire trial record, it is important to remember that the April 2016 incident took place months after the defendant had learned of the February 2016 Facebook call, had it played for him by Officer Rodriguez, and consulted with Officer Rodriguez about it at least twice (facts about which Maria testified, which were again extensively corroborated by other witnesses, Facebook records, telephone records, and MDC records).  At this point, the defendant knew that no further investigation related to the Facebook call had occurred and that Maria's transfer from the MDC to immigration custody was imminent.  Similarly, when summoned to clean by the defendant in April 2016, Maria knew that this was likely to be the last time she was raped by the defendant, given her imminent departure from the MDC.  By this point, Maria knew from experience that if the defendant called her to the second floor, he was going to rape her and that the presence of another inmate on the floor would not prevent or dissuade the defendant in any way.  Based on what the defendant had told her, Maria also believed that she could end up in the SHU and get more prison time if the sexual abuse became known, a belief that was confirmed by Maria's meeting with SIS Officer Rodriguez.  Viewed in the proper context of the entire record, there would be nothing "astonishing," Defense Decl. at 13, about Maria not wanting another inmate to come down to the second floor with her – an inevitably futile step that would not have prevented the sexual abuse, but would have increased the risk of shame and embarrassment if someone saw her in that position, or worse, jeopardized her

imminent release date.  As Maria repeatedly testified, she was "tired" and just wanted "to get out of that hell hole." (T.161, 176, 178, 195, 207).[22]  The most important thing to her was "[t]o get out of there."  (T.58)  Indeed, the Report corroborates this sentiment, rather than undermines it.  According to the Report, Maria told Jane Doe #4 that she went alone to clean "because she was leaving and was having relations with that man." (emphasis added).

As a result, when viewed in the full context of the trial record, the Report cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles v. Whitley, 514 U.S. 419, 435 (1995).

B.      The Report Does Not Provide Material Impeachment Information

While the Report discloses information that is inconsistent with Maria's testimony, which thus constitutes impeachment information, it is limited and discrete in nature.  As set forth above, Jane Doe #4's account in the Report is inconsistent with Maria's testimony regarding why she went to the second floor alone in April 2016.  In context, this inconsistency does not constitute material impeachment information.

Defense counsel engaged in an extensive and vigorous cross-examination of Maria that lasting several hours over two days.  That cross-examination covered a wide variety of subjects, including (1) the details underlying Maria's federal conviction for drug conspiracy; (2) her post-arrest statements to law enforcement agents following her federal arrest, which included statements that were false; (3) her statements during a safety-valve

_____

[22] Indeed, her resignation to the defendant's inevitable actions is evident from Maria's own description of her interaction with Officer Nunez on the second floor the day of the April 2016 incident, shortly before the defendant raped her.  Maria testified that when she told Officer Nunez, in response to his question, that she was on the second floor with the defendant, Officer Nunez shook his head from left to right (T.213).  Maria testified that she shrugged and continued cleaning.  (T.213-14)

proffer with a federal agent and prosecutor in her criminal case, which included statements

that were false; (4) her guilty plea in her criminal case; (5) her interview with probation; (6)

statements made by her lawyer at her sentencing proceeding, which she did not correct; (6)

the state of her relationship with her husband; (7) how she paid for her criminal lawyer; (8)

her Facebook call with Larihelys Vargas and her motivations for having Larihelys look the

defendant up on Facebook; (9) her awareness of how to make a complaint at a federal prison

and her failure to report the sexual abuse to prison officials; (10) prior statements she made

to federal agents investigating the instant case; (11) statements made in her immigration

petitions; and (12) her attorney's filing of a Notice of Claim form to preserve Maria's right to

sue the federal Bureau of Prisons and the $20 million amount set forth on the Claim.  (T.243-

46, 250-76, 314-33; 365-77, 386-405, 429-34).  During his cross-examination, defense

counsel further suggested that the only reason Maria asked Larihelys Vargas to look the

defendant up on Facebook was because of "jealousy," characterized the morning-after pill

that the defendant gave to Maria as "a gift," and suggested that she kissed Noel Lopez to

make the defendant jealous.  (T.376, 390-91, 394)

   In his summation, defense counsel argued that Maria was "an inherently

unreliable opportunist who manipulates her friends. . . . She manipulates BOP people, staff,

prosecutors, a federal judge, and even her own lawyer to do what she wants to do to get what

she wants."  (T.1013)  He argued that the jury could not rely on any of Maria's testimony,

which consisted of "manipulation, guile, and lies".  (T.1014-15)  He also argued that the

testimony of Kiara, Melva, and Danilda could not be relied upon because they had been

convicted of drug offenses.  (T.1019-20)  He argued that Maria pursued the defendant

(T.1028) and asked Noel Lopez to kiss her to make the defendant "jealous."  (T.1031)

Indeed, defense counsel's summation makes clear that it is simply preposterous to suggest that Maria's testimony regarding the April 2016 incident went "unchallenged" at trial or that the undisclosed Report prevented the defendant from "argu[ing] that these sexual encounters engaged in by 'Maria' were not the result of physical force." Defense Memo at 12, 13. The entire tenor of defense counsel's cross-examination and impeachment of Maria, his cross-examination of other witnesses, and his summation, was a forceful argument that Maria could not be believed in any respect and that the entirety of her testimony regarding the defendant, including her testimony regarding the use of force and fear, from the first incident to the last – and everything in between – was false. Notwithstanding this direct, forceful, and sustained challenge to Maria's credibility, the jury found her testimony credible in light of the entire trial record.

Given the breadth and quality of the impeachment information defense counsel had available for use in his extensive and rigorous cross-examination of Maria, the undisclosed information in the Report is not sufficient "to undermine confidence in the outcome" of the trial. United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005); see also United States v. Agurs, 427 U.S. 97, 109-110 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.") (emphasis added); Giglio v. United States, 405 U.S. 150, 154 (1972) (undisclosed impeachment evidence is not material in the Brady sense when, although "possibly useful to the defense," it is "not likely to have changed the verdict") (internal quotation marks omitted). The impeachment value of the information in the Report is minimal and cumulative of equally impeaching evidence

introduced at trial.[23]  As set forth above, defense counsel impeached Maria with inconsistent

statements she purportedly made to other witnesses relevant to the charged crimes and,

further, extensively cross-examined Maria on false statements she admitted making in the

past in connection with her criminal case.  In these circumstances, information from the

Report would not have materially increased the jury's likelihood of discrediting Maria.[24]

---

[23] The defendant's citation to United States v. O'Conner, 64 F.3d 355, 359 (8th Cir. 1995), Defense Memo at 11, does not alter this conclusion.  There, the government failed to disclose that one of its cooperating witnesses had reported that (1) two other cooperating witnesses were attempting to influence his trial testimony during the trial; and (2) these same two cooperating witnesses had threatened the witness prior to their cooperation with the government.  The court noted that this was particularly strong impeachment evidence because if the cooperating witnesses in question "were telling the truth at trial, there would be little reason for them to try to influence [the other cooperating witness's] testimony."  Id. at 358 n.4.  While other impeachment material was available to the defense, namely that they were seeking 5K motions from the government and had not yet been sentenced and that there were inconsistencies in their stories, this evidence did not render the undisclosed evidence immaterial, given the particular strength and character of the undisclosed material.  Id at 359. Here, the impeachment material in the undisclosed Report is significantly less compelling than the other impeachment evidence available at trial, not more.

[24] The Defendant's suggestion that the government's Rule 412 motion was somehow improper is without merit.  See Defense Decl. at 9-10, n.2.  Jane Doe #4 did not witness the incident disclosed in the Rule 412 motion.  ECF No. 30, at 30, n.11  As the disclosure made clear, the April 2016 incident where Lieutenant Eugenio Perez made inappropriate comments to Maria, exposed his penis to her, grabbed her hand in an attempt to make her touch his penis and asked him to give her oral sex, which she did not do, occurred while Maria was alone in the Lieutenants' Office and Jane Doe #4 was outside.  Id.  The Report does not suggest otherwise and indeed discloses that Jane Doe #4 was not inside the Lieutenants' Office with Maria and Lieutenant Perez in the period of time before Lieutenant Perez thereafter chose to sexually abuse Jane Doe #4, as witnessed by Maria – conduct which constituted serious crimes for which he was convicted in United States v. Eugenio Perez, 17 CR 280 (S-2) (KAM).  Indeed, for this conduct, Lieutenant Perez was convicted of sexual abuse by threatening and placing Jane Doe #4 in fear, in violation of 18 U.S.C. § 2242(1), sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b), and deprivation of civil rights, in violation of 18 U.S.C. § 242.  Notably, both Maria and Jane Doe #4 testified at the Perez trial and their accounts of what transpired were generally consistent and corroborative of one another, as evidenced by the jury's verdict.  In the event the Court would like to see the relevant transcripts from the Perez trial, the government can provide them upon request.  The government was under no obligation to disclose to the defendant information regarding the

Her credibility was thoroughly tested on cross-examination and during defense counsel's

questioning of other witnesses. The defendant has not shown a reasonable probability that

disclosure of the Report would have changed the outcome of the trial.

<u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion for a new trial pursuant to

Rule 33 should be denied.

Dated:      Brooklyn, New York
            January 19, 2019

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York
                                        Attorney for Plaintiff
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                        By:     /s/ Nadia I. Shihata
                                Nadia I. Shihata
                                Assistant United States Attorney
                                (718) 254-6295

---

sexual abuse of Jane Doe #4, which Maria witnessed, or any inconsistencies of their accounts
of what transpired in connection with a crime committed by a person other than the
defendant.  Notably, however, the government did produce further information about that
incident in Maria's 3500 material in advance of trial, which disclosed the existence of Jane
Doe #4, the fact that she was housed with Maria in Unit 6 South in April 2016, and that she
had cleaned the second floor with Maria in April 2016.  <u>See</u>, <u>e.g.</u>, 3500-M-4, 3500-M-7(b).
Finally, the defendant's claim that the report discloses a sexual episode with Officer Adwapa
is false.  The Report's only mention of Adwapa is a conversation when Jane Doe #4 went
over to Nani's bed and talked with Nani and Maria "about if they liked Adwapa."  The
defendant's imputing a sexual connotation to the word "like" in reference to Adwapa is
unfounded and, even such an unwarranted connotation does not disclose "another [sexual]
episode" implicating Rule 412.

44

UNITED STATES DISTRICT COURT                    <u>**NOT FOR PUBLICATION**</u>
EASTERN DISTRICT OF NEW YORK
_____

United States of America,

       – against –

Carlos Richard Martinez,                              <u>**MEMORANDUM & ORDER**</u>

                Defendant.                       17-CR-281 (ERK)

_____

KORMAN, *J.*:

      Defendant Carlos Martinez, a prison guard, was convicted of sexual abuse, aggravated sexual abuse, sexual abuse of a ward, and deprivation of civil rights under color of law. The prosecution failed to provide the defense with evidence consisting of a report summarizing an interview with a unit-mate of the victim and a witness in a related case, which strongly suggested that the victim's relationship with Martinez was consensual. Upon learning of the withheld evidence, Martinez, who has not yet been sentenced and who faces a life sentence under the Sentencing Guidelines, moved for a new trial.

## BACKGROUND

      According to her trial testimony, Maria, who testified under a pseudonym, worked as a cleaner during her incarceration at the Metropolitan Detention Center in Brooklyn, New York ("MDC"), starting in March 2015. Trial Tr. 58, 67-68. Beginning in May, she cleaned areas on the second floor of the MDC's East Building, such as the medical, legal, and lieutenants' areas. *Id.* at 68-69. Maria was asked to clean multiple times a week, often in the company of another inmate. *Id.* at 68-70. Sometimes Maria cleaned the area alone, but most of the time she and another inmate were both summoned, and they cleaned the second floor together. *Id.* Whenever she was

1

summoned to clean, she was escorted from her unit to the second floor by a guard, who then left her under the supervision of whoever asked for a cleaner. *Id.* at 78-79.

Beginning in the fall of 2015, defendant Lieutenant Carlos Martinez started to regularly summon Maria to clean. *Id.* at 79, 81-82. Martinez usually called for Maria on Fridays, Saturdays, or Sundays, when the second floor was generally empty. *Id.* at 82. Maria testified that, when she first started cleaning for Martinez, he acted kindly, sharing personal information about himself, including facts about his family and living situation, and referring to Maria by her first name. *Id.* at 87-88. But Martinez's comments soon became uncomfortable, veering into improper sexual inquiries. *See id.* at 92-94.

Maria testified that Martinez's misconduct became criminal in December 2015, approximately two to three months after she first started cleaning for him. As usual, he asked Maria to come clean, although this time Maria did not recall if she was accompanied by another inmate. *Id.* at 100-01. While Maria bent over to retrieve cleaning supplies from a cabinet inside the Lieutenants' Office, Martinez pulled his penis out of his pants, grabbed her head and shoulder, and pushed Maria towards his penis, forcing it into her mouth. *Id.* at 102-04. Martinez explained to Maria that she would not get in trouble because he could view the feed from all the cameras monitoring the area via a monitor located on the desk in the Lieutenants' Office, so he could make sure no one would walk in on them. *Id.* at 104. Martinez then pushed Maria, chest-down, on to the desk, pulled her pants down, and penetrated her vagina from behind with his penis. *Id.* at 105-06. Maria testified that, while this was happening, she asked him to use protection but he did not. *Id.* at 106. She also testified that she "[d]id [not] want to have sex with him" and "he force[d] [her] to do those things." *Id.* at 107.

2

Afterwards, Maria noticed she was bleeding and demanded that Martinez buy her a morning-after pill. *Id.* at 108. Martinez explained that he had undergone a vasectomy, but eventually relented and agreed to purchase the pill for Maria. *Id.* at 109-10. He delivered it to her around midnight in her unit, at which point she took it. *Id.* at 110, 130-36. In the interim, Maria returned to her unit, and told her fellow inmates—Kiara Maldonado, Melva Vasquez, and Danilda Osoria—that Martinez had penetrated her and that she was bleeding. *Id.* at 115-17, 119-22. Initially, Maldonado responded as if this were a positive event, "[l]ike it was something . . . happy . . . something good." *Id.* at 119. Osoria had a similar reaction and joked about the incident, but Vasquez became upset and angry at her unit-mates' lack of sympathy. *Id.* at 122, 447-48, 560. After Maria began crying and divulged some of the details of what transpired, both Maldonado and Osoria realized something more serious had occurred. *Id.* at 122-23, 560-62. Maldonado testified that, in the days after the incident, Maria "didn't want to go to work" and "was always in bed," even though she usually socialized with the other inmates. *Id.* at 640. Osoria similarly testified that, in the weeks following the alleged rape, Maria appeared upset whenever she was called to clean by Martinez. *Id.* at 567.

Maria testified that, after the December 2015 incident, Martinez would regularly summon her to the office to clean and rape her. *Id.* at 138-39, 161-62. One of these incidents occurred on a Saturday in either mid-to-late January or early February 2016. *See* Opp. 13 n. 9, ECF No. 84. Maria was escorted to the second floor to clean for Martinez as usual. While Maria was cleaning the bathrooms, she testified that Martinez asked the officer who escorted her to do something in another building in the MDC complex. *See* Trial Tr. 141-44. The errand would leave Martinez and Maria alone for about twenty minutes. *See id.* at 717. As soon as the other officer left, Maria testified that Martinez called for her, but she did not immediately respond. *Id.* at 143. As a result,

3

Martinez came to the door of the bathroom where Maria was cleaning and ordered her to go to the Lieutenants' Office. *Id.* at 143-45. Once inside the office, Maria testified that Martinez groped her, pushed her down on the desk, pulled her pants down, and penetrated her. *Id.* at 146-48. The other officer did not return until after Martinez had finished and Maria was back in the bathroom. *Id.* at 159-60.

Maria also testified to another incident that occurred in January 2016. *See id.* at 165-80. During this incident, Maria and another inmate, Odis De La Cruz, went to clean the second floor. *Id.* at 165-66. De La Cruz told Maria that she would clean the area near the Legal Department and told Maria to clean around the Lieutenants' Office. *Id.* at 171-72. Maria testified that, when she went into the Lieutenant's Office to start cleaning, Martinez again grabbed her, pushed her against the desk, pulled her pants down, and penetrated her. *Id.* at 177-78. Maria noted that while he was penetrating her, he adjusted the video feed on the computer monitor so that he could see where De La Cruz was cleaning. *Id.* at 179.

In late January and early February, Maria contacted two friends outside of the prison. First, she called Noel Lopez. *Id.* at 181. She asked him to visit her and, when he arrived, to kiss her on the lips. *Id.* at 181, 186, 304-06. Maria testified that Martinez had commented that no one visited her at the MDC, and she hoped that Lopez's visit would demonstrate that she was not alone. *Id.* at 181. Even though he found the request odd, Lopez kissed Maria when he visited, but the interaction had the opposite effect Maria had hoped for: she testified that Martinez saw the interaction and subsequently forcibly kissed and groped her. *Id.* at 184-86, 306. But Maria also testified that, after Lopez visited and kissed her, Martinez told her that "he was different" and asked Maria to "get in touch with him" after she was released from prison, even providing her with his email address. *Id.* at 187-88.

4

From the MDC, Maria also called Larihelys Vargas, a friend and former coworker. *Id.* at 289-90. Maria asked Vargas to unfriend her on Facebook and look up Martinez. *Id.* at 291-92. Even though Maria did not tell Vargas why she wanted her to review Martinez's Facebook page, Vargas checked anyway. *Id.* at 293. She described photos from Martinez's page to Maria, including photos of Martinez with other women. *Id.* at 190-91. Vargas also friended Martinez and messaged with him briefly, asking if he was married. *Id.* at 623-24. While on the phone with Maria, Vargas asked about Martinez. Maria testified to the following exchange: "She [Vargas] would say 'does he kiss you?' I'd go, 'yeah, all the way.' So I went, 'yeah, look him up. Look him up.' . . . She said 'all the way?' I said, 'yeah.' And she said 'chiqui, chiqui?' And I said, 'yes.'" *Id.* at 317 (quotation marks added).

Maria testified that she hoped Martinez would listen to her call with Vargas, become worried that other people knew about what he was doing, and stop abusing her. *Id.* at 190. Martinez ultimately did listen to the message when it was relayed to him by a fellow officer. *Id.* at 485. That officer testified that, upon listening to the call, Martinez stated he was "not going to bring these women down anymore" because he "[didn't] want problems." *Id.* at 485.

Nevertheless, after hearing the phone call, Martinez summoned Maria. *Id.* at 192-94. She testified that he chastised her for the phone call, explaining that there would be an investigation and that she might be held in prison longer because of it or sent to solitary confinement, also known as the Special Housing Unit or SHU. *Id.* at 196-98. Later, when Maria was interviewed by prison staff about the phone call, she "started to shake," became emotional and cried. *Id.* at 201, 202, 488. When asked if she liked Martinez, she said no. *Id.* at 488. When told that she could be sent to the SHU pending an investigation into the phone call, she stated that she did not want any trouble and did not want to be sent to the SHU. *Id.* at 202, 490. No further inquiry occurred.

5

The final sexual encounter, according to Maria's testimony, was on April 16, 2016, shortly before she was released from the MDC on April 29, *id.* at 209-20. Maria testified that, during this last incident, she initially thought she would be accompanied by fellow inmate Odis De La Cruz. *Id.* at 210-11. At the last moment, she learned that De La Cruz had a visitor and would not join her. *Id.* She reported to the Lieutenants' Office alone to clean the area and, after the escort officer and another officer left the area, Martinez raped her again. *Id.* at 214-20.

At trial, the defense advanced various alternative theories to the narrative presented above. Primarily, the defense argued that "Maria is an inherently unreliable opportunist who manipulate[d] her friends." *Id.* at 1013. The defense highlighted numerous instances when Maria purportedly lied to the prosecutors or other government agencies, or otherwise behaved inconsistently. *See, e.g.*, *id.* at 1014-15. Additionally, even though various prison officials and guards received training on identifying victims of sexual abuse, none noted that Maria appeared distressed in any of their interactions. *See, e.g.*, *id.* at 1017-18. The defense's ultimate explanation for these inconsistencies was that she was not raped; rather, "Maria was pursuing Lieutenant Martinez," hoping to initiate a consensual relationship. *Id.* at 1028-29. By this account, Maria contacted Noel Lopez and asked him to kiss her to make Martinez jealous, *id.* at 1031, and asked Larihelys Vargas to peruse Martinez's Facebook account because she wanted to learn more about the man she was interested in, *id.* at 1032-33.

The jury rejected this version of events and, on January 19, 2018, found Martinez guilty of all 20 counts of the indictment, including five counts each of deprivation of civil rights, aggravated sexual abuse, sexual abuse, and sexual abuse of a ward. *Id.* at 1163-66. The jury specifically found that Martinez caused Maria to engage in sexual acts by placing her in fear. *Id.* at 1165-66.

On August 22, 2018, defense counsel asked that the prosecutor identify whether she disclosed any interviews with an inmate identified as Jane Doe #4, a testifying victim in a separate trial against another MDC officer. Ricco Decl. 2, ECF No. 82; Opp. 31. The prosecutor responded that she had inadvertently failed to disclose a report summarizing an interview with Jane Doe wherein Jane Doe stated that, in April 2016, Maria mentioned having a relationship with Martinez. Ricco Decl. 2; Opp. 32. Specifically, Jane Doe's account indicated that Maria volunteered to clean the second floor alone because of her relationship with Martinez and declined to have a medical test done because she thought it might reveal the ongoing relationship. *See* Opp. 32. Based on this undisclosed evidence, Martinez moved for a new trial. *See* ECF No. 81.

## LEGAL STANDARD

Defendants may move to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Such motions may be predicated on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See, e.g.*, *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008); *see also* 3 Wright & Welling, Federal Practice and Procedure: Criminal § 586 (4th ed. 2011). A *Brady* violation occurs when the prosecution suppresses "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. A *Brady* claim involves three elements: (1) "The evidence at issue must be favorable to the accused," (2) "that evidence must have been suppressed by the [prosecution]," and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Evidence that may be used to impeach a prosecution witness, in addition to evidence that tends to exculpate a defendant, qualifies as "favorable to an accused." *See United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Even if evidence has both incriminatory and

7

exculpatory aspects, it still qualifies as *Brady* material. *See, e.g.*, *United States v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012).

The suppression of evidence is prejudicial when that evidence is material, meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473 U.S. at 682); *see also Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). This assessment necessarily implicates the other evidence presented at trial. *See United States v. Orena*, 145 F.3d 551, 558 (2d Cir. 1998). Where the prosecution's case is "far from overwhelming," *see, e.g.*, *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 163 (2d Cir. 2008), or where the suppressed evidence accords with the defense's theory and evidence, *see United States v. Rivas*, 377 F.3d 195, 200 (2d Cir. 2004), the suppressed evidence is more likely to be material. Where impeachment evidence has been suppressed by the prosecution, its materiality depends both on the credibility of the relevant witness and the degree to which the suppressed evidence is cumulative. *See, e.g.*, *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016); *Fuentes v. Griffin*, 829 F.3d 233, 251-53 (2d Cir. 2016).

## DISCUSSION

The prosecutors here failed to provide defense counsel with a report describing an interview with an individual identified as Jane Doe #4. In April 2017, Jane Doe, an inmate at the MDC at the same time as Maria, was interviewed by an agent of the Department of Justice's Office of the Inspector-General. She stated that she had spoken with Maria about her encounters with Martinez. A memorandum summarizing the interview was drafted and provided to the prosecutors before trial. The relevant portion reads as follows and centers on the April 2016 incident:

> Maria told Jane Doe #4 that something was going on between her and Lieutenant Martinez. A few days before Maria left the MDC, she was called to clean the hospital area. Inmate Odis Delacruz [sic] asked Maria if she wanted her to go with her to clean. Maria said no. Jane Doe #4 asked Maria if she wanted her to go with

8

her to clean and Maria said no and that she will go alone. Maria went to clean and returned approximately two hours later. A few days after this happened, Jane Doe #4 asked Maria why she did not want Delacruz or her to come along to clean. Maria told her that it was because she was leaving and was having relations with [Martinez]. This was the first time Maria told Jane Doe #4 about this. Maria told Jane Doe #4 that the . . . [Bureau of Prisons] medical staff member[] asked Maria to have a Pap smear test. Maria did not agree to take the test because she was having relations with Martinez. Maria did not tell Jane Doe #4 how the relations between her and Martinez started.

Opp. 32 (brackets omitted).

This account differs markedly from Maria's. First, Maria testified that Odis did not come with her to clean because she had a last-minute visitor. *See* Trial Tr. 210-11. Conversely, Jane Doe reported that Maria chose to go to the Lieutenants' Office alone. Second, Maria drew a distinction at trial between having "relations" and being raped. *See id.* at 318-19. Nevertheless, Maria told Jane Doe that she was having "relations" with Martinez. Third, Maria testified that she was angry at another inmate for failing to report abuse. *See id.* at 319. But Jane Doe claimed that Maria purposely avoided interactions with prison staff that might reveal her relationship with Martinez.

The prosecution offers two replies: Jane Doe's statements are not favorable to Martinez because they are largely consistent with Maria's testimony and, in any event, the evidence against Martinez was so overwhelming that any inconsistent statements are not material.

Jane Doe's statements do corroborate the broad strokes of Maria's narrative, *e.g.*, Maria went, unaccompanied, to clean for Martinez in April 2016; the subsequent encounter was sexual; and they had previously had such interactions. But these elements only serve to inculpate Martinez as to the charges based on sexual abuse of a ward. They have the opposite effect as to the other sexual abuse counts, which require that Martinez engaged in sexual acts with Maria through force, by threatening her, or placing her in fear. The thrust of Jane Doe's statements is that Maria had a consensual relationship with Martinez. Jane Doe's account may not be explicit on that point, but

Maria's purported attempts to see Martinez alone and to hide their "relations" from prison staff suggest a desire to preserve the relationship, in accordance with the defense's theory that Maria "pursued" Martinez. *See* Trial Tr. 1028-29; *cf. Rivas*, 377 F.3d at 200 (explaining that defendant "should have had the opportunity to bolster the defense theory" with suppressed evidence).

The prosecution attempts to recast Jane Doe's statement as consistent with the events described by Maria at trial because it purportedly demonstrates that Maria would have suffered "shame and embarrassment if someone saw her [being raped by Martinez], or worse, jeopardized her imminent release." Opp. 39-40. Putting aside the fact that Maria had already shared details of at least her first encounter with Martinez with her fellow unit-mates and that it is unclear how Martinez's misconduct would have affected Maria's release, Maria's alleged statements to Jane Doe are not necessarily indicative of shame or embarrassment. Indeed, Maria later told Jane Doe about her sexual relationship with Martinez, which she likely would not have done if she was ashamed or embarrassed by it. Moreover, she had already told her friend, Larihelys Vargas, that she and Martinez had "go[ne] . . . all the way" with no indication whether the relationship was consensual or coercive. *See* Trial Tr. 317-18.

In sum, the withheld information derived from Jane Doe's interview was exculpatory and its suppression violates *Brady* if her statements are material. *See Mahaffy*, 693 F.3d at 130 ("Where suppressed evidence is inculpatory as well as exculpatory, and 'its exculpatory character harmonize[s] with the theory of the defense case,' a *Brady* violation has occurred." (quoting *Triumph Capital*, 544 F.3d at 164)). "Although . . .the test of materiality is whether the withheld evidence reasonably undermines confidence in the verdict[,] . . . the existence of substantial independent evidence of guilt is unavoidably relevant." *See Orena*, 145 F.3d at 558. Thus, the other evidence presented at trial must be evaluated.

10

As one of the Assistant U.S. Attorneys noted: "[T]he whole case really comes down to . . . whether the jurors believe Maria. . . . [I]t's important for the Government to be able to corroborate her in every way that we can." Trial Tr. 688. Indeed, this was the express reason the prosecution fought to ensure that another woman—a fellow prison guard, not an inmate—with whom Martinez was having a consensual relationship would testify. The prosecution introduced this other guard's testimony to corroborate Maria's testimony that Martinez used the video screens in the Lieutenants' Office to avoid getting caught, *see id.* at 686-90, even though that fact was not disputed. The prosecutor's insistence that the testimony was necessary to corroborate Maria's testimony underscores a key point: This is not a case where "considerable forensic and other physical evidence link[ed] [the defendant] to the crime." *See, e.g.*, *Strickler*, 527 U.S. at 293. Instead, the prosecution relied primarily on the perceptions of those who interacted with Maria at the time of the first alleged rape to corroborate her account.

Contradictory evidence can destroy a jury's confidence in a witness's story, especially where the prosecution's case is built upon observations or perceptions of circumstances surrounding or related to the offense conduct, rather than the conduct itself. *See Kyles*, 514 U.S. at 441-43; *cf. Smith v. Cain*, 565 U.S. 73, 76 (2012) (holding that evidence is material where it undermines "the only [testimony] linking [defendant] to the crime" (emphasis omitted)). This is particularly true where, as here, the most persuasive testimony offered by the prosecution comes from individuals with a personal connection to the victim, *see, e.g.*, Trial Tr. 161, 181, 188, 289, 306, 441, 447, 551, 629 (witnesses and victim indicating they were friends), and the suppressed evidence offers "independent corroboration of the defense's theory of the case by a neutral and disinterested witness." *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001).

11

Within that category of testimony from those personally connected to the victim is the testimony of three women who lived in the same unit as Maria. Moreover, the weight of their testimony is least affected by the undisclosed statements of Jane Doe. Although her unit-mates initially joked when Maria told them about the alleged rape upon returning to her unit on December 13, 2015, Maldonado, Osoria, and Vasquez all eventually recognized that she was distraught and upset. Indeed, they remarked that she continued to cry throughout the evening and that she appeared more somber and withdrawn in the days after the incident. Trial Tr. 115-23, 560-62, 640. If Maria had "pursued" Martinez, as the defense argued, or sought to maintain their "relations," as the Jane Doe interview suggests, Maria would not have been "upset" or felt "bad," as she testified she did, when her fellow inmates laughed or made jokes after she told them of the sexual contact. *See id.* at 119, 122, 447-48, 560.

Nevertheless, Jane Doe's statements would have bolstered defense counsel's cross-examination of Maria's fellow inmates. For example, defense counsel engaged in the following colloquy with Kiara Maldonado, one of the prosecution's witnesses and Maria's unit-mate:

> Q: You met with the agents. You just told us, they came and spoke to you, right?
> . . .
> A: Yes.
> Q: And what you told them was that Maria flirted with a male correction officer. Isn't that correct?
> A: Yes.
> Q: And you say – you also said that Maria told you that she gave him oral sex. Right?
> A: Yes.
> Q: And then the correction officer penetrated her on the desk and the chair in the lieutenant's office, right?
> A: Yes.

Trial Tr. 642. While Maldonado's testimony is suggestive of consent, it is not as definitive as Jane Doe's statements. Accordingly, defense counsel could have strengthened the impact of this cross-examination by calling Jane Doe as a witness, using her statements to further cross-examine Maria,

12

or providing a good-faith basis for asking additional questions of the other women. *Cf. Payne*, 63 F.3d at 1210 (noting that affidavit may be material where it "add[s] concrete evidence" to support impeachment). If the defense had a witness who could testify to the consensual nature of the relationship between Maria and Martinez, perhaps counsel would have pursued other lines of cross-examination, such as asking whether there was another reason Maria might have been crying. For instance, counsel might have asked whether Martinez's failure to use a condom or Maria's fear of being caught might have prompted Maria to be upset. Of course, counsel could have inquired about such things even without Jane Doe's statement, but he would not have been able to rebut a contradictory answer and may not have had a good-faith basis for making such an inquiry absent the evidence furnished by Jane Doe. Such additional testimony or cross-examination may have been feasible if defense counsel knew he could present an affirmative defense of consent.

More significantly, the Jane Doe interview colors much of the other testimony offered by the prosecution. In particular, Maria testified that she contacted Noel Lopez and Larihelys Vargas in her attempts to dissuade Martinez from continuing to abuse her. Trial Tr. 181, 186. Lopez testified that Maria asked him to visit her and kiss her during the visit. *Id.* at 304-06. Vargas testified that Maria asked her to examine Martinez's Facebook profile and report back on the information she found, including whether he was married or had photos with other women. *Id.* at 190-91, 292-93, 317-18, 623-24. Indeed, Maria admitted that she asked Vargas to "look [Martinez] up" immediately after confiding in Vargas that Martinez "kiss [her]" and that they "[went] . . . all the way." *Id.* at 317. Significantly, at no point during her conversations with Vargas does Maria indicate that her relationship with Martinez was nonconsensual.

During summation, defense counsel argued that these were not attempts to deflect Martinez's interest; rather, they were calculated to inspire jealousy. *Id.* at 1031-33. Jane Doe's

13

statement could have supported such a theory, as it indicates that Maria engaged in other acts to preserve her relationship with Martinez, such as asking Odis De La Cruz not to accompany her to clean or by declining to receive a medical test she believed might reveal her sexual relationship. Moreover, the narrative of an active interest in Martinez—and, accordingly, a consensual relationship with him—helps explain the otherwise unstated reasons for Maria asking Vargas to look at Martinez's Facebook page.

Put another way, the withheld evidence could have afforded the defense an opportunity to construct an alternative explanation by emphasizing how the Jane Doe statement intersected with, and illuminated the inferences that could be drawn from, the evidence presented by the prosecution. This is the same tactic the prosecution used—structuring its case as a series of interconnected and reinforcing statements aimed at corroborating Maria's version of events. For example:

- Maria testified that, during her first encounter with Martinez, he told her that he had a vasectomy and could not get her pregnant. Trial Tr. 109-10. A doctor confirmed that Martinez had a vasectomy. *Id.* at 650-51.
- Maria testified that Martinez sent a fellow officer who was present in the area of the Lieutenants' Office to another building in the MDC complex, and proceeded to rape her while the other officer was moving between the two buildings. *Id.* at 143-49, 159-60. That other officer testified that Martinez did in fact send him to the other building and, at times, it took him at least 20 minutes to return. *Id.* at 671-73, 717.
- Maria testified that, during the April incident, Martinez could not hold her down as forcefully as usual because his hand had been injured. *Id.* at 218-19. Documents obtained from the MDC indicated that he sustained a hand injury in early April. *Id.* at 865.

Each of these examples confirms elements of Maria's narrative, but none addresses the key factual issue raised by Jane Doe's statements—or indeed, the key factual issue at trial: whether the relationship between Maria and Martinez was consensual. Maria could have known each of these facts even if the relationship was consensual. The prosecution's hope was that proving that Maria told the truth about each of these related events would convince the jury to believe her about the

core offense conduct. And the jury did. Yet, as noted above, the prosecutor thought that she needed more evidence to further corroborate Maria's story. *See id.* at 686-90. The mere fact that Maria accurately relayed collateral facts does not necessarily mean that a jury would have believed her as to the core elements of the crime in the face of contradictory testimony offered by Jane Doe, or more extensive cross-examination based on Jane Doe's statements. *Cf. Kyles*, 514 U.S. at 445 (evidence material where "[d]amage to the prosecution's case would not have been confined to evidence of the eyewitnesses," but also affected "the probative value of crucial physical evidence and the circumstances" surrounding it).

Moreover, Jane Doe's statements highlight other inconsistencies in the prosecution's theory. The additional information related to Maria's purported reluctance to report the mistreatment she suffered is at odds with her criticism of another inmate for refusing to report her own sexual abuse. *See* Trial Tr. 318-20. Similarly, the prosecution argued that prison officials would not have been able "to detect the signs of abuse and rape" exhibited by Maria due to poor training or limited interaction with her. *Id.* at 1049-51. But the Jane Doe interview suggests that Maria may not have shown any such signs because she was not a victim of abuse. In sum, the defense could have used the withheld evidence to demonstrate that the trial evidence was equally indicative of consensual sex as nonconsensual sex.

Finally, the prosecution contends that, because defense counsel thoroughly and comprehensively impeached Maria, any additional evidence for that purpose would merely be cumulative. *See, e.g.*, *Shabazz v. Artuz*, 336 F.3d 154, 166 (2d Cir. 2003) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)); *see also United States v. Zagari*, 111 F.3d 307, 320-21 (2d Cir. 1997). Nevertheless, few, if any, of the attacks on Maria's credibility went to the core of her testimony—the nonconsensual nature of her interactions with Martinez. *See, e.g.*, Trial Tr.

15

243-46 (prior false statements to law enforcement), 257 (same), 261-62 (same), 271-72 (withheld information from asylum petition), 327 (same), 373-74 (inconsistent testimony), 404-05 (inconsistent statements on asylum application and during plea), 433-34 (financial interest in the outcome from filing a $20 million suit against the MDC). Moreover, even though her general credibility was heavily attacked, the defense could not present a compelling alternative explanation for the sexual encounters—specifically, that the relationship was consensual. Jane Doe's statement provides the basis for this alternative narrative, elevating the value of the withheld testimony beyond merely cumulative impeachment evidence.

Taking the value of Jane Doe's statement as a whole and weighing it against the other evidence presented at trial, "there is a 'reasonable probability' that disclosure of the evidence would have led to a different outcome—*i.e.*, an acquittal or hung jury rather than a conviction" as to the counts where the use of force, threats, or fear is an element. *Turner v. United States*, 137 S. Ct. 1885, 1897 (2017) (Kagan, J., dissenting) (noting that the majority and dissent "agree on the legal standard by which to assess the materiality of undisclosed evidence"). "[T]he testimony that [Jane Doe] would have given . . . is of a different nature than that given by" the other witnesses. *Boss*, 263 F.3d at 745. She references specific acts Maria undertook to hide her relationship with Martinez, offering an alternative narrative to the one presented by the prosecution. That Maria may have taken steps to minimize the likelihood that others would find out about her relations with Martinez lends a great deal of support to the defense's theory of the case, especially in light of Maria's own testimony distinguishing between "relations" and rape and her criticism of other inmates for failing to report sexual misconduct.

Moreover, this new testimony cuts to the very core of the prosecution's approach: they sought to corroborate Maria's version of events "in every way that [they could]." Trial Tr. 688. If

a jury ultimately concluded that even some aspect of Maria's relationship with Martinez was consensual—and, more significantly, that Maria was lying about it—the bulk of the case would have unraveled. In other words, Maria's credibility as to any one incident is inextricably linked with the jury's verdict on every other count involving force, threats, or fear. *See Wearry*, 136 S. Ct. at 1006 (evidence is material where "trial evidence resembles a house of cards, built on the jury crediting" government witness's account). In sum, the withheld evidence substantially corroborates the defense's primary theory, indicating that it is material. *See Rivas*, 377 F.3d at 200; *see also United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (evidence material where "arguments and inferences [it] could support or reinforce . . . bear importantly on the central issue at trial").

## CONCLUSION

Jane Doe's testimony may not inexorably lead to an acquittal in this case. But even if the suppressed evidence does not mandate acquittal, it raises a reasonable probability of a different outcome. Accordingly, a new trial must be ordered. Defendant's motion for a new trial is granted, except as to the counts based on sexual abuse of a ward, as consent is not relevant to those counts and the undisclosed evidence primarily goes to the issue of consent.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York                        Edward R. Korman
July 2, 2019                              United States District Judge

17